# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LIQUIDIA TECHNOLOGIES, INC.,

      *Plaintiff*,

    v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, *et al.*,

      *Defendants*,

    and

UNITED THERAPEUTICS CORPORATION,

      *Intervenor-Defendant*.

**REDACTED**

Case No. 1:24-cv-02428-TJK

Honorable Timothy J. Kelly

<u>**ORAL ARGUMENT REQUESTED**</u>

## <u>REDACTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIQUIDIA TECHNOLOGIES, INC.'S RENEWED MOTION FOR A PRELIMINARY INJUNCTION AND MOTION FOR SUMMARY JUDGMENT</u>

Sonia Nath (DC Bar No. 977095)
David E. Mills (DC Bar No. 401979)
Robby Saldaña (DC Bar No. 1034981)
Matt K. Nguyen (DC Bar No. 1736777)
COOLEY LLP
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004-2400
Telephone: (202) 842-7800

Kathleen R. Hartnett (DC Bar No. 483250)
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 4

I.    The Statutory and Regulatory Background ....................................................................... 4

    A.    The New Drug Approval Process. ........................................................................... 4

    B.    Statutory Exclusivities Under the FDCA. ............................................................... 6

    C.    FDA's Regulatory Framework for NCI Exclusivity. ............................................... 7

II.   Statement of the Facts. ...................................................................................................... 8

    A.    Use of Treprostinil for PAH and PH-ILD. .............................................................. 8

    B.    UTC's Nearly 20-Year Marketing Exclusivity for Treprostinil Products. ........... 10

    C.    Liquidia's Submission of Yutrepia—the First Treprostinil Dry Powder Inhalation Drug Submitted to FDA for Full Approval—Over Four Years Ago and FDA's First Issuance of Tentative Approval for Yutrepia. ............................................... 11

    D.    UTC Seeks FDA Approval of Tyvaso DPI. ........................................................... 12

        1.    Tyvaso DPI's Dry Inhalation Powder Formulation of Treprostinil. ......... 13

        2.    The Absence of New Clinical Investigations in the Tyvaso DPI NDA. .... 13

        3.    FDA Approves Tyvaso DPI and Denies NCI Exclusivity. ...................... 15

    E.    UTC's Concerted Efforts to Thwart the Launch of Yutrepia. ............................... 15

    F.    FDA Reverses Course to Award NCI Exclusivity to Tyvaso DPI and Thereby Block Full Approval of Yutrepia for Any Indication. ........................................... 16

    G.    FDA's Exclusivity Decision Harms Liquidia. ....................................................... 18

LEGAL STANDARDS ........................................................................................................... 19

ARGUMENT ........................................................................................................................... 19

I.    Liquidia Is Entitled to Summary Judgment on Its APA Claims. ..................................... 19

    A.    BREEZE Is a Bioavailability Study that Cannot Support NCI Exclusivity. ........ 22

        1.    FDA Exceeded Its Statutory Authority and Acted Contrary to Law. ....... 22

        2.    FDA Arbitrarily and Capriciously Departed from Its Prior Finding that BREEZE Is a Bioavailability Study. ......................................................... 24

    B.    BREEZE Is Not a New Clinical Investigation. ..................................................... 25

        1.    The Decision Is Contrary to the FDCA and FDA Regulations that Limit NCI Exclusivity to *New* Clinical Investigations. .................................... 25

        2.    FDA's Finding that BREEZE Was a New Clinical Investigation Arbitrarily and Capriciously Departed from FDA's Prior Finding and Longstanding Interpretation. .................................................................... 27

C.    FDA's Exclusivity Decision Is Unlawful Because BREEZE Was Not Essential to FDA's Approval and Thus Tyvaso DPI Was Ineligible for NCI Exclusivity. ..... 29

    1.    The Decision Is Contrary to the FDCA and FDA Regulations that Limit NCI Exclusivity to an NCI "*Essential* to Approval" by FDA. ................. 29

    2.    FDA's "Essential to Approval" Finding Was Arbitrary and Capricious Because It Ran Contrary to FDA's Interpretation and the Evidence. ....... 30

D.    FDA's Exclusivity Decision Is Unlawful Because It Recognizes "Conditions of Approval" for Tyvaso DPI that BREEZE Does Not Establish. ........................... 34

    1.    The Decision Violates the FDCA Because There Is No Logical Relationship Between the Conditions of Approval and BREEZE. ........... 34

    2.    The Decision Is Arbitrary and Capricious Because FDA Departed from Its Practice Limiting the Scope of a Drug's "Conditions of Approval." ....... 37

II.    Liquidia Will Suffer Irreparable Harm Absent Injunctive Relief. ....................................... 41

III.    The Balance of the Equities and Public Interest Strongly Favor Liquidia. ......................... 42

IV.    The Exclusivity Decision Should Be Set Aside in Its Entirety. .............................................. 44

CONCLUSION .................................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ............................................................................................... 19

*Accrediting Council for Indep. Colls. & Schs. v. Devos*,
  303 F. Supp. 3d 77 (D.D.C. 2018) ........................................................................................... 20

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
  429 F.3d 1136 (D.C. Cir. 2005) ............................................................................................... 45

*Am. Fed'n of Gov't Emps., AFL-CIO, Local 1929 v. Fed. Labor Rels. Auth.
  (AFGE)*,
  961 F.3d 452 (D.C. Cir. 2020) ........................................................................................... 24, 25

*Am. Fin. Servs. Ass'n v. FTC*,
  767 F.2d 957 (D.C. Cir. 1985) ................................................................................................. 20

*AstraZeneca Pharms. LP v. FDA*,
  850 F. Supp. 2d 230 (D.D.C. 2012) ........................................................................................... 6

*AstraZeneca Pharms. LP v. FDA*,
  872 F. Supp. 2d 60 (D.D.C. 2012), *aff'd*, 713 F.3d 1134 (D.C. Cir. 2013) ..................... *passim*

*Barker v. United States*,
  404 F. Supp. 3d 251 (D.D.C. 2019) .......................................................................................... 19

*Bayer HealthCare v. FDA*,
  942 F. Supp. 2d 17 (D.D.C. 2013) ........................................................................................... 42

*Bonumose, Inc. v. FDA*,
  No. CV 23-645 (RDM), 2024 WL 3967258 (D.D.C. Aug. 28, 2024) .................................... 39

*Bracco Diagnostics v. Shalala*,
  963 F. Supp. 20 (D.D.C. 1997) ................................................................................................ 25

*Brady Campaign to Prevent Gun Violence v. Salazar*,
  612 F. Supp. 2d 1 (D.D.C. 2009) ............................................................................................. 27

*Braeburn Inc. v. FDA*,
  389 F. Supp. 3d 1 (D.D.C. 2019) ........................................................................................ 35, 36

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ................................................................................................. 41

*Coe v. McHugh*,
   968 F. Supp. 2d 237 (D.D.C. 2013) ...................................................................19

*Commc'ns Satellite Corp. v. FCC*,
   836 F.2d 623 (D.C. Cir. 1988) .........................................................................25

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) .............................................................................................31

*Eagle Pharms., Inc. v. Azar*,
   2018 WL 3838265 (D.D.C. June 8, 2018) (Kelly, J.), *aff'd*, 952 F.3d 323
   (D.C. Cir. 2020) ...............................................................................................22

*Endo Par Innovation Co. v. Becerra*,
   No. 24-cv-999, 2024 WL 2988904 (D.D.C. 2024)...........................................41

*Hikvision USA, Inc. v. FCC*,
   97 F.4th 938 (D.C. Cir. 2024)..........................................................................20

*Indep. Petrol. Ass'n of Am. v. Babbitt*,
   92 F.3d 1248 (D.C. Cir. 1996) .........................................................................25

*Kisor v. Wilkie*,
   588 U.S. 558 (2019).................................................................................20, 21

*Landstar Express Am., Inc. v. Fed. Mar. Comm'n*,
   569 F.3d 493 (D.C. Cir. 2009) .........................................................................24

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016).............................................................................42

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024).............................................................20, 21, 23, 34

*Monument Realty LLC v. Wash. Metro. Area Transit Auth.*,
   540 F. Supp. 2d 66 (D.D.C. 2008) ...................................................................42

*Moreno v. Spencer*,
   310 F. Supp. 3d 83 (D.D.C. 2018) ...................................................................19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).....................................................................................21, 38

*Nat'l Env't. Dev. Ass'n's Clean Air Project v. EPA*,
   752 F.3d 999 (D.C. Cir. 2014) .........................................................................20

*Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Sullivan*,
   979 F.2d 227 (D.C. Cir. 1992) .........................................................................24

*Nuclear Energy Inst., Inc. v. EPA*,
    373 F.3d 1251 (D.C. Cir. 2004) ..............................................................................21

*Patterson v. Comm'r of Soc. Sec. Admin.*,
    846 F.3d 656 (4th Cir. 2017) ...................................................................................39

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ...........................................................................42

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ...................................................................................................24

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021) ...............................................................................3, 42

*Smoking Everywhere, Inc. v. FDA*,
    680 F. Supp. 2d 62 (D.D.C. 2010) ...........................................................................41

*Teva Pharmaceuticals USA, Inc. v. FDA*,
    No. CIV. A. 99-67, 1999 WL 1042743 (D.D.C. Aug. 19, 1999) ............................45

*Torpharm, Inc. v. Shalala*,
    No. Civ. A. 97-1925, 1997 WL 33472411 (D.D.C. Sept. 15, 1997) ....................41, 42, 43, 45

*United Therapeutics Corp. v. Liquidia Techs., Inc.*,
    No. CV 23-975, 2024 WL 2805082 (D. Del.) .......................................3, 10, 16, 44

*United Therapeutics Corp. v. Liquidia Techs., Inc.*,
    No. 20-cv-755 (D. Del.) ............................................................................................12

*United Therapeutics Corp. v. Liquidia Techs., Inc.*,
    No. 24-cv-484-JDB (D.D.C.) ..............................................................16, 18, 43

*Veloxis Pharms., Inc. v. FDA*,
    109 F. Supp. 3d 104 (D.D.C. 2015) ........................................................... *passim*

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
    559 F.2d 841 (D.C. Cir. 1977) .................................................................................44

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...............................................................................................19, 42

*Zhang v. U.S. Citizenship & Immigr. Servs.*,
    344 F. Supp. 3d 32 (D.D.C. 2018) ...........................................................................24

**Statutes**

5 U.S.C. § 706 ............................................................................................................19, 20, 21, 44

21 U.S.C.
  § 355 .............................................................................................................................6
  § 355(a) .........................................................................................................................4
  § 355(b)(1)(A) ...............................................................................................................5
  § 355(b)(2) .....................................................................................................................5
  § 355(c)(3)(C) ..............................................................................................................12
  § 355(c)(3)(E)(iii) ................................................................................................ *passim*
  § 355(d) .........................................................................................................................4
  § 355(j)(8)(A)(i) .......................................................................................................6, 23
  § 527(c) ........................................................................................................................10

Drug Price Competition and Patent Term Restoration Act of 1984
  Public Law 98-417 (1984) .............................................................................................4

**Legislative Materials**

H.R. REP. NO. 98-857, pt. 1 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647 ....................................4

**Regulations**

21 C.F.R.
  § 201.57(c)(2) ............................................................................................................5, 6
  § 314.3 .......................................................................................................................6, 23
  § 314.54(a)(1)(iii) ..........................................................................................................5
  § 314.105(a) ...................................................................................................................5
  § 314.107(b)(3) ............................................................................................................12
  § 314.108 ........................................................................................................................5
  § 314.108(a) .......................................................................................................... *passim*
  § 314.125 ........................................................................................................................5
  § 314.126 ........................................................................................................................4

**Rulemakings**

54 Fed. Reg. 28,872 (July 10, 1989) ...............................................................................28

59 Fed. Reg. 50,338 (Oct. 3, 1994) .............................................................................8, 30

**Federal Rules**

Federal Rule of Civil Procedure 56 .................................................................................19

**FDA Materials**

FDA, CDER, NDA No. 22-387 (Tyvaso Inhalation Solution) Approval Letter
(July 30, 2009),
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2009/022387s000lt
r.pdf...........................................................................................................................11

*Orphan Drug Designation: Disease Considerations*, FDA (last updated Mar. 9,
2018), https://www.fda.gov/industry/designating-orphan-product-drugs-and-
biological-products/orphan-drug-designation-disease-considerations .....................................9

*Search Orphan Drug Designations and Approvals*, FDA ("Orphan Drug Database"),
https://www.accessdata.fda.gov/scripts/opdlisting/oopd/detailedIndex.cfm?cfgridkey=105197
..........................................................................................................................10

**Publications**

J.R. Sysol & Roberto F. Machado, *Classification and Pathophysiology of
Pulmonary Hypertension*, CONTINUING CARDIOLOGY EDUCATION (July 27,
2018), https://onlinelibrary.wiley.com/doi/epdf/10.1002/cce2.71........................................8, 9

Nicholas S. Hill *et al.*, *INSPIRE: Safety and Tolerability of Inhaled Yutrepia
(treprostinil) in Pulmonary Arterial Hypertension (PAH)*, PUBMED (July 1,
2022), https://onlinelibrary.wiley.com/doi/epdf/10.1002/pul2.12119....................................12

Robin M. Fowler, Kevin R. Gain & Eli Gabbay, *Exercise Intolerance in
Pulmonary Arterial Hypertension*, *Pulmonary Arterial Hypertension*,
PULMONARY MEDICINE (June 10, 2012),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3377355/pdf/PM2012-
359204.pdf ...............................................................................................................9

**Press Releases**

Press Release, Liquidia, *FDA Accepts Submission to Add PH-ILD to
YUTREPIA™ Label* (Sept. 25, 2023),
https://www.liquidia.com/node/10646/pdf ............................................................................15

**Other Sources**

*Classes and Stages of Heart Failure*, AMERICAN HEART ASSOCIATION (last
reviewed Jun. 7, 2023), https://www.heart.org/en/health-topics/heart-
failure/what-is-heart-failure/classes-of-heart-failure ...........................................................9

UTC Q1 2023 Earnings Call Transcript (May 3, 2023),
https://www.roic.ai/quote/UTHR/transcripts/2023/1............................................................44

## INTRODUCTION

Plaintiff Liquidia Technologies, Inc. ("Liquidia") renews its motion for a preliminary injunction and moves for summary judgment on its claims under the Administrative Procedure Act ("APA"), challenging the August 16, 2024 decision (the "Exclusivity Decision" or "Decision") issued by Defendant U.S. Food and Drug Administration[1] ("FDA") for a drug marketed by Intervenor-Defendant United Therapeutics Corporation ("UTC"), called Tyvaso DPI.

The Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act ("FDCA") allow FDA to grant market exclusivity to certain drugs to reward innovation in certain circumstances. One type of such exclusivity attaches to an innovation studied in a new clinical investigation that was essential to approval of the drug ("NCI exclusivity"). Here, FDA has incorrectly interpreted the FDCA and arbitrarily determined that UTC is entitled to three years of NCI exclusivity for Tyvaso DPI based on a so-called "new" clinical investigation, the BREEZE study. But that study does not qualify as a new clinical investigation for which exclusivity can be awarded under the FDCA and FDA's regulations. FDA also erred in granting an expansive scope of NCI exclusivity for Tyvaso DPI that is contrary to the FDCA and FDA's own precedent.

FDA's Decision represents an abrupt change and an erroneous determination in how the agency classified BREEZE. In May 2022, when it initially approved Tyvaso DPI, FDA correctly determined that BREEZE was *not a new clinical investigation* and therefore *ineligible to support NCI exclusivity*. Yet, *more than two years after* its approval of Tyvaso DPI, FDA reversed course and awarded NCI exclusivity to Tyvaso DPI, resulting in a tentative (rather than full) approval to Yutrepia, Liquidia's competing drug. Inexplicably, FDA did so notwithstanding that BREEZE was

---

[1] Liquidia has also sued Robert M. Califf, M.D., in his official capacity as Commissioner of Food and Drugs, U.S. Department of Health and Human Services ("HHS"), and Xavier Becerra, in his official capacity as Secretary of HHS. References to "FDA" include these Defendants.

a three-week, 51-patient trial that did not study the same patient population for which Yutrepia is indicated, and did not study chronic use of treprostinil.

FDA's erroneous actions have gravely harmed Liquidia. Due to FDA's unlawful Exclusivity Decision, Yutrepia remains unavailable *despite* FDA's findings that it is a safe and effective treatment for patients with pulmonary arterial hypertension ("PAH") and for improving exercise capacity in patients with pulmonary hypertension associated with interstitial lung disease ("PH-ILD"). Rather than allowing patients access to Yutrepia, FDA has extended UTC's nearly 20-year monopoly for treprostinil, which is the active ingredient in both Yutrepia, and Tyvaso DPI. FDA's action turns the FDCA on its head and must be set aside under the APA.

Liquidia is entitled to summary judgment as a matter of law, and each preliminary injunction factor weighs decisively in favor of granting Liquidia immediate injunctive relief.

*First*, Liquidia is entitled to summary judgment on its APA claims because:

- ***BREEZE Was Not a New Clinical Investigation Other than a Bioavailability Study***: FDA unlawfully granted NCI exclusivity to Tyvaso DPI by erroneously concluding that BREEZE—the only study on which FDA relied to award exclusivity—met the threshold eligibility requirement of a new clinical investigation other than a bioavailability study. FDA's finding violates the FDCA and FDA regulations because BREEZE ***falls within*** the FDCA's definition of a bioavailability study and is therefore ***ineligible*** for NCI exclusivity. FDA's finding in August 2024 that BREEZE was not "solely" a bioavailability study improperly rewrites the FDCA and its implementing regulations. FDA's finding was arbitrary and capricious because it is a ***post hoc rationalization*** more than two years after FDA had already concluded that the Tyvaso DPI NDA required review of only a bioavailability study and was ineligible for NCI exclusivity. Furthermore, BREEZE did not qualify as a new clinical investigation because its results merely provided confirmatory information, including "***confirmatory*** efficacy information only," as FDA conceded.

- ***BREEZE Was Not Essential to Approval***: Even if BREEZE were a new clinical investigation other than a bioavailability study (it is not), FDA unlawfully granted NCI exclusivity to Tyvaso DPI by erroneously concluding that BREEZE was essential to FDA's approval of the drug. ***BREEZE was not essential*** to FDA's approval of Tyvaso DPI because it was merely a confirmatory study. Indeed, ***other data could—and did—support approval*** of the drug, specifically, the safety and efficacy data UTC resubmitted from prior drug applications.

2

- ***FDA Unlawfully Awarded Exclusivity to Tyvaso DPI for Conditions of Approval that BREEZE Does Not Support***: FDA unlawfully recognized conditions of approval that ***do not logically relate*** to any innovation that BREEZE purportedly studied. In particular, FDA exceeded its authority under the FDCA by awarding NCI exclusivity for Tyvaso DPI that broadly encompasses treprostinil inhalation powder drug for "chronic use," including in PAH and PH-ILD patients. However, BREEZE could not support that condition of approval because it ***never studied*** chronic use, nor did it study use of Tyvaso DPI in PH-ILD patients or PAH patients naïve to treprostinil; it only studied PAH patients switching from a stable dose of treprostinil. FDA's award of exclusivity was arbitrary and capricious because FDA departed from its practice of limiting NCI exclusivity to the patient populations actually studied by a new clinical investigation.

*Second*, injunctive relief is necessary to remedy the immediate and irreparable harm that Liquidia suffers ***each*** day that FDA's Exclusivity Decision stands. FDA's erroneous and arbitrary Decision means that Liquidia is unable to market Yutrepia until May 2025, when NCI exclusivity expires. Liquidia will suffer monetary losses that it ***cannot recover***, and it cannot generate any revenue from Yutrepia for any indication given FDA's arbitrary and capricious actions.

*Third*, the equities and public interest weigh decisively in Liquidia's favor. Because Liquidia is likely to succeed on its claims that the Exclusivity Decision violates the APA, "a preliminary injunction would serve the public interest because there is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (cleaned up).[2] Injunctive relief would not harm FDA because it is not harmed by being required to comply with the law. Nor would UTC suffer any creditable harm, let alone harm that could outweigh the substantial irreparable harm Liquidia faces, as UTC is "a large company with more than $2 billion in annual revenue and two decades on the market." *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 2024 WL 2805082, at *13 (D. Del. May 31, 2024).

The Court should immediately set aside the Exclusivity Decision and require FDA to take

---

[2] In this brief and unless otherwise noted, all emphasis is added, and all internal citations for cases are omitted.

all actions to effectuate the ruling, *i.e.*, immediately grant full approval to Yutrepia or, at a minimum, grant full approval for the PH-ILD indication.

## BACKGROUND

### I.    THE STATUTORY AND REGULATORY BACKGROUND.

#### A.    The New Drug Approval Process.

The FDCA requires FDA to approve new drugs before they may be distributed in interstate commerce. 21 U.S.C. § 355(a). In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Amendments"), which, among other changes, amended the FDCA to provide new abbreviated pathways for drug approval by FDA under sections 505(b)(2) and 505(j). Public Law 98-417 (1984). The Hatch-Waxman Amendments reflected Congress's efforts to balance the need to "make available more low cost generic drugs by establishing a generic drug approval procedure" with new incentives for drug development in the form of exclusivity and patent term extensions. H.R. REP. NO. 98-857, pt. 1, at 14–15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647–48.

The FDCA contemplates three types of drug applications for small molecule (*i.e.*, non-biological) drugs: (1) a full NDA under section 505(b)(1) of the FDCA, (2) an abbreviated NDA under section 505(j) of the FDCA, and (3) an intermediate form of NDA under section 505(b)(2) of the FDCA. An NDA must include adequate studies to show that the drug will be safe, and "substantial evidence" that the drug will be effective, under the conditions of use prescribed, recommended, or suggested in its labeling. "Substantial evidence" is a term of art meaning one or more (usually at least two) adequate and well-controlled clinical trials conducted by qualified experts. 21 U.S.C. § 355(d); *see* 21 C.F.R. § 314.126.

Under section 505(b)(1), an NDA applicant must, among other requirements, submit full

reports of investigations made to show whether the drug is safe for use and effective. 21 U.S.C. § 355(b)(1)(A)(i). By contrast, under section 505(b)(2), an applicant may submit an NDA for a new drug by relying on all or part of the prior safety and/or effectiveness data for a listed drug that FDA has already approved. *Id*. § 355(b)(2); 21 C.F.R. § 314.54(a)(1)(iii).

FDA has three ways to resolve an NDA: (1) denial (or delay), (2) tentative approval ("TA"), or (3) approval. First, FDA may deny the NDA. *See* 21 C.F.R. § 314.125. Grounds for denial include, among other reasons, lack of adequate studies on safety and efficacy or test results showing that the drug is unsafe for its intended uses. *Id*. § 314.125(b). Second, "FDA will issue a [TA] letter if an NDA ***otherwise meets the requirements for approval under the*** [***FDCA***], but cannot be approved" for certain reasons. 21 C.F.R. § 314.105(a). Among the reasons why FDA will not give full approval to a drug are when "there is a period of exclusivity for the listed drug under [21 C.F.R.] § 314.108." 21 C.F.R. § 314.105(a). By definition, under FDA's regulations, a drug that receives a TA satisfies ***all*** requirements for approval under the FDCA as of the date of the TA—including safety and efficacy requirements. *Id.* A drug that receives TA "is not an approved drug and will not be approved until FDA issues an approval after any necessary additional review of the NDA." *Id.* Third, "FDA will approve an NDA and send the applicant an approval letter if none of the reasons in § 314.125 for refusing to approve the NDA applies." *Id.* Final approval allows the applicant to market the drug immediately.

An applicant also must propose labeling for its drug product as part of the approval process. Among the labeling requirements is a requirement that the applicant must identify the "[i]ndications and usage" of the drug. 21 C.F.R. § 201.57(c)(2). An indication reflects that "the drug is indicated for the treatment, prevention, mitigation, cure, or diagnosis of a recognized disease or condition, or of a manifestation of a recognized disease or condition, or for the relief of

symptoms associated with a recognized disease or condition." *Id.*

B.    **Statutory Exclusivities Under the FDCA.**

The Hatch-Waxman Amendments amended the FDCA to provide certain statutory periods of exclusivity for drugs approved by FDA. "Through the Hatch-Waxman Amendments, … Congress sought to encourage innovation. To this end, pioneer drug companies are entitled to certain periods of marketing exclusivity." *AstraZeneca Pharms. LP v. FDA*, 850 F. Supp. 2d 230, 234 (D.D.C. 2012). These exclusivities apply only if specific statutory requirements are met and have varying lengths of exclusivity depending on the degree of innovation. *See* 21 U.S.C. § 355. Among the FDCA's exclusivities are (1) orphan drug exclusivity ("ODE"), a seven-year period, (2) new chemical entity ("NCE") exclusivity, a five-year period, and (3) NCI exclusivity, a three-year period. NCI exclusivity is the focus of this lawsuit.

The FDCA creates a two-step inquiry for evaluating NCI exclusivity: (1) whether a first-approved drug is eligible for exclusivity and (2) the scope of NCI exclusivity for a first-approved drug that bars approval of subsequent drugs. At the first step, a drug is eligible for NCI exclusivity if its application "contain[ed] reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the applicant." 21 U.S.C. § 355(c)(3)(E)(iii).[3] If the application for the first-approved drug contained such reports, the reports must also be ***essential*** to FDA's approval of the drug in order for the drug to be eligible for NCI exclusivity. At the second step, and only if a drug satisfies step one, the FDCA establishes the scope of NCI exclusivity and its effect on applications for prospective drugs. FDA may not

---

[3] The FDCA defines "bioavailability" as "the rate and extent to which the active ingredient or [active moiety] therapeutic ingredient is absorbed from a drug product and becomes available at the site of drug action." 21 U.S.C. § 355(j)(8)(A)(i). FDA regulations have a similar definition. 21 C.F.R. § 314.3 (defining "[b]ioavailability" as "the rate and extent to which the active ingredient or active moiety is absorbed from a drug product and becomes available at the site of drug action").

approve a second drug in an application submitted under section 505(b) for a three-year period from the approval date for the first drug, but only "for the conditions of approval" of the first-approved drug, if the applicant for the second drug did not conduct the investigations on which it relies to show the safety and efficacy of the second drug and "has not obtained a right of reference or use from the person by or for whom the investigations were conducted." *Id.*

### C.    FDA's Regulatory Framework for NCI Exclusivity.

FDA has promulgated regulations to implement the FDCA's provisions on NCI exclusivity. Like the FDCA, the regulations exclude bioavailability studies from the clinical investigations eligible for exclusivity. 21 C.F.R. § 314.108(a) (defining "clinical investigation" to mean "any experiment other than a bioavailability study in which a drug is administered or dispensed to, or used on, human subjects"). FDA regulations define a "bioavailability study" as "a study to determine the bioavailability or the pharmacokinetics of a drug." *Id.*

FDA's implementing regulations define the phrase "new clinical investigation" as follows:

> [*A*]*n investigation in humans the results of which* have not been relied on by FDA to demonstrate substantial evidence of effectiveness of a previously approved drug product for any indication or of safety for a new patient population and *do not duplicate the results of another investigation that was relied on by the agency to demonstrate the effectiveness or safety in a new patient population of a previously approved drug product*. For purposes of this section, data from a clinical investigation previously submitted for use in the comprehensive evaluation of the safety of a drug product but not to support the effectiveness of the drug product would be considered new.

21 C.F.R. 314.108(a).

FDA's regulations define "essential to approval" to mean "with regard to an investigation, that there are *no other data available* that could support approval of the [application]." *Id.* Under FDA's longstanding interpretation, "3-year exclusivity is *reserved for* investigations 'that are necessary for approval of *important innovations*,' and require 'a *considerable investment of time and money*.'" *AstraZeneca Pharms. LP v. FDA*, 872 F. Supp. 2d 60, 66 (D.D.C. 2012), *aff'd*, 713

F.3d 1134 (D.C. Cir. 2013) (quoting Abbreviated New Drug Application Regulations; Patent and

Exclusivity Provisions, 59 Fed. Reg. 50,338, 50,358 (Oct. 3, 1994)).

The FDCA does not define the phrase "conditions of approval," and FDA has not defined

it by regulation. FDA's longstanding view, as applied by the courts, is that the FDCA sets up a

"logical relationship between the change in the product for which the new clinical investigations

were essential to approval of the [product], and the scope of any resulting three-year exclusivity."

*Veloxis Pharms., Inc. v. FDA*, 109 F. Supp. 3d 104, 120–21 (D.D.C. 2015); *AstraZeneca*, 872 F.

Supp. 2d at 80. According to FDA's established interpretation, the "conditions of approval" "can

be ***no broader than the innovations presented to*** … ***FDA*** in the new clinical investigations that

led to the FDA's approval of the first-in-time 505(b) NDA." *Veloxis*, 109 F. Supp. 3d at 121 n.16.

In 1994, FDA instructed that "[i]nterested parties can obtain information on exclusivity

decisions through the Freedom of Information Act process (21 CFR part 20)." 59 Fed. Reg. at

50,357. FDA further instructed that "[p]arties who wish to challenge an exclusivity decision can

utilize the citizen petition procedures (21 CFR 10.30)." *Id.*

## II.    STATEMENT OF THE FACTS.

### A.    Use of Treprostinil for PAH and PH-ILD.

Treprostinil is a treatment for pulmonary hypertension ("PH") conditions. FDA-000876.

PH is a condition that causes elevated blood pressure in the pulmonary arteries, which can worsen

over time and may lead to heart failure.[4] A person with PH suffers from reduced exercise capacity,

greater need for supplemental oxygen, decreased quality of life, and earlier death.

The identification of various PH subtypes has led to the development of improved and

---

[4] *See, e.g.*, J.R. Sysol & Roberto F. Machado, *Classification and Pathophysiology of Pulmonary Hypertension*, CONTINUING     CARDIOLOGY     EDUCATION     (July     27,     2018), https://onlinelibrary.wiley.com/doi/epdf/10.1002/cce2.71.

differentiated treatment strategies. PH subtypes are classified into five different groups ("WHO Groups") based on shared histology, pathophysiology, clinical presentation, and treatment strategy, pursuant to a World Health Organization ("WHO") symposium in 2013. FDA considers each WHO Group a ***distinct*** disease or condition.[5] Thus, a drug approved for one PH indication is not necessarily approved for other PH indications.

Both WHO and the New York Heart Association ("NYHA") have a multi-stage classification system to describe the stages of heart failure based upon patient symptoms when performing physical activities.[6] As relevant here, PAH is designated within WHO Group 1, and is characterized by higher pulmonary arterial pressure, among other things.[7] A hallmark of PAH patients is limited exercise capacity.[8] Pulmonary hypertension due to lung disease and/or hypoxia, also known as WHO Group 3, is associated with several other diseases, including Interstitial Lung Disease ("ILD"), a particularly devastating form of PH. ILD describes a group of diseases that cause scarring and inflammation of the lungs, which can result in difficulty breathing and poor exchange of oxygen between the lungs and blood vessels. PH-ILD is a subset of WHO Group 3.

Treprostinil is a drug that FDA has repeatedly approved for the treatment of PH conditions. FDA-000307. Treprostinil is a mimetic that causes dilation of blood vessels in the lungs and

---

[5] *Orphan Drug Designation: Disease Considerations*, FDA (last updated Mar. 9, 2018), https://www.fda.gov/industry/designating-orphan-product-drugs-and-biological-products/orphan-drug-designation-disease-considerations.

[6] *See, e.g.*, *Classes and Stages of Heart Failure*, AMERICAN HEART ASSOCIATION (last reviewed Jun. 7, 2023), https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure. Although the WHO/NYHA classification is separate from the WHO Groups of PH, it is used to help characterize the severity of symptoms experienced by patients with PH, and has been referenced in the approved indications for several UTC treprostinil products.

[7] Sysol & Machado, *supra* note 4.

[8] *See, e.g.*, Robin M. Fowler, Kevin R. Gain & Eli Gabbay, *Exercise Intolerance in Pulmonary Arterial Hypertension*, PULMONARY MEDICINE (June 10, 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3377355/pdf/PM2012-359204.pdf.

arteries, thereby decreasing lung artery pressure. FDA-000310.

**B.    UTC's Nearly 20-Year Marketing Exclusivity for Treprostinil Products.**

UTC is "a large company with more than $2 billion in annual revenue and two decades on the market." *United Therapeutics*, 2024 WL 2805082, at *13. It has maintained a monopoly over treprostinil drugs by reformulating treprostinil and splicing the patient populations to claim eligibility for successive seven-year ODE and three-year NCI exclusivity periods, which together span over 20 years.[9] UTC's treprostinil drugs include Remodulin, Orenitram, and Tyvaso and Tyvaso DPI. FDA-000348–49, 396.

***Remodulin.*** On May 21, 2002, FDA approved UTC's Remodulin injection for general treatment of PAH (WHO Group 1). FDA-000005. The ODE period for Remodulin began on May 21, 2002 and expired on May 21, 2009.[10]

***Orenitram.*** On December 20, 2013, FDA approved UTC's Orenitram for the treatment of PAH (WHO Group I), and received ODE for PAH to delay disease progression and improve exercise capacity. FDA-000005–06. The ODE period for Orenitram began on December 20, 2013 and expired on December 20, 2020.[11] On October 18, 2019, FDA approved a second ODE period for Orenitram for a subset of WHO Group 1 patients (those treated to delay disease progression only), which ends on October 18, 2026.[12]

***Tyvaso.*** While it had ODE for Remodulin, UTC submitted an NDA for Tyvaso Inhalation

---

[9] Under the Orphan Drug Act and FDA regulations, the FDA may confer a seven-year ODE period for certain drugs that treat rare conditions. A drug that has already been approved for the given disease or condition may not receive ODE again after that ODE period has elapsed. 21 U.S.C. § 527(c); 21 C.F.R. pt. 316. ODE is not relevant to this case, except to the extent that it offers context for inapplicable or already-expired ODE periods held by UTC's other drugs.

[10] *Search Orphan Drug Designations and Approvals*, FDA ("Orphan Drug Database"), https://www.accessdata.fda.gov/scripts/opdlisting/oopd/detailedIndex.cfm?cfgridkey=105197 (last accessed Aug. 20, 2024).

[11] *Id.*

[12] *Id.*

Solution ("Tyvaso") on June 27, 2008, and received FDA approval on July 30, 2009, for the treatment of PAH (WHO Group 1) in patients with NYHA Class III symptoms, to improve exercise ability.[13] FDA-000005. FDA granted an ODE period to UTC's Tyvaso (treprostinil) on June 17, 2010, and limited that exclusivity to patients with NYHA Class III symptoms to increase walk distance, a subset of WHO Group 1. The ODE period for Tyvaso began on July 30, 2009, and expired on July 30, 2016.[14] The efficacy and tolerability of inhaled treprostinil for the treatment of PAH (WHO Group 1) was demonstrated by the TRIUMPH 001 study ("TRIUMPH"), submitted for the Tyvaso NDA. FDA-000472.

On June 1, 2020, UTC submitted a supplemental NDA for Tyvaso to add a new indication for treatment of PH-ILD (WHO Group 3) to improve exercise ability, which FDA approved on March 31, 2021. FDA-000005. The safety and efficacy of inhaled treprostinil for the treatment of this population was demonstrated by the INCREASE study ("INCREASE"), submitted for the Tyvaso NDA. FDA-000472. FDA's approval based on INCREASE triggered a three-year period of NCI exclusivity for Tyvaso, which expired on March 31, 2024.

**C.    Liquidia's Submission of Yutrepia—the First Treprostinil Dry Powder Inhalation Drug Submitted to FDA for Full Approval—Over Four Years Ago and FDA's First Issuance of Tentative Approval for Yutrepia.**

On January 24, 2020, Liquidia submitted its NDA for Yutrepia (treprostinil dry powder inhalation) for treatment of PAH under section 505(b)(2) of the FDCA. FDA-001257. This was well before UTC submitted the Tyvaso DPI NDA to FDA on April 16, 2021. *Contrast id.*, *with* FDA-000006 (April 2021 submission for Tyvaso DPI).

In the Yutrepia NDA, Liquidia referenced the efficacy data from TRIUMPH that UTC had

---

[13] FDA, Center for Drug Evaluation and Research ("CDER"), NDA No. 22-387 (Tyvaso Inhalation Solution) Approval Letter (July 30, 2009), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2009/022387s000ltr.pdf.
[14] *Id.*

previously submitted to FDA for Tyvaso, and did not rely on any other listed drug. FDA-001268.
Liquidia conducted clinical investigations for Yutrepia, including a Phase 3, open-label,
multicenter trial called INSPIRE whose primary objective was to assess the safety and tolerability
of Yutrepia in patients naïve to prostacyclin therapy and patients transitioning from stable doses
of Tyvaso to Yutrepia. FDA-001262.[15]

Less than six months after Liquidia's submission of the Yutrepia NDA to FDA, UTC filed
a patent suit against Liquidia, alleging infringement of several UTC patents for Tyvaso. *See*
Complaint, *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-cv-755 (D. Del. June 4,
2020), ECF No. 1. UTC's lawsuit triggered an automatic stay under the FDCA, which barred FDA
from giving full approval to Yutrepia for a specific period of time.[16]

On November 4, 2021, amidst the ongoing patent stay triggered by UTC's lawsuit, FDA
issued a TA to Liquidia for Yutrepia for the treatment of PAH to improve exercise ability in
patients with NYHA functional Class II-III symptoms. FDA-001257. By issuing the TA, FDA
found that Yutrepia met all safety and efficacy requirements for approval. However, FDA did not
grant full approval to Yutrepia solely because of the patent stay. FDA-001257.

## D.    UTC Seeks FDA Approval of Tyvaso DPI.

On April 16, 2021, during the pendency of Liquidia's Yutrepia NDA and several months
after bringing its patent suit against Liquidia, UTC submitted for "priority review" an NDA for
Tyvaso DPI under section 505(b)(1) of the FDCA. FDA-000836, 839. UTC requested three years

---

[15] *See* Nicholas S. Hill *et al.*, *INSPIRE: Safety and Tolerability of Inhaled Yutrepia (treprostinil) in Pulmonary Arterial Hypertension (PAH)*, PUBMED (July 1, 2022), https://onlinelibrary.wiley.com/doi/epdf/10.1002/pul2.12119.

[16] Because of the statutory patent stay, FDA could not approve Yutrepia until the earlier of the expiration of the patent, resolution of the lawsuit, or 30 months after a patentee has received notice from an NDA applicant that a patent that claims the drug is invalid, unenforceable, or will not be infringed by the drug. 21 U.S.C. § 355(c)(3)(C); 21 C.F.R. § 314.107(b)(3)(viii).

of exclusivity for Tyvaso DPI. FDA-000454.

On July 8, 2021, following the submission of the Tyvaso DPI NDA, a citizen petition was submitted on Liquidia's behalf regarding potential risks related to Tyvaso DPI's formulation. FDA-000445. On July 15, 2021, Liquidia submitted a letter to FDA, requesting that FDA deny or limit any award of three-year exclusivity to Tyvaso DPI. FDA-000001–19.

### 1.    Tyvaso DPI's Dry Inhalation Powder Formulation of Treprostinil.

"Tyvaso DPI incorporates the dry powder formulation technology and … inhalation device technology used in Afrezza® (insulin human) Inhalation Powder product, which was approved by the FDA in 2014." FDA-000150. Afrezza uses the excipient fumaryl diketopiperazine ("FDKP"). FDA-000296. It has a warning that "[a]cute bronchospasm has been observed in AFREZZA-treated patients with asthma and COPD," and "is contraindicated in patients with chronic lung disease such as asthma or COPD." *Id.* Tyvaso DPI's dry powder formulation uses only 1% of treprostinil, FDA-000857, suggesting that approximately 99% of the drug is FDKP.[17]

### 2.    The Absence of New Clinical Investigations in the Tyvaso DPI NDA.

The Tyvaso DPI NDA included ***no new clinical investigations*** that studied patients with PAH who were naïve to treprostinil or patients with PH-ILD. Instead, the NDA consisted of: (1) safety, efficacy, and tolerability data from TRIUMPH and INCREASE (submitted with the Tyvaso NDA), (2) bioavailability data necessary to justify extrapolation of the prior data for Tyvaso to Tyvaso DPI, and (3) data concerning the tolerability of PAH patients switching from a stable dose of treprostinil inhalation solution to treprostinil dry powder inhalation. FDA-000878 (Sept. 2021 Clinical Review). This data was contained in the following studies:

- ***TRIUMPH***: A 12-week randomized, double-blind, placebo-controlled study to investigate the efficacy and tolerability of ***Tyvaso*** in 235 patients with PAH already receiving other PAH treatments. FDA-000854. The primary efficacy endpoint was

---

[17] The true percentage is not available in the record because FDA redacted it. FDA-000913.

change in 6-minute walk distance ("6MWD") at week 12 compared to baseline. *Id.*; *see also* FDA-000424–25 (Exclusivity Decision).

- ***INCREASE***: A 16-week randomized, double-blind, placebo-controlled study to investigate the safety and efficacy of ***Tyvaso*** in 326 patients with PH-ILD. The primary efficacy endpoint was the change in 6MWD at peak exposure of the drug from baseline to week 16. FDA-000854.

- ***BREEZE***: An open-label study with a primary objective of "evaluat[ing] the safety and tolerability of treprostinil inhalation powder (TreT) in subjects with [PAH] currently using Tyvaso." FDA-000529. Secondary endpoints were assessment of pharmacokinetics after the administration of each treatment, a 6MWD, a PAH-Symptoms and Impact Questionnaire, and a preference questionnaire. FDA-000530. BREEZE lasted 3 weeks and consisted of 51 patients. FDA-000882. The study included patients who had already been taking Tyvaso for at least 3 months prior to the study. FDA-000777. BREEZE ***excluded*** patients "diagnosed with PH for reasons other than (WHO Group 1)." FDA-000778.

- ***TIP-PH-102***: A 6-treatment crossover study of Tyvaso and Tyvaso DPI in 36 healthy subjects, which was used to estimate bioavailability in the target patient population. FDA-000839–40. The study also collected data on observed respiratory adverse events ("AEs"), and showed an "overall respiratory safety profile[] comparable" to the safety profile in BREEZE. FDA-000843–44.

As FDA has repeatedly recognized, BREEZE—which became the basis for FDA's Exclusivity Decision—merely confirmed the "expected known safety profile of Tyvaso[]." FDA-000853; *see also* FDA-000453 (May 2022 Exclusivity Summary noting that BREEZE "provided confirmatory efficacy information only"). FDA's May 2022 clinical review of Tyvaso DPI confirmed that the prevalence of AEs identified in BREEZE was similar to the AEs reported in TRIUMPH. FDA-000880 (Tyvaso DPI Clinical Review). FDA's review expressly noted that "[e]vidence for the safety and effectiveness of the drug product treprostinil ***administered by inhalation*** comes from the liquid formulation (TYVASO®) used in the … TRIUMPH I study of 235 patients with WHO group I PAH, and in the … INCREASE study of 326 patients with WHO group III PH-ILD." *Id*. FDA's review further made clear that "[***n***]*o additional evidence for effectiveness* was submitted as part of the [Tyvaso DPI NDA]." *Id*.

### 3.    FDA Approves Tyvaso DPI and Denies NCI Exclusivity.

On May 23, 2022, FDA approved the Tyvaso DPI NDA for the treatment of PAH (WHO Group 1) and PH-ILD (WHO Group 3), to improve exercise ability. FDA-000413. In its Exclusivity Summary issued that date, FDA confirmed that the basis for its approval of Tyvaso DPI was "the safety, tolerability, and bioavailability established in studies." FDA-000453. FDA determined that Tyvaso DPI "required review only of bioavailability or bioequivalence data" and observed that BREEZE merely "provided confirmatory efficacy information only." *Id.* Thus, FDA concluded Tyvaso DPI was ***ineligible*** for NCI exclusivity. FDA-000455.

On June 1, 2022, Liquidia submitted a FOIA request to FDA requesting all documentation prepared by the CDER Exclusivity Board, documenting FDA's decision whether to award three-year exclusivity to Tyvaso DPI. Declaration of Michael Kaseta ("Kaseta Decl.") Decl. ¶ 7, Ex. A. Unaware that FDA had ***already*** determined that Tyvaso DPI was ineligible for NCI exclusivity, Liquidia submitted a supplemental letter to FDA on July 25, 2022, to support its request that FDA deny or limit any award of NCI exclusivity to Tyvaso DPI. FDA-000283–92. FDA responded to Liquidia's FOIA request on August 17, 2022, and provided a copy of the May 2022 Exclusivity Summary. *Id.* ¶ 8, Exs. B, C. That summary showed that FDA had refused to grant NCI exclusivity to Tyvaso DPI. *Id.* Ex. C; *see also* FDA-000453–59.

### E.    UTC's Concerted Efforts to Thwart the Launch of Yutrepia.

On July 24, 2023, while its NDA was pending approval with FDA, Liquidia submitted an amendment to the Yutrepia NDA to add a new indication: treatment of PH-ILD. FDA-001292. FDA had previously confirmed that Liquidia would not need to submit new clinical data for the PH-ILD indication.[18] FDA accepted the amendment for review in September 2023. *Id.*

---

[18] *See* Press Release, Liquidia, *FDA Accepts Submission to Add PH-ILD to YUTREPIA™ Label* (Sept. 25, 2023), https://www.liquidia.com/node/10646/pdf.

Following FDA's acceptance of Liquidia's amendment to the Yutrepia NDA for the PH-ILD indication, UTC responded on multiple fronts. On February 20, 2024 (nearly a month before the March 31, 2024 expiration of the NCI exclusivity based on INCREASE that FDA granted to Tyvaso for the use of inhaled treprostinil to treat PH-ILD patients), UTC sued FDA in a lawsuit challenging FDA's acceptance of Liquidia's amendment to the Yutrepia NDA to add the PH-ILD indication. *See* Complaint, *United Therapeutics Corp. v. FDA*, No. 24-cv-484-JDB (D.D.C. Feb. 20, 2024), ECF No. 1. Thereafter, on March 4, 2024, UTC moved to enjoin FDA from granting final approval to Yutrepia. Motion for Temporary Restraining Order & Preliminary Injunction (D.D.C. Mar. 4, 2024), ECF No. 14. This Court denied that motion on March 29, 2024.

UTC also challenged Liquidia's launch of Yutrepia for the PH-ILD indication, which UTC argued infringed a new UTC patent. *See* Complaint, *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 23-cv-00975 (D. Del. Sept. 5, 2023), ECF No. 1. UTC moved for a preliminary injunction, which the district court denied. *United Therapeutics*, 2024 WL 2805082, at *1.

## F.    FDA Reverses Course to Award NCI Exclusivity to Tyvaso DPI and Thereby Block Full Approval of Yutrepia for Any Indication.

Notwithstanding FDA's conclusion in the May 2022 Exclusivity Summary that BREEZE was a bioavailability study that did ***not*** warrant NCI exclusivity, FDA-000453, FDA reversed course in August 2024. Following an internal summary circulated on July 2, 2024, FDA-000505, FDA met with staff who had reviewed Tyvaso DPI. FDA-000509. Days later, FDA circulated an internal memorandum that did not acknowledge its prior rejection of NCI exclusivity and which concluded for the first time that Tyvaso DPI was eligible for exclusivity. FDA-000460–97.

On August 16, 2024, FDA issued the Exclusivity Decision in which it relied entirely on BREEZE to grant NCI exclusivity to Tyvaso DPI. FDA-000450. FDA determined that Tyvaso DPI has NCI exclusivity until May 23, 2025, for all "inhalation powder dosage form of the active

moiety treprostinil for chronic use." *Id.* FDA conceded that UTC had "relied on safety and efficacy data submitted in the Tyvaso NDA and provided relative bioavailability data to justify extrapolation of the previously submitted data to Tyvaso DPI." FDA-000424. That safety and efficacy data was from TRIUMPH and INCREASE. *Id.* FDA acknowledged that the bioavailability data in BREEZE showed the bioavailability and safety profiles of Tyvaso and Tyvaso DPI are similar. Nevertheless, FDA determined that BREEZE qualified as a new clinical investigation for the purposes of NCI exclusivity because it was "not considered to be ***solely*** a bioavailability study." FDA-000432. FDA did not identify any basis in the FDCA or FDA regulations for the conclusion that a study must be ***solely*** a bioavailability study to qualify as a bioavailability study under the FDCA. 21 U.S.C. § 355(c)(3)(E)(iii). FDA did not acknowledge or attempt to reconcile this finding with FDA's treatment of TIP-PH-102 as a bioavailability study although that study also collected safety data. Nor did FDA acknowledge or attempt to reconcile its findings more than two years earlier that Tyvaso DPI did not qualify for exclusivity because there were no new clinical studies in the Tyvaso DPI NDA that merely required review of bioavailability data. FDA-000413–52 (Decision), FDA-000453–59 (May 2022 Exclusivity Summary). In the Decision, FDA determined that—although Yutrepia does not use the excipient FDKP—NCI exclusivity for Tyvaso DPI blocked approval for Yutrepia. FDA-000451.

On the same day as the Exclusivity Decision, FDA issued a tentative approval letter to Liquidia for Yutrepia. With that letter, FDA provided approved labeling for Yutrepia covering both the PAH and PH-ILD indications, showing that—but for the NCI exclusivity awarded to UTC for BREEZE—FDA was ready to approve Yutrepia on that date for these indications. Thus, the Exclusivity Decision means that FDA will not grant full approval for Yutrepia for both the PAH and PH-ILD indications until at least May 2025 although FDA has found Yutrepia is safe and

effective to treat patients with these conditions. FDA-000450–51.

Four days after the Decision, UTC dismissed its lawsuit against FDA. *See* Notice of Voluntary Dismissal, *United Therapeutics Corp. v. FDA*, No. 24-cv-484-JDB (D.D.C. Aug. 20, 2024), ECF No. 56.

### G.    FDA's Exclusivity Decision Harms Liquidia.

FDA's award of NCI exclusivity to Tyvaso DPI, and its resulting failure to provide full approval for Yutrepia, poses immediate and substantial harm to Liquidia. In August 2022, FDA documentation provided to Liquidia showed that FDA had rejected any NCI exclusivity for Tyvaso DPI. Kaseta Decl. ¶ 8, Ex. C. Liquidia relied on that decision, and prepared for commercial launch of Yutrepia in 2024. *Id.* ¶ 9. FDA's reversal in the Exclusivity Decision harms Liquidia.

Had FDA granted full approval to distribute Yutrepia effective August 16, 2024, Liquidia was ready to launch marketing by early September 2024. *Id.* ¶ 13. Now, as a result of the Exclusivity Decision, Liquidia is deprived of the opportunity to market Yutrepia for at least nine months—time that Liquidia can ***never*** get back. *Id.* ¶¶ 12–13. The permanent loss of that marketing opportunity prevents Liquidia from realizing any economic gain for at least three quarters in a market for inhaled treprostinil that has an estimated current run rate of $1.5 billion and the potential to grow in excess of $3 billion in the coming years. *Id.* ¶ 13. The Decision deprives Liquidia's salesforce of the ability to carry out their duties and responsibilities to secure sales of Yutrepia and generate revenue from those sales for at least nine months. *Id.* ¶ 14. By depriving Liquidia of the opportunity to market Yutrepia immediately, the Decision also threatens Liquidia's operations by depriving Liquidia of revenue that Liquidia would use to alleviate operating losses and jeopardizing funding of Liquidia's research and development programs. *Id.* ¶¶ 15–17. Liquidia's inability to launch Yutrepia will also require it to dispose of millions of dollars of inventory that it manufactured in anticipation of launching in 2024, but which will now expire before the inventory

can be sold and used. *Id.* ¶ 18. Full approval of Yutrepia effective immediately for any of its intended uses would address these harms. *Id.* ¶ 19.

## LEGAL STANDARDS

A preliminary injunction is appropriate when (1) the movant is likely to succeed on the merits, (2) the movant is likely to suffer irreparable harm absent relief, (3) the balance of equities tips in the movant's favor, and (4) issuance of an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Liquidia satisfies each factor.

The standard under Federal Rule of Civil Procedure 56 does not govern motions for summary judgment in actions for judicial review of an administrative agency's decision under the APA. *See Barker v. United States*, 404 F. Supp. 3d 251, 260 (D.D.C. 2019); *Moreno v. Spencer*, 310 F. Supp. 3d 83, 86 (D.D.C. 2018). Courts must "review the whole record or those parts of it cited by a party" when reviewing agency action, 5 U.S.C. § 706, and decide "as a matter of law, whether the agency action is supported by the Administrative Record and otherwise consistent with the APA standard of review." *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013). FDA's Exclusivity Decision finds no support in the Administrative Record and violates the APA.

## ARGUMENT

**I.    LIQUIDIA IS ENTITLED TO SUMMARY JUDGMENT ON ITS APA CLAIMS.**

The merits of Liquidia's APA claims are the fundamental issue here. *See Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) ("likelihood of success on the merits" is the "most important factor" in evaluating a preliminary motion injunction); *Coe*, 968 F. Supp. 2d at 240 (summary judgment resolves the merits of an APA claim). Liquidia challenges the Exclusivity Decision as violating the APA's prohibitions on (1) agency action that exceeds statutory authority and is contrary to law and (2) agency action is arbitrary and capricious.

The APA requires the Court to set aside agency action that exceeds statutory authority and

is contrary to statute. 5 U.S.C. § 706(2)(A), (D); *see Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 944 (D.C. Cir. 2024) (courts must reject agency action "[i]n the absence of statutory authorization"); *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 968 (D.C. Cir. 1985) (courts "must reject administrative agency actions which exceed the agency's statutory mandate or frustrate congressional intent"). Unlike every prior case addressing NCI exclusivity (which relied on now-abrogated *Chevron* deference), Liquidia's claims arise after the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), which settled how this Court must review Liquidia's APA claims challenging the Exclusivity Decision as exceeding FDA's statutory authority and as contrary to the FDCA. As the Supreme Court instructed, under the APA, "courts, not agencies, will decide '***all relevant questions of law***' arising on review of agency action." *Id.* at 2261 (quoting 5 U.S.C. § 706). If there is a statutory ambiguity, this Court must "determine the best reading of the statute and resolve the ambiguity…." *Id*. at 2266. The APA "prescribes ***no*** deferential standard … to employ in answering … legal questions." *Id.* at 2261. Instead, "[c]ourts ***must*** exercise their independent judgment in deciding whether an agency has acted within its statutory authority," *id.* at 2273, and "police the outer statutory boundaries" of any authority delegated to the agency. *Id.* at 2268.

The APA also requires a court to set aside agency action contrary to its own regulations. 5 U.S.C. § 706(2)(A); *see Nat'l Env't. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("[A]n agency is not free to ignore or violate its regulations while they remain in effect.") (cleaned up); *Accrediting Council for Indep. Colls. & Schs. v. Devos*, 303 F. Supp. 3d 77, 104 (D.D.C. 2018) ("the Secretary's violation of … the regulations … independently support findings that the APA was violated"). This Court reviews an agency's interpretation of its regulations pursuant to *Kisor v. Wilkie*, 588 U.S. 558, 607 (2019). Under *Kisor*, the Court cannot

defer to FDA's interpretation of its regulations "unless, after exhausting all the 'traditional tools' of construction, … the regulation is genuinely ambiguous." *Id.* at 559. Even if a court determines that a regulation is ambiguous, the agency's interpretation must be ***reasonable***, *id.* at 575-76, and even then "countervailing reasons" may "outweigh" deference. *Id.* at 573.

The APA further requires the Court to reject agency action that is arbitrary and capricious. 5 U.SC. § 706(2)(A). Under the APA, a court must ensure that an "agency has engaged in reasoned decisionmaking within those boundaries" set by statute. *Loper Bright*, 144 S. Ct. at 2263 (cleaned up). An agency acts arbitrarily or capriciously if it (1) "has relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency also acts arbitrarily when it "decides to change" course but fails to "supply a reasoned analysis indicating prior policies are being deliberately changed, not casually ignored." *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1296 (D.C. Cir. 2004) ("If an agency decides to change course, … we require it to supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." (cleaned up)).

In granting NCI exclusivity to Tyvaso DPI for BREEZE, FDA both acted contrary to law and acted arbitrarily and capriciously. First, BREEZE did not satisfy the threshold requirement limiting statutory exclusivity to new clinical investigations other than bioavailability studies because BREEZE was, by FDA's own repeated admissions, a bioavailability study. Second, BREEZE was not a new clinical investigation because it merely confirmed the results of prior studies on which FDA had relied to approve prior drugs. Third, BREEZE was not essential to

FDA's approval of Tyvaso DPI as FDA itself conceded years ago. Indeed, other available data could (and did) support approval of Tyvaso DPI, *i.e.*, the data for Tyvaso and Afrezza. Fourth, even if BREEZE could support NCI exclusivity for Tyvaso DPI, FDA overreached when it found that BREEZE's condition of approval was a dry inhalation powder of treprostinil for chronic use as a general matter. BREEZE was merely intended to study the use of the drug in treprostinil-stable PAH population, not the sweeping general use that FDA found, *i.e.*, chronic use of dry powder oral treprostinil for chronic use in treprostinil-naïve PAH and PH-ILD populations.

### A.    BREEZE Is a Bioavailability Study that Cannot Support NCI Exclusivity.

#### 1.    FDA Exceeded Its Statutory Authority and Acted Contrary to Law.

FDA violated the APA because it acted contrary to limitations in the FDCA and FDA regulations that categorically exclude bioavailability studies from the types of new clinical investigations that may make a drug eligible for NCI exclusivity.

The FDCA clearly instructs that NCI exclusivity is limited to a drug application that "contains reports of new clinical investigations (***other than bioavailability studies***)." 21 U.S.C. § 355(c)(3)(E)(iii); *see also Eagle Pharms., Inc. v. Azar*, 2018 WL 3838265, at *6 (D.D.C. June 8, 2018) (Kelly, J.) ("The Court starts, as it must, with the text of the statute as it stood at the time of the FDA's decision…."), *aff'd*, 952 F.3d 323 (D.C. Cir. 2020). FDA's regulations similarly exclude bioavailability studies from NCI exclusivity by defining the phrase "[c]linical investigation" to mean "any experiment ***other than a bioavailability study*** in which a drug is administered or dispensed to, or used on, human subjects." 21 C.F.R. § 314.108(a). Thus, bioavailability studies are ***categorically excluded*** from NCI exclusivity.

The FDCA and FDA regulations also explain what a bioavailability study is. Under the FDCA, "bioavailability" is "the rate and extent to which the active ingredient or [active moiety] therapeutic ingredient is ***absorbed*** from a drug [product] and becomes available at the site of drug

action." 21 U.S.C. § 355(j)(8)(A)(i). FDA has adopted a similar definition. 21 C.F.R. § 314.3 (defining "[b]ioavailability" as "the rate and extent to which the active ingredient or active moiety is **absorbed** from a drug product and becomes available at the site of drug action").[19] Thus, if a study evaluates the absorption of a drug's active moiety, the study is a bioavailability study.

Tyvaso DPI is ineligible for NCI exclusivity because BREEZE qualifies as a bioavailability study under the FDCA and FDA regulations. By design, the **only** endpoints in BREEZE for which there was any pre-specified "statistical analysis" were "[p]harmacokinetic assessments." FDA-000319. The study included "pharmacokinetic analyses for plasma concentrations of treprostinil," *i.e.*, the amount of treprostinil (the active moiety in Tyvaso and Tyvaso DPI) in the bloodstream following each treatment. *See id.*; *see also* FDA-000426. These aspects confirm that BREEZE was a bioavailability study, as FDA's Exclusivity Decision concedes. FDA-000432. Thus, FDA had **no authority** to grant NCI exclusivity to Tyvaso DPI based on BREEZE.

Yet FDA went against the clear language of the FDCA and FDA regulations here by allowing a study that evaluates bioavailability to support exclusivity. Alluding to BREEZE's "primary" safety and tolerability endpoints, FDA opined that Tyvaso DPI was eligible for NCI exclusivity because BREEZE "is not considered to be **solely** a bioavailability study." FDA-000432. But the word "solely" exists nowhere in the FDCA. While FDA may think its novel interpretation of the FDCA is preferable as a policy matter, that preference cannot salvage FDA's misinterpretation of the FDCA. *See Loper Bright*, 144 S. Ct. at 2268 ("Courts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy

---

[19] FDA has further explained that "BA data provide an estimate of the fraction of the drug absorbed as well as information related to the pharmacokinetics of the drug, such as distribution, metabolism, excretion, the effects of food on the absorption of the drug, dose proportionality or linearity in the pharmacokinetics of the active moieties." FDA-001009.

preferences … that ha[ve] not made it into the statute."); *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[A]n order may not stand if the agency has misconceived the law.").

Nor can FDA justify the Decision by constructively rewriting the FDCA or its regulations to ignore a study's bioavailability endpoints for the purpose of NCI exclusivity. FDA has ***no*** authority to rewrite a statute or its regulations. *Landstar Express Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009); *Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 236 (D.C. Cir. 1992) (agency cannot "constructively rewrite the regulation … through internal memoranda or guidance directives that incorporate a totally different interpretation and effect a totally different result"); *Zhang v. U.S. Citizenship & Immigr. Servs.*, 344 F. Supp. 3d 32, 58 (D.D.C. 2018) ("[A] policy that adds a requirement not found in the relevant regulation is a substantive rule that is invalid unless promulgated after notice and comment."). This, too, shows that FDA's grant of NCI exclusivity by finding that BREEZE was not "solely" a bioavailability study exceeded FDA's authority and was contrary to law.

> **2.    FDA Arbitrarily and Capriciously Departed from Its Prior Finding that BREEZE Is a Bioavailability Study.**

FDA's Exclusivity Decision violates the APA because FDA arbitrarily changed course— ***without*** any reasoned explanation for or recognition of the change—from its May 2022 finding that BREEZE was a bioavailability study. *See Am. Fed'n of Gov't Emps., AFL-CIO, Local 1929 v. Fed. Labor Rels. Auth. (AFGE)*, 961 F.3d 452, 457 (D.C. Cir. 2020) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." (cleaned up)). ***None*** of the evidence about BREEZE changed between May 2022 and August 2024. The ***only*** change was FDA's novel determination in August 2024 that studies that are not "solely" bioavailability studies are eligible for NCI exclusivity. FDA-000453. FDA failed to explain how this novel interpretation comported with the

FDCA or FDA regulations that exclude bioavailability studies as a basis for NCI exclusivity. That failure is arbitrary and capricious. *See AFGE*, 961 F.3d at 457 (action was arbitrary when agency "failed to explain how its decision comports with the express language of [the statute])"); *Commc'ns Satellite Corp. v. FCC*, 836 F.2d 623, 632 (D.C. Cir. 1988) (vacating order as "arbitrary and capricious" when the agency "provided no explanation for its … departure from prior and practice and because it makes no sense in light of the clear purpose all applicable statutes").

FDA's finding that BREEZE was not "solely" a bioavailability study was also inconsistent with FDA's treatment of TIP-PH-102, another study submitted with the Tyvaso DPI NDA. *See Indep. Petrol. Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996) ("[A]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."). As FDA recognized, TIP-PH-102 assessed ***both*** "relativity bioavailability" of Tyvaso DPI and Tyvaso, ***and*** "safety," including "adverse events, vital signs, clinical laboratory tests, 12-lead ECGs, and physical examinations." FDA-000429. BREEZE ***also*** assessed bioavailability and safety. FDA-000878. FDA was legally required to treat BREEZE and TIP-PH-102 similarly, or to at least provide a rational reason for its different treatment. *See Bracco Diagnostics v. Shalala*, 963 F. Supp. 20, 28 (D.D.C. 1997) (FDA had to treat "similar products in the same way" or "provide a rational basis" for different treatment). FDA did not do either. Instead, FDA treated TIP-PH-102 as a bioavailability study that could not support NCI exclusivity, but took the ***opposite*** approach with BREEZE by ***ignoring*** its bioavailability endpoints. FDA gave ***no*** rationale for this disparate treatment. This, too, renders the Exclusivity Decision arbitrary and capricious.

## B.     BREEZE Is Not a New Clinical Investigation.

### 1.     The Decision Is Contrary to the FDCA and FDA Regulations that Limit NCI Exclusivity to *New* Clinical Investigations.

FDA's Exclusivity Decision flouts the FDCA and FDA regulations that limit eligibility for

NCI exclusivity to *new* clinical investigations. Under the FDCA, NCI exclusivity is limited to a drug application that "contains reports of *new* clinical investigations (other than bioavailability studies)." 21 U.S.C. § 355(c)(3)(E)(iii). The FDCA does not define "new clinical investigations," but FDA's implementing regulations define it as "an investigation in humans the results of which have not been relied on by FDA to demonstrate substantial evidence of effectiveness of a previously approved drug product for any indication or of safety *for a new patient population* and *do not duplicate the results of another investigation* that was relied on by the agency to demonstrate the effectiveness or safety in a new patient population *of a previously approved drug product*." 21 C.F.R. § 314.108(a).

BREEZE was not a "*new* clinical investigation" because its results *merely duplicated* findings from prior studies on which FDA had already relied to approve certain drugs. The March 2021 labeling for Tyvaso makes clear that TRIUMPH and INCREASE demonstrated the safety and efficacy of treprostinil administered by inhalation for use in PAH and PH-ILD populations. FDA-000132–33, 137–42.[20] BREEZE merely confirmed these results. BREEZE was conducted in "51 patients with WHO group I PAH" who were "treated with stable doses of [Tyvaso]" and "transitioned to a similar dose of [Tyvaso DPI]." FDA-000309. In evaluating these patients' baselines from taking Tyvaso before switching them to Tyvaso DPI for three weeks, FDA-000760, BREEZE found "comparable systemic treprostinil exposure" between the formulations. FDA-000151. Thus, BREEZE confirmed that PAH patients already taking Tyvaso would not face adverse consequences when taking an equivalent dose of Tyvaso DPI. FDA-000453 (concluding that the Tyvaso DPI NDA had "*confirmatory* efficacy information only"). BREEZE was also

---

[20] *See also* FDA-000876–77 ("Substantial evidence of effectiveness for the drug product treprostinil administered by inhalation has been previously concluded based on" TRIUMPH for patients with WHO Group I PAH and INCREASE for patients with WHO Group III PH-ILD).

confirmatory of prior studies showing the safety and tolerability of dry powder formulations containing the excipient FDKP in the approval of Afrezza, ███████████████████████

████████████████████████████████████████. FDA-000881, 885, 908, 910.

Indeed, BREEZE did not identify any "bronchospastic adverse events" from the use of FDKP in Tyvaso DPI. FDA-000910. Because BREEZE was merely confirmatory prior data, FDA could not lawfully conclude that BREEZE qualified as a ***new*** clinical investigation under its own regulations. 21 C.F.R. § 314.108(a) (new clinical investigations "***do not duplicate the results of another investigation*** that was relied on by the agency to demonstrate the effectiveness or safety in a new patient population ***of a previously approved drug product***").

### 2.    FDA's Finding that BREEZE Was a New Clinical Investigation Arbitrarily and Capriciously Departed from FDA's Prior Finding and Longstanding Interpretation.

FDA's finding that BREEZE was a new clinical investigation was arbitrary and capricious because it departed from FDA's prior finding that BREEZE was not a new clinical investigation, and FDA's longstanding policy limiting the types of studies eligible for NCI exclusivity.

In a quintessentially arbitrary and capricious action, FDA's Exclusivity Decision found for the first time that BREEZE was purportedly a "new clinical investigation" despite FDA's contrary finding more than two years earlier based on the same evidence. FDA-000453–59. While an agency may change course, an agency must at least acknowledge that it is doing so. *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 18 (D.D.C. 2009) ("[A]n agency's decision to reverse its position in the face of a precedent it has not persuasively distinguished is quintessentially arbitrary and capricious." (cleaned up)). FDA's failure to acknowledge its opposite conclusion in May 2022 ***anywhere*** in the Decision alone renders the Decision arbitrary.

FDA's failure to acknowledge its prior conclusion is unsurprising give that FDA could not,

under its longstanding interpretation, rationally conclude that BREEZE was a new clinical investigation warranting NCI exclusivity. For nearly 35 years, FDA has interpreted NCI exclusivity to be "*limit[ed]* . . . to changes in a drug product that are *significant enough* to require human safety or effectiveness studies for approval." 54 Fed. Reg. 28,872, 28,899 (July 10, 1989). FDA explained that "most studies qualifying for exclusivity will be efficacy studies," with "occasional clinical investigations qualifying for exclusivity that *establish* that a product *is safer* than originally thought and that *permit broader use* of the drug." *Id.* FDA has further explained that only an NDA supported by "new clinical investigations" with *new* safety and efficacy findings for "new indications or uses of the already approved pioneer drug" may receive NCI exclusivity— and only for those "new indications or use." *AstraZeneca*, 872 F. Supp. 2d at 64, 85.

The record confirms that FDA's treatment of BREEZE in the Exclusivity Decision was inconsistent with and implausible under FDA's longstanding interpretation. In 2017, FDA had *already* confirmed ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████. In its submission for the Tyvaso DPI NDA, UTC relied on the data from TRIUMPH and INCREASE submitted with the Tyvaso NDA, which had already shown the safety and efficacy of treprostinil in PAH and PH-ILD patients. FDA-000876– 77. In its clinical review of Tyvaso DPI, FDA also determined that ████████████████████ ████████████████████████████████████████████████████████████ █████████████████ ████████████████████████████████████████████.

Contrary to FDA's conclusory assertion in the Exclusivity Decision that BREEZE studied a "broader use of treprostinil," FDA-000436 at n.87, BREEZE did not study an expanded patient population to support a "broader use" of treprostinil than these prior studies. BREEZE was *limited*

to a PAH population switching from a nebulized solution form of treprostinil (*i.e.*, Tyvaso) to Tyvaso DPI. FDA-000309. The final label for Tyvaso DPI covers the **same** patient populations as the label for Tyvaso—not a new patient population. *Compare* FDA-000129 (prior Tyvaso labeling), *with* FDA-000620 (Tyvaso DPI labeling). As for the population BREEZE studied, BREEZE did not establish that Tyvaso DPI was safer than Tyvaso. FDA recognized in October 2021 that "[t]he safety profile in [BREEZE] is **indistinguishable** from that for the inhaled liquid." FDA-000913. FDA found that "[*n*]*o new* risks associated with treprostinil formulated as an inhaled powder (Tyvaso DPI$^{TM}$) were identified in … BREEZE." FDA-000312. In fact, FDA noted in the Decision that the median overall change in the patient-reported outcome measure in BREEZE was **zero**, which suggests that the median patient did not experience any detectable improvement. FDA-000428. In short, as FDA recognized in May 2022, BREEZE provided "**confirmatory** efficacy information only." FDA-000453. Thus, the Exclusivity Decision cannot be justified under FDA's interpretation of the types of investigations that may qualify for NCI exclusivity.

C.   **FDA's Exclusivity Decision Is Unlawful Because BREEZE Was Not Essential to FDA's Approval and Thus Tyvaso DPI Was Ineligible for NCI Exclusivity.**

1.   **The Decision Is Contrary to the FDCA and FDA Regulations that Limit NCI Exclusivity to an NCI "*Essential* to Approval" by FDA.**

FDA's Exclusivity Decision is contrary to the FDCA and FDA regulations that further limit the types of new clinical investigations that may support an award of NCI exclusivity. Even if a study qualifies as a new clinical investigation, the investigation must be "essential to the approval of the application" for the drug to be eligible for NCI exclusivity. 21 U.S.C. § 355(c)(3)(E)(iii). The FDCA does not define the phrase "essential to approval." FDA's regulations, however, define the phrase "essential to approval" to mean "with regard to an investigation, that there are **no other data available** that could support approval of the NDA." 21 CFR § 314.108(a).

BREEZE does not satisfy FDA's regulatory requirement because there were "other data

available that could [and did] support approval of the NDA." FDA-000422 (Exclusivity Decision). UTC had already established the safety and efficacy essential to FDA approval with TRIUMPH and INCREASE—the same studies on which FDA relied to approve Tyvaso. FDA-000132–33, 137–42. The fact that BREEZE's results were merely confirmatory of these studies shows that the studies could support approval of Tyvaso DPI. *See supra* Part I.B. In fact, the approved indications for Tyvaso do not even allude to BREEZE, but rather allude to the patient populations studied in TRIUMPH and INCREASE, confirming that other data could support approval of Tyvaso DPI (and did). *Compare* FDA-000620–21, *with* FDA-000629–31. This alone renders FDA's "essential" finding unlawful and means that FDA had no authority to grant NCI exclusivity here.

Furthermore, BREEZE could not have been essential to FDA's approval of Tyvaso DPI for use in PH-ILD patients because BREEZE ***did not*** study this population. FDA-000429. The ***only*** data that "could support approval," 21 C.F.R. § 314.108(a), for the PH-ILD indication came from INCREASE. FDA-000133. This further renders FDA's finding that BREEZE was essential to approval of Tyvaso DPI contrary to FDA's regulation and means that FDA had no authority to grant NCI exclusivity to Tyvaso DPI for the PH-ILD indication based on BREEZE.

### 2. FDA's "Essential to Approval" Finding Was Arbitrary and Capricious Because It Ran Contrary to FDA's Interpretation and the Evidence.

FDA's determination that BREEZE was essential to the approval of Tyvaso DPI was also arbitrary and capricious. As discussed, *see supra* Part I.C.1, under FDA's longstanding interpretation, "3-year exclusivity is ***reserved for*** investigations 'that are necessary for approval of ***important innovations***.'" *AstraZeneca*, 872 F. Supp. 2d at 66 (quoting 59 Fed. Reg. 50,338, 50,358). FDA's core contention in the Exclusivity Decision is that "the innovation represented by Tyvaso DPI for which a new clinical investigation [the BREEZE Study] was essential is the inhalation powder dosage form for the active moiety treprostinil for chronic use." FDA-000442.

FDA's "essential to approval" analysis exemplifies the unsupportable post hoc rationalizations FDA made to justify its new grant of NCI exclusivity for Tyvaso DPI after having rejected such exclusivity over two years ago. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020) ("An agency must defend its actions based on the reasons it gave when it acted.").

First, FDA manufactured novel safety concerns that the record does not support. In the Exclusivity Decision, FDA asserted for the first time that BREEZE was essential to approval because FDA was purportedly concerned that "an inhalation powder might present a risk of getting stuck in the throat or might cause a sensation of something stuck in the throat." FDA-000433. FDA does not cite any document that corroborates its purported safety concern, let alone a document contemporaneous with FDA's review and approval of Tyvaso DPI, nor can it. In an October 2021 memorandum, FDA staff expressly opined that "Treprostinil is approved in an inhaled liquid formulation (with no FDKP), so little beyond demonstrating bioavailability was necessary for Tyvaso DPI." FDA-000913. Thus, the record in fact contradicts FDA's novel assertions that it had purported safety concerns that required it to rely on the results from BREEZE to grant approval.[21]

Nor is there any evidence showing that BREEZE was designed to or did address FDA's novel safety concern. As FDA has repeatedly conceded, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮; FDA-000427 (Exclusivity Decision) (noting that "BREEZE … provided limited safety data"). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *see also* ▮▮▮▮▮▮.

There is no evidence showing that BREEZE was designed to address this issue in any way. The

---

[21] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

absence of such evidence is unsurprising because Tyvaso DPI incorporated and relied on the same technology as Afrezza—a drug powder that FDA had approved years earlier as safe and effective. This further confirms that FDA's "essential to approval" finding was arbitrary and capricious.

Second, even assuming arguendo that Tyvaso DPI's inhalation powder dosage form of treprostinil could be deemed an innovative change, BREEZE did not study safety and tolerability of this form for "chronic use."[22] In fact, the notion that BREEZE studied "chronic use" did not appear until August 2024—when FDA sought to justify its new award of NCI exclusivity.

BREEZE was designed to study **short term** safety and tolerability—not chronic use.



. Consistent with that recommendation, FDA and UTC repeatedly acknowledged that BREEZE was a short-term study. *See* FDA-000397 ("Three clinical studies were conducted to support the filing of the NDA. … 2) an open-label study to evaluate the **short-term** safety and tolerability following repeat doses of TreT (TIP-PH-101) in PAH patients currently treated with Tyvaso….");

---

[22] To the extent that a dry powder form of treprostinil represents an innovation, that **true innovator** of this form **is Liquidia**—not UTC. Liquidia submitted its NDA for Yutrepia in January 2020, FDA-001292, well before UTC submitted its NDA for Tyvaso DPI in April 2021, FDA-000145, and completed the submission on May 7, 2021. FDA-001257. Liquidia relied on the results from TRIUMPH, FDA-001268, as well as the tolerability results from Liquidia's INSPIRE study. FDA-001262–63. FDA gave tentative approval to the Yutrepia on November 4, 2021, thereby finding a dry powder inhalation form of treprostinil safe and effective for use **at least six months before** FDA approved Tyvaso DPI. *Compare* FDA-001291 (Nov. 2021 TA of Yutrepia), *with* FDA-000413. FDA's grant of exclusivity to Tyvaso DPI here effectively allows UTC to bootstrap an additional three years of exclusivity onto the 30-month stay that UTC previously received in connection with its ultimately meritless patent litigation, which was the sole reason that Tyvaso DPI received full approval before Yutrepia.

███████████████████████████████████████

███████████████████████████████████. Because BREEZE, as

a short-term study, could not generate answers regarding the safety and tolerability of the "chronic

use" of Tyvaso DPI, FDA's "essential to approval" finding is completely unsupported, thereby

rendering the Exclusivity Decision arbitrary.[23]

Third, the true innovation reflected in Tyvaso DPI—the excipient FDKP that allows

Tyvaso DPI's dry powder formulation to exist—is not an innovation that BREEZE studied, but

rather was an innovation already known to FDA through the approval process for Afrezza. "Tyvaso

DPI incorporate[d] the dry powder formulation technology and … inhalation device technology

used in … Afrezza® (insulin human) Inhalation Powder product, which was approved by the FDA

in 2014." FDA-000150. In fact, Tyvaso DPI appears to be almost entirely comprised of FDKP

when considering that the drug's formulation is merely 1% treprostinil. FDA-000857 ("Tyvaso

DPI consists of single-use plastic cartridges filled with a white powder containing 1% of

treprostinil…."). FDKP was already used in the dry inhalation powder drug Afrezza. FDA-000910.

As FDA repeatedly recognized in its review of the Tyvaso DPI NDA, "the safety of the excipient

fumaryl diketopiperazine (FDKP) is supported by a comprehensive battery of safety pharmacology

and toxicology studies conducted for Afrezza." FDA-000909; *see also* FDA-000881–82. FDA

found that exposure to the excipient FDKP via the treprostinil inhaled powder formulation was

"acceptable" by comparing the maximal dose of Tyvaso DPI to the maximal dose of Afrezza.

FDA-000910. Thus, there was no new innovation in Tyvaso DPI studied by BREEZE. FDA's

---

[23] While BREEZE had an optional extension phase, the data FDA highlights in the Exclusivity Decision and on which FDA relied to approve Tyvaso DPI was from the ***three-week*** treatment phrase of BREEZE. FDA-000860 (Sept. 2021 Office of Clinical Pharmacology Review describing outcomes); FDA-000429 (Table 1 graphic).

contrary conclusion was irrational and thus the Exclusivity Decision cannot stand.

      **D.**    **FDA's Exclusivity Decision Is Unlawful Because It Recognizes "Conditions of Approval" for Tyvaso DPI that BREEZE Does Not Establish.**

          **1.**    **The Decision Violates the FDCA Because There Is No Logical Relationship Between the Conditions of Approval and BREEZE.**

Even if the Court addresses the conditions of approval FDA gave Tyvaso DPI, FDA unlawfully exceeded its authority and acted contrary to law by recognizing conditions of approval for Tyvaso DPI that BREEZE does not establish, specifically use in the PH-ILD population.

The FDCA's NCI exclusivity bar clause creates a two-step inquiry. First, the "conditions of approval" for the first NDA must be identified because NCI exclusivity attaches *only* "for the *conditions of approval*" of the first-approved drug that is eligible for NCI exclusivity. 21 U.S.C. § 355(c)(3)(E)(iii). Second, after identifying the "conditions of approval" of the first NDA, the next step is to "identif[y] the relevant conditions of approval *shared* between [the drug receiving NCI exclusivity and the competitor drug's NDA]," as NCI exclusivity covers *only* the overlap between the conditions of approval. *Veloxis*, 109 F. Supp. 3d at 120.

Neither the FDCA, nor FDA regulations define the statutory phrase "conditions of approval," but that statutory text sets the boundaries of NCI exclusivity that FDA may lawfully grant and which this Court must police. *Loper Bright*, 144 S. Ct. at 2268 (noting that courts have "obligations under the APA to independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA"). In the absence of a statutory definition, it is the role of this Court to determine the plain meaning of this phrase and, if it is ambiguous, to "use every tool at [its] disposal to determine the best reading of the statute and resolve the ambiguity." *Id.* at 2266. Courts have previously determined that the statutory phrase is ambiguous, but have arrived at a best reading of the provision that necessarily limits FDA's authority. *See Braeburn Inc. v. FDA*,

389 F. Supp. 3d 1, 23 (D.D.C. 2019) ("Section 355(c)(3)(E)(iii)'s ambiguity is not a license for the FDA to adopt any interpretation it chooses.").

As multiple courts have concluded in analyzing the FDCA and as FDA has opined before, the best reading of the bar clause is that "the scope of [NCI] exclusivity … can be ***no broader than the innovations presented to the FDA in the new clinical investigations*** that led to the FDA's approval of the first-in-time … NDA." *Veloxis*, 109 F. Supp. 3d at 121 n.16; *see also AstraZeneca*, 872 F. Supp. 2d at 83 ("substantive relationship between new clinical studies and changes in the [NDA] ... dictates what changes receive exclusivity"). The FDCA requires a "logical relationship between the change in the product for which the new clinical investigations were essential to approval of the [NDA], and the scope of any resulting three-year [NCI] exclusivity." *Id.* at 80. The "conditions of approval" are "tied to the specific characteristics of the drug that warranted exclusivity in the first instance," *i.e.*, "the novel indications or patient populations for which the drug product may be used." *Braeburn*, 389 F. Supp. 3d at 22–23. This interpretation "serv[es] the Hatch-Waxman Amendments' objective of finding an equilibrium that protects research and leaves room for market competition." *Id.* at 23. Thus, the scope of any NCI exclusivity is limited to the innovative change presented by the new clinical investigation necessary for approval of the NDA.

The "conditions of approval" that FDA recognized in the Exclusivity Decision exceed FDA's authority under the FDCA and are contrary to law. FDA found that the purported "innovation represented by Tyvaso DPI for which a new clinical investigation was essential is the inhalation powder dosage form for the active moiety treprostinil for chronic use." FDA-000442. This finding violates the FDCA because there is ***no logical connection*** between this sweeping condition of approval and the change in the product that BREEZE studied.

First, FDA's grant of NCI exclusivity is ***not*** tied to any "novel indications or patient

populations for which the drug product may be used," *Braeburn*, 389 F. Supp. 3d at 22–23, and which were studied in BREEZE. BREEZE did not study any novel indications, or new uses for PAH and PH-ILD populations—the same populations as Tyvaso. *Compare* FDA-000620 (Tyvaso DPI labeling), *with* FDA-000637 (Tyvaso labeling). BREEZE merely studied PAH patients who were already taking stable doses of Tyvaso. FDA-000762. By design, BREEZE **excluded** PH-ILD patients. It is also undisputed that the Tyvaso DPI NDA had **no** clinical investigations with PAH patients who did **not** switch from Tyvaso to Tyvaso DPI. Given these limitations, FDA could not lawfully grant Tyvaso DPI any NCI exclusivity for treatment of PAH patients who did not switch from Tyvaso or for treatment of PH-ILD patients because **neither** could have been a "condition of approval" for Tyvaso DPI.

Second, as discussed, *see supra* Part I.C.2, to the extent that Tyvaso DPI is novel as an inhalation powder dosage form of treprostinil, BREEZE did not study this innovation. Rather, the safety and effectiveness of this form comes from a combination of the known safety and efficacy information about treprostinil that FDA already had available to it from the Tyvaso NDA, and what FDA already knew about dry powders using FDKP from its approval of Afrezza. FDA and UTC both recognized years ago that BREEZE was an "open-label, uncontrolled study to evaluate the short term (~2-3 weeks) safety and tolerability" of Tyvaso DPI. Only in August 2024, more than two years after it approved Tyvaso DPI, has FDA tried to rationalize an overly broad interpretation of the conditions of approval by recasting BREEZE as a study that examined the tolerability of dry powders generally, or specifically for "chronic use." These defects confirm that FDA had no authority under the FDCA to recognize any conditions of approval for Tyvaso DPI. Thus, the Exclusivity Decision exceeds FDA's statutory authority and is contrary to law.

### 2. The Decision Is Arbitrary and Capricious Because FDA Departed from Its Practice Limiting the Scope of a Drug's "Conditions of Approval."

FDA also acted arbitrarily and capriciously when it departed, without a rational justification, from its longstanding practice limiting the conditions of approval to the **scope** of the new clinical investigations essential to approval of the prior NDA. As FDA recognized in the Exclusivity Decision, it has long limited the scope of exclusivity in this manner. FDA-000418;

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████. Here, FDA failed to limit NCI exclusivity to the PAH patient population that BREEZE studied (those switching from stable doses of Tyvaso to Tyvaso DPI), and the specific drug formulation. In failing to limit NCI exclusivity in this manner, FDA failed to examine the facts and gave inadequate explanations for its findings.

First, in the Exclusivity Decision, FDA irrationally failed to limit the scope of exclusivity to the patient population actually studied by BREEZE, as FDA has done in prior cases. For example, as discussed in *Veloxis*, FDA determined that two new clinical studies made a drug eligible for NCI exclusivity **only** insofar as the studies addressed "[extended release] dosage form and its once-daily dosing regimen [for *de novo* patients], both of which were changes from the previously approved … drug." 109 F. Supp. 3d at 111 (brackets in original). Although FDA had approved the drug "for the prophylaxis of organ rejection in patients receiving *de novo* kidney transplant," FDA-001136, FDA did not grant NCI exclusivity identical to the approved indication. Instead, FDA **limited** the scope of exclusivity because "the new clinical investigations … for which Astagraf XL received exclusivity did not also demonstrate the safety and effectiveness of the Astagraf XL once-daily, ER dosage form for every use (or even just for conversion use), but rather **only** for de novo use in kidney transplant patients." FDA-001165. Thus, FDA found that "the scope

of 3-year exclusivity for Astagraf XL **does *not* extend** to a once-daily, ER dosage form of tacrolimus for prophylaxis of organ rejection for converting kidney transplant patients who are stable on IR tacrolimus." FDA-001166.

In another example, FDA expressly limited the scope of NCI exclusivity for MorphaBond, a drug with approved labeling that included an abuse deterrent claim for intranasal abuse. There, FDA expressly rejected ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████. Thus, FDA limited the scope of exclusivity to what the new clinical investigation was actually intended to evaluate.

Contrary to Astagraf XL and MorphaBond, FDA recognized a sweeping condition of approval for Tyvaso DPI that BREEZE did not support without providing any satisfactory explanation for its finding. *See State Farm*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (cleaned up)). Despite Liquidia's objection that NCI exclusivity for Tyvaso DPI should be limited to "stable, switch patients," FDA-000016, FDA distinguished Astagraf XL with a bare assertion that "BREEZE … supported the approval of Tyvaso DPI for use in a broader patient population than that included in the study (PAH patients switching from a stable dose of Tyvaso inhalation solution)." FDA-000448. But FDA did not explain ***how*** BREEZE supported approval in a broader patient population, nor did FDA explain why its reliance on BREEZE to support approval for use in both the PAH and PH-ILD patients (as matter of general safety and tolerability requirements) would automatically result in a "condition

38

of approval" covering the same populations for the purposes of NCI exclusivity. *Id.* FDA's failure to "show [its] work" was arbitrary and capricious. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017).

In failing to explain how BREEZE supported a grant of NCI exclusivity for this broader use, FDA "fail[ed] to come to grips with conflicting precedent" in Astagraf XL and MorphaBond in any reasoned way. *See Bonumose, Inc. v. FDA*, 2024 WL 3967258, at *11 (D.D.C. Aug. 28, 2024). BREEZE **never** studied the PH-ILD indication, and BREEZE was **never intended** to study dry powder inhalation form of treprostinil for chronic use as a general matter, but rather **only** for use in PAH patients. ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████. Applying FDA's approach in Astagraf XL and MorphaBond would have resulted in FDA extending the conditions of approval to **only** PAH patients, and **only** those that were stabilized on treprostinil who would be eligible to switch to Tyvaso DPI. Other patient populations, including treprostinil-naïve and PH-ILD patients should have been excluded from the conditions of approval recognized for Tyvaso DPI. FDA's failure to explain its departure from these conflicting precedents reinforces that the Exclusivity Decision was arbitrary and capricious.

Second, FDA irrationally failed to limit the scope of NCI exclusivity to the specific formulation presented in Tyvaso DPI, a dry inhalation powder form of treprostinil using FDKP. In prior cases, FDA has limited the scope of NCI exclusivity to the "product's specific formulation,

drug release profile, and/or excipient[,]" as Liquidia raised to FDA. FDA-000013, 016–17. For example, with Dyanavel XR, an amphetamine product, FDA limited NCI exclusivity to the unique formulation and associated drug release profile, and concluded the drug did not block approval of Adzenys ER, another amphetamine drug. ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

FDA's assertion in the Exclusivity Decision that it considered the safety issues posed by FDKP merely because of Liquidia's citizen petition, FDA-000446, is not supported. The safety of FDKP in a dry powder inhalation form of treprostinil was first raised in ██████████████████████████

████████████████████████████████████████████, and in multiple clinical reviews of Tyvaso DPI (without any reference to the citizen petition). *See* FDA-000879 (stating that BREEZE showed "there were no bronchospastic adverse events reported"); FDA-000910 (same). FDA addressed whether FDKP posed safety risks because FDA was well aware of the black box warning it had required for Afrezza—the *only* other approved drug using FDKP. FDA-000881–82, 910. Indeed, in October 2021, FDA staff noted the Afrezza black box warning and stated that "[t]he review team and I have a low level of suspicion that FDKP will cause bronchospasm in patients with PAH, and this risk is not specifically named in proposed labeling of Tyvaso DPI." FDA-000913. It was not until May 2022—the same day that FDA approved Tyvaso DPI and denied the citizen petition—that FDA even acknowledged that the citizen petition also raised a FDKP safety concern with the drug. FDA-000920. FDA included a warning for Tyvaso DPI concerning bronchospasm risks, similar to the black box warning it required for Afrezza. FDA-000620 ("May cause bronchospasm"); FDA-000623 (same). Thus, Afrezza, not

BREEZE, supported the innovative change of a dry powder inhalation formulation of treprostinil. Thus, FDA's award of NCI exclusivity for Tyvaso DPI on the basis of BREEZE for this innovation was an arbitrary and capricious post-hoc rationalization that is belied by the record.

## II.    LIQUIDIA WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

Liquidia faces substantial irreparable harm as a result of FDA's Exclusivity Decision. An injury warrants injunctive relief when it is "beyond remediation" and is "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (cleaned up) (emphasis in original). Liquidia faces certain and ongoing irreparable harm each day that the Exclusivity Decision remains in place.

*First*, absent preliminary injunctive relief, Liquidia will permanently lose the opportunity to market Yutrepia for at least nine months. Kaseta Decl. ¶¶ 12–13. That loss is an irreparable harm that warrants preliminary injunctive relief. *See Torpharm, Inc. v. Shalala*, 1997 WL 33472411, at *4 (D.D.C. Sept. 15, 1997) (company showed irreparable harm because it would "be permanently disadvantaged in the market for ranitidine hydrochloride if precluded from entering the market until many months after its competitors").

*Second*, absent preliminary injunctive relief, Liquidia will suffer substantial economic harm that is unrecoverable due to FDA's sovereign immunity. *See Endo Par Innovation Co. v. Becerra*, 2024 WL 2988904, at *7 (D.D.C. 2024) (noting that the plaintiff's "economic harm is unrecoverable" because "[i]t cannot recover damages against the FDA for its claims in this suit on account of the FDA's sovereign immunity"); *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 76–77, 77 n.19 (D.D.C. 2010) (same). The Exclusivity Decision prevents Liquidia from generating any revenue from sales of Yutrepia for at least an additional nine months, which Liquidia would use to address operating losses. Kaseta Decl. ¶ 15. The economic harm to Liquidia

is irreparable because sovereign immunity shields FDA from monetary liability for the injuries its Exclusivity Decision will cause Liquidia. Thus, the clear and immediate irreparable harm Liquidia will face strongly weighs in favor of granting a preliminary injunction.

### III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR LIQUIDIA.

The balance of the equities and the public interest also weigh heavily in Liquidia's favor. In addressing these factors, the Court must "balance the competing claims of injury," specifically, "the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. The Court must also consider whether an injunction would harm other interested parties. *See Monument Realty LLC v. Wash. Metro. Area Transit Auth.*, 540 F. Supp. 2d 66, 74 (D.D.C. 2008). Conducting that balance here shows FDA and UTC would not suffer legally cognizable harm from an injunction against FDA's unlawful Exclusivity Decision, in contrast to the immediate and substantial harm Liquidia and the public will suffer absent injunctive relief.

***The Public Interest***. Liquidia's success on the merits of its APA claims also means that "a preliminary injunction would serve the public interest because there is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe*, 984 F.3d at 102 (cleaned up). There is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations" and "generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up); *Bayer HealthCare v. FDA*, 942 F. Supp. 2d 17, 27 (D.D.C. 2013) ("The public has an interest in federal agency compliance with its governing statute."); *Torpharm*, 1997 WL 33472411, at *5 (similar). Similarly, injunctive relief here would not harm FDA. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (an agency "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required"). Not only would an injunctive further the public interest by ending an unlawful practice, but it would also be faithful

to the purpose of Hatch-Waxman Amendments, which were enacted to encourage competition and reward only certain types of innovations—not every single study submitted to FDA as part of an NDA. *See AstraZeneca*, 872 F. Supp. 2d at 66 (noting that FDA "does not consider a study to be essential to approval simply because the applicant conducted it and submitted the study for agency review," but rather "3-year exclusivity is reserved for investigations that are necessary for approval of important innovations, and require a considerable investment of time and money" (cleaned up)).

Furthermore, preliminary injunctive relief in Liquidia's favor would serve the public interest by increasing competition amongst drug companies that offer inhaled treprostinil. The public has an interest in competition. *See Torpharm*, 1997 WL 33472411, at *5. That is particularly true here because granting injunctive relief to Liquidia would help give PAH and PH-ILD patients access to a new and differentiated treatment option.

***No Cognizable Harm to UTC***. As shown above, UTC has ***no*** protectable interest in the NCI exclusivity that FDA extended in the Exclusivity Decision because, on the merits, Tyvaso DPI is ineligible for NCI exclusivity under the FDCA and FDA regulations and, even if it were eligible, the conditions of approval cannot lawfully block full approval of Yutrepia. An order enjoining the Exclusivity Decision and requiring FDA to grant full approval to Yutrepia effective immediately would not cause any cognizable harm to UTC and certainly none that could outweigh the harm to Liquidia without an injunction.

UTC cannot credibly assert that it would suffer economic harm from an injunction that prohibits FDA from enforcing the unlawful Exclusivity Decision. UTC had ***already*** expected that its exclusivity for Tyvaso for the PH-ILD indication would expire in March 2024, as UTC alleged in a complaint filed in this very court. *See* Complaint ¶ 42, *United Therapeutics Corp. v. FDA*, No. 24-cv-484-JDB (D.D.C. Feb. 20, 2024), ECF No. 1 ("FDA approved UTC's supplemental NDA

for PH-ILD in 2021. As a result, UTC was granted a three-year period of new-clinical-study exclusivity until March 31, 2024. That means that FDA cannot approve any 505(b)(2) application to market a treprostinil product for the PH-ILD indication until after that date.").

Nor will UTC face any cognizable harm from competition if Liquidia is allowed to market Yutrepia earlier than May 2025. "The mere existence of competition is not irreparable harm, in the absence of substantiation of severe economic impact." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.3 (D.C. Cir. 1977). UTC will not suffer "severe economic impact" from Liquidia's launch of Yutrepia. As another federal district court recognized earlier this year when it denied UTC's request to enjoin Liquidia from launching Yutrepia, "[UTC] is a large company with more than $2 billion in annual revenue and two decades on the market." *United Therapeutics*, 2024 WL 2805082, at *13. Notably, UTC had already expected that its "double-digit growth rate remains a solid forecast even with the possibility of new FDA approvals of … Liquidia."[24] Thus, UTC's interests cannot outweigh the substantial irreparable harm to Liquidia.

## IV.    THE EXCLUSIVITY DECISION SHOULD BE SET ASIDE IN ITS ENTIRETY.

In light of the numerous ways in which the Exclusivity Decision is unlawful, and Liquidia's showing under the preliminary injunction factors, the only remaining issue for the Court to address is the relief to provide Liquidia. The APA instructs that a reviewing court "shall hold unlawful and set aside agency actions, findings, and conclusions" that violate the APA. 5 U.S.C. § 706(2).

First, because the Exclusivity Decision exceeds FDA's statutory authority under the FDCA and is contrary to FDA regulations, the Court should set aside the Decision as unlawful and prohibit FDA from recognizing any NCI exclusivity for Tyvaso DPI. *See supra* Parts I.A.1, B.1, C.1, D.1. If the Court sets aside the Decision on any one of these grounds, Liquidia requests that

---

[24] *See* UTC Q1 2023 Earnings Call Transcript (May 3, 2023), https://www.roic.ai/quote/UTHR/transcripts/2023/1.

the Court require FDA to take all steps necessary to promptly give full approval to Yutrepia. *See Teva Pharms. USA, Inc. v. FDA*, 1999 WL 1042743, at *7 (D.D.C. Aug. 19, 1999) (plaintiff was "entitled to immediate final effective approval" for its drug application); *Torpharm*, 1997 WL 33472411, at *1, *3-5 (requiring FDA to approve plaintiff's drug application after concluding that FDA had incorrectly applied the FDCA provisions at issue).

Second, in the alternative, the Exclusivity Decision must be set aside as arbitrary and capricious because FDA's multiple findings are contrary to the evidence in the record, FDA's own prior determinations regarding BREEZE, and FDA's practices. *See supra* Parts I.A.2, B.2, C.2, D.2. If the Court sets aside the Exclusivity Decision solely on this basis, then the proper course is to remand to FDA to reconsider its arbitrary and capricious findings. *See Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) ("[U]nsupported agency action normally warrants vacatur.").

Third, whether the Court sets aside the Exclusivity Decision as contrary to law or as arbitrary and capricious, Liquidia respectfully requests that the Court set a two-week timeline for the prompt resolution of any remand to FDA, and retain jurisdiction over the case.

## CONCLUSION

For the foregoing reasons, Liquidia requests that the Court grant summary judgment for Liquidia and set aside the Exclusivity Decision or, alternatively, limit the Decision to the PAH indication. Liquidia further requests that the Court order FDA to make a final decision approving Yutrepia within 14 days of the Court's order granting summary judgment for Liquidia.

Dated: September 24, 2024

Respectfully submitted,

By: */s/ Sonia W. Nath*
    Sonia W. Nath (DC Bar No. 977095)
    David E. Mills (DC Bar No. 401979)
    Robby Saldaña (DC Bar No. 1034981)
    Matt K. Nguyen (DC Bar No. 1736777)
    COOLEY LLP
    1299 Pennsylvania Ave., NW, Suite 700
    Washington, DC 20004-2400
    Telephone: (202) 842-7800
    Facsimile: (202) 842-7899
    snath@cooley.com
    dmills@cooley.com
    rsaldana@cooley.com
    mnguyen@cooley.com

    Kathleen R. Hartnett (DC Bar No. 483250)
    COOLEY LLP
    3 Embarcadero Center, 20th Floor
    San Francisco, CA 94111-4004
    Telephone: (415) 693-2000
    Facsimile: (415) 693-2222
    khartnett@cooley.com

    *Counsel for Plaintiff Liquidia Technologies, Inc.*