## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIQUIDIA TECHNOLOGIES, INC.,

    *Plaintiff*,

  v.

FOOD AND DRUG
ADMINISTRATION, *et al.*,

    *Defendants*,
and

UNITED THERAPEUTICS
CORPORATION,

    *Intervenor-Defendant*
    *and Cross-Claimant.*

No. 1:24-cv-02428-TJK

**Federal Defendants' Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Renewed Motion for a Preliminary Injunction and Motion for Summary Judgment**

SAMUEL BAGENSTOS
General Counsel
Department of Health and Human
  Services

MARK RAZA
Chief Counsel
Food and Drug Administration

WENDY S. VICENTE
Deputy Chief Counsel for
  Litigation
Food and Drug Administration

DANLI SONG
Associate Chief Counsel

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
  General

BURDEN H. WALKER
Acting Deputy Assistant Attorney
General

AMANDA N. LISKAMM
Director

LISA K. HSIAO
Senior Deputy Director

HILARY K. PERKINS
Assistant Director

Department of Health and Human
Services
Office of the Chief Counsel
Food and Drug Administration
10903 New Hampshire Avenue
Bldg. 32, Room 4397
Silver Spring, MD 20993
301-273-4477
Danli.Song@fda.hhs.gov

NOAH T. KATZEN (D.C. Bar. No. 1006053)
Trial Attorney
Consumer Protection Branch
Civil Division, Department of Justice
P.O. Box 386
Washington, DC 20044-0386
(202) 305-2428
(202) 514-8742 (fax)
Noah.T.Katzen@usdoj.gov

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

   I.    Approval Pathways Under the FDCA .................................................... 3

   II.   3-Year Exclusivity ................................................................................ 4

   III.   FDA's Reliance on the BREEZE Study to Approve Tyvaso DPI .......... 7

   IV.   FDA's Exclusivity Decision ................................................................. 9

LEGAL STANDARD ........................................................................................................ 12

ARGUMENT ................................................................................................................... 14

   I.    FDA Is Entitled To Summary Judgment ............................................ 14

      A.   FDA did not change its exclusivity determination ........................... 14

      B.   FDA correctly determined the BREEZE study is a "clinical investigation (other than a bioavailability study)" ................................................ 16

      C.   Liquidia misunderstands the role of the BREEZE study .................. 20

      D.   Yutrepia is within the scope of exclusivity ...................................... 27

   II.   Liquidia Is Not Entitled To An Injunction ......................................... 30

      A.   Relief (if any) should be limited to the normal APA remedy .......... 31

      B.   Liquidia fails to satisfy the standards for a preliminary injunction ............... 32

CONCLUSION ................................................................................................................. 35

TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Young*,
  920 F.2d 984 (D.C. Cir. 1990) ................................................................ 4

*Allison Engine Co., Inc. v. United States ex rel. Sanders*,
  553 U.S. 662 (2008) ............................................................................ 18

*Air Transport Ass'n of Am. v. Export-Import Bank of the United States*,
  840 F. Supp. 2d 327, 335 (D.D.C. 2012) .................................................33

*Am. Hosp. Ass'n v. Azar*,
  385 F. Supp.3d 1 (D.D.C.) .................................................................... 31

*Archiocese of Wash. v. Wash. Metropolitan Area Transit Auth.*,
  897 F.3d 314 (D.C. Cir. 2018) .............................................................. 17

*\*AstraZeneca Pharm. LP v. FDA*,
  972 F. Supp. 2d 60 (D.D.C. 2012) ........................................................... 7

*\*Bennett v. Donovan*,
  703 F.3d 582 (D.C. Cir. 2013) .......................................................... 31, 34

*\*Braeburn Inc. v. FDA*,
  389 F. Supp. 3d 1 (D.D.C. 2019) ............................................................. 7

*Camp v. Pitts*,
  411 U.S. 138 (1973) ............................................................................ 12

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ......................................................... 13, 33

*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971) ............................................................................ 13

*Coal. for Common Sense in Gov't Procurement v. United States*,
  821 F. Supp. 2d 275 (D.D.C. 2011) ....................................................... 12

*Cytori Therapeutics, Inc. v. FDA*,
  715 F.3d 922, 923 (D.C. Cir. 2013) ....................................................... 13

*Del. Dep't of Nat. Res. & Envmtl. Control v. EPA*,
  895 F.3d 90 (D.C. Cir. 2018) ................................................................ 17

*Eli Lilly & Co. v. Medtronic, Inc.*,
  496 U.S. 661 (1990) .............................................................................. 4

*Endo Par Innovation Co., LLC v. Becerra*,
  No. 24-cv-999-TJK, 2024 WL 2988904 (D.D.C. June 10, 2024) (Kelly, J.) ........................ 33

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021) ................................................................................. 13, 14

*Henley v. FDA*,
   77 F.3d 616 (2d Cir. 1996) ................................................................................ 25

*\*Hill Dermaceuticals, Inc. v. FDA*,
   709 F.3d 44 (D.C. Cir. 2013) ................................................................. 17, 31, 35

*\*Hi-Tech Pharmacal Co., Inc. v. FDA*,
   587 F. Supp. 2d 1 (D.D.C. 2008) ....................................................................... 33

*Ipsen Biopharmaceuticals, Inc. v. Becerra*,
   108 F.4th 836 (D.C. Cir. 2024) ......................................................................... 13

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024) ...................................................................................... 13

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ........................................................................................... 14

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................................. 13

*\*Mylan Labs. Ltd. v. FDA*,
   910 F. Supp. 2d 299 (D.D.C. 2012) ................................................................... 33

*N. Air Cargo, v. USPS*,
   674 F.3d 852 (D.C. Cir. 2012) ........................................................................... 31

*\*PPG Indus., Inc. v. United States*,
   52 F.3d 363 (D.C. Cir. 1995) ............................................................................. 31

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
   472 F.3d 882 (D.C. Cir. 2006) ........................................................................... 17

*S. Pac. Transp. Co. v. ICC*,
   69 F.3d 583 (D.C. Cir. 1995) ............................................................................. 17

*Sandoz Inc. v. Becerra*,
   57 F.4th 272 (D.C. Cir. 2023) .............................................................................. 4

*\*Starbucks Corp. v. McKinney*,
   144 S. Ct. 1570 (2024) ...................................................................................... 32

*Torpharm, Inc. v. Shalala*,
   No. 97-cv-1925-JR, 1997 WL 33472411 (D.D.C. Sept. 15, 1997) ...................... 34

*Trump v. Int'l Refugee Assistance Project*,
   582 U.S. 571 (2017) ........................................................................................... 33

*University of Tex. v. Camenisch*,
   451 U.S. 390 (1981) ........................................................................................... 32

iii

*Veloxis Pharm., Inc. v. FDA,*
  109 F. Supp. 3d 104 (D.D.C. 2015) ................................................................ 7
*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................................... 13
*Wisc. Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985) ....................................................................... 33
*World Wildlife Fund v. Hodel,*
  No. 88-cv-1276, 1988 WL 66193 (D.D.C. June 17, 1988) .................................. 35

## Statutes

5 U.S.C. §
  706(2)(A) ...................................................................................................... 12
  706(2)(C) ...................................................................................................... 12

21 U.S.C. §
  355(a) ............................................................................................................ 3
  355(b)(1) ......................................................................................................... 4
  355(b)(2) ......................................................................................................... 4
  355(c)(3)(E)(ii) ................................................................................................ 5
  355(c)(3)(E)(iii) ....................................................................................... 1, 5, 7
  355(j) ............................................................................................................... 4
  355(j)(5)(F)(ii) ................................................................................................. 5
  505(c)(3)(E)(iii) ........................................................................................... 5, 6

Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98
  Stat. 1584 (1984) ............................................................................................. 4

## Regulations

21 C.F.R. §
  314.108(a) ......................................................................................... 6, 7, 16, 18
  314.3(a) ........................................................................................................... 6
  314.3(b) ............................................................................................... 27, 32, 35
  320.25(a)(1) ..................................................................................................... 20

## Other Authorities

54 Fed. Reg 28872, 28899 (July 10, 1989) .......................................................... 11
54 Fed. Reg. 28872 (July 10, 1989) ...................................................................... 1
54 Fed. Reg. 28872, 28899 (July 10, 1989) ........................................................ 22

## INTRODUCTION

Tyvaso DPI is a novel dosage form of treprostinil, a drug approved to treat pulmonary arterial hypertension (PAH) and pulmonary hypertension associated with interstitial lung disease (PH-ILD). The United States Food and Drug Administration (FDA) determined that Tyvaso DPI was eligible for 3-year exclusivity under 21 U.S.C. § 355(c)(3)(E)(iii) and that this exclusivity blocks final approval of the application for Yutrepia, another proposed inhalation powder form of treprostinil, until after the exclusivity's expiration on May 23, 2025 (the Exclusivity Decision).

A drug is eligible for 3-year exclusivity if its approved application contains reports of "new clinical investigations (other than bioavailability studies)" that are "essential to approval" of the application and were conducted or sponsored by the applicant. 21 U.S.C. § 355(c)(3)(E)(iii). That exclusivity bars approval of another application "for the conditions of approval of [the previously approved] drug" for three years. *Id.* The "conditions of approval" mean the innovative change for which new clinical investigations are essential to approval. *See* Abbreviated New Drug Application Regulations, 54 Fed. Reg. 28872 (July 10, 1989).

FDA determined that Tyvaso DPI is eligible for exclusivity because its application contained a "new clinical investigation[] (other than [a] bioavailability stud[y])": the BREEZE study. The BREEZE study specifically addressed the safety and tolerability of the inhalation powder dosage form, and FDA determined that it could not have approved Tyvaso DPI without that study. Moreover, FDA determined that the innovation for which the BREEZE study was essential was the inhalation powder

dosage form of treprostinil for chronic use. Because the Yutrepia application seeks approval for that same condition of approval, its approval is barred until after the Tyvaso DPI exclusivity expires.

Yutrepia's sponsor, Liquidia Technologies, Inc. (Liquidia), attacks these determinations, but none of its arguments withstand scrutiny. *First*, it accuses FDA of changing its mind about exclusivity without explanation. But FDA has made only one determination regarding eligibility and scope of 3-year exclusivity for Tyvaso DPI. What Liquidia characterizes as FDA's original position was simply an initial assessment from one agency component providing input for a subsequent agency determination. Following that initial assessment, that agency component, as well as other components, worked together to evaluate the eligibility and scope of any 3-year exclusivity for Tyvaso DPI. FDA only made its exclusivity determination at the conclusion of this process.

*Second*, Liquidia claims the BREEZE study was actually a "bioavailability study" because one of its secondary endpoints measured bioavailability. But that contradicts what Liquidia itself told the agency before the Exclusivity Decision. At that time, in a letter to the agency, Liquidia treated secondary endpoints as "irrelevant." Based on primary endpoints, Liquidia argued that *another* study—but *not* the BREEZE study— was a "bioavailability study." Even if Liquidia may change course now, its novel and strained interpretation of "bioavailability studies" is wrong and would generate untenable and perverse consequences.

*Third*, Liquidia argues that the BREEZE study was not "new" or "essential to approval" because it did not provide any vital information that was not already established by other studies. That is simply not true. No other study before the agency assessed the safety and tolerability of the inhalation powder dosage form for chronic use.

*Fourth*, Liquidia argues that FDA erred in declining to limit the scope of exclusivity to certain PAH patients or Tyvaso DPI's specific formulation. But no other study before the agency evaluated the safety and tolerability of the inhalation powder dosage form for *either* the PAH or the PH-ILD indication. Thus, FDA reasonably concluded that the BREEZE study was also essential to approval for the PH-ILD indication, and that the innovation for which the BREEZE study was essential was the inhalation powder dosage form and was not limited to Tyvaso DPI's specific formulation.

For these reasons, the Court should deny Liquidia any relief and instead grant FDA summary judgment. If the Court does grant Liquidia relief, it should adhere to the normal APA remedy of remand to the agency and decline Liquidia's requests to enjoin future agency decision-making, whether through final relief or a preliminary injunction.

BACKGROUND

## I.    Approval Pathways Under the FDCA

Section 505 of the Federal Food, Drug and Cosmetic Act (FDCA) generally forbids introducing a "new drug" into interstate commerce without an FDA-approved application. 21 U.S.C. § 355(a). In many instances, an applicant must submit a new drug

3

application containing reports of investigations demonstrating the drug's safety and effectiveness. *Id.* § 355(b)(1).

Clinical investigations can be prohibitively expensive. In some circumstances, they can also expose human patients to unnecessary risk to establish findings that have already been proven. Therefore, the Drug Price Competition and Patent Term Restoration Act of 1984 (more commonly known as the Hatch-Waxman Amendments) codified certain pathways that enable applicants to sometimes rely on FDA's safety and effectiveness findings for previously approved drugs. *See Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 667 (1990); *see also* Pub. L. No. 98-417, 98 Stat. 1584 (1984). One of those pathways is § 505(b)(2),[1] which allows an applicant to rely on FDA's safety and effectiveness findings for one or more previously approved drugs if the applicant establishes a scientifically justified basis for doing so and if certain other requirements are met. 21 U.S.C. § 355(b)(2).

## II. 3-Year Exclusivity

While codifying abbreviated approval pathways, the Hatch-Waxman Amendments also "preserved incentives for the research and innovation necessary for the development of new drugs." *Sandoz Inc. v. Becerra*, 57 F.4th 272, 274 (D.C. Cir. 2023). Specifically, Congress established periods of marketing exclusivity, the length of which "depend[s] primarily on the pharmaceutical novelty of a drug." *Abbott Labs. v. Young*, 920 F.2d 984, 986 (D.C. Cir. 1990). For example, if a drug contains an active moiety that

---

[1] The other is § 505(j), which concerns generic drugs and is not relevant here. *See* 21 U.S.C. § 355(j).

has not previously been approved, in general, no application which refers to the drug can be submitted to FDA for five years. 21 U.S.C. §§ 355(c)(3)(E)(ii), (j)(5)(F)(ii). By contrast, under § 505(c)(3)(E)(iii), a drug that contains a previously approved active moiety may be eligible for 3-year exclusivity based on clinical investigations that the applicant conducted or sponsored. *See* 21 U.S.C. § 355(c)(3)(E)(iii).[2] This case concerns 3-year exclusivity under § 505(c)(3)(E)(iii).

The 3-year exclusivity provision contains an "Eligibility Clause" and a "Bar Clause." To qualify for 3-year exclusivity under § 505(c)(3)(E)(iii)'s "Eligibility Clause," an approved application for a drug containing a previously approved active moiety must "contain[] reports of *new clinical investigations* (other than *bioavailability studies*)

---

[2]     If an application submitted under subsection (b) for a drug, which includes an active moiety (including any ester or salt the active moiety) that has been approved in another application approved under subsection (b), is approved after the date of the enactment of this clause and if such application contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the applicant, the Secretary may not make the approval of an application submitted under subsection (b) for the conditions of approval of such drug in the approved subsection (b) application effective before the expiration of three years from the date of the approval of the application under subsection (b) if the investigations described in clause (A) of subsection (b)(1) and relied upon by the applicant for approval of the application were not conducted by or for the applicant and if the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted.

21 U.S.C. § 355(c)(3)(E)(iii).

*essential to the approval* of the application and *conducted or sponsored by the applicant*." *Id.* (emphases added). Under FDA's regulations:

- A **"bioavailability study"** is "a study to determine the bioavailability or the pharmacokinetics of a drug." 21 C.F.R. § 314.108(a).[3]

- A **"clinical investigation"** is "any experiment other than a bioavailability study in which a drug is administered or dispensed to, or used on, human subjects." *Id.*

- A clinical investigation is a **"*new* clinical investigation"** if its results (1) "have not been relied on by FDA to demonstrate substantial evidence of effectiveness of a previously approved drug product for any indication or of safety for a new patient population" and (2) "do not duplicate the results of another investigation that was relied on by the agency to demonstrate the effectiveness or safety in a new patient population of a previously approved drug product." *Id.*

---

[3] "Bioavailability" refers to "the rate and extent to which the active ingredient or active moiety is absorbed from a drug product and becomes available at the site of drug action." 21 C.F.R. § 314.3(a).

"Pharmacokinetics" "refers to the movement of drug into, through, and out of the body—the time course of its absorption, bioavailability, distribution, metabolism, and excretion." Jennifer Le, "Overview of Pharmacokinetics," Merck Manual (Professional Edition), https://www.merckmanuals.com/professional/clinical-pharmacology/pharmacokinetics/overview-of-pharmacokinetics.

- A new clinical investigation is **"essential to approval"** if "there are no other data available that could support approval of the application." *Id.*[4]

When the conditions for eligibility are met, the "Bar Clause" prohibits FDA from approving another application "for the conditions of approval of [the previously approved] drug" for three years. 21 U.S.C. § 355(c)(3)(E)(iii). FDA has interpreted "conditions of approval" in this context to mean "the innovative change for which new clinical investigations are essential to approval." FDA-000418. In this way, the phrase "conditions of approval" establishes a "logical relationship" between the Eligibility Clause and the Bar Clause. *See Braeburn Inc. v. FDA*, 389 F. Supp. 3d 1, 24 (D.D.C. 2019); *Veloxis Pharm., Inc. v. FDA*, 109 F. Supp. 3d 104, 120-21 (D.D.C. 2015); *AstraZeneca Pharm. LP v. FDA*, 972 F. Supp. 2d 60, 79 (D.D.C. 2012), *aff'd* 713 F.3d 1134 (D.C. Cir. 2013).

### III. FDA's Reliance on the BREEZE Study to Approve Tyvaso DPI

On May 23, 2022, FDA approved United Therapeutics' (UTC's) new drug application for Tyvaso DPI. FDA-000505, 527. Tyvaso DPI contains the active moiety treprostinil and is approved, in relevant part, for the treatment of pulmonary arterial hypertension (PAH) and pulmonary hypertension associated with interstitial lung disease (PH-ILD) to improve exercise ability. FDA-000424. Tyvaso DPI is an inhalation powder, a dosage form distinct from UTC's earlier-approved inhalation solution known as Tyvaso. *Id.*; *see also* FDA-00043.

---

[4] The regulations also define "conducted or sponsored by the applicant," a term not at issue in this case. 21 C.F.R. § 314.108(a).

UTC sought approval of Tyvaso DPI based on data from five studies in humans. FDA-000424-30. Two of these (the TRIUMPH I study and the INCREASE study) were incorporated by reference by UTC from its Tyvaso application. FDA-000424-25. Those studies did not involve the use of Tyvaso DPI inhalation powder. In addition, the Tyvaso DPI application included data from two single-dose studies of Tyvaso DPI in healthy subjects. One of these was a pivotal relative bioavailability study that justified extrapolation of the safety and effectiveness data from the TRIUMPH I and INCREASE studies to Tyvaso DPI. FDA-000425-26, 429-30.

The fifth study, known as the BREEZE study, evaluated the safety and tolerability[5] of Tyvaso DPI in PAH patients following multiple doses. FDA-000426-429. As FDA explained, the results of the BREEZE study "allow[ed] for adequate characterization of the safety profile [of Tyvaso DPI] and support[ed] a positive benefit risk profile consistent with approval." FDA-000434 (quoting Clinical/Decisional Memo at FDA-000921). The BREEZE study provided "essential data on '[p]atient tolerability [with multiple-dose use], as assessed by incidence of new adverse events following transition to Tyvaso DPI.'" FDA-000434-35 (quoting Tyvaso DPI labeling at FDA-000623). Among other things, the BREEZE study established THAT "the prevalence of adverse events with treprostinil inhaled powder was similar to the prevalence reported

---

[5] "Tolerability" refers to "the degree to which overt adverse effects can be tolerated by the subject." FDA-000433 n.71. The primary endpoint of the BREEZE study was safety and tolerability of Tyvaso DPI. FDA-000426. Secondary endpoints included 6-minute walking distance, PAH Symptoms and Impact Questionnaire, Preference Questionnaire for Inhaled Treprostinil Devices, and pharmacokinetics. *Id.*

in the TRIMUPH I study of treprostinil inhaled liquid formulation[.]" FDA-000434 (quoting Clinical Review at FDA-000882). This allowed FDA's Division of Cardiology and Nephrology ("Clinical Division") to conclude that the benefit/risk profile of the new dosage form for both the PAH and PH-ILD indications was acceptable. FDA-000435; *see also* FDA-000910; FDA-000913.

## IV. FDA's Exclusivity Decision

On August 14, 2024, FDA determined that Tyvaso DPI was eligible for 3-year exclusivity based on the BREEZE study. FDA-000505-510 (signed Orange Book Exclusivity Eligibility Evaluation). On August 16, 2024, FDA determined that approval of Liquidia's inhalation powder treprostinil drug, Yutrepia, was barred by that exclusivity until May 23, 2025. FDA-001292-1330 (Tentative Approval Letter).

These determinations followed a process in which multiple components of the agency's Center for Drug Evaluation and Research ("Center") worked together to evaluate the exclusivity issues raised with respect to the Tyvaso DPI application. At the time of Tyvaso DPI's approval, staff from the Clinical Division completed the Original Exclusivity Form, which indicated a preliminary assessment against exclusivity. FDA-000453-459. Liquidia sent letters to the Center's Exclusivity Board on July 15, 2021, and July 25, 2022, requesting that FDA deny or limit 3-year exclusivity for Tyvaso DPI. FDA-000001-412. The Exclusivity Board oversees and provides recommendations on certain exclusivity determinations. FDA, CDER Exclusivity Board, https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/cder-exclusivity-board.

After consulting the Clinical Division and reviewing the approval of Tyvaso DPI and Liquidia's letters, the Exclusivity Board recommended that exclusivity be recognized for Tyvaso DPI and that the Yutrepia application be blocked from final approval. FDA-000460-497. The Exclusivity Board detailed its recommendations and analysis in its Exclusivity Memorandum, *id.*, which the Office of Generic Drug Policy and the Clinical Division adopted. FDA-000413-452; FDA-000505-562. FDA conveyed its reasoning to Liquidia in an August 16, 2024, explanatory letter, FDA-000413-452, which was materially identical to the Exclusivity Board's Memorandum, FDA-000460-497.

*First*, FDA explained that the BREEZE study qualified as a "clinical investigation[] (other than [a] bioavailability stud[y])." FDA-000431-432. That was so, FDA explained, because the BREEZE study "was an experiment in which a drug was administered or dispensed to, or used on, human subjects," and it "specifically evaluated the safety and tolerability of Tyvaso DPI," which was the primary endpoint of the study. FDA-000432.

*Second*, FDA determined that the BREEZE study was a "*new* clinical investigation." *Id.* The agency explained that the BREEZE study (1) had not been relied upon by FDA to demonstrate substantial evidence of effectiveness of a previously approved drug product for any indication or of safety for a new patient population, and (2) did not duplicate the results of another study that was relied upon by the agency to demonstrate the effectiveness or safety in a new patient population of a previously approved drug product. *Id.*

10

FDA also addressed arguments raised by Liquidia in its two letters to the agency, including, among other things, that the BREEZE study was a "general safety study" that was not "the type of safety study that qualifies for three-year exclusivity." FDA-000007, 10; *see also* FDA-000285-87. Specifically, Liquidia had argued that a "general safety study" cannot be eligible for exclusivity unless it either permits broader use of a drug or establishes safety for a new patient population. FDA-000008 (citing 54 Fed. Reg 28872, 28899 (July 10, 1989)). FDA explained, however, that "even assuming" this were the case, "the BREEZE study is not such a general safety study." FDA-000436 n.87. Rather, it "specifically evaluated the tolerability in patients of multiple doses of treprostinil in an inhalation powder dosage form and *permitted broader use* of treprostinil through the approval of this new dosage form." *Id.* (emphasis added); FDA-000438 ("Liquidia's argument that the BREEZE study was a 'general safety' study that did not permit broader use of treprostinil is incorrect.").

*Third*, and in a similar vein, FDA explained that it determined that the BREEZE study was "essential to approval." FDA-000432-35, 38-40. Specifically, FDA stated that the BREEZE study "provided vital data on safety and tolerability beyond single-dose use in patients to support the finding of safety for the inhalation powder dosage form of treprostinil." FDA-000433. Indeed, "[w]ithout the BREEZE study, the Clinical Division would not have had sufficient information regarding the safety and tolerability of multiple doses of the new dosage form of treprostinil to support approval." FDA-000435. Because that study addressed a "specific safety question" and "was a vital piece of the data package" for Tyvaso DPI's approval, FDA found that it "was not 'merely

supportive'" (as Liquidia had argued). FDA-000439. Rather, "it was, in fact, needed for approval." *Id.*

*Fourth*, FDA determined that the innovative change for which the BREEZE study was essential was "the inhalation powder dosage form for the active moiety treprostinil for chronic use." FDA-000442. Since the Yutrepia new drug application seeks approval for that exclusivity-protected condition of approval, FDA concluded that it is within the scope of the Bar Clause. FDA-000450. In so concluding, FDA addressed other arguments that Liquidia had made in its letters. FDA-000443-450. These include arguments that, based on agency precedent, the scope of exclusivity should be limited to PAH patients who switch from Tyvaso, as well as to Tyvaso DPI's specific formulation containing the excipient fumaryl diketopiperazine (FDKP). *Id.* FDA explained that agency precedent did not compel these conclusions. *Id.*

## LEGAL STANDARD

The Court must grant summary judgment to an agency in an APA case unless, based on the Court's review of the administrative record, *Camp v. Pitts*, 411 U.S. 138, 142 (1973), it finds that the challenged agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory . . . authority," *id.* § 706(2)(C). *See Coal. for Common Sense in Gov't Procurement v. United States*, 821 F. Supp. 2d 275, 280 (D.D.C. 2011). "In analyzing the FDA's decision, [the court] 'must be careful not to unduly second-guess an agency's scientific judgments,' and will affirm the FDA's decision so long as it is reasonable and

reasonably explained.'" *Ipsen Biopharmaceuticals, Inc. v. Becerra*, 108 F.4th 836, 840 (D.C. Cir. 2024) (quoting *Cytori Therapeutics, Inc. v. FDA*, 715 F.3d 922, 923 (D.C. Cir. 2013)).

The reviewing court may not "substitute its judgment for that of the agency," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), but must uphold the agency's action if it is "rational, based upon consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained its decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Moreover, an agency's interpretation of a statute "may be especially informative to the extent it rests on factual premises within the agency's expertise." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2247 (2024) (cleaned up).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "To warrant preliminary injunctive relief, the moving party must show (1) substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). A preliminary injunction "should not be granted unless the movant, *by a clear showing*,

carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original).

**ARGUMENT**

### I.    FDA Is Entitled To Summary Judgment

As set out above, FDA determined that Tyvaso DPI is eligible for 3-year exclusivity because the BREEZE study was a (1) "new" (2) "clinical investigation[] (other than a bioavailability stud[y]" that was (3) "essential to the approval" of the Tyvaso DPI application.[6] And FDA determined that this period of exclusivity bars approval of Yutrepia until May 23, 2025, because Yutrepia is a proposed inhalation powder form of treprostinil for chronic use—the innovation represented by Tyvaso DPI's approval for which the BREEZE study was essential. In making those determinations, FDA "acted within a zone of reasonableness and, in particular . . . reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 141 S. Ct. at 1158. The APA requires no more. Liquidia's attacks on FDA's decision-making, *see* ECF No. 32-1 (Pl. Mem.), are without merit.

### A.    FDA did not change its exclusivity determination

Liquidia mistakenly contends that FDA reversed its position on exclusivity without explanation (Pl. Mem. 1, 15, 16, 24-25, 27). But Liquidia relies on the incorrect assumption that the Exclusivity Summary form is an FDA decision on exclusivity. As

---

[6] FDA also determined that the "new clinical investigation[] (other than a bioavailability stud[y])" that was "essential to the approval of the application" was "conducted or sponsored by the applicant." FDA-000435. As noted *supra* in note 4, this element is not at issue in this case.

14

explained below, it is not. The FDA component that ultimately made the agency's exclusivity eligibility determination was the Office of Generic Drug Policy, FDA-000505-562, and the first (and only) determination by the agency regarding eligibility for 3-year exclusivity occurred in August 2024.

To be sure, at the time of approval of the Tyvaso DPI application, staff from the Clinical Division completed the Original Exclusivity Summary form, with checked boxes indicating an initial assessment of no exclusivity. FDA-000453-59. That Exclusivity Summary, like every exclusivity summary prepared by a review division in the Office of New Drugs, was simply a tool intended to assist the agency in its exclusivity determination.

Before a final determination on exclusivity was made, several other agency components provided input to the Office of Generic Drug Policy. The Exclusivity Board consulted with the Clinical Division, reviewed the administrative record related to the approval of Tyvaso DPI, and carefully considered the arguments raised by Liquidia in its letters to the Exclusivity Board. *Id*. In a 38-page memorandum, the Exclusivity Board recommended that the agency recognize 3-year exclusivity for Tyvaso DPI and that the 3-year exclusivity delay the approval of Yutrepia until the expiration of that exclusivity. *Id*. The Clinical Division agreed with the Exclusivity Board and completed a

Superseding Exclusivity Summary consistent with the recommendations in the Exclusivity Board memorandum. FDA-000498-504.[7]

Staff from the Orange Book Division, taking into account the Superseding Exclusivity Summary form and the Exclusivity Board memorandum, recommended that 3-year exclusivity be recognized for Tyvaso DPI. FDA-000505-510. A final determination on exclusivity eligibility with respect to Tyvaso DPI was made by the Office of Generic Drug Policy on August 14, 2024, when its Director signed the Orange Book's Exclusivity Eligibility Evaluation. FDA-000506. So the premise of Liquidia's argument—that the Clinical Division's Original Exclusivity Summary was an agency determination—is wrong.

## B. FDA correctly determined the BREEZE study is a "clinical investigation (other than a bioavailability study)"

FDA reasonably determined that the BREEZE study is a "clinical investigation (other than a bioavailability study)." Liquidia does not dispute that the BREEZE study was an "experiment . . . in which a drug is administered or dispensed to, or used on, human subjects." 21 C.F.R. § 314.108(a). But it argues that the BREEZE study was a "bioavailability study" because one of its secondary endpoints was pharmacokinetics. Pl. Mem. 2, 22-25.

As an initial matter, Liquidia is precluded from making this argument because it took the opposite position before the agency. In its July 15, 2021 letter, Liquidia argued

---

[7] *See* FDA-000498 ("This Exclusivity Summary supersedes the original one dated May 23, 2022, and reflects the Division's agreement with the recommendations in the CDER Exclusivity Board memorandum dated August 13, 2024, on Tyvaso DPI.").

that another study—not the BREEZE study—was a "bioavailability study" because its "primary objective" was to study bioavailability. FDA-000008. By contrast, Liquidia argued that the BREEZE study was a "general safety" study because its "primary objective" was "to evaluate the safety and tolerability of Tyvaso DPI." *Id.* Liquidia did not argue that the BREEZE study was a bioavailability study based on its secondary pharmacokinetics endpoint. Instead, Liquidia argued that, in a prior exclusivity determination, the agency had treat[ed] "secondary endpoints" as "irrelevant." FDA-000010. And it urged FDA to apply this same analysis to Tyvaso DPI. *Id.*

But in a reversal, Liquidia now argues that the BREEZE study's secondary endpoint (far from being "irrelevant") makes it a "bioavailability study." Pl. Mem. 22-25. Having conceded the conclusion it now calls error, Liquidia cannot challenge it here. A litigant who argues one thing before the agency cannot do an "about-face" and argue the opposite when it challenges the agency's decision in court. *Del. Dep't of Nat. Res. & Envmtl. Control v. EPA*, 895 F.3d 90, 96 (D.C. Cir. 2018) (citing *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882 (D.C. Cir. 2006)); *see also S. Pac. Transp. Co. v. ICC*, 69 F.3d 583, 588 (D.C. Cir. 1995). This principle of administrative law is necessary to ensure that the court's role in APA cases is properly confined to that of an "appellate tribunal" reviewing the decision of a lower tribunal. *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 46 n.1 (D.C. Cir. 2013) (*per curiam*); *cf. Archiocese of Wash. v. Wash. Metropolitan Area Transit Auth.*, 897 F.3d 314, 322 (D.C. Cir. 2018) (noting that the "the usual practice" is that "concessions" before the lower tribunal are "waived for the purposes of review").

In any event, FDA's identification of the BREEZE study as a "clinical investigation[] (other than [a] bioavailability stud[y])" is correct and should be sustained. Liquidia does not purport to challenge FDA's regulatory definitions of "clinical investigation" and "bioavailability study." *See* Pl. Mem. 7 (citing FDA definitions), 22 (invoking FDA's definition of "clinical investigation"). Under those definitions, a study qualifies as a clinical investigation other than a bioavailability study if it is "an[] experiment other than a [study *to determine* the bioavailability or the pharmacokinetics of a drug] in which a drug is administered or dispensed to, or used on, human subjects." 21 C.F.R. § 314.108(a) (emphasis added). The italicized infinitive "to determine" requires FDA to look to the *purpose* or *purposes* of a study. *See Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 668-69 (2008) (explaining that "to get" conveys a "purpose" of getting). Thus, a study with a purpose "other than"—that is, besides, *see* "Other than," Merriam-Webster, https://perma.cc/3VFK-Z29P—measuring bioavailability or pharmacokinetics may qualify as a clinical investigation other than a bioavailability study. In other words, the mere inclusion of bioavailability data in a study is not dispositive of whether it is a clinical investigation (other than a bioavailability study." *See*, *e.g.*, FDA-001199 & n.60 (explaining that a study that measured pharmacokinetics was "other than a bioavailability study" because it featured a clinical endpoint intended to measure abuse potential).

FDA also reasonably and appropriately applied its interpretation here. As the agency explained, the BREEZE study—consistent with its primary endpoints—"specifically evaluated the safety and tolerability of Tyvaso DPI," and thus was "an

investigation *other than a bioavailability study*."[8] FDA-000432. FDA recommended the BREEZE study for the purpose of obtaining data on tolerability with multiple-dose use, as assessed by the incidence of new adverse events following transition from Tyvaso to Tyvaso DPI. FDA-000433-34; FDA-000691. Because no other study provided such data, FDA needed these data for approval. On the other hand, the pharmacokinetics of Tyvaso DPI were evaluated in two single-dose studies of Tyvaso DPI in healthy subjects, including the pivotal relative bioavailability study. *See* FDA-000425-26; FDA-000429-30.[9] Thus, consistent with prior FDA precedent, *see* FDA-001199 & n.60, the BREEZE study was a clinical investigation (other than a bioavailability study), and its inclusion of bioavailability data did not change that fact. Contrary to Liquidia's arguments (Pl. Mem. 23-24, 25), FDA's description of the BREEZE study as not "solely a bioavailability study" was therefore consistent with the statute: it highlighted that the BREEZE study's assessment of safety and tolerability made the BREEZE study a clinical investigation "other than" a bioavailability study.

---

[8] As FDA also noted, the BREEZE study's secondary endpoints included 6-minute walking distance, PAH-Symptoms and Impact Questionnaire, and Preference Questionnaire for Inhaled Treprostinil Devices. FDA-000432.

[9] Liquidia wrongly contends that FDA's determination that the BREEZE study was a new clinical investigation other than a bioavailability study was "inconsistent with its treatment of [the pivotal relative bioavailability study (TIP-PH-102)]." Pl. Mem. 25. But FDA did not take an inconsistent position. Indeed, FDA expressly declined to address Liquidia's letter argument to the agency that Study TIP-PH-102 was a bioavailability study. FDA-000436 n.86. It was not necessary to address this argument because FDA determined that the Tyvaso DPI application included at least one new clinical investigation (the BREEZE study) that was essential to approval of the application. *See id.*

In contrast to FDA's reasonable approach, Liquidia proposes an interpretation of "clinical investigation (other than a bioavailability study)" that is untenable and unsupported. According to Liquidia, "if a study evaluates the absorption of a drug's active moiety, the study is a bioavailability study," Pl. Mem. 23, regardless of what else the study assessed or demonstrated. Even a study relied on to establish substantial evidence of effectiveness would fail to qualify for exclusivity under Liquidia's interpretation if it included any pharmacokinetic measurements. Liquidia never explains why a study that has a purpose *other than* measuring bioavailability cannot be "other than [a] bioavailability stud[y]."

Liquidia's novel interpretation would also be contrary to the protection of public health. For instance, to preserve their eligibility for exclusivity, sponsors might study pharmacokinetics only in separate studies. This, in turn, would result in additional, unnecessary testing on human subjects in direct contravention of FDA regulations. 21 C.F.R. § 320.25(a)(1) ("The basic principle in an in vivo bioavailability study is that no unnecessary human research should be done."). Liquidia fails to explain why Congress would have wanted this result or why the language of the statute requires it.

### C.  Liquidia misunderstands the role of the BREEZE study

FDA correctly determined that the BREEZE study was a "new clinical investigation" that was "essential to approval" of Tyvaso DPI. FDA-000432-433. Prior to approval of the Tyvaso DPI application, the BREEZE study had not been relied upon by the agency to demonstrate substantial evidence of effectiveness of a previously approved drug product for any indication or of safety for a new patient population.

FDA-000432. Nor did the BREEZE study duplicate the results of another study that was relied upon by the agency to demonstrate the effectiveness or safety in a new patient population of a previously approved drug product. FDA-000433. The BREEZE study involved 51 patients with PAH who switched from a stable regimen of Tyvaso to a corresponding dose of Tyvaso DPI for three weeks (or more, if they entered an optional extension phase, as most did[10]). FDA-000427. As FDA explained, the "results of the BREEZE study provided assurance that there was no significant change in safety or tolerability with the new inhalation powder dosage form as compared to [the] approved inhalation solution (Tyvaso)." FDA-000439. This assurance "was not available from any other source, and it was an essential part of determining that Tyvaso DPI met the approval standard and that a positive benefit/risk profile existed." *Id*.

As set forth below, Liquidia mistakenly contends that the BREEZE study is not a "*new* clinical investigation" and was not "essential to approval" of Tyvaso DPI. But Liquidia relies on the incorrect premise that the BREEZE study did not provide any new and vital safety information, which the agency adequately refuted.

*First*, Liquidia argues that the BREEZE study does not meet the regulatory definition of "new clinical investigation" because it "duplicate[s] the results of" investigations used to establish the safety of Tyvaso and Afrezza, an inhalation powder

---

[10] After the three weeks, patients were offered the opportunity to continue using Tyvaso DPI in the optional extension phase of the study. FDA-000427. If they did not enter this phase, the patients could resume Tyvaso therapy and were required to return to the clinic two weeks later for an end-of-study visit. *Id*. Forty-nine of the 51 patients in the BREEZE study participated in the optional extension phase of the study, during which they attended follow-up study visits every 8 weeks. FDA-000623; FDA-000427.

form of insulin. Pl. Mem. 26-27. Not so. As FDA explained, the "specific safety question" that the BREEZE study addressed was "the tolerability of multiple doses daily of *treprostinil in the new inhalation powder dosage form* to support approval for chronic use." FDA-000435 (emphasis added). The Tyvaso studies did not address that question because they did not involve the use of an inhalation powder. The Afrezza studies did not address that question because they did not involve the use of treprostinil.[11] The BREEZE study—and only the BREEZE study—provided data on multiple-dose use of treprostinil inhalation powder that was necessary to support approval. FDA-000435.

*Second*, Liquidia argues that "longstanding policy" requires finding that the BREEZE study is not a "new clinical investigation." Pl. Mem. 27-29. This is so, according to Liquidia, because the BREEZE study did not involve (and Tyvaso DPI's labeling does not cover) a "new patient population." Pl. Mem. 28-29. But the alleged policy that Liquidia relies on contemplates recognizing exclusivity for studies that "permit a broader use of the drug," *see* Pl. Mem. 28 (citing 54 Fed. Reg. 28872, 28899 (July 10, 1989)), and FDA found that the BREEZE study "permitted broader use of treprostinil" by supporting the approval of a new dosage form. FDA-000436 n.87; FDA-000437 ("Here, Tyvaso DPI represented an additional treatment option for patients, thus

---

[11] As Liquidia notes, Afrezza contains the excipient FDKP. While Tyvaso DPI also contains FDKP, FDA did not consider the BREEZE study as necessary to establish the safety of that excipient.

permitting broader use of the drug."). Liquidia fails to demonstrate how FDA's determination was incorrect.

*Third*, Liquidia argues that the BREEZE study was not "essential to approval" because the Tyvaso studies "had already established the safety and efficacy essential to FDA approval" of Tyvaso DPI. Pl. Mem. 30. This is simply another version of Liquidia's argument that the BREEZE study simply "duplicated" results of the Tyvaso studies, and it fails for similar reasons. As FDA explained, the BREEZE study provided information that was "not available from any other source" by "address[ing] an important safety question, specifically the tolerability of the inhalation powder dosage form of treprostinil." FDA-000439. As discussed above, the Tyvaso studies did not study treprostinil inhalation powder.

Moreover, Liquidia's argument is in tension with its own apparent position about the role of the tolerability data in the Yutrepia application. The Yutrepia application relies on the findings of safety and effectiveness for Tyvaso. FDA-000430. Liquidia notes that it also "relied on . . . the tolerability results from Liquidia's INSPIRE study," a study that was similar in many respects to the BREEZE study.[12]  *See* Pl. Mem. 32 n.22. Thus, Liquidia appears to, on the one hand, suggest that tolerability data were needed for the Yutrepia application despite its reliance on Tyvaso. Yet it simultaneously contends that the BREEZE study's tolerability data were not essential to approval

---

[12] Liquidia describes the INSPIRE study as a "clinical investigation[]" "whose primary objective was to assess the safety and tolerability of Yutrepia in patients naïve to prostacyclin therapy and patients transitioning from stable doses of Tyvaso to Yutrepia." Pl. Mem. 12.

because "UTC had already established the safety and efficacy essential to FDA approval [of Tyvaso DPI] with TRIUMPH and INCREASE—the same studies on which FDA relied to approve Tyvaso." *See* Pl. Mem. 30.

*Fourth*, Liquidia contends that the BREEZE study could not have been essential to approval of the PH-ILD indication or to approval for chronic use because the BREEZE study was a short-term study involving only PAH patients. Pl. Mem. 30, 32. As FDA explained, "a particular clinical investigation may be more limited in scope or more specific than the conclusions . . . that can be drawn from it." FDA-000447. Thus "a drug studied in very specific conditions might be approved with a broader indication and not limited to those conditions under which it happened to be studied." *Id.*; *see also* FDA-990 ("In some cases, FDA's expert reviewers may fairly and responsibly conclude, based on their scientific training and experience, that the available evidence supports approval of an indication that is broader or narrower in scope than the precise population studied.").

Here, FDA explained that it viewed the safety and tolerability results of the BREEZE study as essential to the approval of the inhalation powder dosage form of treprostinil, including for use by PH-ILD patients. FDA-000447 ("Based on data from the BREEZE study . . . FDA approved Tyvaso DPI, the first approved treprostinil inhalation powder, for treatment of both PAH and PH-ILD patients . . . ."); *see also, e.g.*, FDA-000592 ("FDA has determined that the safety data in BREEZE supports the safety of Tyvaso DPI in patients with PH-ILD (WHO Group 3) and that no further data collection is needed to characterize potential pulmonary risks within this population.").

24

Liquidia's assertion that the BREEZE study "did not study safety and tolerability of this [dosage] form for 'chronic use'" is also misplaced. *See* Pl. Mem. 32. Based on data from the BREEZE study, Tyvaso DPI was approved for two indications, both of which involve the chronic use of treprostinil. Because the BREEZE study was needed to approve the new inhalation powder dosage form for any indication or use, it was essential to the approval of both indications and for chronic use.[13] In addition, FDA is especially suited to determine what conclusions can be extrapolated from the BREEZE study results, and its conclusions are entitled to deference. *See, e.g.*, *Henley v. FDA*, 77 F.3d 616, 621 (2d Cir. 1996) ("FDA possesses the requisite know-how to conduct such [scientific] analyses, by sifting through the scientific evidence . . . .").

*Fifth*, Liquidia argues that "the record in fact contradicts FDA's novel assertions that it had purported safety concerns that required it to rely on the results of the BREEZE study to grant approval." Pl. Mem. 31. Quite the opposite. As FDA explained, treprostinil is known to present tolerability concerns, including when inhaled.[14] FDA-000433. The Clinical Division "was concerned that the inhalation powder dosage form

---

[13] Moreover, as noted in Tyvaso DPI's approved labeling, Section 6.1: "The safety of Tyvaso DPI was also studied in an extension phase of the [BREEZE] study in which 49 patients were dosed for a duration of 43 patient-years. Fifty-nine percent (59%) of patients achieved a dose of 64 mcg, 4 times daily or higher. The adverse events during this long-term, extension phase were similar to those observed in the 3-week treatment phase."

[14] For example, Tyvaso's labeling discloses that in the TRIUMPH I study, 54% of patients who received Tyvaso inhalation solution experienced coughing. The same study showed that 41% of such patients had headaches, 25% had throat irritation or pharyngolaryngeal pain, and 19% had nausea. FDA-000433; FDA-000640.

could present new or worse tolerability issues than those observed with Tyvaso and other approved treprostinil products." *Id.* For example, in theory, "an inhalation powder might present a risk of getting stuck in the throat or might cause a sensation of something stuck in the throat." *Id.* Because of this concern, the Clinical Division "did not believe" that relying on single-dose experience studies in healthy subjects "was adequate to assess safety and tolerability of the new inhalation powder for chronic use, regardless of whether the product was found to provide similar bioavailability to the approved Tyvaso inhalation solution." *Id.*

Indeed, during Tyvaso DPI's development phase, the Agency was asked whether showing comparable pharmacokinetics between treprostinil inhalation powder and Tyvaso would be "sufficient for approval." FDA-000690. In response, the Agency recommended that the sponsor conduct a safety and tolerability study *in addition to* the relative bioavailability assessment and a single-ascending dose study in which patients would receive "repeat doses" of treprostinil inhalation powder. FDA-000691. Consistent with that recommendation, the sponsor conducted the BREEZE study. Thus, the Clinical/Decisional Memorandum accompanying Tyvaso DPI's approval notes that the BREEZE study "allow[ed] for adequate characterization of the safety profile," thus indicating that it would not have been possible to adequately characterize the safety profile without the BREEZE study. FDA-000921.

*Sixth*, in a footnote, Liquidia suggests that Tyvaso DPI should not be entitled to exclusivity because Liquidia submitted its Yutrepia NDA before UTC submitted the Tyvaso DPI NDA, and FDA tentatively approved Yutrepia for PAH before it gave final

approval to Tyvaso DPI. Pl. Mem. 32 n.22. But Liquidia's argument ignores the regulatory meaning of tentative approval[15]—a tentative approval is not an approval— and it does not explain how Yutrepia's *tentative* approval makes the BREEZE study any less essential to approval of Tyvaso DPI.

### D. Yutrepia is within the scope of exclusivity

Turning from eligibility to scope, the agency correctly determined that the innovation represented by Tyvaso DPI for which the BREEZE study was essential was the inhalation powder dosage form, which was approved for both the PAH and PH-ILD indications. FDA-000442. FDA explained that although the BREEZE study involved only PAH patients, that did not mean exclusivity was limited only to that patient population. FDA-00447. Without the BREEZE study, Tyvaso DPI could not have been approved for *either* indication. FDA-000448. Thus, the scope of exclusivity properly encompassed the PH-ILD as well as the PAH indication.

Liquidia agrees with FDA that the "conditions of approval" that define the scope of exclusivity for Tyvaso DPI are the "innovative change" for which the BREEZE study was essential. Pl. Mem. 35 ("[T]he scope of any [3-year] exclusivity is limited to the innovative change presented by the new clinical investigation necessary for approval of the NDA."); *accord* FDA-000418 (noting "FDA's view that conditions of approval for the

---

[15] "Tentative approval" is defined in the regulations at 314.3(b). The definition specifically notes that "[a] drug product that is granted tentative approval is not an approved drug and will not be approved until FDA issues an approval letter after any necessary additional review of the NDA or ANDA." 21 C.F.R. § 314.3(b); *see also* FDA-001258 ("Until we issue a final approval letter, this NDA is <u>not</u> approved.") (emphasis in original).

purposes of 3-year exclusivity means the innovative change for which new clinical investigations are essential to approval"). Liquidia spends several pages of its brief trying to manufacture a dispute about this point. Pl. Mem. 34-36. But, in truth, there is no daylight between the parties as to the meaning of "conditions of approval."

Liquidia's *real* objection is that it disagrees with FDA's determination that the relevant "innovative change" was "the inhalation powder dosage form for the active moiety treprostinil for chronic use." FDA-000442. Liquidia attacks that determination for failing to limit the scope of exclusivity to (1) drugs for the treatment of PAH, Pl. Mem. 37-39, and (2) drugs containing Tyvaso DPI's specific formulation including FDKP, Pl. Mem. 39-41. Neither contention has merit.

*First*, agency precedent does not support Liquidia's contention that exclusivity must be limited to the exact conditions of the new clinical investigation. In the Veloxis matter, FDA concluded the sponsor "did not obtain approval of Astagraf XL in conversion patients and its exclusivity thus cannot extend to block approval for this population." FDA-001164. In other words, as FDA explained to Liquidia, FDA found only that Astagraf's exclusivity did not extend to an indication for which Astagraf was *not* approved. FDA-000448. But Tyvaso DPI *is* approved for PH-ILD, a distinction Liquidia simply ignores.

In the MorphaBond precedent, FDA made a highly fact-bound determination that exclusivity was limited to labeling describing certain properties of the drug, which were intended to deter drug abuse. Specifically, based on a study that "demonstrated that MorphaBond has physiochemical properties that are expected to reduce abuse by

28

the intranasal route of administration," FDA approved labeling describing deterrence by that route. FDA-001188. Because that study could not support claims about other routes of administration, FDA found that exclusivity did not extend to deterrence more generally. FDA-01200-01. It does not follow, however, that *no* study can *ever* support *any* conclusion beyond the precise conditions of the study.

*Second*, Liquidia's contention that exclusivity must be limited to Tyvaso DPI's specific formulation containing FDKP is equally unsupported. Liquidia itself asserts that "the excipient FDKP that allows Tyvaso DPI's dry powder formulation to exist . . . is not an innovation that BREEZE studied, but rather was an innovation already known to FDA through the approval process for Afrezza." Pl. Mem. 33; *see also* FDA-000288 (July 25, 2022 letter to FDA in which Liquidia similarly asserted that "the BREEZE study was not 'essential' for demonstrating the safety of [FDKP]").[16] Liquidia's apparent argument that the scope of Tyvaso DPI's exclusivity should be limited to an "innovation" supported by a different drug defies logic. *See* FDA-000419 ("Exclusivity does not cover aspects of the drug product for which new clinical investigations were not essential.").

In any event, FDA reasonably explained why the scope of exclusivity was not limited to Tyvaso DPI's specific formulation containing FDKP and rejected Liquidia's arguments for limiting the scope based on agency precedent. FDA-000444-47, 448-49.

---

[16] Contrary to Liquidia's misconstruction, FDA did not say that it "considered the safety issues posed by FDKP merely because of Liquidia's citizen petition." Pl. Mem. 40. Rather, FDA explained that it took certain specific actions in response to that citizen petition. FDA-000445-46.

Liquidia nevertheless contends that FDA's Dyanavel precedent requires limiting a drug's 3-year exclusivity to its specific formulation. Pl. Mem. 29-40. But the Dyanvel precedent provides no support for a broad rule that exclusivity is necessarily limited to a specific formulation. As FDA explained in that precedent, the "scope of exclusivity is, by definition, context-specific." FDA-000446. With Dyavanel, the specific characteristics of the drug required a demonstration that the drug's formulation and associated release profile provided clinical efficacy throughout the day. *Id.* But the agency had no similar concern about Tyvaso DPI's formulation. Rather, what was needed for Tyvaso DPI was a demonstration that "treprostinil administered as an inhalation powder is safe and tolerable for chronic use." FDA-000446-47.

Indeed, agency precedent cuts squarely against Liquidia. In the MorphaBond precedent, FDA considered whether exclusivity should be "limited to the specific formulation" in MorphaBond. FDA-001201. It declined to do so, reasoning that a "specific-formulation . . . scope of exclusivity would be inconsistent with the scope of" the relevant new clinical investigation. *Id.* Similarly, here, a "specific-formulation" scope of exclusivity would be inconsistent with the innovation supported by the BREEZE study.

## II.  Liquidia Is Not Entitled To An Injunction

For the reasons set forth above, Liquidia's claims fail on the merits. It is therefore entitled to no relief. If the Court believes, however, that FDA erred in any respect, it should simply identify that error and remand the matter to the agency. It should not grant Liquidia's request for injunctive relief.

## A.  Relief (if any) should be limited to the normal APA remedy

"Usually, where a district court reviews agency action under the APA, it acts as an appellate tribunal, so the appropriate remedy for a violation is 'simply to identify a legal error and then remand to the agency.'" *Hill Dermaceuticals*, 709 F.3d a 46 n.1 (quoting *Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013)). On remand, the agency may take "further action consistent with the corrected legal standards," *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995), including by exercising its "prerogative . . . to decide in the first instance how best to provide relief" from whatever error the Court identifies, *Bennett*, 703 F.3d at 589.

In contrast to this usual remedy, enjoining agency action is "anomalous." *N. Air Cargo, v. USPS*, 674 F.3d 852, 861 (D.C. Cir. 2012); *see also Hill Dermaceuticals*, 709 F.3d at 46 n.1 ("[A]ny such injunction would need to be limited only to vacating the unlawful agency action, not to precluding future agency decisionmaking); *Am. Hosp. Ass'n v. Azar*, 385 F. Supp.3d 1, 11 (D.D.C.) ("Injunctive relief is typically appropriate when there is only one rational course for the agency to follow upon remand.") (internal quotation marks and alteration omitted).

If the Court concludes FDA erred, it should follow the usual course and remand to the agency, without ordering any particular course of action. Then, with the benefit of this Court's opinion, FDA can consider once more whether Tyvaso DPI is eligible for 3-year exclusivity and, if so, whether that exclusivity blocks approval of Liquidia's application until the exclusivity expires on May 23, 2025.

Even if the Court's ruling is determinative regarding exclusivity, a remand would be necessary to allow FDA to assess whether all requirements for approval are met. While FDA tentatively approved Liquidia's application on August 16, 2024, that tentative approval was "based upon information available to the Agency at [that] time," such as the adequacy of manufacturing facilities, and "is subject to change on the basis of new information that may come to [the Agency's] attention."[17] Because time will have passed between FDA's tentative approval determination and any decision by the Court, the appropriate process would be for Liquidia to submit an amendment to its application requesting final approval, which FDA could then evaluate before granting final approval.[18]

### B.  Liquidia fails to satisfy the standards for a preliminary injunction

Nor has Liquidia demonstrated that it is entitled to the "extraordinary remedy" of a preliminary injunction. The "purpose" of that remedy "'is merely to preserve the relative positions of the parties until a trial on the merits can be held,'" *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (quoting *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)), "not to conclusively determine the rights of the parties," *Trump v. Int'l*

---

[17] FDA 001257-1291. As noted above, *supra* note 17, "[a] drug product that is granted tentative approval is not an approved drug and will not be approved until FDA issues an approval letter *after any necessary additional review of the NDA or ANDA*." 21 C.F.R. § 314.3(b) (emphasis added).

[18] The need for remand would be especially stark if the Court determined that the 3-year exclusivity for Tyvaso DPI does not block final approval of Yutrepia for the PH-ILD indication. To obtain approval for that indication, Liquidia would need to submit an amendment seeking approval of that indication only and proposing new labeling, which FDA would need to review before final approval.

*Refugee Assistance Project*, 582 U.S. 571, 580 (2017). But Liquidia's demand for immediate approval would obliterate the "relative position of the parties" and (as explained above) grant it *more* relief than would be entitled to if it prevailed on the merits.

Liquidia fails to meet its burden to "clear[ly] show[] that it will suffer irreparable harm absent a preliminary injunction. *Chaplaincy of Full Gospel Churches*, 454 at 207 (D.C. Cir. 2006). The D.C. Circuit's "high standard for irreparable injury" has two parts. *Id.* First, "the injury must 'must be both certain and great; it must be actual and not theoretical.'" *Id.* (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). Second, the injury must be "beyond remediation." *Id.*

Contrary to Liquidia's contention, its alleged economic injuries do not automatically satisfy this test because of the government's sovereign immunity. It must also show that "[t]he harm [Liquidia] will likely suffer is great." *Endo Par Innovation Co., LLC v. Becerra*, No. 24-cv-999-TJK, 2024 WL 2988904, at *8 (D.D.C. June 10, 2024) (Kelly, J.). Otherwise, "[a]ny movant that could show any damages against an agency with sovereign immunity—even as little as $1—would satisfy the standard." *Air Transport Ass'n of Am. v. Export-Import Bank of the United States*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012). Thus, "[m]onetary loss, even 'irretrievable' monetary loss, may constitute irreparable harm only if it is 'so severe as to cause extreme hardship to the business or threaten its very existence.'" *Mylan Labs. Ltd. v. FDA*, 910 F. Supp. 2d 299, 313 (D.D.C. 2012) (quoting *Hi-Tech Pharmacal Co., Inc. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008)).

Liquidia does not attempt to satisfy that standard. Nor could it. Its alleged economic harm stems from being unable to market Yutrepia, something it has never been permitted to do. Moreover, UTC's exclusivity will expire on May 25, 2025, and Liquidia has already agreed to a briefing schedule that culminates in oral argument on December 5, 2025. It gives no reason to think that the status quo will become unbearable sometime in that approximately five-and-a-half-month window.

Citing *Torpharm, Inc. v. Shalala*, No. 97-cv-1925-JR, 1997 WL 33472411 (D.D.C. Sept. 15, 1997), Liquidia argues that "permanent[] lo[ss] [of] the opportunity to market Yutrepia for at least nine months" is irreparable harm. Pl. Mem. 41. But *Torpharm* does not support that proposition. The irreparable harm claimed in that case was not simply an inability to market a product for a period of time, but the permanent loss of a competitive advantage over other companies that *would* be able to enter the market. *Torpharm*, 1997 WL 33472441, at* 4. Liquidia makes no such argument here.

Liquidia also fails to show that the balance of equities and public interest favor relief. In fact, in addition to contravening FDA's regulatory processes, ordering immediate approval of Liquidia's application would be inequitable and contrary to the public interest. That relief would deprive the agency of its "prerogative" to consider exclusivity on remand. *Bennett*, 703 F.3d at 589. In addition, it would improperly preclude any further review of Liquidia's application, as both the August 16, 2024

tentative approval letter and FDA's regulations contemplate.[19] *Hill Dermaceuticals*, 709 F.3d at 46 n.1 ("Any [preliminary] injunction would need to be limited only to vacating the unlawful action, not precluding future agency decisionmaking.").[20]

## CONCLUSION

The Court should grant FDA's cross-motion for summary judgment and deny Liquidia's motion for summary judgment, as well as its motion for a preliminary injunction. A proposed order accompanies FDA's cross-motion for summary judgment.

DATED: October 15, 2024                     Respectfully submitted,

                                            */s/ Noah T. Katzen*
                                            NOAH T. KATZEN (D.C. Bar. No.
                                            1006053)
                                            Trial Attorney
                                            Consumer Protection Branch
                                            Civil Division, Department of Justice
                                            P.O. Box 386
                                            Washington, DC 20044-0386
                                            (202) 305-2428
                                            (202) 514-8742 (fax)
                                            Noah.T.Katzen@usdoj.gov

---

[19] *See* 21 C.F.R. § 314.3(b) (noting in the definition of "Tentative approval" that "[a] drug product that is granted tentative approval is not an approved drug and will not be approved until FDA issues an approval letter *after any necessary additional review of the NDA or ANDA.*") (emphasis added).

[20] It is unclear whether Liquidia retains its alternative request, included in its original motion for a preliminary injunction, for a preliminary injunction remanding the case to the agency. ECF No. 13-1, at 44. If so, that relief is "inappropriate on a motion for preliminary injunction." *World Wildlife Fund v. Hodel*, No. 88-cv-1276, 1988 WL 66193, at *5 (D.D.C. June 17, 1988).

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the CM/ECF system, will be sent via electronic mail through that system to all counsel of record.

October 15, 2024                                    /s/ Noah T. Katzen
                                                    Noah T. Katzen