# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIQUIDIA TECHNOLOGIES, INC.,

        *Plaintiff,*

   v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, ROBERT M.
CALIFF, M.D., in his official capacity as
COMMISSIONER OF FOOD AND
DRUGS, UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES, XAVIER
BECERRA, in his official capacity as
SECRETARY OF HEALTH AND
HUMAN SERVICES,

        *Defendants*, and

UNITED THERAPEUTICS CORP.,

        *Intervenor-Defendant and
Cross-Claimant.*

**REDACTED**

No. 1:24-cv-2428-TJK

**Hearing Scheduled for
December 5, 2024, at 2 p.m.**

---

## UTC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO LIQUIDIA'S RENEWED MOTION FOR A PRELIMINARY INJUNCTION AND MOTION FOR SUMMARY JUDGMENT

Shaun R. Snader (D.C. Bar No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

Douglas Carsten (admitted *pro hac vice*)
Art Dykhuis (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

Adam W. Burrowbridge (D.C. Bar No. 1001783)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

William C. Jackson (D.C. Bar No. 475200)
William M. Jay (D.C. Bar No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20001
(202) 346-4000

Kurt R. Karst (D.C. Bar No. 482615)
Michael D. Shumsky (D.C. Bar No. 495078)
Sara Wexler Koblitz (D.C. Bar No. 1017284)
HYMAN, PHELPS & MCNAMARA, P.C.
700 13th Street, NW, Suite 1200
Washington, DC 20005
(202) 737-5600

*Counsel for United Therapeutics Corporation*
October 15, 2024

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................3

    I.       Statutory and Regulatory Framework ....................................................3

    II.     Factual Background ..............................................................................7

          A.     UTC develops novel treatments for pulmonary hypertension. .................. 7

          B.     FDA requires UTC to conduct a new clinical investigation to assess the safety and tolerability of treprostinil in a dry powder formulation, and then approves Tyvaso DPI based on that investigation. ........................................................................... 8

          C.     Liquidia files a 505(b)(2) application to market a treprostinil product in a dry powder dosage form, and then submits letters to FDA regarding UTC's potential three-year exclusivity for Tyvaso DPI. .................................................................................. 12

          D.     UTC and Liquidia engage in litigation related to Liquidia's 505(b)(2) application, including as to FDA's acceptance of Liquidia's amendment to add a new indication. ....................... 13

          E.     FDA determines that Tyvaso DPI is entitled to three-year exclusivity for the BREEZE study, blocking final approval of Liquidia's 505(b)(2) product....................................................... 14

          F.     The current litigation................................................................ 18

LEGAL STANDARDS .........................................................................................18

ARGUMENT .......................................................................................................20

    I.       FDA's Decision Should Be Upheld Because FDA Did Not Exceed Its Legal Authority in Finding That Tyvaso DPI Is Eligible for Exclusivity. ............20

          A.     FDA correctly determined that the BREEZE study is not an ineligible "bioavailability study" within the meaning of section 505(c)(3)(E)(iii). ................................................................... 20

          1.     Liquidia's contention that BREEZE was an ineligible "bioavailability study" has no basis in the FDCA or FDA regulations.................................................................... 21

          2.     FDA's decision was internally consistent and consistent with

agency precedent.................................................................................. 25

B.    The BREEZE study includes a report of a new clinical
       investigation........................................................................... 26

C.    The BREEZE study was essential to approval of Tyvaso DPI. ............... 31

1.    The BREEZE study was the sole source of data on which FDA
       relied to establish the safety and tolerability of the dry powder
       formulation of treprostinil........................................................ 31

2.    FDA's finding that BREEZE was essential for approval was not
       arbitrary or capricious. ............................................................ 32

D.    FDA's evaluation of the scope of Tyvaso DPI's conditions of
       approval rested on sound scientific judgment and is consistent with
       prior agency decisions............................................................... 36

1.    Liquidia identifies no basis to second-guess FDA's scientific
       judgment that BREEZE supports use of Tyvaso DPI in PAH and
       PH-ILD patients who are new to treprostinil inhalation. ..................... 37

2.    FDA reasonably exercised its scientific judgment in finding the
       scope of innovation for Tyvaso DPI is not limited to its specific
       chemical formulation. .............................................................. 40

II.    Liquidia Is Not Entitled to a Preliminary Injunction. ............................. 42

A.    Liquidia has not shown irreparable harm................................... 42

B.    The balance of hardships and public interest strongly disfavor an
       injunction. ........................................................................... 43

III.   Liquidia's Requested Relief Should Be Denied. .................................... 44

CONCLUSION.................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Air Transp. Ass'n v. Exp.-Imp. Bank*,
840 F. Supp. 2d 327 (D.D.C. 2012) ...................................................................43

*Apotex, Inc. v. FDA*,
2006 WL 1030151 (D.D.C. Apr. 19, 2006) *aff'd*, 449 F.3d 1249 (D.C. Cir.
2006) ...................................................................................................................43

*Astellas Pharma US, Inc. v. FDA*,
642 F. Supp. 2d 10 (D.D.C. 2009) ................................................................5, 40

*AstraZeneca Pharms. LP v. FDA*,
872 F. Supp. 2d 60 (D.D.C. 2012), *aff'd*, 713 F.3d 1134 (D.C. Cir. 2013) .....................29, 30

*Bayer HealthCare, LLC v. FDA*,
942 F. Supp. 2d 17 (D.D.C. 2013) ...................................................................44

*\*Braeburn Inc. v. FDA*,
389 F. Supp. 3d 1 (D.D.C. 2019) .................................................1, 38, 39, 40

*Calcutt v. FDIC*,
598 U.S. 623 (2023) ........................................................................................45

*Ctr. for Biological Diversity v. E.P.A.*,
749 F.3d 1079 (D.C. Cir. 2014) ......................................................................19

*Doe v. Rumsfeld*,
341 F. Supp. 2d 1 (D.D.C. 2004) .....................................................................34

*Fulbright v. McHugh*,
67 F. Supp. 3d 81 (D.D.C. 2014) ................................................................18, 19

*Gold Reserve Inc. v. Bolivarian Rep. of Venezuela*,
146 F. Supp. 3d 112 (D.D.C. 2015) .................................................................36

*Int'l Dark-Sky Ass'n v. FCC*,
106 F.4th 1206 (D.C. Cir. 2024) ......................................................................33

*ITServe All., Inc. v. Cissna*,
443 F. Supp. 3d 14 (D.D.C. 2020) ...................................................................30

*Kondapally v. U.S. Citizenship & Immigr. Servs.*,
2020 WL 5061735 (D.D.C. Aug. 27, 2020) .....................................................42

iii

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ...........................................................................................19

*Mova Pharm. Corp. v. Shalala,*
    140 F.3d 1060 (D.C. Cir. 1998) ........................................................................20, 43

*Mylan Labs. Ltd. v. FDA,*
    910 F. Supp. 2d 299 (D.D.C. 2012) ......................................................................43

*Otsuka Pharm. Co. v. Price,*
    869 F.3d 987 (D.C. Cir. 2017) .................................................................................5

*Pharm. Mfg. Rsch. Servs. v. FDA,*
    957 F.3d 254 (D.C. Cir. 2020) ........................................................................19, 28

*Policy & Rsch., LLC v. HHS,*
    313 F. Supp. 3d 62 (D.D.C. 2018) ........................................................................18

*Starbucks Corp. v. McKinney,*
    144 S. Ct. 1570 (2024) ...........................................................................................42

*Torpharm, Inc. v. Shalala,*
    1997 WL 33472411 (D.D.C. Sept. 15, 1997) .......................................................43

*Teva Pharms. USA v. FDA,*
    1999 WL 1042743 (D.D.C. Aug. 19, 1999) .........................................................45

*\*Veloxis Pharm., Inc. v. FDA,*
    109 F. Supp. 3d 104 (D.D.C. 2015) ...............................................4, 5, 6, 21, 38, 39

*Xiaomi Corp. v. Dep't of Defense,*
    2021 WL 950144 (D.D.C. Mar. 21, 2021) ...........................................................44

**STATUTES:**

5 U.S.C. § 706 ....................................................................................................................18

21 U.S.C. § 355(b)(1)(A) ......................................................................................................3

21 U.S.C. § 355(b)(2) ..............................................................................................3, 4, 12, 13

\*21 U.S.C. § 355(c)(3)(E)(iii) ..............................................2, 4, 20, 22, 23, 24, 26, 36

21 U.S.C. § 355(j)(2)(A) ........................................................................................................3

21 U.S.C. § 355(j)(5)(F)(iii) ..................................................................................................4

Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat.
    1585 (1984) (Hatch-Waxman Act) ........................................................................3

**REGULATIONS AND RULEMAKINGS:**

*21 C.F.R. § 314.108(a)................................................................5, 22, 23, 27, 31

54 Fed. Reg. 28,872 (1989) ................................................................5, 29

*59 Fed. Reg. 50,338 (1994) ................................................................27, 29

**OTHER AUTHORITIES:**

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
    § 2948.1 (3d ed. 2021) ................................................................44

FDA, *Draft Guidance: Multiple Endpoints In Clinical Trials Guidance For
    Industry*, 2017 WL 345609 (Jan. 2017) ................................................................22

HHS, *Endpoint*, toolkit.ncats.nih.gov/glossary/endpoint ................................................................23

# GLOSSARY

ANDA .................................................abbreviated new drug application

APA....................................................Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*

FDA....................................................Food and Drug Administration

FDCA .................................................Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq.

FDKP ................................................an excipient fumaryl diketopiperazine

Liquidia ..............................................Liquidia Technologies, Inc.

NCI....................................................new clinical investigation

NDA ..................................................new drug application

Liquidia Opening Brief. ....................Memorandum of Points and Authorities in Support of Liquidia Technologies, Inc.'s Renewed Motion for a Preliminary Injunction and Motion for Summary Judgment (ECF No. 32-1)

PAH....................................................pulmonary arterial hypertension

PH ......................................................pulmonary hypertension

PH-ILD ..............................................pulmonary hypertension associated with interstitial lung disease

UTC...................................................United Therapeutics Corporation

## INTRODUCTION

Pharmaceutical breakthroughs extend beyond discovery of brand-new molecules. Congress recognized that often discoveries involving an *existing* drug (whether for a new use or a new dosage form) can be a significant innovation. But those discoveries require clinical studies— and clinical studies require significant investment. So, to encourage industry to commit the necessary resources to discovering new uses and product forms, Congress offered a reward: if a manufacturer sponsors a clinical trial and, as a result, is the first company to win FDA approval for a safe, effective, and new use of an existing "active moiety" (roughly equivalent here to the active ingredient), the manufacturer qualifies for three years of limited market exclusivity. During that three-year period, no other company can use a shortcut application to obtain approval of a drug labeled for the same "conditions of approval." This exclusivity helps to "forestall" the "problem" of competitors "free riding" off the innovator's safety and efficacy investigations. *See Braeburn Inc. v. FDA*, 389 F. Supp. 3d 1, 7 (D.D.C. 2019).

Plaintiff Liquidia Technologies, Inc. (Liquidia) is the would-be free rider: it seeks to circumvent the statutory three-year exclusivity period and launch a product using a shortcut application. FDA correctly rejected Liquidia's arguments, which second-guess the agency's assessment of a clinical trial's design and significance. This Court should do the same.

The exclusivity here belongs to United Therapeutics Corp. (UTC), an innovator company whose clinical development efforts have resulted in multiple FDA approvals for use of the drug treprostinil. In 2009, UTC secured approval for an inhaled *solution* version of treprostinil, which requires a battery-powered nebulizer. When UTC later sought approval for a *dry powder* version, FDA advised that a bioavailability study—one establishing that the new product behaves similarly to the existing one in the human body—would not be enough. Rather, because of questions FDA had about the safety and tolerability of treprostinil in a new dosage form, FDA recommended

conducting, ██████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████    That is what UTC did.  Its

study, called BREEZE, had safety and tolerability as its primary endpoints.  BREEZE showed for

the first time that dry powder treprostinil was both safe and tolerable in sick patients.  FDA

approved UTC's dry-powder product—Tyvaso DPI—increasing patient access to treprostinil

through this more convenient dosage form.

The relevant statute confers three years of exclusivity upon approval of a new drug

application that "contains reports of new clinical investigations (other than bioavailability studies)

essential to the approval of the application."  21 U.S.C. § 355(c)(3)(E)(iii).  FDA correctly

determined that the BREEZE study was a qualifying "new clinical investigation"; that it is not a

"bioavailability study"; and that it was "essential to the approval" of Tyvaso DPI because it

assuaged the safety and tolerability concerns FDA itself had raised.  Liquidia attempts to argue

that because the study contains some bioavailability *data*, it must be disqualified from eligibility.

That misunderstands both the study and the statute:  a study with a primary endpoint aimed at

safety and/or tolerability like this one is a "new clinical investigation"; it does not become a

"bioavailability *study*" merely because it also collects pharmacokinetic data.  And Liquidia's

argument that FDA did not *really* need the additional clinical investigation of safety and

tolerability second-guesses FDA on a quintessentially scientific judgment.

Liquidia nominally pairs its motion for summary judgment with a request for a preliminary

injunction, but the relief it seeks—final FDA approval for its competing product, overriding UTC's

exclusivity—is not "preliminary" at all.  Because Defendants are entitled to summary judgment,

Liquidia cannot obtain any interim relief.  Regardless, Liquidia barely addresses the equitable

factors; it cannot establish that it faces any irreparable harm before a summary-judgment decision, the standard means of resolving APA cases.

The Court should grant summary judgment against Liquidia on its claims and deny Liquidia's motion for summary judgment and for a preliminary injunction.

## BACKGROUND

### I.    Statutory and Regulatory Framework

Federal law requires anyone seeking to market a new drug to first demonstrate that the product is effective and safe for use. To do so, the sponsor may submit a new drug application (NDA) under section 505(b)(1) of the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 355(b)(1), or one of the more streamlined applications created by the Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Act"), Pub. L. No. 98-417, 98 Stat. 1585 (1984). The choice depends on whether (and to what extent) the sponsor relies on previous FDA approvals and associated studies to which it has no right of reference.

If an applicant seeks approval for an entirely new drug product, it typically submits a full, stand-alone NDA under section 505(b)(1). An NDA must include the "full reports of investigations"—*i.e.*, clinical trials—conducted or licensed by the sponsor showing "whether such drug is safe for use and whether such drug is effective in use." 21 U.S.C. § 355(b)(1)(A). UTC's NDA at issue here was a 505(b)(1) application. By contrast, if an applicant seeks to market a generic drug that is a copy of an approved brand drug, the Hatch-Waxman Act allows the applicant to submit an abbreviated new drug application (ANDA) establishing only that the proposed generic drug is bioequivalent and pharmaceutically equivalent to a previously approved product. *See id.* § 355(j)(2)(A). The third option, followed by Liquidia here, is an intermediate pathway for approval of a new drug product that shares features with a previously approved drug: an application under section 505(b)(2) of the FDCA. "Like the full NDA, a [section] 505(b)(2) NDA must

directly demonstrate that the proposed drug product is safe and effective." *Veloxis Pharm., Inc. v. FDA*, 109 F. Supp. 3d 104, 108 (D.D.C. 2015). But to do so, the section 505(b)(2) NDA "can rely on clinical studies that were previously submitted to the FDA in support of another drug and that were not conducted or licensed by the [section] 505(b)(2) sponsor." *Id.* at 109 (brackets omitted).

To "incentivize pharmaceutical companies and reward them for researching and developing innovative drugs," Congress also established certain marketing exclusivities. *Id.* at 119. Relevant here, Congress provided for a three-year marketing exclusivity in connection with the completion of a new clinical investigation to secure approval for a new use of an already-approved active ingredient. Section 505(c)(3)(E)(iii) provides:

> If an application submitted under [§ 505(b)] for a drug, which includes an active moiety … that has been approved in another application approved under [§ 505(b)], is approved after September 24, 1984, and if such application contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application, the Secretary may not make the approval of an application submitted under [§ 505(b)] for the conditions of approval of such drug in the approved [§ 505(b)] application effective before the expiration of three years from the date of the approval of the application under [§ 505(b)] if the investigations described in subsection (b)(1)(A)(i) and relied upon by the applicant for approval of the application were not conducted by or for the applicant and if the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted.

21 U.S.C. § 355(c)(3)(E)(iii).[1] That is both a narrower and a shorter period of exclusivity than the one granted to the first manufacturer to win approval of an entirely *new* chemical entity.

The "statutory provision is clear as to how three-year exclusivity operates and can be unambiguously parsed into essentially two components: entitlement to exclusivity and scope of that exclusivity." *Veloxis*, 109 F. Supp. 3d at 116.

---

[1] A parallel provision ensures that the same exclusivity blocks approval of ANDAs on essentially the same terms as 505(b)(2) applications. *See* 21 U.S.C. § 355(j)(5)(F)(iii).

*Entitlement:* "Under the plain language of this provision, entitlement to three-year exclusivity requires" three things: (1) a 505(b) NDA; (2) a previously approved active moiety; and (3) "at least one new clinical investigation, excluding bioavailability studies, that is essential to the conditions of approval for the 505(b) drug." *Id.* (footnote omitted). "In other words," this exclusivity applies "when a pharmaceutical company obtains approval to market a previously approved active moiety in a new formulation or for new purposes, and doing so requires it to furnish new clinical investigations to the FDA." *Otsuka Pharm. Co. v. Price*, 869 F.3d 987, 990 (D.C. Cir. 2017). FDA regulations define a "[c]linical investigation" to mean "any experiment other than a bioavailability study in which a drug is administered or dispensed to, or used on, human subjects." 21 C.F.R. § 314.108(a). Agency regulations further define the full phrase "new clinical investigation" as:

> an investigation in humans the results of which have not been relied on by FDA to demonstrate substantial evidence of effectiveness of a previously approved drug product for any indication or of safety for a new patient population and do not duplicate the results of another investigation that was relied on by the agency to demonstrate the effectiveness or safety in a new patient population of a previously approved drug product.

21 C.F.R. § 314.108(a). By contrast, FDA regulations define a "[b]ioavailability study" as one "to determine the bioavailability or pharmacokinetics of a drug." *Id.* Bioavailability studies are performed by applicants (including both 505(b)(2) and ANDA applicants) to show that "the rate and extent of absorption of the drug" is equivalent to the corresponding "pioneer drug." *Astellas Pharma US, Inc. v. FDA*, 642 F. Supp. 2d 10, 13-14 (D.D.C. 2009). Bioavailability studies are intended only to show how a drug moves through the system of a healthy subject and do not provide independent evidence that a drug is safe or effective for its intended use. Abbreviated New Drug Application Regulations, 54 Fed. Reg. 28,872, 28,899 (July 10, 1989).

*Scope:* Once "exclusivity is appropriately granted to the drug that is the subject of the first-

in-time 505(b) NDA," FDA "may not approve a second-in-time" 505(b)(2) application (or ANDA) "that shares 'conditions of approval' with the first-in-time 505(b) drug." *Veloxis*, 109 F. Supp. 3d at 117 (citation omitted). An applicant that wants approval for the same "conditions of approval" during its rival's period of exclusivity must conduct its own trials and submit a 505(b)(1) application, rather than use the abbreviated 505(b)(2) or ANDA pathways relying on others' data.

FDA "has consistently interpreted" the undefined phrase "conditions of approval" "as the innovation represented by the approved product for which new clinical investigations were essential to approval." FDA-000093-94; *accord* Liquidia Opening Br. 34-35 (asserting that this phrase is "ambiguous," but endorsing FDA's longstanding "scope of innovation" interpretation). In "identifying the innovation," FDA asks "what unique clinical question(s) about the safety and/or efficacy of the active moiety for the relevant use do the new clinical investigations essential to approval answer for the first time." FDA-000114 (emphasis omitted); *accord* FDA-000421. FDA has recognized that the scope of exclusivity under this test may differ from the specific parameters of the underlying clinical investigation that triggered exclusivity. For example, "a particular clinical investigation may be more limited in scope or more specific than the conclusions (and thus the scope of exclusivity) that can be drawn from it." FDA-000116; *accord* FDA-000423.

The breadth of exclusivity granted for new innovations depends on the innovations that have preceded them. *See* FDA-000443 ("The scope of a product's exclusivity is determined relative to previously approved products …."). The first grant of exclusivity, for five years, is broad such that "if the innovation relates to a new active moiety or ingredient, then exclusivity protects the pioneer drug product from other competition from products containing that moiety or ingredient," in any form and for any use. FDA-000419 (citation omitted). Subsequent innovations receive three years of exclusivity protection for the incremental gain demonstrated in the new

clinical investigation.  *See id.*  For instance, innovations concerning "a new dosage form or route of administration" receive grants of exclusivity that "protect[] only that aspect of the drug product, … not the active ingredients."  *Id.* (citation omitted).  Likewise, innovations for "a new use" receive exclusivity grants that "protect[] only that labeling claim and not the active ingredients, dosage form, or route of administration."  *Id.* (citation omitted).

## II.    Factual Background

### A.    UTC develops novel treatments for pulmonary hypertension.

This case concerns UTC's product Tyvaso DPI, a prescription drug product containing the active pharmaceutical ingredient treprostinil, which is used to treat pulmonary hypertension (PH). PH is a rare, chronic, and often fatal disease generally characterized by increased pressure in the pulmonary blood vessels.  Compl. ¶ 38.  That increased pressure strains the heart and, over time, can result in heart failure and death.  *Id.*  The World Health Organization has designated five subcategories of PH differing in cause and expected clinical outcomes.  Treprostinil is one of a number of therapies approved for Group I PH (also known as pulmonary arterial hypertension (PAH)).  Treprostinil is the only therapy ever approved to treat patients with pulmonary hypertension associated with interstitial lung disease (PH-ILD), a subcategory of Group III PH.

UTC is a public benefit corporation created to develop treatments for PH patients, and it has pioneered many such treatments.  UTC's treprostinil-based drug products include: an infusion administered subcutaneously or intravenously (Remodulin), an extended-release tablet (Orenitram), a nebulized inhalation solution (Tyvaso), and a dry powder inhaler (Tyvaso DPI).

In 2009, FDA approved Tyvaso, the first inhaled treprostinil therapy to treat PAH. ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████  Tyvaso is a solution taken four times a day using a powered nebulizer, the Tyvaso

Inhalation System, "an ultrasonic, pulsed delivery device" that allows patients to receive treatments in "2 to 3 minutes" per session.  FDA-000638-639.

Tyvaso was initially approved only to treat PAH.  In 2021, following a clinical trial known as INCREASE, UTC discovered that inhaled treprostinil can achieve clinical benefit in patients with PH-ILD.  *See* FDA-000425.  FDA subsequently approved Tyvaso for the treatment of patients with PH-ILD.  *See* FDA-000129.

> **B.**   **FDA requires UTC to conduct a new clinical investigation to assess the safety and tolerability of treprostinil in a dry powder formulation, and then approves Tyvaso DPI based on that investigation.**

Following the approval of Tyvaso, UTC continued its efforts to innovate for PH patients. Relevant here, UTC pursued FDA approval of a novel dry powder formulation of treprostinil.  That product, Tyvaso DPI, is a drug-device combination product with plastic cartridges containing treprostinil dry powder for inhalation.  FDA-000424.  Tyvaso DPI, for the first time, "enable[s] patients to go about their day with just a small breath-actuated, dry powder inhaler that easily fits in a side pocket and requires no batteries or external power source to operate."  FDA-000145 (quotation marks omitted).  Patients have reported "significant satisfaction with and preference for the use of" Tyvaso DPI over the nebulizer.  FDA-000762.

In preparing its Tyvaso DPI NDA, UTC had to invest in a new study to convince FDA to approve the new dosage form.  Specifically, UTC executed a development plan requested by FDA to show that a dry powder formulation of treprostinil would be safe and tolerable for patients. Although FDA had previously approved treprostinil for use by oral inhalation (Tyvaso), the agency had concerns about the safety and tolerability of the new dry powder formulation.  FDA-000432-433.   Treprostinil  has  known  tolerability  issues,  including  inducing  cough,  headache,  throat irritation, and nausea.  FDA-000433.  FDA worried the new "powder dosage form could present new or worse tolerability issues than those observed with treprostinil inhalation solution," such as

a risk of choking. *Id.* Thus, ████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████. Rather, ██████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████.

    UTC followed FDA's direction, conducting what is referred to as the BREEZE study. The BREEZE study was an open-label clinical study that examined participants with PAH who were on a "stable regimen of Tyvaso" and then were switched to a corresponding dose of Tyvaso DPI. FDA-000760. Participants underwent pharmacokinetics assessments, safety assessments, and an efficacy assessment (a six-minute walk test) both before and after they switched to Tyvaso DPI. FDA-000760. The six-minute walk test is often used in PH patients to assess disease progression. *See* FDA-000472. The "primary objective of this study [was] to evaluate the safety and tolerability of [Tyvaso DPI]" for people with PAH who were being treated with Tyvaso. FDA-000760. The "[s]econdary objectives" included "evaluat[ing] the systemic exposure and pharmacokinetics (PK) of treprostinil in subjects with PAH when delivered as Tyvaso and [Tyvaso DPI]." FDA-000760.

    The BREEZE study was successful. As FDA later noted, the BREEZE study's "results did not show a substantial increase in adverse events associated with the transition from Tyvaso to Tyvaso DPI" and "[n]o new risks associated with treprostinil formulated as an inhaled powder (Tyvaso DPI) were identified." FDA-000427. The BREEZE study thus assuaged the safety and tolerability concerns regarding chronic use of a treprostinil inhaled powder that had led FDA to request the study in the first place. The BREEZE study's efficacy endpoints showed equivalent

clinical effect as well.  FDA-000910.  In short, BREEZE demonstrated, for the first time, that dry powder treprostinil was safe and tolerable and was not associated with any decline in efficacy. *See, e.g.*, FDA-000910.  FDA concluded that the study supported approval of Tyvaso DPI "for treatment of both PAH and PH-ILD patients who are new to treprostinil inhalation treatment and such patients who transition from Tyvaso inhalation solution," FDA-000447.

On April 16, 2021, armed with the results of BREEZE, UTC submitted a 505(b)(1) NDA for Tyvaso DPI.  In addition to the BREEZE study, UTC relied on two additional Tyvaso DPI studies (the MKC-475-001 study[2] and the TIP-PH-102 study) and two studies it had previously submitted in support of the Tyvaso NDA (the TRIUMPH I and INCREASE studies).  FDA-000424-425.  TIP-PH-102 was a six-period crossover study that compared the systemic exposure of three doses of Tyvaso DPI and three doses of Tyvaso in healthy volunteers.  FDA-000429. Meanwhile, the TRIUMPH I study was a 12-week, randomized, double-blind, placebo-controlled study that included clinically stable subjects with PAH.  FDA-000425.  The INCREASE study was a 16-week, randomized, double-blind, placebo-controlled study, but the study examined patients with PH-ILD.  *Id.*  Patients who received Tyvaso improved their six-minute walk distance by 21 meters compared to those receiving the placebo.  *Id.*

On May 23, 2022, FDA granted final approval to Tyvaso DPI for use in treating PAH and PH-ILD.  FDA-000413.  ███████████████████████████████████████████ ███████████████████████████████████████████████████████  On the same day as this approval, FDA denied a citizen petition filed by Liquidia, which had argued that FDA should not approve Tyvaso DPI "in the absence of additional clinical data demonstrating that

---

[2] The MKC-475-001 Study was a single-dose, open-label, dose escalation study of Tyvaso DPI in "healthy normal volunteers."  FDA-000426.

it is safe for use in the intended patient population, i.e., patients with certain chronic lung diseases and compromised pulmonary function." FDA-000563; *see* FDA-000582-96. FDA determined that "the existing clinical data (primarily from the BREEZE study) are adequate to support product approval as labeled," and the agency rejected Liquidia's argument that BREEZE was inadequate to address any safety concerns. FDA-000590-93.

Following its approval decision, the Division of Cardiology and Nephrology completed a preliminary checklist form regarding potential eligibility of Tyvaso DPI for marketing exclusivity. FDA-000453-459. In that checklist form, the Division checked a box for "No" in answer to the question whether UTC's NDA required "the review of clinical data other than to support a safety claim." FDA-000453. The Division acknowledged that the NDA "provides for a new dosage form of treprostinil," and that the approval decision had relied on a study that established "safety" and "tolerability" in addition to "bioavailability." *Id.* The Division asserted in a single conclusory sentence that "[t]he safety and tolerability study provided confirmatory efficacy information only," without explaining why any such limitation was relevant to exclusivity given the new information provided on safety and tolerability. *Id.* Later in the form, the Division also checked the box for "No" in response to the question whether the application "contain[s] reports of clinical investigations." FDA-000455. No further explanation was provided. *Id.* This preliminary determination on potential exclusivity by the Division—rather than by the CDER Exclusivity Board[3]—had no impact at the time, because no applications sharing the same active moiety and

---

[3] FDA, through CDER, established the Exclusivity Board "to provide oversight and recommendations regarding exclusivity determinations made by [CDER], with a primary focus on clarity and consistency of decisions." FDA, *CDER Exclusivity Board* (Dec. 15, 2014), www.fda. gov/about-fda/center-drug-evaluation-and-research/cder-cder-exclusivity-board. In this role, the Exclusivity Board is the designated component of the agency with specific expertise on applicable marketing exclusivities: it "oversee[s] certain exclusivity determinations, including whether and what type of exclusivity should be granted and the appropriate scope of exclusivity grants." *Id.*

conditions of approval as Tyvaso DPI were otherwise ready for final approval.

    **C.**    **Liquidia files a 505(b)(2) application to market a treprostinil product in a dry powder dosage form, and then submits letters to FDA regarding UTC's potential three-year exclusivity for Tyvaso DPI.**

On January 24, 2020, Liquidia submitted an NDA under section 505(b)(2) for a treprostinil oral inhalation powder drug, which Liquidia now calls Yutrepia. FDA-001257. Liquidia's 505(b)(2) application relied on, among other things, FDA's findings of safety and efficacy for UTC's Tyvaso product. FDA-000430. In its original application, Liquidia only sought FDA approval to market Yutrepia for the treatment of PAH. *See* FDA-0001257, 001260. On November 4, 2021, FDA issued a tentative approval letter to Liquidia based on that PAH application, explaining that final approval was barred by a 30-month stay triggered by UTC's timely assertion of patents it had listed for Tyvaso. FDA-001257-58. FDA further noted that final approval "cannot be granted" until after that stay expired and "we are assured there is no new information that would affect whether final approval should be granted." FDA-001257-1258. Then, after FDA approved UTC's supplemental application to market Tyvaso for PH-ILD, Liquidia submitted an amendment to its pending application, purporting to add the PH-ILD indication and once again relying on UTC's clinical trials. FDA-001292.

From the beginning, Liquidia recognized that approval of UTC's Tyvaso DPI could result in UTC receiving a three-year new clinical trial marketing exclusivity that could block final approval of Liquidia's competing dry powder treprostinil product. Liquidia submitted multiple confidential letters to FDA, arguing that the agency should either refuse to recognize any three-year exclusivity for Tyvaso DPI or, alternatively, define such exclusivity narrowly. Liquidia submitted its first letter to FDA on July 15, 2021, when UTC's NDA for Tyvaso DPI was still pending, *see* FDA-000001-19, and then submitted a supplemental letter on July 25, 2022, after FDA had approved Tyvaso DPI, *see* FDA-000283-292. Notably, in neither letter did Liquidia ever

argue that BREEZE could not trigger exclusivity because it was a bioavailability study.  *See* FDA-000436.  To the contrary, Liquidia contended only that a separate "pivotal PK study"—TIP-PH-102—was a "bioavailability study" that does not qualify for exclusivity, and Liquidia addressed that study separately from BREEZE.  *See* FDA-000007-8, 000436 n.87.  As to BREEZE, Liquidia argued that it was a "general safety study" and also was not "essential to approval" of Tyvaso DPI.  *E.g.*, FDA-000001; FDA-000285.  Alternatively, Liquidia argued that FDA should restrict the scope of the marketing exclusivity secured based on the BREEZE study to the (1) "unique formulation" of Tyvaso DPI containing a particular inactive ingredient (fumaryl diketopiperazine, or "FDKP"), and (2) a patient population comprised of patients with PAH who switch to Tyvaso DPI from Tyvaso.  *E.g.*, FDA-000002.

### D.    UTC and Liquidia engage in litigation related to Liquidia's 505(b)(2) application, including as to FDA's acceptance of Liquidia's amendment to add a new indication.

Liquidia's submission of its section 505(b)(2) NDA launched a series of disputes between the parties concerning Liquidia's infringement of UTC's patents, the validity of those patents, and, later, FDA's acceptance of Liquidia's amendment to its pending NDA to add a new indication.

As relevant here, in February 2024, UTC filed suit against FDA in this District alleging that FDA had violated the Administrative Procedure Act (APA) and long-established agency policy by accepting Liquidia's amendment to add a new indication (PH-ILD) to its pending section 505(b)(2) application.  UTC Cross-Compl. ¶ 11; Compl. ¶ 76, ECF No. 1; Compl., *UTC v. FDA*, No. 24-cv-484 (D.D.C. Feb. 20, 2024), ECF No. 1.  Liquidia intervened as a defendant in the action.  Minute Order, *UTC v. FDA*, No. 24-cv-484 (D.D.C. Mar. 5, 2024).  Because final approval of Liquidia's application would cause UTC to suffer irreparable harm, UTC also sought to preliminarily enjoin FDA from approving Liquidia's NDA for Yutrepia for the PH-ILD indication.  The district court (Bates, J.) denied the motion, reasoning that FDA's decision accepting Liquidia's

amendment for review likely was not final agency action.  *UTC v. FDA*, No. 24-cv-484, ECF No. 34 (D.D.C. Apr. 5, 2024).  But recognizing that a final approval decision could immediately ripen UTC's claim for irreparable harm, the Court ordered FDA to provide the Court and parties with at least three business days' notice prior to issuing any decision on Liquidia's amended NDA.  ECF No. 18 (No. 24-cv-484).  On August 13, 2024, FDA provided notice pursuant to the Court's order, without specifying the substance of the decision.

>  **E.  FDA determines that Tyvaso DPI is entitled to three-year exclusivity for the BREEZE study, blocking final approval of Liquidia's 505(b)(2) product.**

On August 16, 2024, FDA issued a tentative approval decision to Liquidia for Yutrepia covering both the PAH and PH-ILD indications, stating that final approval was subject to a period of unexpired marketing exclusivity.  FDA-001292.  FDA explained its exclusivity decision in a contemporaneously issued, 39-page letter to Liquidia, which concluded that "Tyvaso DPI qualifies for 3-year exclusivity and that the exclusivity for Tyvaso DPI delays the approval of Yutrepia." FDA-000413-52.  FDA's letter decision drew substantially from a 38-page internal memorandum issued by the CDER Exclusivity Board on August 13, 2024.  FDA-000460-497.  Based on the Exclusivity Board's memorandum, the Division issued an "updated" "Exclusivity Summary" on August 14, 2024, which expressly "supersedes the original one" from May 2022.  FDA-000498-515.  The updated summary "reflects the Division's agreement with the recommendations in the CDER Exclusivity Board memorandum."  FDA-000498, 000511.

As set out in FDA's letter to Liquidia, FDA explained that Tyvaso DPI is entitled to three-year exclusivity because "the application includes a new clinical investigation (other than a bioavailability study) that was essential to approval and conducted or sponsored by the applicant— the BREEZE study."  FDA-000431.  In reaching that conclusion, FDA first considered whether BREEZE was a new clinical investigation (other than a bioavailability study).  FDA-000431-433.

FDA answered in the affirmative, explaining that BREEZE was an experiment in which a drug was provided to human subjects whose "primary endpoint was safety and tolerability." FDA-000432. It could not be classified as merely a "bioavailability" study, because although BREEZE "also assessed pharmacokinetics after administration of each dose as a secondary endpoint," the study "specifically evaluated the safety and tolerability of Tyvaso DPI and additionally provided limited efficacy data." FDA-000432. As the CDER Exclusivity Board noted in its memorandum, Liquidia did "not contest that the BREEZE study was a new clinical investigation (other than a bioavailability study)." FDA-000483.

FDA further determined that BREEZE was a "new" clinical investigation because the agency had not previously "relied on its results to demonstrate substantial evidence of effectiveness of a previously approved drug product for any indication or of safety for a new patient population." FDA-000432. In so finding, FDA rejected Liquidia's argument that BREEZE was only a "general safety study." FDA-000436 (citation omitted). FDA acknowledged (without endorsing) Liquidia's assertion that FDA regulations precluded awarding exclusivity based on a safety study that did not "permit broader use of a drug nor establish safety of a drug for a new patient population." FDA-000436 n.87. FDA explained that it "need not address this particular claim" because BREEZE was "not a general safety study," *id.*; rather, BREEZE "permitted broader use of treprostinil" by providing the data necessary to support the approval of a new dosage form of treprostinil for chronic use—a dosage form that provided significant advantages over existing treatment options, "thus permitting broader use of the drug." FDA-000436-437.

Next, FDA found that BREEZE was "essential" to the approval of Tyvaso DPI because the study "addressed an important safety question, specifically the tolerability of the inhalation powder dosage form of treprostinil" that was "not available from any other source." FDA-000433. FDA

noted that treprostinil was "known to present tolerability challenges," and that the agency had been concerned the "novel" "inhalation powder dosage form could present new or worse tolerability issues than those observed with Tyvaso." *Id.* As a result, FDA "did not believe" single-dose bioavailability studies, such as the MKC-475-001 and TIP-PH-102 studies, "w[ere] adequate to assess safety and tolerability of the new inhalation powder for chronic use." FDA-000433. The BREEZE study filled the gap by providing "essential data on patient tolerability with multiple-dose use." FDA-000434-435 (alterations and citation omitted).

FDA rejected Liquidia's argument that BREEZE was merely a confirmatory study that provided "only supportive information for the application," explaining that Liquidia "misunderst[ood] the nature of the BREEZE study and its role" in the application. FDA-000438-439. Rather, consistent with the Division's contemporaneous recommendation for a "short-term safety and tolerability study" that went beyond establishing similar bioavailability between Tyvaso DPI and Tyvaso, BREEZE provided a "vital piece" of information to approve the new dosage form. FDA-000439. "Without the BREEZE study, the Division would not have had sufficient information regarding the safety and tolerability of multiple dosages of the new dosage form of treprostinil to support approval." FDA-000435. FDA also rejected Liquidia's various technical objections to the BREEZE study as being supposedly inadequate to support findings of safety and tolerability, and the agency explained that neither the statute nor FDA regulations require a study to be a "major, pivotal trial" to be exclusivity-eligible. FDA-000439-440.

Having determined that Tyvaso DPI qualifies for three-year exclusivity, FDA next addressed the scope of that exclusivity and found that it blocked final approval of Yutrepia. FDA-000440-451. The "first step of the scope inquiry focuses on the drug with three-year exclusivity," and is not in dispute here: Tyvaso DPI and Yutrepia "are both single-entity drugs that contain the

16

same active moiety, treprostinil." FDA-000440-441. The second step addresses the "conditions of approval" for Tyvaso DPI as determined by identifying "the innovation" in UTC's NDA "for which the underlying new clinical investigations [*i.e.*, BREEZE] were essential to the approval as compared to previously approved drug products containing the same active moiety." FDA-000441. FDA found that the "innovation represented by Tyvaso DPI for which a new clinical investigation was essential is the inhalation powder dosage form for the active moiety treprostinil for chronic use." FDA-000442. As the agency noted, BREEZE was "essential to [FDA's] safety findings in approving Tyvaso DPI as the first approved treprostinil inhalation powder." *Id.*

FDA rejected Liquidia's arguments for narrower conditions of approval limited to (1) Tyvaso DPI's specific formulation containing the inactive ingredient FDKP, and (2) the patient population enrolled in BREEZE. FDA-000443-444. Exercising its scientific judgment, FDA determined that neither characteristic was clinically meaningful and thus did not serve to "further define or limit the scope of Tyvaso DPI's exclusivity." FDA-000443. Beginning first with the presence of FDKP, FDA explained that it had required a study to assess the safety and tolerability of multiple doses of treprostinil inhalation powder *as a general matter*; BREEZE "was not needed to assess the safety of FDKP in Tyvaso DPI's formulation." FDA-000445. As the agency noted, in denying Liquidia's citizen petition, "FDA disagreed" with Liquidia's assertions regarding "the risks …. associated with FDKP." *Id.* Turning to patient population, FDA disagreed that the scope of exclusivity should be limited to PAH patients switching from Tyvaso to Tyvaso DPI. FDA-000447. FDA explained that a drug studied "in very specific conditions might be approved with a broader indication" and need not be limited to the parameters under which it was studied. FDA-000447. Because, as a matter of FDA's scientific judgment, BREEZE supported approval of Tyvaso DPI for PAH and PH-ILD patients who were either "new to treprostinil inhalation

17

treatment" or had transitioned from Tyvaso, FDA concluded that Tyvaso DPI's exclusivity is not limited to the specific patient population studied in BREEZE. FDA-000447-448.

>        **F.      The current litigation.**

Following FDA's tentative approval decision, Liquidia filed suit against the agency to challenge its conclusion that final approval of Yutrepia is blocked until May 23, 2025 by UTC's unexpired three-year exclusivity for Tyvaso DPI. ECF No. 1. The Court granted UTC's motion to intervene, as well as the parties' joint motion to consolidate Liquidia's motion for preliminary injunction with cross-motions for summary judgment.

Meanwhile, UTC voluntarily dismissed its initial action against FDA and then reasserted, as a crossclaim in this action, its challenge to FDA's decision accepting Liquidia's amendment to add a new indication for PH-ILD to a pending 505(b)(2) application. ECF No. 30, Crossclaim. If UTC's crossclaims succeed, the resulting order would preclude FDA from granting final approval to Liquidia's current bundled application independent of any question regarding the unexpired three-year exclusivity for Tvyaso DPI. UTC moved to expedite production of the administrative record to permit timely briefing on the merits of its crossclaim; FDA opposes. ECF Nos. 36; 43.

>                          **LEGAL STANDARDS**

The summary judgment standard "functions slightly differently" in the APA context, as the "court must limit its review to the 'administrative record' and the facts and reasons contained therein to determine whether the agency's action was consistent with the relevant APA standard of review." *Policy & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 74 (D.D.C. 2018) (citation and quotation marks omitted). Under the APA, this Court cannot set aside FDA's agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Fulbright v. McHugh*, 67 F. Supp.

3d 81, 89 (D.D.C. 2014) (citation omitted). Review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid." *Id.* (citation omitted).

Liquidia strains to wave the banner of *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), attributing significance to the fact that its "claims arise after" that decision, "unlike every prior case addressing" three-year exclusivity. Liquidia Opening Br. 20. But despite rhetorical flourishes accusing FDA of "flout[ing] the FDCA," *id.* at 25, Liquidia largely accepts FDA's longstanding interpretations of the relevant statutory provisions, including for phrases Liquidia asserts are ambiguous. *See, e.g.*, *id.* at 26 (stating that FDCA "does not define 'new clinical investigations,'" and then basing its argument on "FDA's implementing regulations"); *id.* at 29-30 (relying on FDA's regulatory definition of "essential to approval" without advancing an independent statutory argument), 34-35 (describing statutory phrase "conditions of approval" as "ambiguous," but then endorsing understanding what "FDA has opined before" is "best reading" of statute). Rather than dispute FDA's statutory interpretations, Liquidia repeatedly challenges FDA's scientific judgments in applying undisputed legal standards to the BREEZE study. Nothing in *Loper* disturbed the understanding that courts "give a high level of deference to [an] agency's scientific analysis of the evidence before it, and must avoid unduly second-guessing those scientific judgments." *Pharm. Mfg. Rsch. Servs. v. FDA*, 957 F.3d 254, 262 (D.C. Cir. 2020) (quotation marks, brackets, and citations omitted); *accord Loper Bright*, 144 S. Ct. at 2263 (distinguishing arbitrary and capricious review from *de novo* statutory interpretation); *Ctr. for Biological Diversity v. E.P.A.*, 749 F.3d 1079, 1087 (D.C. Cir. 2014) (collecting cases pre- and post-*Chevron* recognizing deference courts owe to agency's scientific judgments).

Liquidia also renews its motion for preliminary injunction. A preliminary injunction is only appropriate if the movant establishes "1) a substantial likelihood of success on the merits,

2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998). Liquidia has not established those four factors here.

## ARGUMENT

I.    **FDA's Decision Should Be Upheld Because FDA Did Not Exceed Its Legal Authority in Finding That Tyvaso DPI Is Eligible for Exclusivity.**

Nothing in FDA's thorough Exclusivity Decision remotely suggests that the agency acted arbitrarily, capriciously, or otherwise unlawfully. What Liquidia paints as legal challenges to FDA's decision boil down to unsupported attacks on its scientific judgment. In concluding that UTC's innovative breakthrough, Tyvaso DPI, is entitled to three-year exclusivity, FDA appropriately determined that BREEZE was a new clinical investigation (other than a bioavailability study) that was essential to the approval of Tyvaso DPI. This Court should deny Liquidia's motion for summary judgment and grant UTC's motion.

### A.    **FDA correctly determined that the BREEZE study is not an ineligible "bioavailability study" within the meaning of section 505(c)(3)(E)(iii).**

Three-year exclusivity is awarded to an NDA sponsor that conducts "new clinical investigations (other than bioavailability studies) essential to the approval of the application." 21 U.S.C. § 355(c)(3)(E)(iii). FDA correctly determined that the BREEZE study reported new clinical investigations that went beyond merely reporting data on bioavailability and, thus, entitled UTC to exclusivity. FDA-000431. Indeed, UTC conducted BREEZE—a three-week study exposing participants to multiple doses of Tyvaso DPI—precisely because FDA advised that a bioavailability study comparing the pharmacokinetics of Tyvaso DPI to Tyvaso would not be sufficient to secure approval for Tyvaso DPI. FDA-000433-434. Instead, FDA recommended new clinical investigations to evaluate "safety and tolerability" of Tyvaso DPI "following repeat

20

doses." FDA-000434. That is precisely what BREEZE delivered, with assessments of "safety and tolerability" identified as the "primary endpoint" for the study. FDA-000319, 000426, 000760.

Liquidia now accuses FDA (at 23) of going "against the clear language of the FDCA and FDA regulations here by allowing a study that evaluates bioavailability to support exclusivity," merely because the study "also assessed pharmacokinetics after administration of each dose" of Tyvaso DPI as one of four "secondary endpoint[s]." FDA-000432.[4] Notably, despite its stridency now, Liquidia never pressed this argument to FDA in either of its two letter submissions. *See* p. 15, *supra*. Nor could Liquidia's silence on the point be characterized as an oversight, as Liquidia *did* argue that UTC's "pivotal PK study"—TIP-PH-102—was a "bioavailability study that cannot be used to support three-year exclusivity for Tvyaso DPI." FDA-000008. Unsurprisingly then, in issuing its decision, FDA understood that "Liquidia does *not* contest that the BREEZE study was a new clinical investigation (other than a bioavailability study)." FDA-000436 (emphasis added). Liquidia should not be allowed to do an about-face now and press a new argument that it abjured before the agency. *See, e.g.*, *Veloxis*, 109 F. Supp. 3d at 123-24 (holding that the plaintiff had waived its challenge to whether a study was a "new clinical investigation" by failing to "give the FDA an opportunity to consider the merits of its arguments").

But even if Liquidia's failure to exhaust is overlooked, its new challenge is baseless. FDA's conclusion that BREEZE is not an ineligible bioavailability study is consistent with the FDCA and FDA regulations, and it is not arbitrary or capricious.

### 1. Liquidia's contention that BREEZE was an ineligible "bioavailability study" has no basis in the FDCA or FDA regulations.

As noted, p. 4, *supra*, the FDCA provides that a study will trigger three-year exclusivity

---

[4] As noted, p. 9, *supra*, the other secondary endpoints were "[six]-minute walk distance (6MWD, an efficacy endpoint)), PAH-Symptoms and Impact (PAH-SYMPACT) Questionnaire, and Preference Questionnaire for Inhaled Treprostinil Devices (PQ-ITD)." FDA-000426.

for the approved drug product if it "contains reports of new clinical investigations (other than bioavailability studies)." FDA regulations, which Liquidia endorses (at 22-23), define a "[c]linical investigation" to mean "any experiment other than a bioavailability study in which a drug is administered or dispensed to, or used on, human subjects." 21 C.F.R. § 314.108(a). And FDA regulations define "bioavailability study," in turn, as "a study to determine the bioavailability or the pharmacokinetics of a drug." *Id.* Applying those undisputed definitions, FDA's determination that BREEZE contains reports of a clinical investigation is plainly correct.

Liquidia asserts (at 23) that "FDA went against the clear language of the FDCA and FDA regulations here by allowing a study that evaluates bioavailability to support exclusivity." But Liquidia is the one that tries to rewrite the text. The statute does not bar eligibility for any study that "evaluates bioavailability." Rather, exclusivity is potentially available if the application "contains reports of new clinical investigations" that are not *limited* to assessing bioavailability. 21 U.S.C. § 355(c)(3)(E)(iii). And UTC's NDA for Tyvaso DPI plainly "contains" such a report. Indeed, BREEZE's "*primary* endpoint"—*i.e.*, the study's objective—was to evaluate "safety and tolerability." FDA-000426, 000432, 000437 n.92 (emphasis added). BREEZE involved the administration of Tyvaso DPI to 51 human subjects over multiple weeks. FDA-000426. Although the study did assess pharmacokinetics as one of four secondary endpoints, BREEZE was not structured solely to "determine the bioavailability or the pharmacokinetics of a drug." 21 C.F.R. § 314.108(a). At a minimum, the fact that BREEZE designated safety and tolerability as its *primary* endpoint confirms it is not a bioavailability study, since the primary endpoint sets a study's objective. *See* FDA, *Draft Guidance: Multiple Endpoints In Clinical Trials Guidance For Industry*, 2017 WL 345609, at *10 (Jan. 2017) ("The endpoint(s) that will be the basis for concluding that the study met its objective (i.e., the study 'wins') is designated the primary

endpoint or primary endpoint family."); HHS, *Endpoint*, toolkit.ncats.nih.gov/glossary/endpoint ("Primary endpoints will be the basis for determining whether the study met its objective or, in the case of interventional [clinical] trials, will be the main data evaluated for regulatory approval.").

Resisting that conclusion, Liquidia tries a diversion, asserting that "BREEZE qualifies as a bioavailability study under the FDCA and FDA regulations" because "the *only* endpoints in BREEZE for which there was any pre-specified 'statistical analysis' were '[p]harmacokinetic assessments.'" Liquidia Opening Br. 23 (quoting FDA-000319). Both the premise and conclusion are wrong. The very page Liquidia cites states that "*[n]o* formal statistical analysis plan was formulated for the secondary endpoints," which includes pharmacokinetic assessments. FDA-000319 (emphasis added). And in any event, nothing in the FDCA or FDA regulations suggests a study's characterization turns on which parameters have a "pre-specified 'statistical analysis.'" There is no basis for Liquidia to dispute FDA's scientific understanding that the primary endpoint for BREEZE was the safety and tolerability analysis that the agency had requested.

Liquidia is thus left to argue (at 22-23) that because BREEZE includes some "bioavailability" *data*, it must be a "bioavailability *study*"—indeed, that it must be *only* a bioavailability study, such that UTC's application including BREEZE cannot even be said to "*contain[]* reports of new clinical investigations (other than bioavailability studies)." 21 U.S.C. § 355(c)(3)(E)(iii) (emphasis added). But that does not follow, and Liquidia conspicuously ignores the regulatory definition of "bioavailability study" as a study intended "to determine" a drug's bioavailability or pharmacokinetics. 21 C.F.R. § 314.108(a).[5] A study directed to a different

_____

[5] Instead, Liquidia relies (at 22-23) on the statutory and regulatory definition of "bioavailability" in isolation. But there is no dispute that BREEZE "assessed pharmacokinetics after administration of each dose as a secondary endpoint." FDA-000432. Rather, the issue whether conducting such a secondary assessment alongside the primary evaluation of safety and tolerability reduces

primary objective is not naturally regarded as a study "to determine" pharmacokinetics merely because some pharmacokinetic assessments are included.  To the contrary, it is common to refer to items by reference to their primary purpose, rather than various secondary features.  An "energy drink" is a drink designed to increase energy, not any beverage that contains calories.  A "picture book" is a book centered around a visual narrative, not any book that happens to have photos.  A "rain coat" is a coat that keeps you dry, not any jacket you happen to be wearing when a downpour begins.  The same plain-English insight guides the meaning of section 505(c)(3)(E)(iii): a bioavailability study is a study whose purpose is to assess bioavailability, not any study that has some pharmacokinetic data.

Liquidia identifies nothing in the text of the FDCA or agency regulations that supports its alternative interpretation, under which bioavailability data effectively contaminates anything it touches, turning any clinical investigation that includes any pharmacokinetic assessment into a bioavailability study—and *only* a bioavailability study.  And that interpretation would have bizarre implications.  Clinical studies routinely contain pharmacokinetic data, even when their purpose is to test other endpoints.  *See, e.g.*, FDA-001199 n.60 (rejecting argument that a study with a "clinical endpoint intended to measure abuse potential" was a "bioavailability study" merely because it also "measured the pharmacokinetic profile" of a drug).  Under Liquidia's view, such studies would be ineligible for exclusivity, even if they reported results from extensive clinical investigations that produced groundbreaking results showing, for example, brand new uses for an existing drug.  Liquidia's approach would also result in irrational distinctions between applicants, with exclusivity eligibility turning on whether an applicant conducts a given investigation in one

---

BREEZE to a mere "bioavailability study" and means that UTC's NDA did not "contain[] reports of new clinical investigations."  The definition of "bioavailability" on its own does nothing to answer that question.

study or several.  For example, BREEZE's secondary endpoints were independent of its primary endpoint evaluating safety and tolerability, meaning that UTC could have conducted the same safety and tolerability investigation in one study and then addressed secondary endpoints such as pharmacokinetic assessments in different studies.  Indeed, as Liquidia has acknowledged, UTC *did indeed* conduct separate bioavailability studies.  *See* FDA-000699-758.  Liquidia advances no reason why Congress would have wanted to incentivize inefficiency and delay by causing an applicant to forfeit exclusivity for investigating too many endpoints at once.

### 2. FDA's decision was internally consistent and consistent with agency precedent.

Liquidia next asserts (at 24-25) that FDA acted arbitrarily and capriciously because it departed from a putative May 2022 finding without explanation and failed to treat the BREEZE study consistently with the TIP-PH-102 study.  Neither accusation is correct.

First, Liquidia (at 24) is simply wrong that the Division's May 2022 Exclusivity Summary contained a "finding that BREEZE was a bioavailability study."  The sum total of the Division's analysis was as follows:

> This NDA provides for a new dosage form of treprostinil, a dry powder for oral inhalation. The basis of approval is the safety, tolerability, and bioavailability established in two studies. The safety and tolerability study provided confirmatory efficacy information only.

FDA-000453.  Nothing in that language deems BREEZE a bioavailability study, nor does any other unexplained checkmark in the form.  *See* FDA-000455.  To the contrary, that passage expressly refers to BREEZE as "[t]he *safety and tolerability* study."  FDA-000453 (emphasis added).  Liquidia's mischaracterization of the review division's preliminary summary creates no

basis for attacking the agency's final Exclusivity Decision.[6]

Second, FDA's treatment of BREEZE was consistent with its treatment of the TIP-PH-102 study. Liquidia argues that "TIP-PH-102 assessed *both* 'relativity [sic] bioavailability' of Tyvaso DPI and Tyvaso, *and* 'safety.'" Liquidia Opening Br. 25 (quoting FDA-000429) (emphasis added by Liquidia). But the primary endpoint of TIP-PH-102 was bioavailability; the study considered safety only secondarily. *See, e.g.*, FDA-000839 (contrasting TIP-PH-102, "which aimed to compare the systemic exposure of TreT and Tyvaso," with BREEZE, "where the efficacy, safety, and tolerability of TreT were assessed"); FDA-000351 (similar); FDA-000476 (describing TIP-PH-102 as a "6-period crossover study comparing systemic exposure of 3 doses of treprostinil inhalation powder and 3 doses of Tyvaso in healthy normal volunteers" (capitalization omitted)). Liquidia itself recognized this distinction before pursuing litigation, as it argued to FDA that TIP-PH-102 was a bioavailability study "because its *primary objective* was to evaluate the systematic exposure and PK of Tyvaso DPI compared to [Tyvaso]," while Liquidia presented no such argument as to BREEZE. FDA-000008. Thus, FDA's treatment of TIP-PH-102 is consistent with—indeed, reinforces—the agency's approach to categorizing studies as "bioavailability studies" depending upon their "primary" objective. FDA-000432.

## B. The BREEZE study includes a report of a new clinical investigation.

BREEZE also contains a report of a "new clinical investigation," 21 U.S.C. § 355(c)(3)(E)(iii), because it is an investigation in humans that FDA had never previously relied upon for any purpose. UTC conducted BREEZE at FDA's direction to establish the safety and

---

[6] Equally wrong is Liquidia's perplexing assertion that FDA's Exclusivity Decision somehow "concede[d]" that certain "aspects [of the BREEZE study] confirm that BREEZE was a bioavailability study." Liquidia Opening Br. 23 (quoting FDA-000432). The page of the decision that Liquidia cites contains the *opposite* conclusion: BREEZE "is considered an investigation *other than a bioavailability study*." FDA-000432.

tolerability of treprostinil in a new dry powder formulation.  FDA-000432, -000691.  The new

information provided by the BREEZE study thus "permitted broader use of treprostinil through

the approval of this new dosage form," regardless of the specific indication, which offers

convenience advantages to patients and increases access to treprostinil compared to Tyvaso

inhalation solution.  FDA-000436 n.87.  The BREEZE study thus falls squarely within the

regulatory definition of "[n]ew clinical investigation" as describing:

> an investigation in humans the results of which have not been relied upon by FDA
> to demonstrate substantial evidence of effectiveness of a previously approved drug
> product for any indication or of safety for a new patient population and do not
> duplicate the results of another investigation that was relied on by the agency to
> demonstrate the effectiveness or safety in a new patient population of a previously
> approved drug product.

21 C.F.R. § 314.108(a).  Indeed, FDA has long recognized that "changes in … dosage form" are

among those changes that "would normally warrant exclusivity." Abbreviated New Drug

Application Regulations; Patent and Exclusivity Provisions, 59 Fed. Reg. 50,338, 50,357 (1994).

Despite purporting to argue that FDA's decision "flouts the FDCA," Liquidia never

advances a statutory argument, as it simply endorses the agency's regulatory definition.  Liquidia

Opening Br. 25-26.  As to the regulation, Liquidia identifies no interpretive disagreement, and its

arguments collapse into a scientific dispute over whether BREEZE's results "merely duplicated

findings from prior studies on which FDA had already relied to approve certain drugs." *Id.* at 26

(emphasis omitted).  Liquidia's assertion that the study results were duplicative of earlier findings

contradicts FDA's thoroughly explained scientific judgment that the "BREEZE study answered

for the first time whether the active moiety treprostinil administered as an inhalation powder is

safe and tolerable for chronic use."  FDA-000442.

Liquidia insists (at 26, 28) that TRIUMPH and INCREASE already "demonstrated the

safety and efficacy of treprostinil administered by inhalation for use in PAH and PH-ILD

populations," and that BREEZE "merely confirmed those results."   But TRIUMPH and INCREASE did not address "the safety and efficacy of treprostinil inhalation powder," which was "assessed for the first time in the BREEZE study."  FDA-000434.  Indeed, TRIUMPH had shown that treprostinil could "present tolerability challenges," leading FDA to conclude a new study was needed for Tyvaso DPI to assess safety and tolerability for "a novel dosage form of treprostinil … i.e., inhalation powder."  FDA-000433.  Nor, contrary to Liquidia's assertion (at 27-28), did prior studies of the inactive ingredient FDKP in the approval of Afrezza—an inhalable form of insulin for treating diabetes[7]—fill this gap.  FDA did not credit Liquidia's argument, advanced in its citizen petition, that FDKP likely played a causal role in inducing respiratory risk for Afrezza patients.  *See* FDA-000445 (describing this possibility as "speculative"); FDA-000589-590 (same).  As a result, "the BREEZE study was not needed to assess the safety of FDKP in Tyvaso DPI's formulation."  FDA-000445.  FDA's concern was grounded in the safety and tolerability of *delivering treprostinil* in a new dry powder formulation—not in whether the inactive ingredient used in that formulation is safe.  *See* FDA-000440 ("BREEZE study was needed precisely to assess whether the new dosage form presented any such new or greater safety and tolerability risks relative to previously approved treprostinil products.").  Thus, as FDA explained, the "BREEZE study was not 'merely supportive'" of previous studies; "it was, in fact, needed for approval." FDA-000439.  Liquidia provides no basis for "second-guessing" FDA's "scientific judgments" on these points.  *Pharm. Mfg. Rsch. Servs.*, 957 F.3d at 262.

In resisting FDA's understanding of BREEZE's contribution, Liquidia challenges (at 28-29) FDA's conclusion that BREEZE studied a "broader use of treprostinil."  Liquidia relies on the

---

[7] Afrezza Label (rev. Feb. 2023), https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/02 2472s023lbl.pdf; *see also* FDA-000445 (noting Afrezza is "an inhaled insulin product").

fact that BREEZE was conducted with PAH patients and that the labeling for Tyvaso DPI covers PAH and PH-ILD patients, which mirrors the patient populations for Tyvaso.  *Id.* at 29.  Liquidia also states (repeatedly) that "BREEZE provided 'confirmatory efficacy information only.'"  *Id.* at 26, 29 (quoting FDA-000453).  But there is no requirement that a qualifying study—which may be focused on safety or tolerability—must show a new product formulation is *more efficacious* than previously approved formulations.  Liquidia skips past FDA's conclusion that BREEZE permitted approval of "an additional treatment option for patients"—the Tyvaso DPI inhaler— which has significant benefits compared to Tyvaso inhalation solution and "thus permit[s] broader use of" treprostinil.  *See* FDA-000437.

Liquidia also ignores longstanding FDA policy recognizing that studies supporting "changes" in the "dosage form" for a product "would normally warrant exclusivity."  59 Fed. Reg. at 50,357; *accord* 54 Fed. Reg. at 28,899.  Inexplicably, Liquidia fails to address this FDA statement, even as it relies on another FDA statement three paragraphs down in the same proposed rulemaking preamble discussing the changes FDA regards as "significant enough" to support exclusivity.  Liquidia Opening Br. 28 (quoting 54 Fed. Reg. at 28,899).  Liquidia engages in similar evasion when it invokes (at 28) the Court's decision in *AstraZeneca Pharms. LP v. FDA*, 872 F. Supp. 2d 60 (D.D.C. 2012), *aff'd*, 713 F.3d 1134 (D.C. Cir. 2013).  Liquidia implies that FDA and the Court adopted Liquidia's restrictive understanding of an exclusivity-eligible "new" use of a drug.  In fact, however, FDA explained in its *AstraZeneca* briefing that "[t]hree-year exclusivity may also be granted for, e.g., new combinations of older products, or new esters, new strengths, and *new dosage forms*."  *AstraZeneca Pharms. LP v. FDA*, ECF No. 27 at 6 (D.D.C. Apr. 11, 2012) (emphasis added).  The Court then upheld FDA's determination that a study establishing new safety information applicable to the original drug product was ineligible for exclusivity, and

as a point of contrast, it noted that the study had not led to changes such as "a new dosage." *AstraZeneca*, 872 F. Supp. 2d at 87.  The *AstraZeneca* decision thus supports FDA's decision here despite Liquidia's attempt to gin up an inconsistency.

Finally, Liquidia asserts (at 27) that FDA acted arbitrarily and capriciously because the decision rendered in August 2024, based on the recommendation of the CDER Exclusivity Board (the entity within FDA responsible for exclusivity interpretation and policy), departed from the preliminary assessment by the Division of Cardiology and Nephrology in the May 2022 checklist summary.  That earlier assessment was not a final agency action; indeed, it was prepared before any competing application was otherwise ready for approval.  Contrary to Liquidia's assertion, FDA expressly recognized that its new exclusivity determination—made for the first time with input from the Exclusivity Board—"supersedes the original one dated May 23, 2022."  FDA-000498.  The Division's original checklist summary included a single conclusory statement that the BREEZE "safety and tolerability study provided confirmatory efficacy information only." FDA-000453.  This checklist summary did not explain the significance of such a determination, given that three-year exclusivity is not reserved for studies that provide new efficacy information. Notably, the checklist never suggested that the safety and tolerability investigation from BREEZE was only "confirmatory."  In any event, both the CDER Exclusivity Board's memorandum and the resulting FDA Exclusivity Decision addressed the assertion that BREEZE provided "only *supportive* efficacy information" and explained that BREEZE was "not 'merely supportive,'" because it provided "vital" information to enable "the approval of treprostinil in [a] new dosage form."  FDA-000438-439, 000486-487.  No more explanation was required.  *See, e.g.*, *ITServe All., Inc. v. Cissna*, 443 F. Supp. 3d 14, 31 (D.D.C. 2020) ("So long as any change is reasonably explained, it is not arbitrary and capricious for an agency to change its mind ….").

### C.   The BREEZE study was essential to approval of Tyvaso DPI.

There is likewise no reason to disturb FDA's finding that BREEZE was essential to approval of Tyvaso DPI.  FDA has defined "essential to approval" to mean "with regard to an investigation, that there are no other data available that could support approval of the NDA."  21 C.F.R. § 314.108(a).  As FDA explained, the BREEZE study meets that standard because it provided vital information not available from any other source:  "Without the BREEZE study, the Division would not have had sufficient information regarding the safety and tolerability of multiple doses of the new dosage form of treprostinil to support approval."  FDA-000435; *see* FDA-000432-435, 000438-440.  In other words, without the BREEZE study, patients would not have been able to access Tyvaso DPI's innovative dry-powder inhaler—a product that many participants in the BREEZE study significantly preferred over Tyvaso.  *See* FDA-000831.

Again, Liquidia dresses up its challenge to FDA in legal garb, but it accepts (at 30) the agency's regulation interpreting the FDCA.  Liquidia merely disputes FDA's assessment of the relevant clinical investigations, but offers no basis to disturb FDA's scientific judgments.

### 1.   The BREEZE study was the sole source of data on which FDA relied to establish the safety and tolerability of the dry powder formulation of treprostinil.

Liquidia opens its attack on FDA's scientific judgment by rewriting FDA's Exclusivity Decision.  Liquidia selectively quotes that decision to contend that "BREEZE does not satisfy FDA's regulatory requirement because there were 'other data available that could [and did] support approval of the NDA.'  FDA-000422 (Exclusivity Decision)."  Liquidia Opening Br. 29-30 (alteration in original).  But the language Liquidia points comes from FDA's explanation of the statutory and regulatory background, throughout which FDA makes no mention of BREEZE, let alone suggests that other data "could [and did] support approval."  *See* FDA-000422.  To the contrary, as discussed, pp. 15-16, *supra*, FDA explained that BREEZE was the only source of data

to support a critical question for approval: whether multiple doses of treprostinil would be safe and tolerable in the new dry powder dosage form. *See* FDA-000432-435, 000438-440.

Liquidia then recycles arguments raised earlier in its brief, as it again contends (at 30) that (1) "BREEZE's results were merely confirmatory" of the TRIUMPH and INCREASE studies that FDA relied on in approving Tyvaso, and (2) BREEZE could not have been essential to approval for Tyvaso DPI to treat PH-ILD patients because the study only had PAH patients in its population sample. As explained above, pp. 27-29, *supra*, these arguments are misguided because they elide FDA's actual reasoning. FDA reasonably determined that a new clinical investigation beyond TRIUMPH and INCREASE was needed to determine the safety and tolerability of treprostinil in the dry powder dosage form—a question that neither TRIUMPH nor INCREASE could answer because patients in those studies received Tyvaso, not Tyvaso DPI's innovative inhalation powder. *See* FDA-000425, -000438-439. FDA also reasonably determined that BREEZE supported approval of Tyvaso DPI for both PAH and PH-ILD because the study's findings about the tolerability and safety of the dry powder formulation were not limited by indication. FDA-000448. Liquidia provides no basis for the Court to second-guess FDA's thoroughly explained understanding of the science.

### 2. FDA's finding that BREEZE was essential for approval was not arbitrary or capricious.

Liquidia likewise fails to substantiate its contention (at 30-34) that FDA's "essential to approval" finding contradicts FDA precedent and the evidence here.

To start, Liquidia accuses FDA (at 31) of "manufactur[ing] novel safety concerns that the record does not support." But it is Liquidia's narrative that conflicts with the record. Far from a *post hoc* rationalization, the record shows that FDA provided guidance even before UTC submitted the NDA for Tyvaso DPI that further clinical investigations would be needed to establish the safety

and tolerability of treprostinil in a dry powder formulation.  FDA-000433-434, 000690-691.
Liquidia's assertion (at 31) that FDA "does not cite any document that corroborates its purported
safety concern" is wrong.  There is no question that, before approving Tyvaso DPI, FDA had
identified certain adverse reactions for inhaled liquid treprostinil, as reflected in Tvyaso's
approved labeling.  FDA-000881. ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████.

Liquidia's argument on this issue reduces to a criticism of FDA's notetaking, as Liquidia
complains (at 31) that the meeting minutes did not memorialize the precise safety concerns that
led to FDA's recommendation, *e.g.*, FDA's concern that inhalation powder could "get[] stuck in
the throat or might cause a sensation of something stuck in the throat," FDA-000433.  Liquidia
provides no justification for its accusation that FDA fabricated safety concerns *post hoc*, which
runs contrary to the "presumption of regularity" to which agencies are entitled. *Int'l Dark-Sky
Ass'n v. FCC*, 106 F.4th 1206, 1215 (D.C. Cir. 2024).[8]

---

[8] Liquidia over-relies on the statement by a single Division reviewer that "little beyond
demonstrating bioavailability was necessary for Tyvaso DPI." FDA-000913. Regardless of how
the BREEZE study is characterized, the record is clear that UTC was required to do more than
"demonstrat[e] bioavailability," and that BREEZE filled the evidentiary gap FDA had identified
for approval of the new dosage form. As discussed, p. 10, *supra*, ██████████████████████

████████████████████████████████████████████████████████████████████.

Liquidia next disputes (at 31-33) whether BREEZE was adequate to address FDA's concerns about safety and tolerability, as Liquidia quotes various statements from FDA reviewers describing the BREEZE safety data as "limited." But BREEZE followed precisely FDA's recommendations for an "open-label," "short-term" safety and tolerability study, FDA-000691, and FDA concluded that the data, whatever their limitations, supported a finding that the benefits of the novel dosage form presented in Tyvaso DPI outweighed any risks. *See* FDA-000433, 000881, 000900. It is hard to imagine a judgment to which FDA is owed more deference than that one. *E.g.*, *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 9 (D.D.C. 2004). Liquidia's observation (at 31) that BREEZE only identified one instance of throat discomfort for a patient who discontinued the study is an odd digression. BREEZE documented the adverse events identified among study participants. FDA-000331-332, 000821-827. The fact that a particular adverse event never manifested for most study participants does not suggest that BREEZE failed to study the risk.

Continuing to challenge FDA's scientific assessments, Liquidia insists (at 32-33) that BREEZE did not establish the safety and tolerability of Tyvaso DPI for "chronic use" because the study evaluated "short term safety and tolerability" over a three-week treatment phase. But Liquidia improperly assumes that FDA could not make a reasonable assessment about safety and tolerability for chronic use without conducting a long-term study. As FDA's decision letter explained, "chronic" refers to "multiple-dose use," rather than a single dose. *See* FDA-000439. Indeed, FDA requested the BREEZE study because of its "concern[] that the *single-dose* studies in healthy subjects would not be adequate to assess tolerability of the new inhalation powder for chronic use," and the agency noted that the "BREEZE study provided this vital information for approval for chronic use … following *multiple-dose* use in patients." FDA-000439 (emphases added). In other words, FDA's concern about "chronic" use was about the safety and tolerability

of Tyvaso DPI for *repeat* uses.  *See* FDA-000439.  Indeed, ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  The

BREEZE study did just that.  *See* FDA-000762.  Liquidia cites nothing to support its implicit

contention that the study design FDA recommended was inadequate to allow for reasonable

extrapolation.  FDA acted well within its discretion in finding that BREEZE "was sufficient in size

*and duration* to allow appropriate characterization of safety and tolerability."  FDA-000433-435,

000439-440 (emphasis added).

Moreover, BREEZE included an optional extension phase beyond the three-week

treatment period that also "evaluate[d] the *long-term* safety and tolerability" of Tyvaso DPI.  FDA-

000760 (emphasis added).  Although Liquidia contends (at 33 n.23) that FDA relied solely on the

results of the three-week study and not those of the optional extension, the same table Liquidia

points to in FDA's Exclusivity Decision expressly notes that the "safety of Tyvaso DPI was also

studied in an extension phase" and that the "adverse events during this long-term, extension phase

*were similar* to those observed in the 3-week treatment phase."  FDA-000429 (emphasis added).

Finally, Liquidia repeats its argument (at 33-34) that the "true innovation" reflected in

Tyvaso DPI was use of the inactive ingredient FDKP, which was already known to FDA through

its approval of Afrezza.  But FDA explained this characterization of Tyvaso DPI's "innovative

change" "is incorrect."  FDA-000444.  FDA requested a new clinical investigation to evaluate the

multiple-dose use of *treprostinil* in a dry powder formulation for chronic use, and the innovation

achieved by Tyvaso DPI and supported by BREEZE was to deliver *treprostinil* to patients in this

new dosage form for chronic use.  FDA-000432-435, 000437, 000444, 000447.  By contrast, FDA

"did not view the inclusion of FDKP in the Tyvaso DPI formulation as posing a significant safety

risk, nor did it request the BREEZE study for the purpose of addressing such a risk." FDA-000447. Therefore, the fact that "FDKP had been previously approved in an inhaled insulin product, Afrezza," FDA-000445, is just not legally relevant.[9]

    **D.**    **FDA's evaluation of the scope of Tyvaso DPI's conditions of approval rested on sound scientific judgment and is consistent with prior agency decisions.**

Liquidia agrees with FDA that a drug's three-year exclusivity can only be as broad as the conditions of approval that were based upon the new clinical investigations identified in the application for the drug. *Compare* Liquidia Opening Br. 35, *with* FDA-000418-19. Liquidia likewise agrees (at 35) with FDA precedent providing that exclusivity under this test is based on "the innovative change for which new clinical investigations are essential to approval." FDA-000418. Thus, although the plain text of the statute arguably supports *broader* exclusivity than FDA has applied—the statute extends to block approval of follow-on drug products for the "same conditions of approval" as the product entitled to exclusivity, without refence to the details of the exclusivity-conferring study—the scope of exclusivity is at least as broad as supported by FDA's "innovative change" test that Liquidia endorses.

Here, FDA determined as a scientific matter that the relevant new clinical investigation— the BREEZE study—supported the use of Tyvaso DPI "in both PAH and PH-ILD patients who are new to treprostinil inhalation treatment and such patients who transition from Tyvaso

---

[9] In a footnote, Liquidia asserts (at 32 n.22) that it was the "true innovator" of treprostinil inhalation because it submitted its NDA before UTC submitted its Tyvaso DPI NDA. "[P]erfunctory and undeveloped arguments" are "deemed waived," and that "is especially true where the only reference to the argument is raised in a footnote." *Gold Reserve Inc. v. Bolivarian Rep. of Venezuela*, 146 F. Supp. 3d 112, 126 (D.D.C. 2015) (quotation marks omitted). In any event, Liquidia's boast is legally irrelevant. The three-year exclusivity is triggered by *final approval* of an application, not merely its submission (or even tentative approval). *See* 21 U.S.C. § 355(c)(3)(E)(iii). Here, Tyvaso DPI received final approval first, and Liquidia's application, which shares the same conditions of approval, is barred from receiving final approval until Tyvaso DPI's three-year exclusivity period expires. *See id.*

inhalation solution." FDA-000448. On that basis, FDA approved Tyvaso DPI for that indication and those patient populations. *See id.* FDA further found that the "innovative change represented by Tyvaso DPI is the new dosage form, inhalation powder, for the active moiety treprostinil," since BREEZE was essential to the agency's approval of the first ever treprostinil product in that dosage form. FDA-000444. In short, because "the BREEZE study answered for the first time whether the active moiety treprostinil administered as an inhalation powder is safe and tolerable for chronic use," Tyvaso DPI's new dosage form is entitled to exclusivity. FDA-000446-447. During that exclusivity period, a company like Liquidia can secure approval for a treprostinil product either by filing a 505(b)(1) application and relying only on its own studies, or by seeking approval of treprostinil in a different dosage form. But it may not rely on the 505(b)(2) shortcut to secure approval of another treprostinil product that uses the same dry powder dosage form as Tyvaso DPI.

Liquidia tries two tacks to narrow the innovative change represented by Tyvaso DPI, first arguing that the exclusivity should be cabined to PAH patients, and then asserting that the exclusivity should be limited to Tyvaso DPI's precise chemical formulation. Neither argument is sound, as both distort the role the BREEZE study played in FDA's approval decision.

### 1. Liquidia identifies no basis to second-guess FDA's scientific judgment that BREEZE supports use of Tyvaso DPI in PAH and PH-ILD patients who are new to treprostinil inhalation.

Liquidia does not directly challenge FDA's conclusion that Tyvaso DPI is safe and effective for treatment of both PH-ILD and PAH, bringing the treatment of both illnesses within the conditions of approval for the product. And how could it? After all, Liquidia is itself seeking to piggyback on UTC's earlier approvals to launch a treprostinil powder drug for the same indications. Liquidia nevertheless argues (at 36-37) that UTC's exclusivity should have been "limit[ed] … to the patient population actually studied by BREEZE"—*i.e.*, PAH patients on Tyvaso who switched to Tyvaso DPI. Liquidia purports to derive that rule from FDA precedent,

but Liquidia ignores FDA's contrary explanation of the governing test. As FDA has explained repeatedly:

> [A] particular clinical investigation may be more limited in scope or more specific than the conclusions (and thus the scope of exclusivity) that can be drawn from it. As a result, a drug studied in very specific conditions might be approved with a broader indication and not limited to those conditions under which it happened to be studied.

FDA-000116 (FDA exclusivity letter on remand from *Braeburn*, 389 F. Supp. 3d 1) (footnote omitted); *see also* FDA-000423. The "scope of a product's innovation similarly might not be defined by specific characteristics of its clinical studies where these are not clinically meaningful." FDA-000116; *see also* FDA-000423.

For example, in *Braeburn*, FDA concluded the NDA sponsor was entitled to three-year exclusivity for a monthly depot formulation of buprenorphine to treat moderate-to-severe opioid use disorder. FDA-000094. In reaching that conclusion, FDA rejected the argument that exclusivity should be limited to use in patients that shared the characteristics of the patient population in the qualifying investigation—specifically patients that were "new to buprenorphine treatment," which would exclude "maintenance treatment for patients already receiving buprenorphine." *Braeburn*, 389 F. Supp. 3d at 29; *see also* FDA-000106-107. FDA reaffirmed that determination on remand, concluding that "this characteristic of [the qualifying] studies does not define the scope of its exclusivity, including because it does not actually constrain the population for which use of [the product] is appropriate." FDA-000120. Rather, FDA's "medical and scientific experts determined that the studies in new entrants to treatment supported approval in both groups," because the results of the clinical studies "extend to clinically stable patients." *Id.* Liquidia conspicuously ignores the *Braeburn* remand decision, despite its inclusion in the administrative record and extensive discussion of earlier FDA precedents on which Liquidia relies. *See* FDA-000113-114, 000123-125 (discussing Astagraf XL example from *Veloxis*). Liquidia's

omission is telling: the *Braeburn* example directly contradicts its theory that FDA generally limits "the scope of exclusivity to the patient population actually studied."  Liquidia Opening Br. 37.

To be sure, *sometimes* the scope of exclusivity is limited by particular characteristics of the studied patient population.  In *Veloxis*, for example, the relevant study only demonstrated the safety and efficacy of Astagraf XL in "*de novo*" transplant patients—and so Astagraf XL was approved and indicated *only* for that class of patients.  *See* 109 F. Supp. 3d at 121.  The same was true in MorphaBond: ███████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

But FDA has cautioned that the scope of exclusivity supported by a study is "a fact-specific determination."  FDA-000423.  Here, although BREEZE's patient population consisted of PAH patients on a stable dose of Tyvaso, FDA found that the conclusions one can draw from the study are not limited to those populations.  FDA-000447-448.  As FDA explained:

> Although the population studied was limited, the approval it supported was not; it supported approval in both PAH and PH-ILD patients who are new to treprostinil inhalation treatment and such patients who transition from Tyvaso inhalation solution, and thus the scope of exclusivity is not limited to 'stable, switch patients' in whom it was studied.

FDA-000448.  And so, unlike in Astagraf XL and MorphaBond, the Tyvaso DPI label is not limited to the studied patient populations—it reflects the broader approval that FDA concluded BREEZE justified.  To the extent Liquidia disputes FDA's finding that BREEZE allows one to draw conclusions about the safety and tolerability of Tyvaso DPI for PH-ILD patients or patients new to treprostinil inhalation, Liquidia is again challenging the agency's factual, scientific determination rather than any legal conclusion.  Liquidia offers no evidence to undermine FDA's factual determination—much less evidence sufficient to overcome the "high level of deference"

owed to "FDA's evaluations of scientific data within its area of expertise." *Astellas Pharma US, Inc. v. FDA*, 642 F. Supp. 2d 10, 19 (D.D.C. 2009) (quotation marks omitted).

Liquidia also argues that, even if FDA's judgment is sound on the merits, the agency failed to adequately explain its decision. Liquidia Opening Br. 38-39. Not so. FDA fully laid out the basis for the distinction it drew, which closely echoes its analysis in the *Braeburn* remand decision:



> Here, by contrast, the BREEZE study supported the approval of Tyvaso DPI for use in a broader patient population than that included in the study (PAH patients switching from a stable dose of Tyvaso inhalation solution). Although the population studied was limited, the approval it supported was not; it supported approval in both PAH and PH-ILD patients who are new to treprostinil inhalation treatment and such patients who transition from Tyvaso inhalation solution, and thus the scope of exclusivity is not limited to "stable, switch patients" in whom it was studied.

FDA-000448 (footnotes omitted); *see also* FDA-000125 (*Braeburn* remand decision similarly distinguishing Astagraf XL). There is thus no basis to argue that FDA failed to provide a reasoned decision; Liquidia merely disagrees with—or perhaps does not fully understand—the outcome. Again, though, Liquidia presents no basis to challenge the agency's scientific judgment.

### 2. FDA reasonably exercised its scientific judgment in finding the scope of innovation for Tyvaso DPI is not limited to its specific chemical formulation.

Liquidia contends (at 39) that "FDA irrationally failed to limit the scope of NCI exclusivity to the specific formulation presented in Tyvaso DPI," which contains FDKP. According to Liquidia, "[i]n prior cases, FDA has limited the scope of NCI exclusivity to the product's specific formulation." *Id.* (quotation marks omitted). As the agency explained, however, "the inclusion of FDKP in Tyvaso DPI does not significantly change the population or use for which Tyvaso DPI

is appropriate," and it is not "otherwise expected to change a clinician's determination as to whether the product is appropriate for use in a particular patient."  FDA-000449.  Accordingly, FDA concluded, "FDKP is not a clinically meaningful characteristic of Tyvaso DPI that further defines or limits the scope of its innovation."  *Id.*

Liquidia does not challenge the legal standard FDA applied—*i.e.*, whether the characteristic at issue is "clinically meaningful."  *See* Liquidia Opening Br. 39-40.  Instead, Liquidia invokes a single instance in which FDA limited three-year exclusivity "to the unique formulation and associated drug release profile" studied and then suggests that FDA should have adopted the same approach here.  *Id.* at 40.  But the Dyanavel XR decision that Liquidia cites is inapposite, as FDA explained.  *See* FDA-000446-447 (discussing and distinguishing the Dyanavel XR decision).  In that case, ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████  Here, by contrast, FDA found that BREEZE supported approval of treprostinil in a novel dosage form—it was not limited to the suitability of using FDKP in particular.  FDA-000444-445. Liquidia's efforts to dispute that finding rest on irrelevant distractions.  In particular, Liquidia attributes significance to the Tyvaso DPI label's inclusion of a warning "concerning bronchospasms risks," which Liquidia insists (at 40-41) traces to FDKP and the agency's earlier approval of Afrezza.  But as FDA explained to Liquidia, "this warning is not unique to Tyvaso DPI and is also presented in the approved labeling for Tyvaso inhalation solution, which does not contain FDKP."  FDA-000449 n.144.

****** 

FDA properly applied legal standards that Liquidia does not challenge in determining that BREEZE was essential to approval, recognizing the "conditions of approval" BREEZE established, and concluding Tyvaso DPI is entitled to three-year exclusivity. There was nothing arbitrary, capricious, or otherwise contrary to law about that decision. This Court should accordingly deny Liquidia's motion.

## II.    Liquidia Is Not Entitled to a Preliminary Injunction.

Liquidia formally renews its preliminary injunction motion, but it appears to effectively abandon any request for preliminary relief and instead asks only for final relief under the APA. *See* Liquidia Opening Br. 44. Liquidia's implicit concession is correct: a preliminary injunction would be entirely inappropriate here where Liquidia seeks to upend the status quo and override an exclusivity that could not be restored at the end of the case. *See, e.g.*, *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (purpose of a "preliminary injunction" "is merely to preserve the relative positions of the parties until a trial on the merits can be held"); *Kondapally v. U.S. Citizenship & Immigr. Servs.*, 2020 WL 5061735, at *3 (D.D.C. Aug. 27, 2020) ("Mandatory injunctions that would change the status quo are disfavored as an even more extraordinary remedy than the typical preliminary injunction" (quotation marks omitted)). The Court should accordingly proceed to resolve the case on the cross-motions for summary judgment.

But to the extent still relevant, the traditional factors do not support a preliminary injunction. For the reasons explained above, Liquidia is not likely to succeed on the merits. The other preliminary injunction factors also counsel against injunctive relief.

### A.    Liquidia has not shown irreparable harm.

Liquidia makes no serious effort to show it is suffering or will soon suffer irreparable harm. If Liquidia is delayed entering the inhaled treprostinil market, its harm will be, at most, monetary

injury, which is insufficient on its own to support a preliminary injunction. *Air Transp. Ass'n v. Exp.-Imp. Bank*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012). The holding in *Torpharm, Inc. v. Shalala*, on which Liquidia relies, was based on a competitive market structure with "long-term contracts," which Liquidia does not allege exist in the treprostinil market. 1997 WL 33472411, at *4 (D.D.C. Sept. 15, 1997).

Contradicting its own previous position, Liquidia contends its economic injury is inherently irreparable just because damages against FDA are barred by sovereign immunity. Liquidia recently described that exact argument as "simplistic" and wrong. *United Therapeutics Corp. v. FDA*, 24-cv-00484, ECF No. 24, at 39 (D.D.C. Mar. 18, 2024); *see also Air Transp.*, 840 F. Supp. 2d at 335. Unrecoverable economic injury is *sometimes* irreparable, but Liquidia makes no effort to make such a showing here. Liquidia would simply like to start making money a few months sooner, but it has failed to substantiate the significance of that limited period.

## B.    The balance of hardships and public interest strongly disfavor an injunction.

Neither the balance of harms nor the public interest favors entry of a preliminary injunction. If this Court were to grant preliminary injunctive relief, UTC would forever lose the benefit of the marketing exclusivity provided by Congress, given that Liquidia could secure final approval and launch despite FDA determining that UTC completed a new clinical investigation essential to approval of Tyvaso DPI. And injunctive relief in this context would not be preliminary in nature. Given that this exclusivity period expires in May 2025, it is unlikely that UTC's statutory right could be restored at the end of litigation. Courts in this Circuit have repeatedly recognized that the loss of such a "statutory entitlement" is irreparable because "[o]nce the statutory entitlement has been lost, it cannot be recaptured." *Apotex, Inc. v. FDA*, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006) (citing *Mova*, 140 F.3d at 1067 (D.C. Cir. 1998)), *aff'd*, 449 F.3d 1249 (D.C. Cir. 2006); *see also Mylan Labs. Ltd. v. FDA*, 910 F. Supp. 2d 299, 313 (D.D.C. 2012) (explaining that

the loss of an exclusivity period "specifically intended by Congress" is inherently irreparable). This Court should apply the same reasoning here and hold that the harm to UTC from losing its right to a statutory three-year exclusivity period outweighs Liquidia's interest in accelerating its approval.[10]

The public interest likewise disfavors the award of preliminary injunctive relief that would prematurely terminate UTC's statutory right to exclusivity. Allowing Liquidia to bypass UTC's statutory exclusivity would undermine the incentive Congress created for innovators like UTC to continue investing in research and development. To the extent Liquidia claims (at 43) that Yutrepia would "help give PAH and PH-ILD patients access to a new and differentiated treatment option," Liquidia has provided no evidence to support any suggestion that Yutrepia could treat a more expansive patient population or be more effective. Indeed, as FDA explained, Yutrepia shares the same conditions of approval as Tyvaso DPI. *See* pp. 16-18, *supra*.

## III.   Liquidia's Requested Relief Should Be Denied.

For the reasons given above, Liquidia has not established the right to any relief. FDA's actions are neither arbitrary and capricious nor otherwise unlawful. Liquidia's request for relief overreaches in any event. As Liquidia recognizes in parts of its brief, if the Court were to identify an error with the FDA's exclusivity determination, the proper remedy would be vacatur and remand. Under the ordinary remand rule, it would be left for the agency, not the Court, to conform

---

[10] Moreover, were Liquidia able to launch Yutrepia before Tyvaso DPI's exclusivity period ended, UTC would suffer harm in the form of price erosion, lost market share, and loss of goodwill—all forms of injury that courts have recognized as paradigmatic examples of irreparable harm. *See Bayer HealthCare, LLC v. FDA*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013) ("Courts have recognized that price erosion and diminished market share can constitute irreparable harm."); *Xiaomi Corp. v. Dep't of Defense*, 2021 WL 950144, at *9 (D.D.C. Mar. 21, 2021) ("[B]ecause '[i]njury to reputation or goodwill is not easily measurable in monetary terms' it is typically 'viewed as irreparable.'" (second alteration in original) (quoting 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2021))).

its exclusivity determination to the Court's ruling.  *See, e.g.*, *Calcutt v. FDIC*, 598 U.S. 623 (2023) (describing the ordinary remand rule).[11]  This Court should not constrain what the agency may decide on remand or require it to move unrealistically fast, as under the two-week timetable Liquidia proposes.  Any remand must provide sufficient time for an orderly process, including providing an opportunity for UTC to participate in further defense of its statutory exclusivity right.

In no event should the Court indulge Liquidia's demand (at 45) that it "take all steps necessary to promptly give full approval to Yutrepia."  Not only would that short-circuit FDA's ability to adopt a position on the exclusivity issue, but it would also preempt adjudication of UTC's cross-claim, which contends that final approval of Liquidia's 505(b)(2) application in its current form would be unlawful—whether during or after UTC's period of exclusivity.  This Court should not order what the cross-claim seeks to preclude—a launch of Yutrepia that cannot feasibly be unraveled—without first resolving the merits of the cross-claim.

## CONCLUSION

For the reasons stated above, this Court should grant the Federal Defendants' and UTC's motions for summary judgment and deny Liquidia's renewed motion for a preliminary injunction and motion for summary judgment.

---

[11] The two unpublished decisions on which Liquidia relies (at 45) are outliers that do not support a departure from the remand rule.  In *Teva Pharms. USA v. FDA*, the court concluded there was "no rational reason" for FDA to withhold final approval and thus nothing further for the agency to address.  1999 WL 1042743, at *7 (D.D.C. Aug. 19, 1999).  Similarly, in *Toropharm, Inc. v. Shalala*, the court held that the "unambiguous command of the statute" compelled FDA to make its approval immediately effective; the issue there turned on whether a particular court decision automatically dissolves a statutory stay, not on any issue of scientific judgment by the agency. 1997 WL 33472411, at *3 (D.D.C. Sept. 15, 1997).  The situation here, where Liquidia generally accepts FDA's legal framework but quibbles with its scientific judgments, is not comparable.

October 15, 2024

Shaun R. Snader (D.C. Bar No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

Douglas Carsten (admitted *pro hac vice*)
Art Dykhuis (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

Adam W. Burrowbridge (D.C. Bar No.
  1001783)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

Respectfully submitted.

/s/ *Brian T. Burgess*
William C. Jackson (D.C. Bar. No. 475200)
William M. Jay (D.C. Bar. No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20001
(202) 346-4000

Kurt R. Karst (D.C. Bar No. 482615)
Michael D. Shumsky (D.C. Bar No. 495078)
Sara Wexler Koblitz (D.C. Bar No. 1017284)
HYMAN, PHELPS & MCNAMARA, P.C.
700 13th Street, NW, Suite 1200
Washington, DC 20005
(202) 737-5600

*Counsel for United Therapeutics Corporation*