# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIQUIDIA TECHNOLOGIES, INC.,

        *Plaintiff*,

   v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, *et al.*,

        *Defendants*,

   and

UNITED THERAPEUTICS CORPORATION,

        *Intervenor-Defendant*
        *and Cross-Claimant.*

**REDACTED**

Case No. 1:24-cv-02428-TJK

Honorable Timothy J. Kelly

**ORAL ARGUMENT REQUESTED**

---

**PLAINTIFF LIQUIDIA TECHNOLOGIES, INC.'S REDACTED CONSOLIDATED
OPPOSITION TO INTERVENOR-DEFENDANT UNITED THERAPEUTICS
CORPORATION'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
REPLY IN SUPPORT OF ITS RENEWED MOTION FOR A PRELIMINARY
INJUNCTION AND MOTION FOR SUMMARY JUDGMENT**

Sonia Nath (DC Bar No. 977095)
David E. Mills (DC Bar No. 401979)
Robby Saldaña (DC Bar No. 1034981)
Matt K. Nguyen (DC Bar No. 1736777)
COOLEY LLP
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004-2400
Telephone: (202) 842-7800

Kathleen R. Hartnett (DC Bar No. 483250)
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.    FDA Unlawfully Granted NCI Exclusivity to Tyvaso DPI. ...................................... 2

        A.    FDA's Finding that BREEZE Qualified as a New Clinical Investigation Violated the FDCA and FDA Regulations, and Was Arbitrary and Capricious. ................. 3

                *1.*    *BREEZE was an ineligible bioavailability study.* ...................................... 4

                *2.*    *BREEZE was an ineligible confirmatory study.* ....................................... 9

                *3.*    *UTC's policy and process arguments lack merit.* .................................... 11

                *4.*    *UTC fails to justify FDA's arbitrary and capricious departure from its "Original" decision in 2022 denying NCI exclusivity to Tyvaso DPI.*...... 13

        B.    BREEZE Was Not "Essential to the Approval" of the Tyvaso DPI NDA. .......... 20

        C.    Even Assuming Tyvaso DPI Qualifies for Exclusivity, It Cannot Block Yutrepia. ............................................................................................................... 28

                *1.*    *FDA unlawfully granted NCI exclusivity to Tyvaso DPI covering the entire dry powder dosage form.* ..................................................................... 28

                *2.*    *FDA unlawfully granted NCI exclusivity covering patient populations and indications far beyond the supposed innovations of BREEZE.*................ 30

                *3.*    *UTC's contention that BREEZE's three-week study rendered innovations on "chronic" use of dry powder treprostinil makes no sense.* ................. 37

II.    There Is No Basis for Scientific Deference Here................................................... 41

III.    Summary Judgment Should Be Promptly Granted for Liquidia, or Alternatively, the Court Should Issue a Preliminary Injunction. ........................................................... 43

    CONCLUSION.................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aamer v. Obama*,
    742 F.3d 1023 (D.C. Cir. 2014) ..................................................43

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
    429 F.3d 1136 (D.C. Cir. 2005) ..............................................44–45

*Am. Hosp. Ass'n v. Azar*,
    385 F. Supp. 3d 1 (D.D.C. 2019) .................................................44

*ANR Pipeline Co. v. FERC*,
    71 F.3d 897 (D.C. Cir. 1995) ......................................................15

*AstraZeneca Pharms. LP v. FDA*,
    872 F. Supp. 2d 60 (D.D.C. 2012),
    *aff'd*, 713 F.3d 1134 (D.C. Cir. 2013) ....................................7, 23, 29

*Brady Campaign to Prevent Gun Violence v. Salazar*,
    612 F. Supp. 2d 1 (D.D.C. 2009) .................................................19

*Braeburn Inc. v. FDA*,
    389 F. Supp. 3d 1 (D.D.C. 2019) .............................................27, 28

*DHS v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ...............................................................26

*Eagle Pharms., Inc. v. Azar*,
    Civil Action No. 16-790, 2018 WL 3838265 (D.D.C. June 8, 2018) (Kelly, J.),
    *aff'd*, 952 F.3d 323 (D.C. Cir. 2020) .............................................11

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ...................................................................35

*Endo Par Innovation Co., LLC v. Becerra*,
    No. CV 24-999, 2024 WL 2988904 (D.D.C. June 10, 2024) (Kelly, J.) ...............19

*Indep. Petrol. Ass'n of Am. v. Babbitt*,
    92 F.3d 1248 (D.C. Cir. 1996) ......................................................8

*Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Lab.*,
    358 F.3d 40 (D.C. Cir. 2004) .......................................................35

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ....................................................... *passim*

## TABLE OF AUTHORITIES
### continued

**Page(s)**

*Marbury v. Madison,*
    1 Cranch 137 (1803) ..................................................................................42

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.,*
    70 F.4th 582 (D.C. Cir. 2023) ...................................................................19

*N.Y. Stock Exch. v. SEC,*
    962 F.3d 541 (D.C. Cir. 2020) ..................................................................42

*Policy & Rsch., LLC v. HHS,*
    313 F. Supp. 3d 62 (D.D.C. 2018) ............................................................20

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,*
    421 U.S. 168 (1975) ..................................................................................17

*Starbucks Corp. v. McKinney,*
    144 S. Ct. 1570 (2024) ..........................................................................43–44

*Teva Pharms. USA, Inc. v. FDA,*
    No. Civ.A. 99-67, 1999 WL 1042743 (D.D.C. Aug. 19, 1999) ...............44

*Torpharm, Inc. v. Shalala,*
    No. Civ.A. 97-1925, 1997 WL 33472411 (D.D.C. Sept. 15, 1997) .........44

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ....................................................................................5

*Vanda Pharmaceuticals, Inc. v. FDA,*
    No. 1:22-cv-01432, 2023 WL 6035663, D.D.C (Aug. 2, 2023) ..............39

*Veloxis Pharm., Inc. v. FDA,*
    109 F. Supp. 3d 104 (D.D.C. 2015) ............................................12, 29, 34

**Statutes**

5 U.S.C.
    § 552(b)(5) ................................................................................................17
    § 702 .........................................................................................................11
    § 706(2) ..................................................................................................9, 12

21 U.S.C. § 355(c)(3)(E)(iii) ............................................................................ *passim*

Federal Food, Drug, and Cosmetic Act ("FDCA") ......................................... *passim*

Freedom of Information Act ("FOIA") ...............................................................17

## TABLE OF AUTHORITIES
### continued

Page(s)

**Other Authorities**

21 C.F.R. § 314.108(a) ............................................................................... *passim*

54 Fed. Reg. 28,872 (July 10, 1989) ............................................................. 29

59 Fed. Reg. 50,338 (Oct. 3, 1994) ............................................................... 23

CDER Exclusivity Board, U.S. Food & Drug Administration (Dec. 15, 2014),
    https://www.fda.gov/about-fda/center-drug-evaluation-and-research-
    cder/cder-exclusivity-board ..................................................................... 16

Center for Drug Evaluation and Research, E1A The Extent of Population
    Exposure to Assess Clinical Safety: For Drugs Intended for Long-term
    Treatment of Non-Life-Threatening Conditions, FDA (March 1995),
    https://www.fda.gov/regulatory-information/search-fda-guidance-
    documents/e1a-extent-population-exposure-assess-clinical-safety-drugs-
    intended-long-term-treatment-non-life .................................................. 38–39

H.R. Rep. No. 98-857, pt. 1 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647-48 .......................... 23

Merriam-Webster Dictionary, Chronic,
    https://www.merriam-webster.com/dictionary/chronic ........................... 39

Merriam-Webster Dictionary, Chronic Disease,
    https://www.merriam-webster.com/dictionary/chronic%20disease ........... 39

## INTRODUCTION

For over twenty years, UTC has profited from a monopoly on treprostinil made possible by FDA's serial awards of market exclusivity based on UTC's incremental changes to UTC's drug. With all those exclusivity periods now expired, UTC insists on fighting tooth and nail to prolong that monopoly far beyond statutory limits—first through a litany of patent lawsuits in which Liquidia has consistently prevailed, and now by demanding that this Court rubber-stamp FDA's Exclusivity Decision at the expense of patient choice, rightful competition, and the law.

UTC casts itself as the "innovator" of dry powder treprostinil and disparages Liquidia as a "free rider" for using the 505(b)(2) pathway. But UTC's accusations are as revisionist as they are hypocritical. Liquidia, utilizing its proprietary PRINT process, developed *the first* dry powder formulation of treprostinil; Liquidia conducted its own novel study, INSPIRE, confirming that inhaled dry powder treprostinil demonstrates the same safety and efficacy as inhaled treprostinil solution; and Liquidia was the *first* to submit such studies to FDA with its Yutrepia NDA in January 2020—well before UTC submitted the Tyvaso DPI NDA that included BREEZE in April 2021. And while UTC denigrates the 505(b)(2) pathway,[1] it essentially copied that pathway for Tyvaso DPI's NDA, and curiously ignores that Congress established that alternative pathway to maximize competition and facilitate patient choice.

---

[1] UTC's attacks on 505(b)(2) applicants are particularly questionable given FDA's observation that the approach UTC took for its Tyvaso DPI NDA—i.e., cross-referencing studies submitted with its earlier Tyvaso Inhalation Solution NDA—bears striking "similar[ities] to one that might be used by a 505(b)(2) applicant." FDA-000424. While UTC could use the 505(b)(1) pathway because it owned the older cross-referenced studies, there is no question that UTC took advantage of the same approach to develop Tyvaso DPI that Liquidia did for Yutrepia, including by relying on TRIUMPH and INCREASE previously submitted with the Tyvaso Inhalation Solution NDA. Indeed, UTC recognized that Tyvaso DPI was such a negligible change to Tyvaso Inhalation Solution that it did not change its name, even when it had done so with previous novel changes to treprostinil for which it previously received exclusivity (*e.g.*, Remodulin, Orenitram, Tyvaso).

Setting aside UTC's posturing, its brief boils down to three main contentions: (1) BREEZE is a new clinical investigation, even though it studied bioavailability and falls squarely within the definition of a bioavailability study; (2) BREEZE was "essential" to Tyvaso DPI's approval, even though FDA repeatedly concluded that TRIUMPH and INCREASE had already proven the safety and efficacy of inhaled treprostinil; and (3) Tyvaso DPI is entitled to NCI exclusivity over the entire dry powder treprostinil dosage form, untethered to the limited patients, indications, formulation, and short-term use of Tyvaso DPI that BREEZE studied.

UTC's arguments fail as a matter of law, and are contrary to FDA's stated reasoning in this record review case. What's more, UTC's arguments do little to dispel the pall of arbitrary and capricious decisionmaking looming large over the Exclusivity Decision—including FDA's unexplained flip-flopping on its original exclusivity decision in 2022, which denied NCI exclusivity to Tyvaso DPI. Accordingly, this Court should grant summary judgment in favor of Liquidia, deny FDA's and UTC's cross-motions for summary judgment, vacate FDA's unlawful Exclusivity Decision, and order FDA to issue immediate full approval of the Yutrepia NDA.

## ARGUMENT

### I.    FDA UNLAWFULLY GRANTED NCI EXCLUSIVITY TO TYVASO DPI.

The FDCA and FDA regulations prohibit FDA from granting NCI exclusivity to Tyvaso DPI. BREEZE, the sole study on which FDA based its grant of NCI exclusivity to Tyvaso DPI, (1) cannot qualify as a new clinical investigation because it was a bioavailability and confirmatory study, and (2) was not essential to the approval of the Tyvaso DPI NDA. FDA expressly documented both findings in its original exclusivity decision in 2022. FDA-000453-459 (the "Original Exclusivity Summary"). Further, even if Tyvaso DPI could qualify for NCI exclusivity (it cannot), FDA erred by ascribing an overbroad scope of exclusivity encompassing the entire dosage form of dry powder treprostinil, inclusive of all patient populations and indications, and

covering chronic use.  Neither the FDCA nor FDA regulations contemplate such expansive NCI exclusivity unmoored from BREEZE's self-imposed limitations and the allegedly innovative incremental change that BREEZE claimed to study.

UTC's arguments to the contrary do not change the fact that the Exclusivity Decision violates the FDCA, FDA regulations, and FDA precedent, or that FDA acted arbitrarily, capriciously, and contrary to law in granting NCI exclusivity to Tyvaso DPI.

### A.    FDA's Finding that BREEZE Qualified as a New Clinical Investigation Violated the FDCA and FDA Regulations, and Was Arbitrary and Capricious.

The FDCA and FDA regulations categorically bar (1) previously-submitted studies, (2) bioavailability studies, and (3) duplicative/confirmatory studies from qualifying as new clinical investigations.  21 U.S.C. § 355(c)(3)(E)(iii); 21 C.F.R. § 314.108(a).  Based on this express statutory limitation, all five studies filed with Tyvaso DPI's NDA cannot qualify as new clinical investigations for which NCI exclusivity may be granted.  UTC does not dispute that it submitted the findings of TRIUMPH and INCREASE to FDA with prior NDAs, or that MKC-475-001 and TIP-PH-102 are ineligible bioavailability studies.  ECF No. 56 ("UTC Br."), at 10, 16.[2]  Thus, UTC implicitly acknowledges that 21 U.S.C. § 355(c)(3)(E)(iii) renders TRIUMPH, INCREASE, MKC-475-001, and TIP-PH-102 categorically ineligible.  UTC Br. 10, 16.

Turning to TIP-PH-101, also known as BREEZE, however, UTC insists that BREEZE can both study bioavailability as an endpoint and be confirmatory, yet still remain a new clinical

---

[2] Unless otherwise noted, Liquidia incorporates all of defined terms from its renewed motion for a preliminary injunction and motion for summary judgment.  UTC's and FDA's memoranda for its opposition and cross-motion for summary judgment are respectively referred to as "UTC Br." and "FDA Br."  Liquidia's memorandum in support of its renewed preliminary injunction motion and motion for summary judgment is referred to as "Liquidia Br."  For ease of reference, citations in this Brief to the FDA and UTC memoranda are paginated by the page numbers appearing in those briefs, not their ECF pagination.

investigation warranting NCI exclusivity under the FDCA.  UTC Br. 20–24.  UTC's argument fails as antithetical to the plain text of the FDCA and FDA's implementing regulations.  Moreover, FDA's conclusion must be vacated as arbitrary and capricious in light of FDA's original finding in 2022 that BREEZE was an ineligible bioavailability and confirmatory study.

### 1.    BREEZE was an ineligible bioavailability study.

The FDCA plainly provides that no NDA may qualify for NCI exclusivity unless the NDA "contains reports of new clinical investigations (other than bioavailability studies)."  21 U.S.C. § 355(c)(3)(E)(iii).  It is uncontested that BREEZE did, in fact, study bioavailability.  *See, e.g.*, FDA-000426-427 (documenting FDA's understanding that BREEZE studied "PK assessments," and that those "PK assessments" were an endpoint for BREEZE); FDA-000838 (pharmacokinetics, or "exposure of TreT," was a BREEZE endpoint); UTC Br. 20 (BREEZE "report[ed] data on bioavailability"); *id.* at 21 (bioavailability was one of BREEZE's endpoints); *id.* at 22 (BREEZE "did assess pharmacokinetics"); *id.* at 23 & n.5 (same).  Consequently, there can be no serious dispute BREEZE was a bioavailability study.

UTC accuses Liquidia of trying "to rewrite the text" of the FDCA.  UTC Br. 22.  But its accusation is a confession.  The crux of UTC's argument is that BREEZE qualifies as a new clinical investigation because it did not study bioavailability "solely"; it also studied other endpoints.  *Id.* at 22 (arguing that "BREEZE was not structured ***solely*** to 'determine the bioavailability or the pharmacokinetics of a drug.'" (quoting 21 C.F.R. § 314.108(a))) (emphasis added); *see* FDA-000415 ("Bioavailability data provide an estimate of the fraction of the drug absorbed, as well as provide information related to the pharmacokinetics (PK) of the drug.").  UTC's parsing of what else BREEZE studied ***in addition to*** bioavailability cannot alter the plain text of the FDCA.

UTC's argument would require this Court to modify the FDCA by inserting the word "solely," so the statute would read "other than [studies that are solely] bioavailability studies."  *See*

UTC Br. 22 (arguing that NCI exclusivity is available if the NDA contains new studies "that are *not limited to* assessing bioavailability") (emphasis added). Plainly, the law does not permit an agency to rewrite statutory text to support its decisions. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate . . . . the need to rewrite clear provisions of the statute should have alerted EPA that it had taken a wrong interpretive turn."). Therefore, under the statute as Congress enacted it, there can be no dispute that BREEZE is a bioavailability study, regardless of whether it studied other endpoints as well, such that it is ineligible as a basis for NCI exclusivity. U.S.C. § 355(c)(3)(E)(iii). This Court should decline UTC's invitation to accommodate FDA's statutory overreach.

In defense of its interpretation, UTC further contends that "Liquidia conspicuously ignores the regulatory definition of 'bioavailability study.'" UTC Br. 23. But again, that is mere projection by UTC. FDA regulations unambiguously define a "bioavailability study" as "a study to determine the bioavailability or the pharmacokinetics of a drug." 21 C.F.R. § 314.108(a). UTC attempts to miniaturize BREEZE's intended study of bioavailability and pharmacokinetics as endpoints by recasting BREEZE as merely "contain[ing] pharmacokinetic data, even when [BREEZE's] purpose is to test other endpoints." UTC Br. 24. Not so. BREEZE itself characterized one of its objectives as studying "systemic exposure and *pharmacokinetics* for up to 5 h . . . at baseline for treprostinil inhalation solution and at Week 3 for TreT" as an endpoint, which UTC does not dispute. ECF No. 13-10 (BREEZE), at 2 (emphasis added); FDA-000712–713 (BREEZE "was designed to evaluate the pharmacokinetics" of Tyvaso DPI and "systemic exposure and pharmacokinetics of treprostinil" was a BREEZE endpoint); *see* UTC Br. 23–24 n.5 ("[T]here is no dispute that BREEZE 'assessed pharmacokinetics after administration of each dose . . . .'"

(quoting FDA-000432)).  Moreover, in its review of the NDA for Tyvaso DPI, FDA cited the

BREEZE's pharmacokinetics data.  *See* FDA-000838, 842–844.  Because BREEZE sought "to

determine . . . the pharmacokinetics" of Tyvaso DPI as compared to Tyvaso Inhalation Solution,

and in fact FDA relied on it to establish the relative pharmacology of Tyvaso DPI as compared to

Tyvaso Inhalation Solution, BREEZE fits FDA's regulatory definition of a "bioavailability study"

to a tee.  21 C.F.R. § 314.108(a).

UTC only perpetuates FDA's statutory overreach by emphasizing "primary purpose" as

though that phrase appears in the FDCA or FDA regulations, or even in the Exclusivity Decision.

UTC Br. 23–24 (arguing that "[a] study directed to a different primary objective is not naturally

regarded as a study 'to determine' pharmacokinetics merely because some pharmacokinetic

assessments are included").  In other words, UTC does not dispute that BREEZE was designed "to

determine" bioavailability and pharmacokinetics as an endpoint; it simply quibbles over whether

BREEZE's study of pharmacokinetics as an endpoint should be characterized as a "primary" or

"secondary" endpoint, as if that matters.  UTC Br. 22–23.  But this distinction appears ***nowhere*** in

the FDCA or FDA regulations limiting when FDA may award NCI exclusivity.  Again, the terms

of the FDCA and FDA regulations are clear.

UTC's proposed interpretation would turn the FDCA's express limitation on what qualifies

as a "new clinical investigation" or "bioavailability study" on its head.  Under UTC's flawed view,

any sponsor (or FDA) would have the unilateral power to obtain (or award) NCI exclusivity simply

by labeling the study's bioavailability endpoint as "secondary" instead of "primary"—and not

assess a study based on its study of bioavailability or pharmacokinetics.  *See, e.g.*, UTC Br. 25

(arguing that TIP-PH-102 is distinguishable from BREEZE because, even though both studied

bioavailability and safety as endpoints, TIP-PH-102 opted to characterize bioavailability as a

"primary endpoint" and "safety" as a secondary endpoint). Nothing in the statute or in FDA regulations allows FDA to cherry pick which studies it may deem to be "bioavailability studies" and which studies that study bioavailability as endpoints may nevertheless warrant NCI exclusivity. UTC's heavy hand on the scale would render the express limitations prescribed by the FDCA and FDA regulations toothless, upending the "careful balance" Congress struck "between providing exclusivity rights to promote innovation and making generic alternatives available to patients." *AstraZeneca Pharms. LP v. FDA*, 872 F. Supp. 2d 60, 85 (D.D.C. 2012), *aff'd*, 713 F.3d 1134 (D.C. Cir. 2013).

Case in point: neither UTC nor FDA ever explain how, under this novel interpretation, BREEZE was deemed a new clinical investigation warranting NCI exclusivity, but TIP-PH-102 or MKC-475-001 were not, when all three examined pharmacokinetic data, along with safety and tolerability of Tyvaso DPI. UTC's characterization of BREEZE as a new clinical investigation is incompatible with its concession that MKC-475-001 and TIP-PH-102, the other "new" studies submitted with the Tyvaso DPI NDA, cannot qualify for NCI exclusivity because both were "bioavailability studies"—even though *all three investigated safety as an endpoint*. UTC Br. 16 (conceding MKC-475-001 and TIP-PH-102 were "bioavailability studies"). MKC-475-001 even investigated "safety and tolerability" as a primary endpoint, just like BREEZE. FDA-000713. UTC cannot have it both ways.

Indeed, the administrative record reveals that BREEZE's "safety" assessments and endpoints basically replicated the "safety" assessments and endpoints studied in TIP-PH-102 and MKC-475-001. *Compare* FDA-000426 (the stable PAH patients studied in BREEZE underwent "PK assessments" and "safety assessments (including incidence and severity of reported adverse events, vital signs, clinical laboratory tests, electrocardiograms, and physical examinations)"), *with*

FDA-000429 ("During the [TIP-PH-102] study, subjects underwent PK and safety assessments. . . . Safety assessments included adverse events, vital signs, clinical laboratory tests, 12-lead ECGs, and physical examinations.") *and* FDA-000473 (MKC-475-001 studied the "pharmacokinetics" of Tyvaso DPI and conducted "[s]afety assessments includ[ing] incidence and severity of reported adverse events, as well as changes from screening in vital signs, clinical laboratory tests, electrocardiograms (ECGs), and physical examinations."). In short, both TIP-PH-102 and MKC-475-001 were bioavailability studies that are ineligible for NCI exclusivity based on the very same logic rendering BREEZE ineligible. *See Indep. Petrol. Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996) ("An agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so.") And as detailed further in Section I.A.4 *infra*, FDA itself also concluded that BREEZE was an ineligible bioavailability study in May 2022. FDA-000453–459.

At base, UTC's argument on bioavailability appears to be that the FDCA permits FDA to subdivide a single study like BREEZE into multiple "reports," such that the ineligible portions of BREEZE that indisputably studied "the bioavailability [and] the pharmacokinetics" of Tyvaso DPI can be cabined so BREEZE can still qualify as a new clinical investigation. UTC Br. 22 Neither the FDCA nor FDA regulations permit such creative parsing. In fact, the FDCA squarely precludes FDA from awarding NCI exclusivity unless the "***application*** contains reports of new clinical investigations (other than bioavailability studies)." 21 U.S.C. § 355(c)(3)(E)(iii) (emphasis added). All parties agree that the Tyvaso DPI ***application*** contained just five studies. *See* ECF No. 30 ("UTC Answer"), ¶ 60 ("admit[ing] that the NDA for Tyvaso DPI included the TRIUMPH and INCREASE Studies, bioavailability data, and the BREEZE Study"). Adopting UTC's novel interpretation of the FDCA would require this Court to excise "(other than bioavailability studies)"

from the statute and allow a single study to be subdivided into multiple "reports." UTC Br. 22. UTC's dismissive approach to the clear terms of the FDCA should be rejected. Along the same lines, FDA's regulatory definition of clinical investigation—"any experiment other than a bioavailability study"—similarly undermines UTC's position. 21 C.F.R. § 314.108(a). That regulation again refutes the notion of subdividing the one "experiment" conducted in BREEZE.

Without any legal arguments in support, UTC is left to suggest random analogies that have no bearing on this case. UTC Br. 24 (analogizing dry powder treprostinil to raincoats, energy drinks, and picture books, none of which are regulated under the FDCA). This Court should not be persuaded by UTC's throw-away analogies where the statutory text is clear. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024) ("The APA . . . incorporates the traditional understanding of the judicial function, under which courts must exercise *independent* judgment in determining the meaning of statutory provisions.") (emphasis added); 5 U.S.C. § 706(2).

In short, BREEZE is a bioavailability study under the plain text of the FDCA and FDA regulations, and this alone categorically renders Tyvaso DPI ineligible for NCI exclusivity. 21 U.S.C. § 355(c)(3)(E)(iii); 21 C.F.R. § 314.108(a). Accordingly, FDA's grant of NCI exclusivity to Tyvaso DPI violates the FDCA and APA and must be vacated.

### 2. *BREEZE was an ineligible confirmatory study.*

In addition to rendering bioavailability studies ineligible for NCI exclusivity, FDA regulations make clear that confirmatory studies like BREEZE cannot qualify as "new clinical investigations" because they "duplicate the results of another investigation that was relied on by the agency to demonstrate the effectiveness or safety in a new patient population of a previously approved drug product." 21 C.F.R. § 314.108(a). BREEZE cannot qualify as a new clinical investigation because BREEZE never studied any "new patient population" compared to INCREASE and TRIUMPH, but rather only studied a narrow and well-known population of

"subjects with WHO Group 1 PAH on a stable regimen of Tyvaso who were then switched to a corresponding dose of Tyvaso DPI."  FDA-000474.  Because BREEZE is a confirmatory study, this is an independent basis to find that it cannot qualify as a new clinical investigation.

UTC fails to acknowledge FDA precedents that support Liquidia's argument.  For example, FDA's Veloxis exclusivity memo detailed two studies whose non-duplicative findings qualified them as new clinical investigations under the FDCA.  FDA-001156–1157.  The first new clinical investigation had "a 1-year primary analysis period and a clinical continuation period of treatment for up to 60 months post-transplant," and the second new clinical investigation was "a double-blind, double-dummy study during the first 24 weeks."  FDA-001156.  Together, those studies established for the first time that a once-daily dosing regimen would be safe and effective for treatment naïve kidney transplant recipients (a new patient population), and, unlike BREEZE, those studies did not duplicate the results of prior studies.  *Id.*

Citing the Exclusivity Decision, UTC argues "that the 'BREEZE study answered for the first time whether the active moiety treprostinil administered as an inhalation powder is safe and tolerable for chronic use'" because "TRIUMPH and INCREASE did not address 'the safety and efficacy of treprostinil inhalation powder,' which was 'assessed for the first time in the BREEZE study.'"  UTC Br. 27–28 (quoting FDA-000434, 442).  But UTC fails to rebut the fact that BREEZE was, by FDA's own estimation, a short-term, open-label, and duplicative confirmatory study of what FDA already knew about inhaled treprostinil and FDKP via the studies submitted with UTC's earlier treprostinil NDAs, the Afrezza NDA, and Liquidia's Yutrepia NDA ***all filed long before Tyvaso DPI's NDA***—thereby leaving no doubt that BREEZE offered confirmatory findings only.  FDA-000151 (BREEZE found "comparable systemic treprostinil exposure" to Tyvaso Inhalation Solution); FDA-000728 (BREEZE's "[e]fficacy [m]easurements" were "[n]ot

applicable"); FDA-000908 ("The proposed Tyvaso (treprostinil) inhalation powder (TYVASO

DPI) contains the identical drug substance as the inhaled liquid formulation (TYVASO®).");

FDA-000913 ("The safety profile in [BREEZE] is indistinguishable from that for the inhaled

liquid.").   Thus, BREEZE is ineligible for NCI exclusivity because it was duplicative and

confirmatory and therefore not, by FDA's own definition, a new clinical investigation. 21 C.F.R.

§ 314.108(a).

### 3.    *UTC's policy and process arguments lack merit.*

Lacking support from the FDCA and FDA regulations, UTC is left to defend its atextual

reading by making unwarranted appeals to policy and process.

**First**, UTC speculates about what Congress "would have wanted" and about "bizarre"

policy results if bioavailability and confirmatory studies cannot qualify as new clinical

investigations.  UTC Br. 24.  But it is this Court's obligation to "determine the best reading of the

statute" based on statutory text—not UTC's conjecture or policy preferences. *Loper Bright*, 144

S. Ct. at 2266; *see Eagle Pharms., Inc. v. Azar*, 2018 WL 3838265, at *6 (D.D.C. June 8, 2018)

(Kelly, J.) (analyzing the "text of the statute as it stood at the time of the FDA's decision"), *aff'd*,

952 F.3d 323 (D.C. Cir. 2020).   To the extent UTC bemoans the FDCA's exclusion of

bioavailability and confirmatory studies like BREEZE, its grievances should be lodged not with

this tribunal, but with Congress.

**Second**, UTC's last-ditch effort is to claim procedural fault—i.e., that prior letters to FDA

somehow waived Liquidia's argument that bioavailability and confirmatory studies cannot qualify

for NCI exclusivity.  UTC Br. 21.  UTC is wrong on both the law and the facts.  For one, the APA

does not require Liquidia to preemptively assert every argument that FDA could conceivably make

before FDA renders a decision that triggers APA review.  5 U.S.C. § 702; *Loper Bright*, 144 S. Ct.

at 2261–62 (courts must "set aside any such action inconsistent with the law as they interpret it").

Nor does the APA require any party to do so, when the role of judicial review is to allow this Court to decide whether an agency like FDA exceeded the scope of its statutory authority, or acted arbitrarily and capriciously or contrary to law.  *Id.* at 2262 (The APA "incorporates the traditional understanding of the judicial function, under which courts must exercise ***independent*** judgment in determining the meaning of statutory provisions.") (emphasis added); 5 U.S.C. § 706(2).

Process aside, no conceivable waiver occurred here.  Liquidia's letters to FDA clearly explained:  "Tyvaso DPI is not eligible for three-year exclusivity because its pending [NDA] does not contain ***any*** 'new clinical investigations' that are 'essential to approval' of the reformulated treprostinil product." (FDA-000001) (emphasis added); and "a bioavailability study cannot be used to confer [NCI] exclusivity on a new drug product."  FDA-000008.  Liquidia further argued that BREEZE studied "***PK*** of Tyvaso DPI compared to Tyvaso Inhalation Solution" (FDA-000007) (emphasis added); that BREEZE "does little more than help to ***confirm*** the general safety of Tyvaso DPI in the existing PAH patient population currently taking Tyvaso Inhalation Solution" (FDA-000010) (emphasis added); and that BREEZE "does not qualify for three-year exclusivity." FDA-000008.  Liquidia's unmistakable references to BREEZE's ineligibility for NCI exclusivity as a bioavailability and confirmatory study hardly constitute the "silence," "about-face," or "abjured" argument that UTC alleges.  UTC Br. 21.

UTC also cannot accuse Liquidia of waiving an argument that FDA ultimately ***credited***. UTC Br. 21 (arguing that Liquidia failed to afford FDA the "'opportunity to consider the merits of its arguments'" (quoting *Veloxis Pharm., Inc. v. FDA*, 109 F. Supp. 3d 104, 123–24 (D.D.C. 2015))).  To the contrary, as detailed in Section I.A.4 *infra*, FDA had every "opportunity to consider the merits of [this] argument" because that very argument prevailed as the centerpiece of

FDA's Original Exclusivity Summary issued in May 2022, which found Tyvaso DPI ineligible for NCI exclusivity on the basis of BREEZE.  FDA-000453–459.

> 4.    *UTC fails to justify FDA's arbitrary and capricious departure from its "Original" decision in 2022 denying NCI exclusivity to Tyvaso DPI.*

As it turns out, FDA wholeheartedly agreed with Liquidia regarding the inadequacies of the Tyvaso DPI NDA and BREEZE when it made its original exclusivity decision in 2022.  Fatal to UTC's arguments is the fact that, on the same day that FDA approved Tyvaso DPI, FDA also issued its Original Exclusivity Summary denying NCI exclusivity based on FDA's own express finding that BREEZE constituted an ineligible bioavailability and confirmatory study.  FDA-000453-459.  That Original Exclusivity Summary was signed by Dr. Norman Stockbridge, Director of FDA's Division of Cardiology and Nephrology on May 23, 2022, FDA-000459, in accordance with the authority delegated to him by the Commissioner of Food and Drugs.  *See* FDA Staff Manual Guides, Volume II—Delegations of Authority 1410.104(1)(C).

UTC argues that "Liquidia . . . is simply wrong" that the Original Exclusivity Summary "contained a 'finding that BREEZE was a bioavailability study.'"  UTC Br. 25.  But it is UTC that misunderstands the Original Exclusivity Summary.  When FDA was asked to determine whether the Tyvaso DPI NDA, which included TRIUMPH, INCREASE, TIP-PH-102, MKC-475-001, and BREEZE, "contain[ed] reports of clinical investigations?  (***The Agency interprets 'clinical investigations' to mean investigations conducted on humans other than bioavailability studies.***)," FDA unequivocally concluded: "NO."  FDA-000455 (emphasis added).  BREEZE was "conducted on humans" and so, pursuant to FDA's interpretation of the FDCA that "clinical investigation[]" has only two criteria (1) an "investigation[] conducted on humans" (2) "other than bioavailability studies," FDA's conclusion that BREEZE did ***not*** qualify as a "clinical

13

investigation[]" necessarily turned on FDA's finding that BREEZE was an ineligible bioavailability and confirmatory study.  *Id.*

Further dispelling any doubt that FDA viewed BREEZE as an ineligible bioavailability study for NCI exclusivity, when FDA was asked to determine whether the Tyvaso DPI NDA "require[d] the review of clinical data other than to support a safety claim or change in labeling related to safety? (***If it required review only of bioavailability or bioequivalence data, answer 'no.'***)," FDA again concluded:  "NO."  FDA-000453 (emphasis added).  FDA made this finding because BREEZE studied bioavailability, and merely duplicated and confirmed the "expected known safety profile of Tyvaso Inhalation Solution."   FDA-000853; *see* FDA-000453 (documenting FDA's understanding that TRIUMPH and INCREASE had already established the "safety" and "tolerability" of inhaled treprostinil, including Tyvaso Inhalation Solution and Tyvaso DPI).

The Original Exclusivity Summary then instructed FDA to elaborate only if FDA "believe[s] the study is a bioavailability study and, therefore, not eligible for exclusivity," and to then "EXPLAIN why it is a bioavailability study."  FDA-000453.  Contrary to UTC's position, however, FDA readily provided that explanation in May 2022.  *Id.*; *see* UTC Br. 25.  In the space provided immediately below, FDA documented its finding that, for Tyvaso DPI's NDA, FDA's "basis of approval is the safety, tolerability, and bioavailability established in two studies."  FDA-000453.  FDA pulled no punches when characterizing BREEZE's duplicative, confirmatory, and ultimately nonessential findings:   "The safety and tolerability study provided ***confirmatory efficacy information only***."  *Id.* (emphasis added).  FDA would not have had to "EXPLAIN" had it viewed BREEZE as anything other than "a bioavailability study and, therefore, not eligible for exclusivity."  *Id.*

FDA thus made abundantly clear that it considered BREEZE for its "confirmatory" findings "only." *Id.*  In sum, the Original Exclusivity Summary underscores FDA's understanding—contemporaneous with its approval of the Tyvaso DPI NDA—that BREEZE was a bioavailability study that merely duplicated and confirmed UTC's other studies.

It is notable that UTC does not appear to dispute FDA's original assessment regarding the prior established findings from TRIUMPH and INCREASE.  Nor could it.  As UTC admitted in its Answer, those two studies previously demonstrated that inhaled treprostinil "is safe and effective for certain indications," i.e., PAH and PH-ILD patients.  UTC Answer ¶ 61.  And but for UTC's (ultimately unsuccessful) patent litigation causing a significant delay in FDA approval, *see id.* ¶ 75, FDA would have approved Yutrepia's dry powder treprostinil on the basis of TRIUMPH and INCREASE, both of which were cross-referenced in the Yutrepia NDA, which UTC acknowledges had already been tentatively approved by FDA in November 2021 before FDA approved UTC's later-filed NDA for Tyvaso DPI.  *Id.* ¶ 72.

UTC cursorily addresses FDA's flip-flopping on BREEZE, insisting that the Original Exclusivity Summary was just the "division's preliminary summary" and "not a final agency action" because FDA issued its Original Exclusivity Summary "before any competing application was otherwise ready for approval" and without involvement from FDA's Center for Drug Evaluation and Research ("CDER") Exclusivity Board.  UTC Br. 25, 30.  UTC's argument is a red herring for at least four reasons.

***First***, UTC's argument is irrelevant because it conflates what constitutes "final agency action" for purposes of ripeness under the APA with what constitutes an agency decision on the record, after which the APA requires the agency to justify any later-in-time departure or reversal. *ANR Pipeline Co. v. FERC,* 71 F.3d 897, 901 (D.C. Cir. 1995).

**Second**, UTC cites no laws providing that FDA **must** involve the CDER Exclusivity Board before making an exclusivity decision.[3]

**Third**, UTC speculates that FDA needed to have a "competing application . . . ready for approval" before its Original Exclusivity Summary would cease being predecisional and only then become final.  UTC Br. 30.  For support, UTC cites exclusivity decisions woefully misaligned with the facts here.  UTC Br. 38–39.  In those cases, FDA found that a given drug qualified for NCI exclusivity, such that it was necessary for FDA to review later-in-time NDAs to assess whether the two drugs overlapped in their conditions of approval.  While true for the necessarily later-in-time "conditions of approval" or scoping prong of the exclusivity analysis, nothing prevents FDA from finding a study ineligible for NCI exclusivity at the time of NDA approval.  UTC's "waiting period" argument is therefore nonsensical because FDA's original exclusivity decision finding BREEZE ineligible for NCI exclusivity did not turn on any competing NDA.  In any event, UTC is incorrect on the timeline.  When FDA reviewed and approved Tyvaso DPI's NDA and denied NCI exclusivity to Tyvaso DPI in 2022, FDA already had on-hand the Yutrepia NDA as well as INSPIRE, Liquidia's clinical investigation that studied dry powder treprostinil in both treatment naïve and treatment stable populations.  Complaint ¶¶ 69–70.  Liquidia submitted this data to FDA more than a year before UTC filed for Tyvaso DPI, *id.* ¶¶ 69–71, and UTC "admits" that FDA tentatively approved the Yutrepia NDA, finding it safe and effective, for the

---

[3] To the contrary, FDA has stated that the CDER Exclusivity Board does "**not** review or make recommendations with respect to all exclusivity determinations [involving 5-year new chemical entity (NCE) exclusivity, 3-year new clinical trial exclusivity, and exclusivity for biological products], but will **assist** the Center in resolving certain matters."  CDER Exclusivity Board, U.S. Food & Drug Administration (Dec. 15, 2014), https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/cder-exclusivity-board (last visited Oct. 30, 2024) (emphasis added).

first time in November 2021—**before** it approved the Tyvaso DPI NDA in May 2022. UTC Answer ¶¶ 59, 72.

**Fourth**, FDA's production of the Original Exclusivity Summary pursuant to Liquidia's FOIA request conclusively repudiates UTC's claim that FDA's 2022 decision was "preliminary" or predecisional, as FOIA precludes FDA from disclosing predecisional documents. 5 U.S.C. 552(b)(5). Liquidia filed a FOIA request seeking, in FDA's own words, "***the Agency's decision*** whether to award three-year exclusivity to Tyvaso DPI (treprostinil) inhalation powder (NDA 214324)." ECF No. 13-8 (emphasis added). In response, FDA produced one document—the Original Exclusivity Summary—confirming that it did indeed reflect "the Agency's decision." *Id.* UTC's contention that the Original Exclusivity Summary was predecisional irrationally presumes that FDA failed to invoke or voluntarily waived deliberative process privilege in making this FOIA production, without any indication from FDA that it was doing so. *See* 5 U.S.C. 552(b)(5); *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975) (The privilege "distinguish[es] between predecisional memoranda prepared in order to assist an agency decision-maker in arriving at his decision, which are exempt from disclosure, and postdecisional memoranda setting forth the reasons for an agency decision already made, which are not.").

It is unsurprising that FDA's certified index of the administrative record labeled the two divergent exclusivity determinations the "***Original*** Exclusivity Summary" and "***Superseding*** Exclusivity Summary." ECF No. 42-1 (Amended Index of Administrative Record) at 2 (emphasis added). If an earlier exclusivity decision were never made in the first place, it could not be "supersed[ed]." And common sense dictates that if the FDA's exclusivity summary were predecisional, it certainly could not be called the "***Original*** Exclusivity Summary." FDA used these adjectives precisely because, unlike what UTC wants this Court to believe, FDA's Original

Exclusivity Summary was not preliminary or predecisional; it was simply the first of two exclusivity decisions by FDA.

As for the merits, UTC's two arguments in the alternative fare no better. As an initial matter, UTC pans the Original Exclusivity Summary for "includ[ing] a single conclusory statement." UTC Br. 30. But that makes no sense at all. In making this baseless argument, it appears that UTC overlooked the extensive questions FDA asked and answered across the Original Exclusivity Summary. *See* UTC Br. 25 (dismissing FDA's Original Exclusivity Summary as "unexplained checkmark[s]"); FDA-000453–459. As noted above, those detailed questions and FDA's YES/NO responses, alongside FDA's clarifying explanation, illuminated FDA's unequivocal reasoning as to why BREEZE and the other studies submitted with the Tyvaso DPI NDA failed to qualify as new clinical investigations. *Id.* That UTC is dissatisfied with the questions and answers in the Original Exclusivity Summary is of no import. *Id.* UTC's unfounded criticisms of the Original Exclusivity Summary are particularly ironic because the Original Exclusivity Summary offered ***significantly more*** written explanation than the Superseding Exclusivity Summary upon which UTC relies. *Compare* FDA-000453-459 (Original Exclusivity Summary), *with* FDA-000498-504 (Superseding Exclusivity Summary).

Next, UTC posits that FDA adequately explained its break from its on-point precedent two years later. But UTC's insistence that FDA explained its marked departure cannot be reconciled with the contrary position taken by FDA in its brief. *Compare* UTC Br. 30 ("FDA expressly recognized that its new exclusivity determination . . . 'supersedes the original one dated May 23, 2022.'"), *with* ECF No. 55 ("FDA Br.") at 14 ("FDA did not change its exclusivity determination.").

All UTC could muster for its assertion of a reasoned departure was FDA's brief and conclusory note that the Superseding Exclusivity Summary "supersedes the original one"—without *any* explanation about why it was departing from its original exclusivity decision made more than two years prior.  UTC Br. 30 (citing FDA-000498).  UTC cited nothing in the record showing FDA weighing the findings and reasoning from the Original Exclusivity Summary or justifying why those findings were incorrect or no longer applicable to BREEZE.  *See Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 599 (D.C. Cir. 2023) (finding that agency's failure to address "its own flip flop" was "arbitrary and capricious").  Nor does the Exclusivity Decision or the record reveal any meaningful developments occurring after FDA's Original Exclusivity Summary in 2022 that could hypothetically justify FDA's reversal in 2024.

In fact, FDA's Exclusivity Decision does not even mention its Original Exclusivity Summary.  FDA-000460-497.  UTC has no answer for why the Exclusivity Decision failed to respond to, much less acknowledge, FDA's Original Exclusivity Summary denying Tyvaso DPI NCI exclusivity.  *See Endo Par Innovation Co., LLC v. Becerra*, 2024 WL 2988904, at *4 (D.D.C. June 10, 2024) (Kelly, J.) (FDA acted arbitrarily and capriciously when it "offered no such explanation" for its action); *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 18 (D.D.C. 2009) ("[A]n agency's decision to reverse its position in the face of a precedent it has not persuasively distinguished is quintessentially arbitrary and capricious.") (cleaned up).  Nothing could be more arbitrary or capricious.

\* \* \*

Ultimately, of five studies submitted with the Tyvaso DPI NDA, two (TRIUMPH and INCREASE) cannot be "new clinical investigations" because they were "relied on by FDA to demonstrate substantial evidence of effectiveness of a previously approved drug product."  21

C.F.R. § 314.108(a); *see* FDA-000876-77 (finding that "[s]ubstantial evidence of effectiveness" for inhaled treprostinil "has been previously concluded based on" TRIUMPH and INCREASE). And the remaining three (TIP-PH-102, MKC-475-001, and BREEZE) were likewise ineligible because (1) they studied bioavailability, 21 U.S.C. § 355(c)(3)(E)(iii); and/or (2) duplicated or confirmed the findings of TRIUMPH and INCREASE, 21 C.F.R. § 314.108(a).

While FDA or UTC may conjure reasons outside the administrative record as to why FDA reversed course, this Court should not countenance any attempt to depart from the record in this record review case. *Policy & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 74 (D.D.C. 2018) (limiting review in an APA challenge "to the 'administrative record' and the facts and reasons contained therein"). In 2022, FDA correctly concluded that BREEZE satisfied both of these independent bases of ineligibility and therefore denied NCI exclusivity to Tyvaso DPI. FDA-000453–459. In 2024, FDA arbitrarily and capriciously reversed course without adequate justification. FDA-000498–504. This Court should not tolerate FDA's unlawful about-face and should instead conclude—as FDA correctly found in 2022—that the FDCA and FDA regulations prohibit FDA from granting Tyvaso DPI NCI exclusivity on the basis of BREEZE.

### B.    BREEZE Was Not "Essential to the Approval" of the Tyvaso DPI NDA.

For many of the same reasons that BREEZE fails to qualify under FDCA and FDA regulations as a new clinical investigation, and once again contrary to UTC's arguments, the record makes abundantly clear that BREEZE was not essential to Tyvaso DPI's approval as that phrase is defined in FDA's regulations. As a result, FDA could not lawfully grant NCI exclusivity to Tyvaso DPI based on BREEZE.

The FDCA prohibits NCI exclusivity for any drug unless the NDA contained new clinical investigations "essential to the approval of the application." 21 U.S.C. § 355(c)(3)(E)(iii). FDA's regulations define "*essential to approval* to mean, 'with regard to an investigation, there are ***no***

*other data available* that could support approval of the NDA.'"  FDA-000418 (second emphasis

added); 21 C.F.R. 314.108(a).  FDA outlined the "essential to approval" test in its Braeburn

exclusivity memo, asking:  "[W]hat *unique, previously unanswered* clinical question(s) about the

safety and/or efficacy of [the active moiety] for the relevant use . . . the new clinical investigations

essential to [the drug's] approval answered"?  FDA-001247 (emphasis added).

Taken together and applied here, BREEZE could only be essential to approval if, standing

alone, it answered a "unique, previously unanswered clinical question(s) about the safety and/or

efficacy of [inhaled treprostinil]" because "there are no other data available" from other studies to

show the safety and efficacy of inhaled treprostinil.  The Exclusivity Decision observed that

"safety and efficacy of inhalational treprostinil in the treatment of PAH (WHO Group 1) to

improve exercise ability and PH-ILD (WHO Group 3) to improve exercise ability were

demonstrated in the TRIUMPH I study and the INCREASE study, which were submitted to the

Tyvaso NDA."  FDA-000472.  Despite FDA's conclusion, UTC argues BREEZE was essential to

approval because BREEZE supposedly proved that inhaled treprostinil in dry powder dosage form

was safe and effective for the first time.  UTC Br. 31–32.

But UTC's contention is belied by the administrative record, which makes abundantly clear

that BREEZE never "answered" any "unique, previously unanswered clinical question(s) about

the safety and/or efficacy" of inhaled treprostinil, whether in dry powder or liquid form.  As FDA

expressly recognized, TRIUMPH and INCREASE had already made ample "data available" to

establish the safety and efficacy of inhaled treprostinil without any need for BREEZE at all.  FDA-

000880 ("No additional evidence for effectiveness was submitted as part of the application for

[Tyvaso DPI].  The application relies on the evidence from the approved formulations of

treprostinil," i.e., TRIUMPH and INCREASE from the Tyvaso Inhalation Solution NDA.); *id.*

(finding that "the safety and effectiveness" of Tyvaso DPI comes only from TRIUMPH and INCREASE, without mentioning BREEZE). As such, FDA knew that, for NDA approval, "little beyond demonstrating bioavailability was necessary for Tyvaso DPI." FDA-000913. All BREEZE did was "provide[] confirmatory efficacy information only." FDA-000453. And crucially, FDA never needed to distinguish between inhaled treprostinil in Tyvaso Inhalation Solution or in Tyvaso DPI, because FDA itself knew that both drugs revolved around "the identical drug substance," FDA-000908—i.e., inhaled treprostinil—and MKC-475-001 had already established the safety of Tyvaso DPI in healthy volunteers. FDA-000908 ("The proposed Tyvaso (treprostinil) inhalation powder (TYVASO DPI) contains the identical drug substance as the inhaled liquid formulation (TYVASO®)."); FDA-000473 (describing the safety assessments conducted in MKC-475-001); FDA-000913 (finding that "[t]he safety profile in [BREEZE] is *indistinguishable* from that for the inhaled liquid.") (emphasis added).

In an attempt to recast BREEZE as essential, UTC leans heavily on FDA's pre-IND meeting with UTC in 2017, during which FDA voiced support for UTC's plan to conduct BREEZE, in which UTC would compare the "[p]harmacokinetics . . . prior to and after switching to ensure that the patients were transitioned to an appropriate dose of your product." FDA-000691. In other words, FDA supported UTC conducting a bioavailability study of its specific formulation of dry powder treprostinil that would be ineligible for NCI exclusivity. *Id.* But even if FDA supported or encouraged UTC to conduct BREEZE, it does not follow that such support or encouragement meant that BREEZE was somehow now "essential to the approval" of Tyvaso DPI's NDA such that it would warrant NCI exclusivity. 21 U.S.C. § 355(c)(3)(E)(iii). In fact, FDA's 2017 meeting minutes reflected FDA's understanding that the existing "literature for treprostinil and safety data on FDKP is *sufficient* to support the clinical use of Treprostinil

22

Inhalation Powder." FDA-000689 (emphasis added). This Court should not take UTC's bait to confuse or conflate what FDA said is enough to approve an NDA with what must be shown to entitle that NDA to NCI exclusivity. The two are necessarily different, as Congress put limitations on exclusivity to ensure a balance between enabling innovation and encouraging competition. H.R. Rep. No. 98-857, pt. 1, at 14–15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647–48.

UTC cites to federal regulations indicating that "'changes in . . . dosage form' are among those changes that 'would normally warrant exclusivity.'" UTC Br. 27 (quoting Abbreviated New Drug Application Regulations; Patent and Exclusivity Provisions, 59 Fed. Reg. 50,338, 50,357 (Oct. 3, 1994)). That regulation is inapposite here because it presumes that the dosage form in question is a "new" and innovative dosage form. *AstraZeneca*, 872 F. Supp. 2d at 87. Here, however, the safety and tolerability of the "dosage form"—dry powder for inhalation consisting primarily of FDKP—had already been established by the earlier Afrezza NDA. FDA-000881, 885, 908, 910 (discussing the prior comprehensive evaluation of FDKP during the review of Afrezza and 3-year Risk Evaluation and Mitigation Strategy (REMS) study).

During the 2017 meeting, FDA also reasserted its understanding that the Afrezza NDA had already answered all relevant questions about the Tyvaso DPI inhaler and the ability of FDKP to serve as the backbone of an inhalational dry powder. FDA-000689–690; *see id.* (noting that "the manufacturing process [for FDKP in Tyvaso DPI] was **the same** as that used in the approved insulin product Afrezza") (emphasis added). As FDA's Exclusivity Decision observed, and UTC concedes, "the BREEZE study was not needed to assess the safety of FDKP in Tyvaso DPI's formulation." FDA-000445; UTC Br. 28. Consequently, as it relates to FDA's understanding of the known safety and efficacy of inhaled treprostinil and of its inhaler or excipient, BREEZE—a bioavailability and confirmatory study conducted long **after** the 2017 meeting—was nonessential.

23

Just as importantly, across key documents in the record, FDA clearly and repeatedly refuted UTC's misguided notion that BREEZE was essential to approval. For example, FDA concluded in its Cross-Discipline Team Leader ("CDTL") Review that BREEZE had no role in establishing the "safety" and "effectiveness" of Tyvaso DPI. FDA-000909–910. Citing the CDTL Review, UTC bafflingly asserts that the CDTL Review found that "BREEZE demonstrated, for the first time, that dry powder treprostinil was safe and tolerable and was not associated with any decline in efficacy." UTC Br. 10 (citing FDA-000910). On the contrary, FDA's CDTL Review stressed that TRIUMPH and INCREASE had already revealed both the efficacy and safety of inhaled treprostinil and Tyvaso DPI to justify FDA approval of the NDA, irrespective of BREEZE:

- **Safety of Tyvaso DPI**: "Based on ***the results of the nonclinical pharmacology, PK, and toxicology studies conducted to support Tyvaso (NDA 022387), Remodulin (NDA 021272), and Orenitram (NDA 203496)***, and the assessment of impurities present in Tyvaso DPI, it is considered that Tyvaso DPI has an acceptable safety profile and that there are no findings that preclude long-term inhalation administration in humans." FDA-000909 (emphasis added).

- **Efficacy of Tyvaso DPI**: "[S]ubstantial evidence of effectiveness for the proposed treprostinil inhalation powder (TYVASO DPI) ***has been previously concluded*** based on the liquid formulation (TYVASO®) in the 12-week, placebo-controlled ***TRIUMPH I study*** of 235 patients with WHO group I PAH, and in the 16-week, placebo-controlled ***INCREASE study*** of 326 patients with WHO group III PH-ILD." FDA-000910 (emphasis added).

The CDTL Review's evaluation of Tyvaso DPI's safety and efficacy never once suggested that BREEZE played any essential role in FDA's findings of safety or efficacy, or in FDA's approval of the Tyvaso DPI NDA more generally. *See also* FDA-000728 (stating that BREEZE's "[e]fficacy [m]easurements" were "[n]ot applicable").

Beyond this, to the extent FDA had any concerns about Tyvaso DPI's inhaler or FDKP excipient, FDA made clear that the Afrezza NDA had already established the safety of both the inhaler and FDKP excipient:

> The inhaler used to deliver treprostinil inhalation powder ("TreT Inhaler") **contains the same components and is assembled in the same manner as the Afrezza Inhaler** (FDA approved; reviewed under DMF 028677). Briefly, the inhaler is a mechanical device consisting of 5 plastic injection molded components assembled with an ultrasonic weld. The flow resistance of the TreT Inhaler **is the same as the Afrezza Inhaler**). The TreT inhaler delivers the treprostinil inhalation powder consistently and effectively [**identical to the Afrezza Inhaler**]. The shelf life of the TreT Inhaler is the **same as that for the Afrezza inhaler** (4 years) because the design and materials of construction are the same.

FDA-000909 (emphasis added). Even further, FDA found that "the safety of the excipient [FDKP] is supported by a **comprehensive** battery of safety pharmacology and toxicology studies conducted for Afrezza (BLA 022472)." FDA-000909 (emphasis added). Once again, BREEZE was nonessential.

Indeed, in FDA's eyes, BREEZE was so inconsequential to approval that Afrezza and FDKP are mentioned at least twenty-one times throughout the CDTL Review, FDA-000907–912, whereas BREEZE was mentioned only twice on just a single page. *See* FDA-000910. And on that one page, FDA repeatedly observed that BREEZE's findings were duplicative and confirmatory of TRIUMPH, INCREASE, and the Afrezza NDA. *Id.*

FDA's Office of Clinical Pharmacology ("OCP") Review echoed the very same sentiments regarding BREEZE's nonessential role in FDA's approval of the Tyvaso DPI NDA. In noting the limited findings of BREEZE, the OCP Review confirmed: "Patient tolerability, as assessed by incidence of new adverse events following transition to Tyvaso DPI, was consistent with the **expected known safety profile** of Tyvaso Inhalation Solution." FDA-000853 (emphasis added). That "expected known safety profile" is attributable to none other than TRIUMPH and INCREASE. And FDA's Clinical Review of Tyvaso DPI likewise found that "TIP-PH-101 (BREEZE) provides limited safety data" and that "the prevalence of adverse events was **similar to prior formulations** of treprostinil liquid for inhalation." FDA-000900 (emphasis added).

Collectively, this mountain of indisputable evidence across the administrative record squarely rejects UTC's theory that BREEZE answered some previously unanswered clinical question about the safety and efficacy of inhaled treprostinil for the first time. *See* FDA-001247–1248 (finding a study nonessential because "previous approvals demonstrated that the studies were not necessary to establish the efficacy of [the active moiety]" and FDA's prior approval of an earlier drug with the same active moiety had already "demonstrated effectiveness"). To the extent UTC argues that BREEZE was "essential" to show that an inhalation powder poses no "risk of getting stuck in the throat or might cause a sensation of something stuck in the throat," this is a manufactured concern that FDA mentions for the ***first and only time*** in the Exclusivity Decision (but nowhere else in the record). FDA-000480. That supposed concern did not appear in the 2017 pre-IND meeting minutes, in FDA's Original Exclusivity Summary, in any of FDA's CDTL, OCP, or Clinical Reviews, or anywhere else other than the Exclusivity Decision. FDA's *post hoc* rationalization cannot stand under the APA. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action.") (cleaned up); *see, e.g.*, FDA-000691; FDA-000453–459; FDA-000881–882.

To put a finer point on FDA's (and UTC's) *post hoc* justification that BREEZE proved no new throat blockage issues, this Court need look no further than contrasting FDA precedent. In 2015, FDA approved Morphabond as a "single-entity morphine product with claims in the labeling related to deterring abuse via the intranasal and intravenous routes." FDA-001188. FDA had previously approved other morphine drugs with the historical concern that morphine had high abuse potential among patients as an opioid drug. FDA-001196. Given this historical issue, the sponsor conducted M-ARER-002, a "human abuse liability (HAL) study," FDA-001188, which

was specifically designed to "demonstrate[] that MorphaBond has physicochemical properties that are expected to reduce abuse by the intranasal route of administration as described in the product's labeling," as contrasted to prior FDA-approved morphine drugs. FDA-001199. In its Morphabond exclusivity memo, FDA explained that "M-ARER-002 was 'essential to approval'" because it was a new clinical investigation tailored to establish for the first time that Morphabond reduced such abuse potential. FDA-001199.

Unlike Morphabond, BREEZE did not specifically study the supposed concern of throat blockage. BREEZE did not collect any data as to whether patients experienced a sensation of the powder becoming stuck in their throats or whether the powder did in fact deposit in patients' throats. Nor did BREEZE show that Tyvaso DPI reduced those risks. In reality, rather than collect data and actually study these issues, BREEZE "withdrew" and "discontinued" all patients who self-reported any such issues. FDA-000720 (BREEZE patients were "withdrawn if necessary, to protect their health and safety or the integrity of the study data"); FDA-000878 ("Two patients (3.9%) withdrew from the 3-week study due to treatment-related adverse events of dyspnea and globus pharyngus," also known as throat blockage); FDA-000900 (same). It is inconceivable that a study was essential for approval for mitigating an alleged safety concern, when BREEZE *disqualified* patients if they presented with the precise condition that FDA never raised as a safety concern in the first place. This Court knows when FDA is engaged in *post hoc* rationalization, and it has not let those decisions stand. *Braeburn Inc. v. FDA*, 389 F. Supp. 3d 1, 29-30 (D.D.C. 2019).

Across the administrative record—including the 2017 pre-IND meeting, FDA's Original Exclusivity Summary, FDA's CDTL Review, FDA's OCP Review, and FDA's Clinical Review—FDA repeatedly and unambiguously found that TRIUMPH and INCREASE had already demonstrated safety and efficacy of inhaled treprostinil and Tyvaso DPI, and that the Afrezza

NDA had already demonstrated the safety of Tyvaso DPI's inhaler and FDKP excipient (and all without any mention of supposed throat blockage concerns up until the Exclusivity Decision). Where, as here, a study "might be determined not to be essential to [the drug's] approval because they merely reestablish something that has been shown by the previous approvals" (FDA-001246– 1247), FDA may not lawfully confer NCI exclusivity—and particularly not with the post hoc rationalizations FDA offered for Tyvaso DPI.

In short, the record demonstrates that BREEZE was not a new clinical investigation essential to the approval of Tyvaso DPI within the meaning of the FDCA and FDA regulations.

### C.    Even Assuming Tyvaso DPI Qualifies for Exclusivity, It Cannot Block Yutrepia.

Assuming arguendo that BREEZE was a new clinical investigation (it was not) and that it was essential to Tyvaso DPI's approval (it was not), UTC echoes FDA's contention that the scope of NCI exclusivity must encompass all dry powder treprostinil, which FDA and UTC characterize as a "new dosage form" covering all patient populations and indications for "chronic use." But such a broad reading of exclusivity reaching far afield of the limited patients, indications, short-term duration, and characteristics studied by BREEZE is unsupported by the FDCA, FDA regulations, or FDA's prior practice, and must be cabined or voided altogether. *See Braeburn*, 389 F. Supp. 3d at 27–28 ("[T]he alleged inconsistency is that the FDA failed to limit the scope of Sublocade's innovation by the patient population on which the drug product was tested, as was done elsewhere. Braeburn is right as to each inconsistency, each of which is, in fact, a symptom of the FDA's unreasonable statutory interpretation discussed in the prior section.").

> #### 1.    *FDA unlawfully granted NCI exclusivity to Tyvaso DPI covering the entire dry powder dosage form.*

FDCA and FDA regulations provide that the scope of NCI exclusivity may extend only to the overlapping "conditions of approval" of the approved drug and the competing NDA.  To

ascertain those "conditions of approval," FDA regulations require FDA to identify the specific "**innovations** presented . . . in [BREEZE] that led to the FDA's approval" of the Tyvaso DPI NDA. *Veloxis*, 109 F. Supp. 3d at 121 n.16 (emphasis added).  UTC argues that "the plain text of the statute arguably supports *broader* exclusivity than FDA has applied."  UTC Br. 36 (emphasis in original).

But this District already foreclosed this argument by concluding that FDA may award NCI exclusivity "no broader than the innovations presented to the FDA in the new clinical investigation[] that led to the FDA's approval," and that such exclusivity can only block a competitor to the extent the first drug shares the same conditions of approval as a later-in-time NDA.  *Veloxis*, 109 F. Supp. 3d at 121 n.16.  The FDCA limits the scope of NCI exclusivity only to "significant innovations" arising out of the new clinical investigation to strike a "careful balance between providing exclusivity rights to promote innovation and making generic alternatives available to patients."  *AstraZeneca*, 872 F. Supp. 2d at 85; *see* 54 Fed. Reg. 28,872, 28,899 (July 10, 1989) (NCI exclusivity is "limit[ed] . . . to **changes** in a drug product that are **significant enough** to require human safety or effectiveness studies for approval," which could include "**occasional** clinical investigations qualifying for exclusivity that establish that a product is **safer than originally thought** and that **permit broader use** of the drug.") (emphasis added).  For the same reason, FDA has long held that NCI "[e]xclusivity does not cover aspects of the drug product for which new clinical investigations were not essential."  FDA-000419.

Here, FDA wrongly granted NCI exclusivity covering the entire "dosage form" of dry powder treprostinil for "chronic use" across all patient populations and indications because it approached the operative question incorrectly.  In characterizing the scope of exclusivity, FDA simply identified how Tyvaso DPI differed from Tyvaso Inhalation Solution generally, pointing

to Tyvaso DPI's dry powder formulation.  But BREEZE did not innovate the "new dosage form"
of dry powder, and so it could not receive NCI exclusivity covering all dry powder treprostinil.
Contrary to UTC's arguments, (i) the innovation of dry powder consisting primarily of FDKP as
a dosage form is attributable to the Afrezza NDA approved by FDA; and (ii) the innovation of a
dry powder treprostinil to treatment naïve patients is attributable to TIP-PH-102 and MKC-475-
001, which are an ineligible bioavailability studies that studied Tyvaso DPI in healthy volunteers.

The most UTC can muster in defense of BREEZE's exclusivity covering the entire dosage
form is the 2017 meeting minutes indicating FDA's concerns about the specific formulation of
Tyvaso DPI's dry powder treprostinil.  FDA-000689–690 (asking UTC "to show that FDKP does
not interfere with the pharmacological activity of treprostinil").  But FDA's concerns were Tyvaso
DPI-specific, and did not apply universally to dry powder treprostinil as a dosage form nor to
Yutrepia's dry powder treprostinil formulation, which contains a different excipient altogether.
*Id.*; FDA-000690 (noting FDA's concerns with the combined "treprostinil/FDKP dry inhalation
powder" and asking whether "FDKP particles in treprostinil inhalation powder . . . may impact
inhalation toxicity").  Given this, at most, BREEZE could answer for the first time only a narrow
clinical question about safety and efficacy strictly limited to Tyvaso DPI's ***specific formulation***
of dry powder treprostinil containing FDKP, not to dry powder treprostinil more generally.  So if
any exclusivity could be drawn based on BREEZE, it must be limited to the specific formulation
of Tyvaso DPI's dry powder, ████████████████████████████████████████████████
and not extend to the entire dosage form of dry powder treprostinil with other excipients.

       2.    *FDA unlawfully granted NCI exclusivity covering patient populations and*
*indications far beyond the supposed innovations of BREEZE.*

There is no question that the scope of NCI exclusivity extends far beyond the outer limits
of BREEZE's supposed innovations.  If any NCI exclusivity could be lawfully awarded on the

basis of BREEZE, it would have to be limited to Tyvaso DPI's unique combination of dry powder treprostinil and FDKP, and could cover only stable-switching PAH patients because that is all BREEZE studied and the entirety of the supposed "evidentiary gap FDA had identified," notwithstanding UTC's attempts to overread BREEZE's marginal findings.  UTC Br. 33 n.8.

Morphabond is again instructive.  When FDA assessed the scope of exclusivity awardable for the new clinical investigation at issue in the Morphabond exclusivity memo, FDA narrowly construed "the scope of Morphabond's exclusivity [a]s limited to the condition of approval supported by Study M-ARER-002:  labeling describing the expected reduction of abuse of a single-entity [extended-release tablet] morphine by the intranasal route of administration due to physicochemical properties."  FDA-001199.  Given the narrow innovations in M-ARER-002, reduced risk of drug abuse, which FDA found essential to approval, Morphabond's exclusivity did not bar FDA approval of other morphine drugs or other morphine drugs with extended-release tablets.  FDA-001200.  FDA thus concluded that the "exclusivity for MorphaBond should protect labeling describing this claim [of reduced opioid abuse]"—and nothing more.  *Id.*  Morphabond makes clear that the contours of NCI exclusivity are constrained by the specific innovations of the supposed new clinical investigation, and not what the drug receives as its FDA-approved labeling based on prior study findings.

Through BREEZE, FDA has countenanced a limitless scope of NCI exclusivity inclusive of all the prior innovations of TRIUMPH and INCREASE, for which FDA granted exclusivity periods that have now expired.  And FDA has done so notwithstanding its own admonition that, to the extent awarded, later-in-time NCI exclusivity periods should be "narrower in scope—relative to any exclusivity recognized for the first drug product."  FDA-000469.  In its Answer, UTC concedes that BREEZE only studied PAH patients on stable doses of Tyvaso Inhalation

Solution who switched to Tyvaso DPI, and that PAH and PH-ILD have different causes and treatment options. *See* UTC Answer ¶ 67 (admitting that BREEZE "required a diagnosis of PAH for inclusion"). Still, UTC insists that "BREEZE supports use of Tyvaso DPI in PAH and PH-ILD patients who are new to treprostinil inhalation." UTC Br. 37; *id.* at 39 ("BREEZE allows one to draw conclusions about the safety and tolerability of Tyvaso DPI for PH-ILD patients or patients new to treprostinil inhalation"). But FDA could only extrapolate in that manner by relying on the findings of TRIUMPH, INCREASE, TIP-PH-102 and MKC-475-001—all of which are ineligible studies that already demonstrated the safety of inhaled treprostinil for PAH and PH-ILD patients who are new to treprostinil inhalation. FDA-000425–26, 429–30. As FDA concedes in its brief, TIP-PH-102 "was a pivotal relative bioavailability study that justified extrapolation of the safety and effectiveness data from the TRIUMPH I and INCREASE studies to Tyvaso DPI." FDA Br. 8. It was those ineligible studies—not BREEZE—that were essential to approval for the purposes of the NCI exclusivity analysis.

UTC does not appear to argue, as is necessary to justify FDA's broad grant of NCI exclusivity here, that BREEZE ***standing alone*** could establish findings of safety and efficacy for treatment naïve PAH patients and treatment naïve or stable-switching PH-ILD patients in the absence of UTC's cross-reference to TRIUMPH and INCREASE. And how could UTC do so when it "admits that there are different treatment strategies for different causes of PH" and further "admits that . . . a drug approved for one indication is not necessarily approved for other indications"? UTC Answer ¶¶ 39, 41. The stable-switching PAH patients studied in BREEZE are fundamentally different than treatment naïve PAH patients and treatment naïve or stable-switching PH-ILD patients, who suffer from a separate disease altogether. *Id.* ¶¶ 39–43. Yet, despite these undisputed limitations of BREEZE, and UTC's contradictory positions about the differences in

treatment populations and indications as it pertains to the approvals of prior treprostinil products, UTC insists that this Court uphold the Exclusivity Decision granting Tyvaso DPI exclusivity for **all** patient populations and indications (treatment naïve and stable-switching PAH and PH-ILD patients) on the basis that BREEZE made the innovations actually attributable to TRIUMPH and INCREASE.

Simply put, BREEZE did not even purport to present **any** innovations for treatment naïve PAH patients or treatment naïve or stable-switching PH-ILD patients. Any extrapolation to these patient populations comes solely from UTC's cross-referencing and reliance on the previously-submitted studies in the Tyvaso DPI NDA (*i.e.*, TRIUMPH and INCREASE), which all parties agree are ineligible for consideration as new clinical investigations, and in the case of INCREASE, whose NCI exclusivity expired in March 2024. *Id.* ¶ 56 ("admit[ting] that Tyvaso Inhalation Solution and Tyvaso DPI received a three-year NCI exclusivity period that expired in March 2024"). Consequently, only by disregarding BREEZE's own self-professed limitations could FDA grant an additional round of NCI exclusivity covering the entire dosage form of dry powder treprostinil for chronic use irrespective of patient population and indication.

UTC attempts to distract the Court from its inconsistent logic by offering a red herring, arguing that "Liquidia does not directly challenge FDA's conclusion that Tyvaso DPI is safe and effective for treatment of both PH-ILD and PAH, bringing the treatment of both illnesses within the conditions of approval for the product." UTC Br. 37. True. Liquidia never alleges this because this case is not about the **mere approval** of Tyvaso DPI. This case is about the scope of **exclusivity** granted to Tyvaso DPI. Specifically, Liquidia challenges FDA's arbitrary and capricious decision in August 2024 to switch course from its original exclusivity decision in 2022 and retroactively award NCI exclusivity to the entire suite of indications for Tyvaso DPI based on BREEZE. It

appears that UTC is conflating what is ***sufficient*** for NDA approval—i.e., the known safety and efficacy of inhaled treprostinil as established by TRIUMPH and INCREASE, *see* UTC Br. 37 (arguing that "Liquidia improperly assumes that FDA could not make a reasonable assessment about safety and tolerability for chronic use without conducting a long-term study"); *id.* at 34— with how the FDCA and FDA regulations ***require*** FDA to delineate the outer boundaries of NCI exclusivity based solely on the "innovations presented . . . in [BREEZE]" itself (and not TRIUMPH or INCREASE) that were "essential" to the FDA's approval of the Tyvaso DPI NDA. *Veloxis*, 109 F. Supp. 3d at 121, 121 n.16.

Tellingly, in defending the scope of Tyvaso DPI's NCI exclusivity encompassing ***all*** patient populations and indications, including PH-ILD, not once does UTC cite FDA's letter to UTC dated February 15, 2022.  FDA-000915–918 (NDA 214324 Information Request).  In that letter, FDA stressed that BREEZE had narrowly "enrolled patients with PAH WHO Group 1 but not PH-ILD WHO Group 3, and patients with FEV1 <60% predicted were excluded."  FDA-000916.  Given BREEZE's narrow patient population, FDA's letter expressed "concerns" that BREEZE could not justify "extrapolation of pulmonary safety (*e.g.*, bronchospasm risk) for Tyvaso DPI from the PAH WHO Group 1 population to the PH-ILD WHO Group 3 population." *Id.*  FDA expressly placed the burden on UTC to "[p]rovide justification" for extrapolation to PH-ILD patients given FDA's pulmonary safety concerns.  *Id.*  But the administrative record does not include any response by UTC to these significant concerns.

And crucially, when FDA issued the Exclusivity Decision two years later granting NCI exclusivity to Tyvaso DPI covering treatment naïve and stable-switching PH-ILD patients, FDA failed to even acknowledge—much less address—FDA's articulated concerns regarding BREEZE's wholesale exclusion of PH-ILD WHO Group 3 patients.  *See* FDA-000460–497.

FDA's failure to explain this critical issue at the heart of the NCI exclusivity it awarded is the very definition of arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions."); *Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Lab.*, 358 F.3d 40, 45 (D.C. Cir. 2004) ("[T]he MSHA failed to provide an adequate explanation for its decision to withdraw the Air Quality proposal. Absent such an explanation, the agency's action was arbitrary and capricious.").

It is uncontested that BREEZE's eligibility criteria failed to "closely mirror the target population" of treatment naïve PAH patients or PH-ILD patients (whether treatment naïve or stable). FDA-000932. The only grounds for FDA's finding that Tyvaso DPI can treat PH-ILD patients is its NDA's cross-reference to INCREASE—which is neither a new clinical investigation, nor part of BREEZE. 21 U.S.C. § 355(c)(3)(E)(iii) (excluding prior submitted studies from qualifying a drug for NCI exclusivity); 21 C.F.R. § 314.108(a) (same); UTC Answer ¶ 68 (conceding that Tyvaso Inhalation Solution already received exclusivity for INCREASE's prior innovations, which "expired in March 2024"); FDA Br. 8 (TIP-PH-102, not BREEZE, allowed for Tyvaso DPI's extrapolation to INCREASE). In short, UTC's view that FDA rightly awarded exclusivity covering PH-ILD patients impermissibly grafts INCREASE's prior innovations onto BREEZE's limited findings, in stark violation of the FDCA and FDA regulations.

How possibly then could FDA grant exclusivity that covers the entire dry powder dosage form—including treatment of treatment naïve PAH patients, treatment naïve PH-ILD patients, stable PH-ILD patients, and patients with PH indications other than PAH and PH-ILD—when the supposed new clinical investigation categorically excluded those patient populations and indications? Under the FDCA, its own regulations, and its own precedent, FDA could not.

UTC claims that prior FDA exclusivity decisions in the administrative record justify the sweeping exclusivity FDA granted to Tyvaso DPI covering treatment naïve patients.  But even a cursory examination of those exclusivity decisions reveals the exact opposite.  For one, in Veloxis, FDA determined that "conversion use is a different 'condition of approval' from the *de novo* use for which Astagraf XL received exclusivity and that Astagraf XL ***did not conduct new clinical investigations essential to the approval of Astagraf XL for the conversion use***," even as Astagraf XL was approved for both de novo and conversion use.  FDA-001166 (emphasis added).  Thus, BREEZE's conscious choice to study solely stable-switching (or conversion) PAH patients means that UTC did not conduct new clinical investigations essential to the approval of Tyvaso DPI for de novo use, a different condition of approval altogether.  *Id.*

For another, UTC cites the Braeburn exclusivity memo for the proposition that FDA can treat treatment naïve and stable-switching patients interchangeably for the purposes of NCI exclusivity.  UTC Br. 38.  UTC misreads Braeburn.  In Braeburn, FDA granted NCI exclusivity to treatment naïve and stable-switching patients based on a new clinical investigation that ***centered on*** treatment naïve patients.  FDA-001249.  FDA reasoned that a study on treatment naïve patients—naturally a more challenging patient population as compared to stable-switching patients—could reasonably be extrapolated to stable-switching patients.  "New entrants to treatment are considered a more difficult population to treat than patients who are already clinically stable."  FDA-001249.  "[S]tudies in stable patients would generally not support approval in new-to-treatment patients."  *Id.*  In the same memo, FDA also made clear that the competitor drug "was not studied in (and was not demonstrated to be safe and effective for use in) patients who have not completed an initiation and dose adjustment period to avoid precipitated withdrawal," so it could not receive approval for treatment naïve patients.  FDA-001251.  In other words, this precedent

confirms that a standalone new clinical investigation demonstrating safety and efficacy for new-to-treatment patients may also support use by stable-switching patients—***but not vice-versa***. UTC strains to fit BREEZE into this fact pattern, since the record here shows that BREEZE studied the least complicated patient population (stable-switching PAH patients) but not treatment naïve PAH patients or any PH-ILD patients whatsoever.

> 3. *UTC's contention that BREEZE's three-week study rendered innovations on "chronic" use of dry powder treprostinil makes no sense.*

UTC's argument that BREEZE's three-week study assessed Tyvaso DPI for chronic use duplicates the Exclusivity Decision in which FDA asserts that "chronic" use refers to "multiple-dose use." UTC Br. 34 (arguing that the term "chronic" means "'multiple-dose use,' rather than a single dose" (quoting FDA-000439)). There, FDA claimed that the "BREEZE study answered for the first time whether the active moiety treprostinil administered as an inhalation powder is safe and tolerable ***for chronic use***." FDA-000442 (emphasis added). UTC's definition of the word "chronic" as merely meaning two or more doses is wildly inconsistent with the administrative record, longstanding FDA guidance, the basic dictionary definition of the word "chronic," and even FDA's representations to this Court in other litigation.

Aside from the Exclusivity Decision, nothing in the administrative record suggests that FDA regarded BREEZE, a "short-term," three-week study, as assessing "chronic use" or that the dosing over just three weeks equates to chronic use of Tyvaso DPI. In stark contrast to FDA's novel definition of "chronic" in the Exclusivity Decision (and UTC's definition here), FDA's Clinical Review for Tyvaso DPI described "***chronic*** Tyvaso dosing" as "a stable dose of Tyvaso for ***at least*** 3 months"—not the three-week period studied in BREEZE. FDA-000886 (emphasis added). Likewise, FDA's OCP Review of Tyvaso DPI excluded any mention of BREEZE in the

section titled "Long-term Treatment of PAH," instead citing TRIUMPH and INCREASE for estimated survival rates for "long-term" treatment by Tyvaso DPI.  FDA-000862.

Not once leading up to the Exclusivity Decision did FDA ever describe BREEZE's three-week open study period as having rendered any findings on the "chronic" use of dry powder treprostinil—much less any innovative changes beyond what was already known about inhaled treprostinil through TRIUMPH and INCREASE.  In other words, FDA's real-time assessments around the time of NDA approval never regarded BREEZE as having studied "chronic" use of Tyvaso DPI.  Nor could it, given the "short-term," three-week nature of BREEZE.  At bottom, FDA and UTC have conflated BREEZE's short-term, three-week findings with what FDA has long known about the safety and efficacy of inhaled treprostinil for chronic use through TRIUMPH and INCREASE.

UTC's argument—i.e., that multiple dosing over just three weeks constitutes "chronic use"—should be rejected by this Court.  FDA declined in its brief to adopt the flawed definition of "chronic" that UTC proposes.  For good reason.  Adopting UTC's definition of "chronic" as meaning "repeat doses" without any minimum time horizon would mean that any study of drug used two or more times qualifies automatically as covering chronic use, even if the study is conducted over just three weeks (or even during a single day).  That is preposterous based on any reasonable definition of the term "chronic."

Longstanding FDA guidance for industry, for example, synonymized the term "chronic" with "long-term treatment" or "repeated intermittent use for *longer than 6 months*."  Center for Drug Evaluation and Research, *E1A The Extent of Population Exposure to Assess Clinical Safety: For Drugs Intended for Long-term Treatment of Non-Life-Threatening Conditions*, FDA (March 1995),    https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e1a-extent-

population-exposure-assess-clinical-safety-drugs-intended-long-term-treatment-non-life

(emphasis added).  FDA's longstanding guidance finds support from the lay definition of the term

"chronic."  Merriam-Webster defines "chronic" as meaning "continuing or occurring again and

again *for a long time*"; "being, providing, or requiring *long-term* medical care (as for a chronic

disease)"; and "always present or encountered."[4]  Along similar lines, Merriam-Webster also

defines a "chronic disease" as "a disease (such as asthma, coronary heart disease, or diabetes) that

continues or occurs again and again for a *long time*:  a medical condition of *prolonged duration*."[5]

Beyond this, UTC's wrongheaded definition of "chronic" as two or more doses over a

"short-term" three-week study simply cannot be reconciled with FDA's divergent interpretation

of the terms "chronic" and "short-term" in *Vanda Pharmaceuticals, Inc. v. FDA*, which the court

considered just last year.  2023 WL 6035663 (D.D.C Aug. 2, 2023).  In *Vanda*, FDA interpreted

Vanda's fast-track request application for tradipitant as seeking designation for "*chronic (as*

*opposed to short-term)* treatment of gastroparesis symptoms."  *Id.* at *9 (emphasis added).

However, FDA rejected Vanda's fast-track request for its drug's designation for chronic use in

light of, among other things, a partial hold on clinical trials lasting *longer than twelve weeks*.  *Id.*

at *8-9.

Why?  Because FDA determined that the partial clinical hold barred studies of sufficient

duration (longer than twelve weeks) necessary to study the unmet medical need for safe and

effective therapies for chronic use of the drug to treat gastroparesis symptoms.  *Id*. at 8.  The court

found that FDA's interpretation was not arbitrary or capricious.  *Id*. at 11-12.  Therefore, FDA has

previously represented to the court that short-term studies, such as those no longer than twelve

---

[4] Merriam-Webster Dictionary, Chronic, https://www.merriam-webster.com/dictionary/chronic.

[5] Merriam-Webster Dictionary, Chronic Disease, https://www.merriam-webster.com/dictionary/chronic%20disease.

weeks, and "chronic" use studies are mutually exclusive. *Vanda* defeats UTC's "chronic" argument in its entirety. Whether BREEZE assessed multiple doses is irrelevant. The APA does not allow FDA to arbitrarily and capriciously redefine the term "chronic" whenever convenient, particularly when it flies in the face of FDA guidance or FDA's prior admissions to the courts.

In an implicit acknowledgment that "chronic" use means taking a drug over more than just three weeks, and not simply two or more doses irrespective of a study's duration, UTC gestures generally at BREEZE's "optional extension phase." UTC Br. 35. However, nothing in the Exclusivity Decision or in the record demonstrates that this voluntary study phase produced any statistically-significant findings, that FDA relied on those findings, or that those findings were essential to FDA's approval of Tyvaso DPI for chronic use. *See, e.g.*, FDA-000896 ("Missing data in the optional extension phase limit the utility of that data . . . ."); FDA-000900 ("Limited additional safety data can be gleaned from the 3-week 51-patient open-label BREEZE study and the optional open label extension."). Moreover, FDA's determination in the Exclusivity Decision that BREEZE was necessary to establish the safety of Tyvaso DPI for "chronic" use, and UTC's arguments to that effect, are incompatible with the 2017 pre-IND meeting between FDA and UTC. There, UTC informed FDA that it would conduct a "study to evaluate the **short-term** (~2 to 3 weeks) safety and tolerability [of Tyvaso DPI] following repeat doses." FDA-000691. Nothing in the 2017 meeting minutes indicates that FDA required this three-week data to assess "chronic" use of Tyvaso DPI, or that FDA had any lingering concerns about chronic use of inhaled treprostinil that TRIUMPH and INCREASE left unanswered and that only BREEZE resolved.

Accordingly, this Court should reject UTC's definition of "chronic" and instead look to the facts in the record here as well as how FDA has distinguished the terms "chronic" and "short-term" more recently in *Vanda*. With that correct definition as the baseline, there is no question

that FDA only considered the "short-term," three-week study findings of BREEZE and that BREEZE simply did not study "chronic" use. As its CDTL Review explained, FDA had long known that Tyvaso DPI is safe and effective for "long-term" based on "the results of the nonclinical pharmacology, PK, and toxicology studies conducted to support Tyvaso (NDA 022387), Remodulin (NDA 021272), and Orenitram (NDA 203496)," which, unlike BREEZE, actually studied long-term use of treprostinil. FDA-000909. All this, in turn, precludes FDA from finding that BREEZE produced any innovative findings on "chronic" use, and prevents FDA from conferring NCI exclusivity on Tyvaso DPI covering chronic use. FDA's Exclusivity Decision to the contrary was nothing short of arbitrary and capricious and contrary to law, and it must be vacated.

* * *

In all, even if Tyvaso DPI were eligible for exclusivity on the basis of BREEZE (it is not), that NCI exclusivity must be limited to the conditions of approval, covering only stable PAH patients who switched from Tyvaso Inhalation Solution to Tyvaso DPI, and not the "entire dosage form" of dry powder treprostinil for "chronic use." To be clear, Tyvaso DPI cannot lawfully receive NCI exclusivity covering treatment naïve PAH patients, any PH-ILD patients, Yutrepia's formulation of dry powder treprostinil, or treatment for chronic use. The scope of NCI exclusivity FDA granted here violates the FDCA, FDA regulations, and FDA precedent.

## II.   THERE IS NO BASIS FOR SCIENTIFIC DEFERENCE HERE.

UTC boldly asserts that, "[r]ather than dispute FDA's statutory interpretations, Liquidia repeatedly challenges FDA's scientific judgments in applying undisputed legal standards to the BREEZE study." UTC Br. 19. Nothing could be further from the truth. UTC has overlooked Liquidia's Complaint alleging that FDA acted in excess of statutory authority when it issued the Exclusivity Decision. Complaint ¶¶ 122-35. And UTC has equally ignored Liquidia's briefs, in

41

which Liquidia has demonstrated that the Exclusivity Decision contravenes the clear mandate of the FDCA and FDA regulations, and that FDA arbitrarily and capriciously departed from the Original Exclusivity Summary and its own precedent. *See* Section I *supra*; Liquidia Br. 11-37.

Perhaps recognizing the weakness of its arguments on NCI exclusivity based on all those authorities, and the administrative record in this case, UTC repeatedly argues that FDA should nevertheless prevail because it is entitled to scientific deference. UTC asks this Court to acquiesce to FDA's "scientific judgment" more than *twenty* times. UTC Br. 2, 17, 19–20, 23, 27–28, 31, 34, 36–37, 39, 40–45, 45 n.11. Curiously, even FDA only mentions this deference *once* in its brief, perhaps recognizing that such deference is no longer the applicable standard for APA cases in the wake of *Loper Bright*, and especially not for the instant case implicating FDA's violation of the FDCA. *See* FDA Br. 25 (referring to "deference" in a single sentence and citing just one out-of-circuit opinion). This Court need not—and should not—abjure its constitutional duty to undertake "the basic judicial task of 'say[ing] what the law is.'" *Loper Bright*, 144 S. Ct. at 2271 (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)). Moreover, UTC's invocation of scientific deference for FDA is unjustified when the issues left for this Court to resolve are statutory, not scientific. *N.Y. Stock Exch. v. SEC*, 962 F.3d 541, 554 (D.C. Cir. 2020) ("[T]he question a court faces when confronted with an agency's interpretation of a statute it administers is always . . . *whether the agency has stayed within the bounds of its statutory authority*.") (citation omitted).

FDA's improper interpretation and application of the clear requirements spelled out in the FDCA and FDA regulations is not entitled to any scientific deference. UTC cannot point to anywhere in the Exclusivity Decision where FDA articulated fact-specific, scientific reasoning as to why and how FDA was exercising discretion between two or more permissible alternatives to define BREEZE as a new clinical investigation, to find BREEZE essential to approval, or to extend

the scope of BREEZE's findings far beyond the stable-switching PAH patients studied.  Even FDA has downplayed any entitlement to scientific deference, implying instead that it has the "best reading" of the FDCA and FDA regulations.  *Loper Bright*, 144 S. Ct. at 2266.  At most, UTC can only parrot back FDA's guidance stating that "a particular clinical investigation may be more limited in scope or more specific than the conclusions (and thus the scope of exclusivity) that can be drawn from it," FDA-000470, whose language this Court can review de novo, all while claiming the guidance reflects unimpeachable scientific judgment beyond the reach of judicial review.

Rather than attacking FDA's scientific judgment, as UTC argues, Liquidia simply revealed FDA's failure to undertake reasoned decisionmaking, which is the ***prerequisite*** before FDA may receive scientific deference in the first instance.  No scientific deference applies here.

### III.    SUMMARY JUDGMENT SHOULD BE PROMPTLY GRANTED FOR LIQUIDIA, OR ALTERNATIVELY, THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION.

UTC suggests that Liquidia has "abandoned" its request for preliminary relief in favor of final relief under the APA.  UTC Br. 42.  It has not.  As stated in its opening brief, Pl. Br. 19-41, preliminary relief is appropriate here.  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) ("likelihood of success on the merits" is the "most important factor" for preliminary injunction).

Although the preliminary injunction factors favor Liquidia, UTC objects to an award of an injunctive relief for Liquidia on the grounds that the "purpose" of injunctive relief "is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (citation omitted).  This Court would not be "upend[ing] the status quo," UTC Br. 42, as UTC alleges, but merely restoring the parties to the position they were in in August 2024 before FDA issued its erroneous Exclusivity Determination, and when FDA's May 2022 Original Exclusivity Summary had not yet been superseded.  At that time, there was ***no*** recognized exclusivity for Tyvaso DPI and thus no basis to block full approval

for a drug that meets all safety and efficacy requirements.  It is the unlawful and arbitrary Exclusivity Decision that has upended that status quo—and an award of injunctive relief here would allow patients access to a safe and effective alternative to Tyvaso DPI and restore the balance Congress intended between innovation and competition.

This Court should set aside the Decision as unlawful and prohibit FDA from recognizing any NCI exclusivity for Tyvaso DPI because the Exclusivity Decision exceeds FDA's statutory authority under the FDCA and is contrary to FDA regulations.  The Court should also order injunctive relief to effectuate that order.  As FDA itself acknowledges, "[i]njunctive relief is typically appropriate when there is **only one rational course** for the agency to follow upon remand."  *Am. Hosp. Ass'n v. Azar*, 385 F. Supp. 3d 1, 11 (D.D.C. 2019); FDA Br. 31.  The only rational course here is to remand with instructions to FDA to grant full approval for Yutrepia. *See Teva Pharms. USA, Inc. v. FDA*, 1999 WL 1042743, at *7 (D.D.C. Aug. 19, 1999) (plaintiff was "entitled to immediate final effective approval" for its drug application); *see also Torpharm, Inc. v. Shalala*, 1997 WL 33472411, at *1, *3–5 (D.D.C. Sept. 15, 1997) (requiring FDA to approve NDA after concluding that FDA had incorrectly applied FDCA provisions at issue).

Alternatively, if the Court sets aside the Exclusivity Decision finding that it is arbitrary and capricious, then it may remand to FDA to reconsider its arbitrary and capricious findings.  *See Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) ("[U]nsupported agency action normally warrants vacatur.").  Should the Court remand the matter to FDA, Liquidia respectfully requests that the Court require FDA to render a decision within 14 days of this Court's order to avoid further delay.  Liquidia Br. 45.

## <u>CONCLUSION</u>

For the foregoing reasons, Liquidia respectfully requests that the Court (1) grant Liquidia's renewed motion for preliminary injunction and motion for summary judgment, vacating FDA's unlawful Exclusivity Decision and ordering FDA to grant full and immediate approval of the Yutrepia NDA; and (2) deny UTC's cross-motion for summary judgment.

Dated: October 30, 2024                    Respectfully submitted,

By: _Sonia W. Nath_
    Sonia W. Nath (DC Bar No. 977095)
    David E. Mills (DC Bar No. 401979)
    Robby Saldaña (DC Bar No. 1034981)
    Matt K. Nguyen (DC Bar No. 1736777)
    COOLEY LLP
    1299 Pennsylvania Ave., NW, Suite 700
    Washington, DC 20004-2400
    Telephone: (202) 842-7800
    Facsimile: (202) 842-7899
    snath@cooley.com
    dmills@cooley.com
    rsaldana@cooley.com
    mnguyen@cooley.com

    Kathleen R. Hartnett (DC Bar No. 483250)
    COOLEY LLP
    3 Embarcadero Center, 20th Floor
    San Francisco, CA 94111-4004
    Telephone: (415) 693-2000
    Facsimile: (415) 693-2222
    khartnett@cooley.com

    *Counsel for Plaintiff Liquidia
    Technologies, Inc.*