**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LIQUIDIA TECHNOLOGIES, INC.,

      *Plaintiff,*

v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, ROBERT M.
CALIFF, M.D., in his official capacity as
COMMISSIONER OF FOOD AND
DRUGS, UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES, XAVIER
BECERRA, in his official capacity as
SECRETARY OF HEALTH AND
HUMAN SERVICES,

      *Defendants*, and

UNITED THERAPEUTICS CORP.,

      *Intervenor-Defendant and
Cross-Claimant.*

**REDACTED**

No. 1:24-cv-2428-TJK

**Hearing Scheduled for
December 5, 2024, at 2 p.m.**

## UTC'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Shaun R. Snader (D.C. Bar No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

Douglas Carsten (admitted *pro hac vice*)
Art Dykhuis (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

Adam W. Burrowbridge (D.C. Bar No. 1001783)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

William C. Jackson (D.C. Bar No. 475200)
William M. Jay (D.C. Bar No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20001
(202) 346-4000

Kurt R. Karst (D.C. Bar No. 482615)
Michael D. Shumsky (D.C. Bar No. 495078)
Sara Wexler Koblitz (D.C. Bar No. 1017284)
HYMAN, PHELPS & MCNAMARA, P.C.
700 13th Street, NW, Suite 1200
Washington, DC 20005
(202) 737-5600

*Counsel for United Therapeutics Corporation*
November 14, 2024

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................1

ARGUMENT ...............................................................................................................3

    I.    There Is No Basis To Second-Guess FDA's Determination That Tvyaso DPI Is Eligible for Three-Year Exclusivity. ...........................................3

        A.    FDA correctly determined that the Tyvaso DPI NDA contains reports of qualifying clinical investigations that did not merely study bioavailability................................................................. 4

            1.    Liquidia waived its argument that BREEZE is ineligible for three-year exclusivity because it is a bioavailability study............. 4

            2.    UTC's Tyvaso DPI application "contains reports" of clinical investigations from BREEZE that were not bioavailability studies. .................................................. 5

            3.    BREEZE is not a "bioavailability study."...................................... 7

        B.    BREEZE is a *new* clinical investigation that did not merely duplicate the findings of previous studies.................................................. 10

        C.    BREEZE was essential to the approval of Tyvaso DPI. ........................... 13

        D.    FDA was not bound to follow the unreasoned initial checklist exclusivity summary issued without input from the Exclusivity Board................................................................................. 17

    II.    FDA Reasonably Determined the Scope of Exclusivity for Tyvaso DPI Based on a Legal Test That Liquidia Does Not Challenge................................19

        A.    FDA properly based exclusivity on Tyvaso DPI's novel dosage form....................................................................................... 20

        B.    FDA reasonably determined that BREEZE supported the use of Tyvaso DPI in patients with PAH or PH-ILD. ........................................ 21

        C.    FDA reasonably concluded that BREEZE supported chronic use of Treprostinil in an inhalation powder........................................... 23

    III.    The Only Remedy Available to Liquidia, If Any, Is Remand. ............................25

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Cogdell v. Reliance Std. Life Ins.*,
--- F. Supp. 3d ----, 2024 WL 4182589 (E.D. Va. Sept. 11, 2024) ............................... 5

*Home Depot USA, Inc. v. Jackson*,
587 U.S. 435 (2019) ....................................................................................................... 7

*\*Ipsen Biopharms., Inc. v. Becerra*,
108 F.4th 836 (D.C. Cir. 2024) ................................................................................ 2, 17

*iTech U.S., Inc. v. Renaud*,
5 F.4th 59 (D.C. Cir. 2021) ............................................................................................ 5

*ITServe All., Inc. v. Cissna*,
443 F. Supp. 3d 14 (D.D.C. 2020) ......................................................................... 18, 19

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024) ....................................................................................... 1, 2, 5, 17

*Marbury v. Madison*,
1 Cranch 137 (1803) ..................................................................................................... 17

*Novartis Pharms. Corp. v. Becerra*,
No. 24-cv-02234 (DLF), 2024 WL 4492072 (D.D.C. Oct. 15, 2024) .......................... 17

*\*Otsuka Pharm. Co. v. Price*,
869 F.3d 987 (D.C. Cir. 2017) ......................................................................... 3, 12, 23

STATUTES:

*\*21 U.S.C. § 355(c)(3)(E)(iii) ........................................................... 1, 2, 3, 4, 6, 16, 19

REGULATIONS:

21 C.F.R. § 314.108 .................................................................................................. 8, 11

21 C.F.R. § 314.108(a) ..................................................................................................... 10

*\*59 Fed. Reg. 50,338 (Oct. 3, 1994) ............................................................................. 12

OTHER AUTHORITIES:

FDA, *Draft Guidance: Multiple Endpoints In Clinical Trials Guidance For
Industry*, 2017 WL 345609 (Jan. 2017) ........................................................................ 9

Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF
    LEGAL TEXTS (2012).................................................................................................................5

# GLOSSARY

ANDA .................................................. abbreviated new drug application

APA ..................................................... Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*

FDA ..................................................... Food and Drug Administration

FDA Opening Br. ............................... Federal Defendants' Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Renewed Motion for a Preliminary Injunction and Motion for Summary Judgment (ECF No. 52)

FDCA .................................................. Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq.

FDKP ................................................. an excipient, fumaryl diketopiperazine

Liquidia .............................................. Liquidia Technologies, Inc.

Liquidia Opp. to FDA Mot. ............... Plaintiff Liquidia Technologies, Inc.'s Consolidated Opposition to Federal Defendants' Cross-Motion for Summary Judgment and Reply in Support of Its Renewed Motion for a Preliminary Injunction and Motion for Summary Judgment (ECF No. 62)

Liquidia Opp. to UTC Mot. ............... Plaintiff Liquidia Technologies, Inc.'s Consolidated Opposition to Intervenor-Defendant United Therapeutics Corporation's Cross-Motion for Summary Judgment and Reply in Support of Its Renewed Motion for a Preliminary Injunction and Motion for Summary Judgment (ECF No. 61)

NCI ..................................................... new clinical investigation

NDA .................................................... new drug application

PAH ..................................................... pulmonary arterial hypertension

PH ....................................................... pulmonary hypertension

PH-ILD .............................................. pulmonary hypertension associated with interstitial lung disease

UTC ..................................................... United Therapeutics Corporation

UTC Opening Br. ............................... UTC's Memorandum in Support of Its Motion for Summary Judgment and in Opposition to Liquidia's Renewed Motion for a Preliminary Injunction and Motion for Summary Judgment (ECF No. 50)

# INTRODUCTION

UTC secured the first-ever approval of a treprostinil product in a dry powder formulation. Before FDA would approve this new dosage form, it insisted that "[i]n addition" to a bioavailability assessment, UTC should study the dry powder formulation's safety and tolerability in clinically ill patients "following repeat doses." FDA-000691. UTC submitted reports of the *exact* study FDA had requested (the BREEZE study). BREEZE provided "vital" data—without it, FDA confirms that it "would not have had sufficient information regarding the safety and tolerability of multiple doses of the new dosage form of treprostinil to support approval." FDA-000435. Because UTC's application for Tyvaso DPI "contain[ed] reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application," 21 U.S.C. § 355(c)(3)(E)(iii), UTC is entitled to a three-year exclusivity period.

In attacking FDA's determination, Liquidia persists in dressing up scientific challenges as legal disputes. Indeed, despite repeated references to *Loper Bright*, Liquidia endorses FDA's statutory interpretations almost across the board. *See* UTC Opening Br. 22-25; Liquidia Opp. to UTC Mot. (ECF No. 61) at 4-9.[1] The sole exception is Liquidia's assertion that FDA cannot recognize exclusivity based on a study that reports novel safety and efficacy data if it also happens to include bioavailability data. But despite claiming fealty to the statutory text, Liquidia badly distorts it. To be eligible for three-year exclusivity, it is enough that an application "contains reports" of qualifying new clinical investigations, 21 U.S.C. § 355(c)(3)(E)(iii), and UTC's NDA

---

[1] UTC refers to the parties' earlier briefs as follows: Liquidia's Consolidated Opposition to Intervenor-Defendant United Therapeutics Corporation's Cross-Motion for Summary Judgment (ECF No. 61) by its ECF number or as "Liquidia Opp. to UTC Mot."; Liquidia's Consolidated Opposition to Federal Defendants' Cross-Motion for Summary Judgment (ECF No. 62) by its ECF number or as "Liquidia Opp. to FDA Mot."; UTC's Memorandum in Support of Its Motion for Summary Judgment (ECF No. 50) as "UTC Opening Br."; and Federal Defendants' Memorandum in Support of Cross-Motion for Summary Judgment (ECF No. 52) as "FDA Opening Br."

unquestionably contains such reports in BREEZE.  The statute clarifies that an applicant does not receive credit merely for studying bioavailability—the reports must be "other than bioavailability studies."  *Id.*  But the applicant does not *lose* credit by doing too much; an application still "contains" reports of qualifying clinical investigations even if the applicant also collected bioavailability data.  Liquidia's contrary reading is not only illogical and contrary to FDA precedent, but was waived because Liquidia chose not to make this argument to FDA.

Liquidia fares no better in pressing various arbitrary and capricious challenges, all of which boil down to an argument that FDA supposedly could have approved Tvyaso DPI without BREEZE.  That is a scientific judgment and FDA disagreed: it demanded the BREEZE study and then relied on the BREEZE results to conclude that treprostinil is safe and tolerable in the new dry powder dosage form.  Liquidia's arguments mischaracterize the record, relying on truncated quotes and strategic omissions.  *E.g.*, pp. 14-16, *infra*.  And Liquidia's assertion (ECF No. 61 at 42) that *Loper Bright* eliminated all deference to agency scientific judgments is foreclosed by post-*Loper Bright* precedent, *see Ipsen Biopharms., Inc. v. Becerra*, 108 F.4th 836, 846 (D.C. Cir. 2024). Liquidia's fixation on the 2022 preliminary "Exclusivity Summary" checklist prepared when FDA approved Tvyaso DPI does not advance the ball.  FDA had no reason to definitively resolve exclusivity until a follow-on application like Liquidia's was otherwise ready for approval.  At that point, FDA carefully addressed the issue with input from the Exclusivity Board, which issued a 38-page memorandum addressing every Liquidia challenge.  FDA-000460-97; FDA-000505-62.

Finally, Liquidia's challenge to the scope of the exclusivity recognized by FDA also fails. Liquidia endorses FDA's long-established interpretation:  the scope of exclusivity corresponds to the approved innovative change for which the qualifying study was essential.  *E.g.*, FDA-000418. That test yields a straightforward result: because BREEZE was essential to approval of treprostinil

in the inhalation powder dosage form for chronic use, exclusivity extends to that novel dosage form of treprostinil—but no further. FDA000442. Liquidia's contention that FDA awarded Tyvaso DPI exclusivity based on earlier UTC studies is just wrong. Liquidia is likewise off-base in arguing BREEZE was too narrow to support dosage-form exclusivity. Liquidia now concedes (ECF No. 61 at 36) that FDA may "extrapolate[]" beyond the details of a qualifying study when deciding whether it supports broader conditions of approval. For example, a study limited to patients with brown eyes may support an approval that is not cabined by eye color if FDA concludes that characteristic is not "clinically meaningful." FDA-0000423. Having conceded the key legal point, Liquidia provides no basis to second-guess FDA's scientific judgment.

UTC's three-year exclusivity for Tyvaso DPI does not prevent anyone from obtaining final approval of *other* treprostinil products, such as an inhaled solution version. It does not even prevent others from obtaining approval for a dry powder treprostinil product if they use the 505(b)(1) pathway, like UTC did. But if Liquidia wants to rely on the 505(b)(2) shortcut, it cannot obtain final FDA approval for its dry powder treprostinil product until after UTC's exclusivity expires.[2] Accordingly, the Court should grant summary judgment for FDA and UTC.

## ARGUMENT

### I.    There Is No Basis To Second-Guess FDA's Determination That Tyvaso DPI Is Eligible for Three-Year Exclusivity.

Tyvaso DPI is a new dosage form of treprostinil that improves patient access through

---

[2] UTC does not "denigrate[] the 505(b)(2) pathway," ECF No. 61 at 1, but rather seeks to enforce the bargain Congress struck. Congress "introduced a regime of marketing exclusivity" to counterbalance the risk that competitors would use the 505(b)(2) shortcut to "'free ride' off of the work of innovators without having to foot the substantial expenses associated with safety-and-efficacy testing." *Otsuka Pharm. Co. v. Price*, 869 F.3d 987, 990 (D.C. Cir. 2017). That is why marketing exclusivity does not block applicants from approval if they conduct all of their own studies. *See* 21 U.S.C. § 355(c)(3)(E)(iii).

enhanced convenience, and FDA concluded that the clinical investigations of safety and tolerability reported in BREEZE provided "vital" new information essential to the agency's decision to approve Tyvaso DPI. FDA-000435-36, 000439. Under the plain text of the statute, FDA regulations, and agency precedent, UTC is entitled to three-year exclusivity based on BREEZE. In challenging FDA's determination, Liquidia relies on a single implausible (and conclusory) statutory interpretation argument that it never raised with the agency, which Liquidia then pairs with unsupported attempts to second-guess FDA's scientific judgments. Liquidia provides no basis to disturb FDA's decision.

### A.    FDA correctly determined that the Tyvaso DPI NDA contains reports of qualifying clinical investigations that did not merely study bioavailability.

An applicant is entitled to three-year exclusivity for submitting "reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application." 21 U.S.C. § 355(c)(3)(E)(iii). UTC's application for Tyvaso DPI included such reports from the BREEZE study, which described results of a study of the safety and tolerability of the new treprostinil dosage form. Liquidia's litigation-driven attempt to dismiss these reports on the theory that BREEZE is an ineligible bioavailability study fails for several reasons.

### 1.    Liquidia waived its argument that BREEZE is ineligible for three-year exclusivity because it is a bioavailability study.

Despite now insisting that the statutory text "plainly" supports its position (ECF No. 61 at 4), Liquidia never argued to FDA that BREEZE is an ineligible bioavailability study. Rather, Liquidia asserted that a *different* study (TIP-PH-102) was a "bioavailability study that cannot be used to support three-year exclusivity for Tyvaso DPI," FDA-00008, because the "primary objective" of TIP-PH-102 was to evaluate pharmacokinetics. *Id.* FDA thus correctly understood Liquidia "not [to] contest that the BREEZE study was a new clinical investigation (other than a bioavailability study)." FDA-000436. The argument is waived or, at least, unexhausted.

Liquidia insists it did raise the same challenge to FDA, quoting a statement from its letter asserting that "a bioavailability study cannot be used to confer … exclusivity."  ECF No. 61 at 12 (quoting FDA-00008).  That is misleading because the statement appears within the section of the letter addressing TIP-PH-102, which Liquidia described as "the pivotal PK study."  FDA-00008.  Liquidia *never* argued that BREEZE is a bioavailability study.  To the contrary, it referred to BREEZE as a "safety study" whose "primary endpoint" relates to "the general safety and tolerability of Tyvaso DPI."  *Id.*[3]  Unable to overcome waiver based on the facts here, Liquidia asserts that *Loper Bright Enterprises v. Raimondo* did away with long-settled rules of administrative exhaustion and waiver.  But *Loper Bright* addressed only the standard of review under the APA for legal issues that are properly presented.  *See* 144 S. Ct. 2244, 2261 (2024).  It is not a license to sandbag the agency.  *Cf. Cogdell v. Reliance Std. Life Ins.*, --- F. Supp. 3d ----, 2024 WL 4182589, at *3-4 (E.D. Va. Sept. 11, 2024) (rejecting argument that *Loper Bright* abrogated requirements for administrative exhaustion).

2. **UTC's Tyvaso DPI application "contains reports" of clinical investigations from BREEZE that were not bioavailability studies.**

Even if Liquidia's waiver were excused, its argument that FDA improperly granted three-year exclusivity based on an ineligible bioavailability study is meritless.  Liquidia purports to ground its argument in the statutory text, fixating on the phrase "bioavailability study" to suggest that inclusion of bioavailability data in BREEZE precludes exclusivity.  But courts "do not read snippets of statutory text in a vacuum."  *iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 63 (D.C. Cir. 2021); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts

---

[3] Liquidia also asserts that there is no waiver here because FDA "ultimately *credited*" its argument on bioavailability.  ECF No. 61 at 12.  But as discussed below, that assertion relies on an unsupported reading of the 2022 checklist summary.  *See* pp. 17-19, *infra*.

167 (2012) ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon…."). And the plain language of the text as a whole strongly supports FDA's interpretation.

The full statutory phrase provides that an applicant is eligible for exclusivity if its NDA "*contains reports* of new clinical investigations (other than bioavailability studies)." 21 U.S.C. § 355(c)(3)(E)(iii) (emphasis added). UTC's NDA "contains" such reports from BREEZE, which provided data on "the safety and tolerability of treprostinil inhalation powder (TreT) in subjects with pulmonary arterial hypertension (PAH) currently treated with Tyvaso®." FDA-000760; *see also* FDA-000774. Those reports were not mere "bioavailability studies." Indeed, FDA had specifically advised it would require such reports of safety and tolerability for the new powdered dosage form ███████████████████████████ FDA-000691. An application does not cease to "contain[]" qualifying reports merely because it *also* includes bioavailability studies. Nothing in the statutory text supports Liquidia's bizarre notion that even if an applicant has invested the time and money to generate reports from new clinical investigations, and even if those reports are what allow FDA to approve a new innovation, the applicant somehow loses exclusivity by reporting *additional* data.

Resisting that conclusion, Liquidia observes (ECF No. 61 at 8) that the statute uses the singular term "application," but it is not clear why Liquidia believes this supports its argument. There is no question that the relevant reports establishing the safety and tolerability of the new treprostinil dry powder dosage form were contained in UTC's "application." Liquidia contends (*id.*) that a single study cannot be "subdivide[d]" into its reports of new clinical investigations on safety/tolerability or efficacy (eligible for exclusivity) and bioavailability studies (ineligible). But nothing about the word "application" remotely supports Liquidia's 1+0=0 reasoning. The

operative word is not the singular "application" (or "study") but "reports."

Notably, beyond its insistence (debunked above) that the text *compels* punishing sponsors for studying more than one thing at a time in a clinical investigation, Liquidia offers no conceivable reason that Congress would have imposed such a test. *See* ECF No. 61 at 11. Nor does Liquidia have any meaningful response to the point that its approach would incentivize sponsors to multiply the number of investigations they conduct to avoiding tainting a qualifying study with "bioavailability" data. *See* Liquidia Opp. to FDA Mot. 10-11 (describing FDA's concern as "nonsensical" but providing no substantive rejoinder). There is no reason to read the statute in the strained manner that Liquidia does, which would result in arbitrary distinctions that it does not even try to defend. *See, e.g., Home Depot USA, Inc. v. Jackson*, 587 U.S. 435, 444 (2019) (rejecting textual interpretation that "makes little sense" in the overall statutory context).

### 3. BREEZE is not a "bioavailability study."

In any event, to the extent BREEZE is characterized as just one kind of study, FDA properly determined that it is "an investigation *other than a bioavailability study*" because its "primary endpoint was safety and tolerability." FDA-000432. Thus, contrary to Liquidia's assertion, the fact that "BREEZE did … study bioavailability" does *not* mean that "BREEZE was a bioavailability study." ECF No. 61 at 4. A clinical investigation with a primary objective of studying safety or efficacy does not become a "bioavailability study"—and *only* a bioavailability study—merely because it also evaluated pharmacokinetics as one of several secondary endpoints. Liquidia's repeated assertion (*id.*) that FDA's decision inserts the word "solely" into the statute is accordingly based on a mistaken premise: BREEZE is not "a bioavailability study." *Id.*

Liquidia's accusation (ECF No. 61 at 6-7) that UTC is inventing a "novel" "primary purpose" test is baffling. UTC described FDA's consistent position, which Liquidia itself has previously embraced. In its exclusivity decision here, FDA explained that BREEZE "is considered

an investigation *other than a bioavailability study*" because its "primary endpoint was safety and tolerability," whereas the study merely "assessed pharmacokinetics after administration of each dose as a secondary endpoint." FDA-000432. FDA applied this same test in precedent that *Liquidia endorses*. *See* FDA-001199 & n.60 (explaining that study supporting approval of Morphabond qualified for exclusivity despite measuring the drug's "pharmacokinetic profile" because it "featured a clinical endpoint intended to measure abuse potential"); *see also* ECF No. 61 at 26-27 (relying on the Morphabond exclusivity decision) (citing FDA-001199). Indeed, as noted, p. 5, *supra*, Liquidia's submissions to FDA *in this case* asserted that the eligibility decision should focus on "the *primary* endpoint" of BREEZE and disregard "secondary endpoints as irrelevant." FDA-000010 (emphasis in original). Liquidia made that argument because it wanted FDA to discount the efficacy data reported by BREEZE (*e.g.*, "six-minute walk distance") as one of four secondary endpoints. *Id.* But there is no principled basis to elevate one secondary endpoint (pharmacokinetics) while ignoring all others *and* the study's primary endpoint.

FDA's attention to the "primary endpoint" adheres to the statutory and regulatory text, including the definition of a "[b]ioavailability study" as "a study *to determine* the bioavailability or the pharmacokinetics of a drug." 21 C.F.R. § 314.108 (emphasis added). Liquidia insists that BREEZE meets this definition because it "examined pharmacokinetic data." ECF No. 61 at 7. But as UTC has explained, it is consistent with both ordinary meaning and accepted scientific practice to rely on primary objectives when characterizing a study and what it set out "to determine." *See* UTC Opening Br. 24. Liquidia dismisses UTC's ordinary-meaning arguments as "analogies" (ECF No. 61 at 9) but never explains why those analogies are wrong or inapposite.

Even more remarkably, Liquidia suggests that the distinction between a study's primary and secondary endpoints is meaningless, and it insinuates that a sponsor can "cherry pick" the

preferred endpoint after the fact to game the system. *Id.* at 7-8. That argument reflects a basic misunderstanding of how clinical trials proceed. As FDA guidance explains, sponsors must designate the "primary variable"—*i.e.*, the "target variable" or "primary endpoint"—in the study's "protocol, along with the rationale for its selection." FDA-000932-33. A primary endpoint serves as "the basis for concluding that the study met its objective (i.e., the study 'wins')." FDA, *Draft Guidance: Multiple Endpoints In Clinical Trials Guidance For Industry*, 2017 WL 345609, at *10 (Jan. 2017). Importantly, sponsors must designate the primary endpoint of an investigation *in advance* precisely to avoid after-the-fact cherry picking. *See* FDA-000932-33 ("Redefinition of the primary variable after unblinding will almost always be unacceptable, since the biases this introduces are difficult to assess."). And that is what UTC did here: it identified safety and tolerability as BREEZE's primary endpoint in accordance with FDA's request. FDA-000760.

There is similarly no basis to Liquidia's contention that FDA's treatment of BREEZE conflicts with its understanding of two other studies: TIP-PH-102 and MKC-475-001. ECF No. 61 at 7-8. Liquidia elides a key distinction between the studies.[4] Whereas BREEZE evaluated the safety and tolerability of repeat doses of dry powder treprostinil in patients suffering from pulmonary arterial hypertension, FDA-000760, TIP-PH-102 and MKC-475-001 were *single-dose* evaluations in *healthy* patients. FDA 000433-434.[5] FDA explained that it "did not believe relying on single-dose experience in healthy subjects (as provided by Studies MKC-475-001 and TIP-PH-102) was adequate to assess safety and tolerability of the new inhalation powder for chronic use." FDA-000433; *see* FDA-000444. As a result, neither study included reports of new clinical

---

[4] Liquidia also conflates the studies, repeatedly citing MKC-475-001 when it purports to describe BREEZE. *See, e.g.*, ECF No. 61 at 5 (citing FDA-000712), 27 (citing FDA-000720).

[5] FDA recommends that bioavailability studies be conducted in single-dose studies of healthy patients. FDA-001014.

investigations essential to the approval of Tyvaso DPI—BREEZE did.  FDA thus had no reason

to decide whether these studies were ineligible bioavailability studies.  *See* FDA-000436 n.86.  But

if FDA had decided the issue, Liquidia would have no basis to complain about the agency

following its lead in distinguishing between BREEZE and TIP-PH-102 because the latter was

UTC's "pivotal PK study" for which bioavailability was its "primary objective."[6]

> **B.  BREEZE is a *new* clinical investigation that did not merely duplicate the findings of previous studies.**

FDA also reasonably determined that BREEZE includes reports of new clinical

investigations.  *See* UTC Opening Br. 26-30; FDA Opening Br. 20-23.  As the agency explained,

BREEZE "assessed a specific safety question" no previous study had addressed: "the tolerability

of multiple doses daily over multiple weeks of treprostinil in the new inhalation powder dosage

form to support approval for chronic use."  FDA-000437.   The study thus "permitted broader use

of treprostinil through the approval of this new dosage form."  FDA-000436 & n.87.

Liquidia challenges FDA's determination on this point, but it accepts the agency's legal

framework.  ECF No. 61 at 9-10.  Liquidia is thus left to argue only that FDA supposedly violated

its own precedent and a regulation that defines "new clinical investigation[]" to exclude studies

that "duplicate the results of another investigation" relied on by the agency.  *Id.* (quoting 21 C.F.R.

§ 314.108(a)).  According to Liquidia, BREEZE merely confirmed what FDA already knew from

---

[6] Liquidia notes that MKC-475-001 identified evaluating safety and tolerability as a primary endpoint, which it asserts contradicts UTC's "concession" that MKC-475-001 is a bioavailability study.  ECF No. 61 at 7.  UTC intended no such concession, but rather merely recognized the gap left by MKC-475-001 and TIP-PH-102 that only BREEZE was able to fill.  *See* UTC Opening Br. 16.  There is no need to determine whether MKC-475-001 is a bioavailability study because it did not contain the reports of a new clinical investigation that FDA recognized were essential to the approval of Tyvaso DPI.

the INCREASE and TRIUMPH studies, along with the Afrezza NDA.[7]  But as FDA explained, Liquidia's arguments "misunderstand the nature of the BREEZE study," which answered a new question not addressed by previous studies:  whether treprostinil was safe and tolerable for chronic use in patients in the new dry powder dosage form.  *See* FDA-000439.  INCREASE and TRIUMPH did not study the new powder dosage form and Afrezza is an inhalable form of *insulin*, not treprostinil.  *See* FDA-000445.  Thus, these studies could not provide the safety and tolerability data FDA sought.  Only BREEZE provided that information.

Given this backdrop, Liquidia's assertion that, "by FDA's own estimation," BREEZE was a "duplicative confirmatory study of what FDA already knew" (ECF No. 61 at 10), is wildly misleading.  Indeed, FDA made the exact opposite finding.  *See, e.g.*, FDA-000440 (explaining that BREEZE provided "vital" information about the new dosage form not available elsewhere, and that the Division's review file "confirms that the other available data, including from TRIUMPH [and] INCREASE," "were not enough on their own to support approval").  Liquidia appears to mean that FDA found, based on BREEZE, that the dry powder dosage form of treprostinil does not have a meaningfully different safety or efficacy profile from the inhaled liquid.  *See* ECF No. 61 at 10-11 (collecting snippets from the administrative record); *see also id.* at 25 (repeating this point).  But that does not make BREEZE's results "duplicative."  FDA identified concerns about whether the new dosage form of treprostinil would present "new or worse tolerability issues than those observed with treprostinil inhalation solution."  FDA-000444;

---

[7] Liquidia also tries to smuggle the "Yutrepia NDA" into its list of preexisting studies (ECF No. 61 at 10), but any consideration of Liquidia's 505(b)(2) application would be legally erroneous. The regulation Liquidia invokes refers to the duplication of studies that FDA relied upon to establish safety or efficacy "of a previously approved drug product."  21 C.F.R. § 314.108.  FDA has never approved Yutrepia, making any studies that Liquidia submitted legally irrelevant.  UTC made this point in its opening brief (UTC Opening Br. 36 n.9), and Liquidia offered no response.

FDA-000433; *see* FDA-000691.  That BREEZE dispelled those concerns, *see* FDA-000762, does not mean BREEZE merely told FDA what it "already knew."  ECF No. 61 at 10.

An investigation establishing the safety and tolerability of a new dosage form of a drug represents an important advance, which is why FDA has long recognized that studies like BREEZE securing approval of "changes in … dosage form" "normally warrant exclusivity."  Abbreviated New Drug Application Regulations; Patent and Exclusivity Provisions, 59 Fed. Reg. 50,338, 50,357 (Oct. 3, 1994).  Contrary to Liquidia's insinuation (ECF No. 61 at 23), this policy is not limited to studies supporting dosage forms that have never been approved for *any* drug—*e.g.*, the *first-ever* dry powder.  Indeed, the premise of three-year exclusivity is to reward studies allowing new uses of a particular previously approved drug, *see Otsuka Pharm. Co. v. Price*, 869 F.3d 987, 990, 993 (D.C. Cir. 2017), including "changes in an approved drug product that affect its … dosage form," 59 Fed. Reg. at 50,356.  Thus, the fact that FDA had approved *insulin* in a "dry powder for inhalation," *see* ECF No. 61 at 23 (relying on the Afrezza NDA approval), does not negate the significance of BREEZE, which allowed for the first dry powder formulation of *treprostinil*.

Even as it discounts on-point regulatory guidance regarding new dosage forms, Liquidia contends that "FDA precedents [] support" its argument.  ECF No. 61 at 10.  Liquidia cites only one such precedent (the Veloxis exclusivity memo), and its supposed relevance is hard to understand.  That FDA concluded the particular studies at issue there were not duplicative of previous investigations, *see id.* (citing FDA-001156), provides no reason to conclude that BREEZE is duplicative despite being the first study evaluating the safety and tolerability of multiple doses of treprostinil in a dry powder formulation.  On the flip side, Liquidia again ignores the Morphabond precedent, in which FDA found that a study supporting approval of a new abuse-resistant dosage form (for an existing patient population) supported exclusivity.  *See* FDA-001198.

In short, FDA's conclusion that BREEZE is an eligible new clinical investigation fully aligns with agency regulations and precedent.

### C.    BREEZE was essential to the approval of Tyvaso DPI.

Liquidia likewise fails to provide any reason to disturb FDA's finding that BREEZE was essential to the approval of Tyvaso DPI.  As Liquidia acknowledges, its arguments on this issue recycle points it presses in challenging whether BREEZE is a new clinical investigation (ECF No. 61 at 20), and they fail here for largely the same reasons.

To start, Liquidia contends (ECF No. 61 at 21-22) that BREEZE did not answer any new questions about inhaled treprostinil "whether in dry powder or liquid form."  Liquidia relies on the fact that Tyvaso and Tyvaso DPI include "the identical drug substance" (ECF No. 61 at 22 (quoting FDA-000908)), and that UTC had conducted studies establishing the safety and efficacy of treprostinil in a liquid form.  Yet FDA found those earlier studies were insufficient to approve Tyvaso DPI.  Liquidia may not think that "dry powder or liquid" should matter, but FDA did. Before approving Tyvaso DPI, FDA expressed concerns about adverse reactions to treprostinil *in dry powder form* and advised that, ████████████████████████████████ an "open-label, uncontrolled study to evaluate the short-term (~2 to 3 weeks) safety and tolerability of [Tyvaso DPI] following repeat doses in PAH patients" be conducted.  FDA-000691.  BREEZE was the answer to that concern.  FDA thus explained in its exclusivity decision that BREEZE "was a vital piece of the data package for the approval of treprostinil in this new dosage form" because it "addressed a specific safety question, the tolerability of an active moiety (treprostinil) in a new inhalation powder dosage form."  FDA-000439.

Despite FDA's explanation that BREEZE "provided information that was essential to the approval of Tyvaso DPI and not available from any other source," FDA-000433, Liquidia contends (ECF No. 61 at 21-22) that TRIUMPH and INCREASE provided "ample" data to "establish the

safety and efficacy of inhaled treprostinil without any need for BREEZE at all." But TRIUMPH and INCREASE administered Tyvaso, not Tyvaso DPI, to subjects. FDA-000424-425. Neither study could address the agency's "concern[] that the inhalation powder dosage form could present new or worse tolerability issues than those observed with Tyvaso and other approved treprostinil products." FDA-000433. Nor could MKC-475-001, which administered a single dose of Tyvaso DPI to healthy volunteers; as FDA explained, the agency "did not believe relying on single-dose experience in healthy subjects (as provided by Studies MKC-475-001 and TIP-PH-102) was adequate to assess safety and tolerability of the new inhalation powder for chronic use, regardless of whether the product was found to provide similar bioavailability to the approved Tyvaso inhalation solution." *Id.* And to the extent Liquidia relies (ECF No. 61 at 22) on the statement of a single Division reviewer that "little beyond demonstrating bioavailability was necessary for Tyvaso DPI," the record is clear that FDA required UTC to go "beyond" establishing bioavailability. Indeed, FDA recommended that BREEZE be conducted ██████████████ ████████████████████████████████████████████████ FDA-000691 (emphasis added), and FDA relied solely on BREEZE in its analysis of Risks and Risk Management in FDA's Clinical Review of the Tyvaso DPI application, FDA-000881.

Liquidia runs into the same problem when it argues (ECF No. 61 at 22-23) that any concerns about the dry powder dosage form were already addressed by the Afrezza NDA, which used the same inactive ingredient (FDKP) as Tyvaso DPI. But FDA's concern was specific to the "the tolerability of the inhalation powder dosage form of *treprostinil*," which studies of an insulin product could not address. FDA-000433 (emphasis added). Liquidia's attempt to characterize FDA's reasoning as mere *post-hoc* justification is refuted by the record, which Liquidia mispresents through strategic omissions. For example, Liquidia quotes FDA's statement in the

minutes from the 2017 development meeting that "literature for treprostinil and safety data on FDKP is *sufficient* to support *the clinical use* of Treprostinil Inhalation Powder." ECF No. 61 at 22-23 (quoting FDA-000689) (first emphasis from Liquidia; second emphasis added). As is apparent from the context, FDA was addressing whether to approve the "use and registration" of Tyvaso DPI for clinical trials. FDA-000689. The standard for authorizing use of a drug in clinical trials is, by definition, lower than the standard for actually approving the drug for use by patients; after all, the point of conducting further trials is because there is an evidentiary gap the sponsor must fill with new data.[8] And FDA stated clearly that a further clinical investigation—the BREEZE study—would be needed to address the agency's concerns about safety and tolerability of treprostinil in the new dry powder dosage form. FDA-000691.

Seeking to overcome the contemporaneous evidence that FDA solicited BREEZE, Liquidia repeats its observation (ECF No. 61 at 26) that FDA's meeting minutes do not memorialize the agency's worry that inhalation powder could "get[] stuck in the throat or might cause a sensation of something stuck in the throat." FDA-000433. But such quibbles about FDA's notetaking provide no basis to dispute that FDA required UTC to conduct a new clinical investigation into the safety and tolerability of Tyvaso DPI to gain approval, with the risk of throat blockages serving as one "example." FDA-000433. Liquidia's assertion (ECF No. 61 at 27) that BREEZE did not study this tolerability issue is baseless. Liquidia points out that two patients withdrew from BREEZE because of issues with throat blockage—contrary to Liquidia's allegations, UTC did not "disqualify" these patients—but it is unremarkable that the very small number of patients who experienced adverse tolerability might voluntarily discontinue. (Does Liquidia believe that UTC

---

[8] Even as to clinical use, the statement that Liquidia quotes was immediately qualified, with FDA concluding " ███████████████████████████████ " was sufficient to support clinical use " ████████ several issues were " ██████████████ ." FDA-000689.

should have forced these patients to stay in the study?)

The point is that BREEZE showed adverse effects for dry powder treprostinil were minimal and consistent with other forms of treprostinil, *see* FDA-000823-24, which FDA then relied upon to approve Tyvaso DPI.  *See* FDA-000878-79.  Liquidia's efforts to suggest otherwise are misleading.  For example, tallying references to BREEZE by the Cross-Discipline Team Leader ("CDTL") Review (*see* ECF No. 61 at 25) is not a serious rejoinder to FDA's determination that BREEZE was "vital" to approval.  FDA-000439.  Only two paragraphs of that six-page CDTL Review document address "Clinical" evidence, and BREEZE features prominently in the relevant discussion.  *See* FDA-000910.  To use Liquidia's language, it is thus "baffling[]" why Liquidia describes the CDTL Review as "conclud[ing] … that BREEZE had no role in establishing the 'safety' and 'effectiveness' of Tyvaso DPI."  ECF No. 61 at 24.  No such "conclu[sion]" even arguably appears in the relevant section of the CDTL Review.  Instead, Liquidia points to a statement regarding "safety" in the section on "Non-Clinical" evidence (*id.*), which stated only that Tyvaso DPI is "considered approvable from Pharmacology/Toxicology perspective," and did not address the concerns about tolerability that had led FDA to solicit BREEZE.  FDA-000909.

Liquidia cannot escape the fact that FDA specifically solicited the BREEZE study before it would approve treprostinil in a new dosage form and then relied on the results of BREEZE to refute its concerns that the new dry powder form might present "new or worse tolerability issues." FDA-000433, 000691.  At one point, Liquidia tries to dodge the problem with an offhand suggestion that there is some distinction between whether a study is "enough to approve an NDA" and whether the study warrants exclusivity.  ECF No. 61 at 22-23.  But that is clearly wrong:  the statute mandates exclusivity if an application contains reports of qualifying new clinical investigations that were "essential to the approval" of the application.   21 U.S.C.

§ 355(c)(3)(E)(iii).  FDA identified an evidentiary gap that precluded approval of Tyvaso DPI without further clinical investigations, recommended the BREEZE study to fill that gap, and then relied on the results from BREEZE to approve Tyvaso DPI.  Based on that chain of events, *of course* FDA concluded that the "BREEZE study provided information that was essential to the approval of Tyvaso DPI and not available from any other source."  FDA-000433.

In the end, Liquidia's arguments reduce to an assertion that FDA did not *really* need BREEZE to approve Tyvaso DPI and an invitation to second-guess FDA on this scientific question.  Liquidia thus resorts to suggesting that deference to agencies on scientific matters did not survive *Loper Bright*.  ECF No. 61 at 41-42.  That is wrong.  As UTC explained (UTC Opening Br. 19), *Loper Bright* did not disturb the ordinary standards for arbitrary and capricious review, which the Court distinguished from *de novo* statutory interpretation.  *See* 144 S. Ct. at 2263.  Decisions issued after *Loper Bright* also reaffirm the "basic principle of administrative law" that "courts must be careful not to unduly second-guess an agency's scientific judgments.'"  *Ipsen Biopharms.*, 108 F.4th at 846 (quotation marks omitted); *see also Novartis Pharms. Corp. v. Becerra*, No. 24-cv-02234 (DLF), 2024 WL 4492072, at *11 (D.D.C. Oct. 15, 2024) (recognizing that "FDA's determination on chemical identity sameness reflects its reasoned 'scientific analysis,' which deserves 'a high level of deference.'" (citations omitted)).  Applying this principle, the "basic judicial task of 'say[ing] what the law is,'" 144 S. Ct. at 2271 (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)), does not ask this Court to decide for itself how much clinical evidence is needed to approve a known active moiety in a new dosage form.

### D.    FDA was not bound to follow the unreasoned initial checklist exclusivity summary issued without input from the Exclusivity Board.

Unable to overcome FDA's thorough reasoning in its 38-page exclusivity decision, Liquidia argues at length (ECF No. 61 at 13-19) that the initial exclusivity summary that the

Division of Cardiology and Nephrology prepared in 2022 irrevocably binds FDA. Yet the Division's checklist summary is only an initial recommendation by one FDA component that lacks authority to bind the agency on exclusivity decisions. *See* FDA Opening Br. 14-15. A different FDA component (the Office of Generic Drug Policy) made the agency's conclusive exclusivity decision after receiving input from the CDER Exclusivity Board. *See id.*[9] The bare fact that FDA chose to produce the Division's exclusivity summary to Liquidia following a FOIA request (ECF No. 61 at 17) does not somehow negate FDA's internal division of authority. Nor is it relevant that FDA had granted *tentative approval* to Liquidia's 505(b)(2) application at the time. *See id.* at 16. As UTC explained (UTC Opening Br. 30), FDA had no reason to reach a decision on exclusivity before a follow-on application was otherwise ready for final approval.

But the back and forth over whether the 2022 checklist summary was a "final" exclusivity decision is ultimately beside the point, because "it is not arbitrary and capricious for an agency to change its mind." *ITServe All., Inc. v. Cissna*, 443 F. Supp. 3d 14, 31 (D.D.C. 2020) (citation omitted). The Division prepared a new summary that expressly "supersede[d]" the 2022 summary. FDA-000498. This is thus not a case where an agency failed to "display awareness" of a shift. *ITServe*, 443 F. Supp. 3d at 31 (citation omitted).[10]

Nor does Liquidia identify any reasoning from the 2022 summary that FDA failed to

---

[9] Liquidia attacks a straw man in asserting (ECF No. 61 at 16) that no laws provide that "FDA *must* involve the CDER Exclusivity Board before making an exclusivity decision." UTC's point is only that it is unremarkable for FDA to reject an initial summary recommendation from the Division that was made without input from the expert Exclusivity Board.

[10] Contrary to Liquidia's assertion (ECF No. 61 at 18), there is no daylight between UTC and the Federal Defendants on this issue. Both UTC and the Federal Defendants explained that the 2022 checklist summary was not FDA's final decision on exclusivity. UTC Opening Br. 30; FDA Opening Br. 14-16. And both UTC and the Federal Defendants recognized that the Division issued a new summary to expressly "supersede[]" the 2022 one (however that earlier summary is characterized). UTC Opening Br. 30; FDA Opening Br. 15-16 & n.7.

address in its exclusivity decision.  The document has just three sentences of analysis, only one of which gestures at a reason for BREEZE's supposed ineligibility, asserting that "[t]he safety and tolerability study provided confirmatory efficacy information only."  FDA-000453.  The document never explains why a lack of novel "efficacy information" would preclude exclusivity; regardless, FDA's ultimate exclusivity decision explained at length that BREEZE was "not 'merely supportive.'"  FDA-00438-439; *see* pp. 10-12, *supra*.  Liquidia tries to read other findings into the 2022 checklist summary, asserting (ECF No. 61 at 13-14) that FDA must have concluded that BREEZE was a bioavailability study because of the question it answered.  But Liquidia's story has holes.  It assumes that by checking the "NO" box for whether UTC's application contained reports of clinical investigations, it must have signaled a finding that BREEZE was a bioavailability study.  *See id*.  But that does not follow.  UTC's application also included TRIUMPH and INCREASE, which were "reports of clinical investigations" even under Liquidia's view—they just were not *new*.  ECF No. 61 at 13.  In any event, there is no reason for the Court to speculate about the best reading of a checklist, which is not the decision under review.  FDA addressed every argument presented by Liquidia and thoroughly explained its exclusivity determination.

## II.    FDA Reasonably Determined the Scope of Exclusivity for Tyvaso DPI Based on a Legal Test That Liquidia Does Not Challenge.

Under the statute, UTC's exclusivity extends to the "conditions of approval" for Tyvaso DPI.  21 U.S.C. § 355(c)(3)(E)(iii).  Liquidia endorses (ECF No. 61 at 29) FDA's longstanding interpretation of this provision, which provides that the scope of exclusivity should match the "innovation represented by the approved drug product for which new clinical investigations were essential to approval."  FDA-000093-94, *see* FDA-000418-19.  Applying this test, exclusivity may extend beyond the specific parameters of the eligibility-conferring clinical investigation, if that study supports broader conclusions.  *See* FDA-000116, 000423.  Here, the outcome of FDA's

unchallenged test is straightforward:  the innovation of Tyvaso DPI that was supported by BREEZE is the new dry powder dosage form of treprostinil, so UTC's three-year exclusivity necessarily extends to that treprostinil dosage form.  FDA-000442.[11]

Because Liquidia accepts FDA's legal test, its arguments again collapse into efforts to second-guess the agency's scientific judgment about what conclusions BREEZE supports. Liquidia provides no basis to set aside FDA's exclusivity determination.

### A.    FDA properly based exclusivity on Tyvaso DPI's novel dosage form.

FDA determined the innovation Tyvaso DPI represented was "the inhalation powder dosage form for the active moiety treprostinil for chronic use."  FDA-000442.  Liquidia insists (ECF No. 61 at 29-30) that UTC did not innovate this dosage form with BREEZE, pointing again to FDA's prior approval of Afrezza, the dry powder form of insulin.  But as explained, pp. 13-17, *supra*, BREEZE addressed the safety and tolerability of "the inhalation powder dosage form for the active moiety *treprostinil*."  FDA-000442 (emphasis added).  Treprostinil "present[s] tolerability challenges," and FDA was concerned the new dosage form might present "new or worse tolerability."  FDA-000433.  Studies of a drug that has a different active ingredient and treats different target patient populations were not a substitute for BREEZE.  Similarly, Liquidia's suggestion that UTC's innovation "is attributable to TIP-PH-102 and MKC-475-001" (ECF No. 61 at 30) ignores that those were single-dose studies using healthy volunteers.  *See* FDA-000429, 000699.  As noted, pp. 9-10, *supra*,  FDA "did not believe relying on single-dose experience in

---

[11] As UTC has explained (UTC Opening Br. 36), the plain language of "conditions of approval" arguably sweeps more broadly than FDA's "scope of innovation" test.  Liquidia's contention (ECF No. 61 at 29) that a *district court* decision "foreclose[s] this argument" misunderstands how precedent works.  This Court likely will have no occasion to address the issue because FDA's decision is fully supportable under the legal test that Liquidia endorses.  But if the Court were to rule in Liquidia's favor on the issue of scope and remand to FDA, it should make clear that UTC is free to argue for a broader statutory interpretation during that remand.

healthy subjects (as provided by Studies MKC-475-001 and TIP-PH-102) was adequate to assess safety and tolerability of the new inhalation powder for chronic use."  FDA-000433.

Liquidia also repeats its contention that UTC's exclusivity should be limited to the specific formulation of Tyvaso DPI on the theory that FDA's concerns about a dry powder dosage form for treprostinil "were Tyvaso DPI-specific."  ECF No. 61 at 30.  But FDA found UTC's "innovation is the new dosage form," not the specific formulation, FDA-000447, and the record refutes Liquidia's reconstruction.  FDA explained that "the BREEZE study was not needed to assess the safety of FDKP in Tyvaso DPI's formulation," which the agency did not "view … as posing a significant safety risk," and that inclusion of FDKP in Tyvaso DPI was "not a clinically meaningful characteristic."  FDA-000445-49.  Liquidia suggests the 2017 development meeting minutes show otherwise (ECF No. 61 at 30), but it quotes from the wrong section, which addressed ███████████ information.  FDA *separately* solicited the BREEZE study, as memorialized in the ███████ section of the meeting notes.  FDA-000690-91.

**B.    FDA reasonably determined that BREEZE supported the use of Tyvaso DPI in patients with PAH or PH-ILD.**

Liquidia next asserts (ECF No. 61 at 30-37) that UTC's exclusivity for Tvayso DPI should be limited to the specific patient populations that were studied in BREEZE.  But as FDA has explained, a "clinical investigation may be more limited in scope or more specific than the conclusions (and thus the scope of exclusivity) that can be drawn from it."  FDA-000116, 000423.  The scope of exclusivity thus turns on FDA's scientific judgment about what "conditions of approval" a clinical investigation supports, which may differ from the study's narrow parameters.  Here, FDA relied on BREEZE to approve Tyvaso DPI for treatment of both PAH and PH-ILD, inclusive of both new-to-treat patients and patients transitioning from treprostinil inhalation solution.  FDA-000447 & n.137, *see* FDA-000620-21 (Tyvaso DPI labeling).

Significantly, Liquidia now *concedes* this legal point, admitting that FDA may determine that a study "centered on" one patient population "could reasonably be extrapolated" to other patient populations.  ECF No. 61 at 36 (emphasis omitted).  Liquidia is thus left to challenge only whether FDA's extrapolation from BREEZE was reasonable, but Liquidia provides no basis to set aside the agency's scientific judgment.[12]  Indeed, for all its table pounding about the limits of BREEZE's patient population, Liquidia does not disagree with FDA's conclusion that the dry powder dosage form of treprostinil is safe and tolerable for all PAH and PH-ILD patients—not only the stable PAH patients who enrolled in BREEZE.  *See id.* at 33; *see also* FDA-000447-48.

Liquidia's attempts (ECF No. 61 at 33-35) to manufacture questions about whether the dry powder formulation of treprostinil is safe and tolerable for PH-ILD patients is thus beside the point.  It also mischaracterizes the record.  FDA did not "express[] concerns" about the scope of BREEZE.  *Id.* at 34.  Rather, the agency merely referred back to its concerns "about the pulmonary safety of treprostinil inhaled powder," FDA-000916, which is the reason FDA solicited BREEZE in the first place.  FDA then asked UTC to "[c]larify" how the data from BREEZE support the safety of Tyvaso DPI "in the proposed indicated population" and to justify the "extrapolation" of the data to PH-ILD patients.  FDA-000916.  FDA was ultimately satisfied, as evidenced by its decision to approve UTC's proposed indications.  *See* FDA-000620-21.  Liquidia objects that FDA's exclusivity decision did not "acknowledge" the putative concerns about BREEZE's patient population (ECF No. 61 at 34-35), but Liquidia misunderstands the inquiry.  In making exclusivity determinations, FDA references the conditions for drugs that *have already been approved* based

---

[12] For that reason, Liquidia's discussion of the Morphabond, Veloxis, and Braeburn precedents (ECF No. 61 at 31, 36-37) does not help Liquidia's position, as they merely illustrate the case-specific nature of FDA's evaluations of clinical investigations and the conclusions they support.  In fact, as UTC has explained, the legal test described in Braeburn (one of FDA's most recent precedents) fully supports FDA's approach here.  *See* UTC Opening Br. 38-39.

on a qualifying new clinical investigation; it does not reconsider whether that approval was justified.  *See* FDA-000421-22.  FDA thus properly referenced the approved labeling for Tyvaso DPI in identifying the conditions of approval that BREEZE had ultimately supported, without any need to relitigate *whether* those conditions of approval were justified.  *See* FDA-000447 & n.137.

Unable to attack the conditions of approval FDA granted for Tyvaso DPI based on BREEZE, Liquidia objects (ECF No. 61 at 31-33) that FDA did not rely on BREEZE "standing alone," but rather needed to "cross-reference to TRIUMPH and INCREASE."  According to Liquidia, this amounts to a "limitless scope of NCI exclusivity."  *See id.*  But that argument mischaracterizes FDA's decision.  FDA did not grant exclusivity that is "inclusive of all [] prior innovations," *id.* at 31.  Contrary to Liquidia's misleading insinuation, UTC no longer has any exclusivity that covers an indication:  its marketing exclusivity for Tyvaso DPI does not bar Liquidia or any other 505(b)(2) applicant from securing final approval for a treprostinil product to treat PAH or PH-ILD *in a different dosage form* (*e.g.*, a liquid inhaled solution, like Tyvaso).  UTC's current exclusivity is thus "narrower in scope" than previous marketing exclusivities, precisely as FDA precedent contemplates and reflecting the scope of its new innovation.  *See* ECF No. 61 at 31 (citing FDA-000469).  The fact that UTC's innovation with a novel dosage form builds on existing knowledge about treprostinil is no basis to artificially restrict the marketing exclusivity awarded for Tyvaso DPI.  Indeed, the premise of the three-year exclusivity statute is to reward companies for conducting studies on previously approved—and thereby studied—active moieties.  *See Otsuka*, 869 F.3d at 990.

### C.    FDA reasonably concluded that BREEZE supported chronic use of Treprostinil in an inhalation powder.

Liquidia's argument that BREEZE did not support a condition of approval covering "chronic use" (ECF No. 61 at 37-40) ignores FDA's ability to reasonably extrapolate from the data

provided by a new clinical investigation.  There is no dispute that FDA *did* approve Tyvaso DPI for long-term use.  *See* FDA-000442 n.110, 000621-22 (Tyvaso DPI label describing "[m]aintenance [d]osage").  Nor can there be any reasonable dispute that FDA relied on BREEZE as essential to that approval decision.  The agency considered whether single-dose studies were sufficient "to assess safety and tolerability of the new inhalation powder for chronic use" and concluded they were not:  BREEZE was "needed to assess the safety and tolerability of treprostinil inhalation powder for multiple-dose use for the first time."  FDA-000444; *see also* FDA-000439.  It necessarily follows that the "powder dosage form for chronic use is Tyvaso DPI's innovation," which BREEZE was essential to support.  FDA-000446-47.

The contrary arguments pressed by Liquidia miss the point.  Liquidia scours dictionaries, FDA guidance, and precedent involving clinical holds (ECF No. 61 at 38-39) to urge that "chronic use" is longer than the three-week period studied in BREEZE and cannot be equated with "repeat doses."  But Liquidia's arguments all rely on the mistaken premise that UTC's exclusivity must overlap with the specific parameters of the BREEZE study (presumably meaning that exclusivity would extend only to a three-week dosing regimen).  As explained, pp. 21-22, *supra*, that is incorrect because, under FDA's unchallenged legal test, a "clinical investigation may be more limited in scope or more specific than the conclusions (and thus the scope of exclusivity) that can be drawn from it."  FDA-000116, 000423.  FDA concluded that BREEZE's multiple-dosage study was sufficient to approve Tyvaso DPI for chronic use, and Liquidia again provides no grounds for questioning the agency's scientific judgment and extrapolation.

In any event, even under Liquidia's cramped reading of the evidence, BREEZE *did* address the "*long-term* safety and tolerability" of Tyvaso DPI in an optional extension phase.  FDA-000760 (emphasis added).  Liquidia asserts (at 40) that the results were not "statistically-significant," but

the clinical review Liquidia cites notes that, despite some gaps, the data reported "show[ed] qualitatively similar results" as in the three-week study.  FDA-000896; *see also* FDA-000900.

FDA's Exclusivity Decision thus properly recognized that this additional data provided support for Tyvaso DPI's approval since "adverse events during this long-term, extension phase were similar to those observed in the 3-week treatment phase."  FDA-000429.  Liquidia may disagree about the probative value of extension-phase data, but the judgment was for FDA to make.

## III.    The Only Remedy Available to Liquidia, If Any, Is Remand.

In no event should the Court order injunctive relief, which would upend the status quo and irreparably harm UTC.  Liquidia's assertion (ECF No. 61 at 43) that the relief it seeks would merely "restor[e] the parties to the position they were in" before the challenged FDA action is plainly wrong.  Liquidia is seeking a mandatory injunction directing FDA "to grant full and immediate approval."  ECF No. 33 at 3.  Such an order would allow Liquidia to irrevocably alter the treprostinil market, short-circuit the ordinary remand process, and trample upon UTC's rights.

Liquidia provides no basis for the Court to dictate the answer to FDA's approval decision without a remand and, in fact, implicitly concedes (ECF No. 61 at 44) that success on its arbitrary and capricious challenges would require a remand.  Liquidia also disregards FDA's point that FDA must assess whether an application is ready for approval at the time when exclusivity expires or is lifted.  FDA Opening Br. 32.  And as UTC has explained, its crossclaims challenging FDA's refusal to apply the Bundling Rule independently bar final approval of Liquidia's current 505(b)(2) application.  UTC Opening Br. 45.  Liquidia just reiterates its citation of two unpublished decisions without addressing UTC's explanation of why those cases are inapposite here.  *Id.* at 45 n.11.

## CONCLUSION

For the reasons stated above, this Court should grant the Federal Defendants' and UTC's motions for summary judgment.

November 14, 2024

Shaun R. Snader (D.C. Bar No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

Douglas Carsten (admitted *pro hac vice*)
Art Dykhuis (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

Adam W. Burrowbridge (D.C. Bar No.
  1001783)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

Respectfully submitted.

/s/ *Brian T. Burgess*
William C. Jackson (D.C. Bar. No. 475200)
William M. Jay (D.C. Bar No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20001
(202) 346-4000

Kurt R. Karst (D.C. Bar No. 482615)
Michael D. Shumsky (D.C. Bar No. 495078)
Sara Wexler Koblitz (D.C. Bar No. 1017284)
HYMAN, PHELPS & MCNAMARA, P.C.
700 13th Street, NW, Suite 1200
Washington, DC 20005
(202) 737-5600

*Counsel for United Therapeutics Corporation*