**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LIQUIDIA TECHNOLOGIES, INC.,

       *Plaintiff,*

    v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, ROBERT M.
CALIFF, M.D., in his official capacity as
COMMISSIONER OF FOOD AND
DRUGS, UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES, XAVIER
BECERRA, in his official capacity as
SECRETARY OF HEALTH AND
HUMAN SERVICES,

       *Defendants*, and

UNITED THERAPEUTICS CORP.,

       *Intervenor-Defendant and
Cross-Claimant.*

No. 1:24-cv-2428-TJK

**ORAL ARGUMENT REQUESTED**

**UTC'S MEMORANDUM IN OPPOSITION TO LIQUIDIA'S AND THE FEDERAL
DEFENDANTS' MOTIONS TO DISMISS**

Shaun R. Snader (D.C. Bar No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

Douglas Carsten (admitted *pro hac vice*)
Art Dykhuis (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

Adam W. Burrowbridge (D.C. Bar No. 1001783)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

William C. Jackson (D.C. Bar No. 475200)
William M. Jay (D.C. Bar No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20001
(202) 346-4000

Kurt R. Karst (D.C. Bar No. 482615)
Michael D. Shumsky (D.C. Bar No. 495078)
Sara Wexler Koblitz (D.C. Bar No. 1017284)
HYMAN, PHELPS & MCNAMARA, P.C.
700 13th Street, NW, Suite 1200
Washington, DC 20005
(202) 737-5600

*Counsel for United Therapeutics Corporation*
December 2, 2024

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 4

I.      Statutory and Regulatory Framework ....................................................... 4

        A.      The FDCA and Hatch-Waxman Act ............................................. 4

        B.      Patent disputes under the Hatch-Waxman Act .............................. 5

        C.      FDA's Bundling Rule ................................................................... 7

        D.      The Medicare Modernization Act ............................................... 10

II.     Factual Background .............................................................................. 11

        A.      UTC develops novel treatments for rare diseases. ...................... 12

        B.      Liquidia applies to market a follow-on treprostinil product, leading
                to patent litigation. ................................................................... 13

        C.      Liquidia submits an amendment to add the PH-ILD indication, and
                UTC and Liquidia engage in litigation related to Liquidia's
                505(b)(2) application. ................................................................ 14

        D.      FDA reaffirms its decision to accept Liquidia's amendment and to
                depart from the Bundling Rule. ................................................... 16

        E.      Liquidia brings this action, and UTC files a crossclaim. ............. 17

LEGAL STANDARDS ..................................................................................... 18

ARGUMENT .................................................................................................. 19

I.      There is no basis for this Court to decline to rule on UTC's APA claims ............ 19

        A.      UTC's claims are ripe for review. .............................................. 20

        B.      UTC has standing to challenge FDA's Bundling Decision. ........... 24

                1.      UTC has been deprived of its statutory 30-month stay ......... 25

                2.      UTC faces a substantial risk of competitive harm because
                        of FDA's acceptance of Liquidia's PH-ILD amendment. ........... 30

        C.      UTC's patent-infringement action against Liquidia is not an
                adequate remedy for FDA's APA violations and the resulting loss

of UTC's statutory rights. ........................................................ 31

D.    UTC's crossclaim is procedurally appropriate and will facilitate the efficient resolution of the parties' entire controversy regarding FDA's ability to approve Liquidia's 505(b)(2) application. ..................... 36

II.    UTC has plausibly alleged an APA claim, which cannot be resolved on a motion to dismiss without the administrative record. ............................................ 38

CONCLUSION .................................................................................................. 42

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Am. Bar Ass'n v. U.S. Dep't of Educ.*,
  370 F. Supp. 3d 1 (D.D.C. 2019) ................................................................39

*Am. Petrol. Inst. v. EPA*,
  683 F.3d 382 (D.C. Cir. 2012) .................................................................20

*Aston v. Johnson & Johnson*,
  248 F. Supp. 3d 43 (D.D.C. 2017) .............................................................18

*Avadel CNS Pharms., LLC v. Becerra*,
  638 F. Supp. 3d 23 (D.D.C. 2022) ..........................................................34, 35

*Bayer HealthCare, LLC v. FDA*,
  942 F. Supp. 2d 17 (D.D.C. 2013) .............................................................24

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ..............................................................................32

*Braeburn Inc. v. FDA*,
  389 F. Supp. 3d 1 (D.D.C. 2019) ..........................................................29, 30

*Bristol-Myers Squibb Co. v. Royce Labs., Inc.*,
  69 F.3d 1130 (Fed. Cir. 1995) .................................................................25

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*,
  846 F.3d 1235 (D.C. Cir. 2017) ...............................................................32

*City of Jersey City v. Consol. Rail Corp.*,
  968 F. Supp. 2d 302 (D.D.C. 2013), *aff'd*, No. 13-7175, 2014 WL 1378306
  (D.C. Cir. Feb. 19, 2014) .......................................................................36

*Coker v. Sullivan*,
  902 F.2d 84 (D.C. Cir. 1990) ..................................................................35

*Colorado Wild Horse & Burro Coalition v. Salazar*,
  639 F. Supp. 2d 87 (D.D.C. 2009) .............................................................32

*Consolo v. Fed. Maritime Comm.*,
  383 U.S. 607 (1966) ..............................................................................36

*D.C. v. Merit Sys. Prot. Bd.*,
  762 F.2d 129 (D.C. Cir. 1985) ..............................................................36, 37

*El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Hum. Servs.*,
396 F.3d 1265 (D.C. Cir. 2005) ............................................................. 33

*Electronic Privacy Info. Ctr. v. IRS*,
575 F. Supp. 3d 84 (D.D.C. 2021) .......................................................... 18

*Eli Lilly & Co. v. Medtronic, Inc.*,
496 U.S. 661 (1990) ........................................................................... 25

*Eli Lilly & Co. v. Teva Pharms. USA, Inc.*,
557 F.3d 1346 (Fed. Cir. 2009) .............................................................. 7

*Endo Par Innovation Co. v. Becerra*,
2024 WL 2988904 (D.D.C. June 10, 2024) ............................................... 26

*Farrell v. Tillerson*,
315 F. Supp. 3d 47 (D.D.C. 2018) .......................................................... 39

*Garcia v. Vilsack*,
563 F.3d 519 (D.C. Cir. 2009) .......................................................... 32, 33

*Gonzalez Boisson v. Pompeo*,
459 F. Supp. 3d 7 (D.D.C. 2020) ....................................................... 32, 33

*Gustave-Schmidt v. Chao*,
226 F. Supp. 2d 191 (D.D.C. 2002) ........................................................ 19

*Heuer v. Smithsonian Inst.*,
619 F. Supp. 3d 202 (D.D.C. 2022) ........................................................ 26

*IMAPizza, LLC v. At Pizza Ltd.*,
334 F. Supp. 3d 95 (D.D.C. 2018) .......................................................... 18

*Int'l Paving Systems, Inc. v. Van-Tulco, Inc.*,
866 F. Supp. 682 (E.D.N.Y. 1994) ......................................................... 36

*Ipsen Biopharms., Inc. v. Becerra*,
678 F. Supp. 3d 20 (D.D.C. 2023) ............................................... 27, 28, 30

*Jafarzadeh v. Nielsen*,
321 F. Supp. 3d 19 (D.D.C. 2018) .......................................................... 18

*Jibril v. Mayorkas*,
20 F.4th 804 (D.C. Cir. 2021) ........................................................... 24, 31

*Liquidia Techs., Inc. v. United Therapeutics Corp.*,
No. IPR2021-00406, 2022 WL 2820717 (P.T.A.B. July 19, 2022) .................... 13

*Norwich Pharms., Inc. v. Becerra,*
    703 F. Supp. 3d 1 (D.D.C. 2023) ...................................................................35

*Occidental Petroleum Corp. v. SEC,*
    873 F.2d 325 (D.C. Cir. 1989) ......................................................................39

*Opal Mfg. Co., Ltd. v. UMC Indus. Inc.,*
    553 F. Supp. 131 (D.D.C. 1982) ...................................................................37

*Pfizer Inc. v. Shalala,*
    182 F.3d 975 (D.C. Cir. 1999) ................................................................22, 23

*Roeder v. Islamic Republic of Iran,*
    333 F.3d 228 (D.C. Cir. 2003) ......................................................................36

*Sandoz Inc. v. Becerra,*
    2022 WL 2904262 (D.D.C. July 22, 2022) ...................................................31

*Seminole Nation of Oklahoma v. Norton,*
    206 F.R.D. 1 (D.D.C. 2001) ..........................................................................38

*Swed. Am. Hosp. v. Sebelius,*
    691 F. Supp. 2d 80 (D.D.C. 2010) ..........................................................19, 39

*\*Teva Pharms. USA, Inc. v. Sebelius,*
    595 F.3d 1303 (D.C. Cir. 2010) .............................................6, 22, 23, 24, 31

*Titan Tire Corp. v. Case New Holland, Inc.,*
    566 F.3d 1372 (Fed. Cir. 2009) ....................................................................34

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ......................................................................................31

*United Therapeutics Corp. v. Liquidia Techs., Inc.,*
    2023 WL 8794633 (Fed. Cir. Dec. 20, 2023) ...............................................13

*United Therapeutics Corp. v. Liquidia Techs., Inc.,*
    2024 WL 2805082 (D. Del. May 31, 2024)...................................................14

*United Therapeutics Corp. v. Liquidia Techs., Inc.,*
    74 F.4th 1360 (Fed. Cir. 2023), *cert denied*, No. 23-804, 2024 WL 675262
    (Feb. 20, 2024)........................................................................................13, 27

*Van Hollen v. Fed. Elec. Com'n,*
    291 F.R.D. 11 (D.D.C. 2013) ........................................................................38

*Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.,*
    887 F.3d 1117 (Fed. Cir. 2018)......................................................................11

*Vargus v. McHugh*,
   87 F. Supp. 3d 298 (D.D.C. 2015) ...................................................................39

*Veloxis Pharms., Inc. v. FDA*,
   109 F. Supp. 3d 104 (D.D.C. 2015) ...................................................................5

*Vinal Inst., Inc. v. EPA*,
   106 F.4th 1118 (D.C. Cir. 2024) .......................................................................41

*Walter O. Boswell Mem'l Hosp. v. Heckler*,
   749 F.2d 788 (D.C. Cir. 1984) ....................................................................19, 39

**STATUTES:**

5 U.S.C. § 704 .........................................................................................................31, 32

5 U.S.C. § 706 .........................................................................................................19, 39

21 U.S.C. § 355 ...............................................................................................................4

   § 355(a) ....................................................................................................................4

   § 355(b)(1) ...........................................................................................................4, 5

   § 355(b)(1)(A) .........................................................................................................4

   § 355(b)(1)(A)(viii) .................................................................................................6

   § 355(b)(2)(A)(iv) ...................................................................................................6

   § 355(b)(4)(A) .......................................................................................................11

   § 355(b)(4)(B) .......................................................................................................11

   § 355(c)(2) ...............................................................................................................6

   § 355(c)(3) ...............................................................................................................7

   § 355(c)(3)(C) ...........................................................................................6, 10, 25

   § 355(c)(3)(C)(i) ......................................................................................................7

   § 355(c)(3)(C)(ii) .....................................................................................................7

   § 355(c)(3)(D)(ii) ...................................................................................................35

   § 355(d)(2) ...............................................................................................................4

   § 355(j)(2)(A) ...........................................................................................................5

§ 355(j)(7)(A)(i) ...............................................................................................6

35 U.S.C. § 271(e)(2)(A) ...................................................................................6

35 U.S.C. § 318(a) ...........................................................................................27

Drug Price Competition and Patent Term Restoration Act (Hatch-Waxman Act),
    Pub. L. No. 98-417, 98 Stat. 1585 (1984) ....................................................4

Medicare Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066 ..................10

REGULATORY MATERIALS:

21 C.F.R. § 314.50(h) .........................................................................................6

21 C.F.R. § 314.50(i)(1)(i)(A)(4) ........................................................................6

21 C.F.R. § 314.53(d) .........................................................................................6

21 C.F.R. § 314.94(a)(12) ...................................................................................6

21 C.F.R. § 314.107(b)(1) .................................................................................30

*Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg.
    69,580 (Oct. 6, 2016) ..........................................................................8, 30, 41

*FDA, Proposed Rule, Abbreviated New Drug Applications and 505(b)(2)
    Applications, 80 Fed. Reg. 6802 (Feb. 6, 2015) .......................................9, 41

OTHER AUTHORITIES:

148 Cong. Rec. S6844 (daily ed. July 16, 2002) ...........................................10, 11, 26

FDA, Approval Package, Administrative & Correspondence Documents,
    Application No. 206682 (Jan. 2015) .............................................................9

FDA, Approval Package, Administrative & Correspondence Documents, NDA
    208780 (May 2015) .......................................................................................9

FDA, Approval Package, Administrative & Correspondence Documents, NDA
    209400 (Nov. 2015) ......................................................................................9

FDA, Approval Package, Administrative & Correspondence Documents, NDA
    210709 (May 2017) .......................................................................................9

FDA, Approval Package, Administrative and Correspondence Documents,
    Application No. 021822 (May 2006) ...........................................................9

FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 021822 (May 2006)...........................................................................................40

FDA, Approval Package, Other Review(s), Application No. 208603 (May 21, 2021) .......................................................................................................................9

FDA, Approval Package, Proprietary Name Review(s), Application No. 761223 (May 24, 2021)..........................................................................................................9

FDA, Approval Package, Proprietary Name Review(s), Application Nos. 761285 & 761331 (Sept. 22, 2023)..........................................................................................9

FDA, *Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees* (Dec. 2004) ...............................8

FDA, *Interim Guidance: Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees Under the Prescription Drug User Fee Act of 1992* (July 12, 1993) ...........................................................................................7, 8

FDA's *Manual of Policies and Procedures 6050.1 Rev. 2: Effect of Failure to Pay PDUFA Fees* (Dec. 3, 2021)...............................................................................29

FDA, SOPP 8401: Administrative Processing of Original Biologics License Applications (BLA) and New Drug Applications (NDA) (2024) ...............................8

H.R. Rep. No. 108-391 (2003).................................................................................10, 11, 26

UTC, *United Therapeutics Corporation History*, https://www.unither.com/about-us/history.................................................................................................................12

## GLOSSARY

'327 patent ..........................................U.S. Patent No. 11,826,327

'793 patent .........................................U.S. Patent No. 10,716,793

1993 Bundling Rule ..........................FDA, *Interim Guidance: Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees Under the Prescription Drug User Fee Act of 1992* (July 12, 1993) (Ex. A to UTC's Memorandum in Opposition)

2004 Bundling Rule ..........................FDA, *Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees* (Dec. 2004) (ECF No. 69-4)

ANDA .................................................abbreviated new drug application

APA.....................................................Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*

FDA.....................................................Food and Drug Administration

Fed. Defs.' Mem. ..............................Memorandum in Support of Federal Defendants' Motion to Dismiss and for Relief from Local Rule 7(n) (ECF No. 71-1)

FDCA..................................................Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq.

Liquidia ..............................................Liquidia Technologies, Inc.

Liquidia Mem.....................................Liquidia Technologies, Inc.'s Memorandum of Points and Authorities in Support of Its Motion to Dismiss United Therapeutics Corporation's Crossclaim (ECF No. 69-1)

MMA...................................................Medicare Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066

NDA....................................................new drug application

Orange Book ......................................FDA, *Approved Drugs with Therapeutic Equivalence Evaluations*

PAH.....................................................pulmonary arterial hypertension

PH .......................................................pulmonary hypertension

PH-ILD ...............................................pulmonary hypertension associated with interstitial lung disease

PTAB ................................................Patent Trial and Appeal Board

UTC....................................................United Therapeutics Corporation

## INTRODUCTION

United Therapeutics Corporation (UTC) challenges an agency decision that FDA *admits* "depart[s]" from the policy articulated in its longstanding guidance.  ECF No. 69-3 at 22 (hereinafter, "Bundling Decision").  By abrogating established policy, FDA has eviscerated an important statutory right provided to UTC, which entitles UTC to an automatic stay of the approval of follow-on drug products while UTC vindicates its patent rights.  The Federal Defendants' attempts to evade review of FDA's unlawful action should be rejected.

Under the Hatch-Waxman Act, how FDA handles additions to a pending new drug application (NDA) that relies on a previously approved reference drug has significant consequences extending beyond the applicant.  If FDA insists that the addition must be done through a *new* application, the applicant must provide a new "paragraph IV certification" to the reference drug's manufacturer.  That paragraph IV certification—a technical act of patent infringement—is a representation that the applicant intends to market a product that relies on the safety and efficacy determinations made for the reference drug, and that the applicant believes the patents publicly listed for the reference drug in FDA's compendium of drug patents (the Orange Book) are invalid, unenforceable, or will not be infringed by the proposed drug.  In most cases, if the reference drug's manufacturer sues the applicant over the paragraph IV certification, FDA is automatically stayed from approving the applicant's product for up to 30 months.  By contrast, if FDA treats the addition as an amendment to the pending application, that leads to a different turn of events.  The applicant must still provide the reference drug's manufacturer with a paragraph IV certification.  But if the reference drug's manufacturer files suit, the 30-month stay does not kick in for that new certification on patents listed after the original application but before the amendment.  Absent extraordinary judicial intervention, FDA is free to approve the potentially infringing product immediately.

Here, FDA allowed Intervenor-Defendant Liquidia Technologies, Inc. (Liquidia) to add a new indication (*i.e.*, a new condition that may be treated by its proposed drug) by way of an amendment to Liquidia's pending new drug application. That decision contradicts binding agency rules (the "Bundling Rule"), which dictate that such an addition must be made in a separate application. Because UTC's approved drug product is the reference-listed drug for Liquidia's pending application, Liquidia has provided UTC with paragraph IV certifications with respect to the patents UTC holds for its reference-listed drug. But because FDA allowed Liquidia's amendment, UTC has been deprived of its right to the 30-month stay with respect to any patents listed after it filed its original NDA but before Liquidia's amendment that may be potentially infringed because of the new indication.

None of this is in doubt. When UTC learned that FDA had accepted Liquidia's amended application, it wrote to FDA to lodge its objections and demand recission—a step that would require Liquidia either to file a new application for its new indication (triggering a 30-month stay based on UTC's timely patent suit) or at least wait until FDA finally approved its first application to file a supplement for the new indication. FDA facilitated an exchange of letters between the parties. On August 16, 2024, FDA issued a 26-page letter decision standing firm on its decision to permit Liquidia to proceed by amendment and bypass the 30-month stay. In the letter, FDA acknowledged that it was "depart[ing] from the recommendation in FDA's Bundling Guidance." Bundling Decision at 21-25. And FDA further admitted that it had described the "Guidance" using mandatory terms like "compliance" and had previously told "an applicant that it could not submit an amendment to add a new indication." *Id.* at 24-25 & nn.111, 113. But FDA concluded that Liquidia's application fell within a purported newfound exception to the Bundling Rule for applications that supposedly did not require review of new clinical data. In relying on this

previously undisclosed exception, FDA brushed past the reliance interests of innovators like UTC on FDA's practices, which it minimized as "at most limited." *Id.* at 23.

In view of FDA's 26-page letter decision, the Federal Defendants do not dispute that FDA has now taken final agency action on the relevant issue: whether Liquidia's new indication may be accepted as an amendment, allowing Liquidia to bypass the automatic 30-month stay. But the Federal Defendants nonetheless contend that UTC's suit is unripe, asserting that UTC should wait to challenge FDA's final approval of Liquidia's application. Yet final approval is the very event that the 30-month stay is meant to delay. If review is put off in this manner, the 30-month stay will have been lost and UTC will suffer irreparable harm. Notably, Liquidia *disagrees* with the Federal Defendants on ripeness, recognizing that delayed review would prejudice UTC *and* Liquidia while burdening the Court by guaranteeing a need for emergency proceedings within a matter of months. UTC's legal challenge based on FDA's express departure from the Bundling Rule will not change and cannot be avoided. It is fit for review now.

Leaving ripeness aside, both the Federal Defendants and Liquidia mount various procedural and jurisdictional objections to UTC's crossclaims, but none succeeds. First, UTC has standing to challenge FDA's decision to accept Liquidia's amendment: UTC lost its statutory right to an automatic stay because of FDA's acceptance, and it faces the threat of significant economic consequences caused by the imminent introduction of Liquidia's free-riding product into the market based on an improperly bundled application. Second, UTC's ability to pursue patent remedies against Liquidia for patent infringement is no substitute for this suit challenging FDA's unlawful action under the APA. FDA's action deprived UTC of its statutory right to an *automatic* 30-month stay; it is no answer that a patent owner may seek preliminary injunctive relief against the alleged infringer under a demanding standard of proof. Third, the Federal Defendants (but not

Liquidia) argue that UTC cannot pursue its challenge as a crossclaim, despite the close relationship between the claim and Liquidia's challenge. But intervenors like UTC become parties with full rights to participate, including by bringing their own related claims. Adjudicating UTC's claim here will promote efficiency and avoid delay.

Finally, Liquidia alone challenges the merits of UTC's claims. But those arguments must be reviewed based on the administrative record, which FDA has been ordered to produce. Liquidia's merits argument is therefore premature.

For these reasons, Defendants' motions to dismiss should be denied.

## BACKGROUND

I.    **Statutory and Regulatory Framework**

A.    **The FDCA and Hatch-Waxman Act**

Before marketing a drug, an applicant must first demonstrate to FDA's satisfaction that the product is effective and safe for its intended use. *See* 21 U.S.C. § 355(d)(2); *see generally id.* § 355(a). To do so, the sponsor must submit either an NDA under section 505(b)(1) of the FDCA, 21 U.S.C. § 355(b)(1),[1] or one of the more streamlined applications created by the Drug Price Competition and Patent Term Restoration Act (Hatch-Waxman Act), Pub. L. No. 98-417, 98 Stat. 1585 (1984). The choice depends on whether (and to what extent) the sponsor relies on other sponsors' previous FDA approvals and their associated studies.

If an applicant seeks approval for an entirely new drug product—a "brand-name" drug—it typically submits a full, standalone NDA under section 505(b)(1). An NDA must include the "full reports of investigations" conducted or licensed by the sponsor showing "whether such drug is safe for use and whether such drug is effective in use." 21 U.S.C. § 355(b)(1)(A). By contrast, if

---

[1] Section 505 of the FDCA is codified at 21 U.S.C. § 355. This memorandum refers to provisions of the session law in text and provisions of the U.S. Code in citations.

an applicant seeks to market a generic drug that is a copy of an approved brand drug, the applicant may submit an abbreviated new drug application (ANDA) establishing that the proposed generic drug is bioequivalent and pharmaceutically equivalent to a previously approved "reference listed drug" (*i.e.*, the brand-name product). *See id.* § 355(j)(2)(A).

The Hatch-Waxman Act also establishes an intermediate pathway for approval of a new drug product that shares features with a previously approved drug: an application under section 505(b)(2) of the FDCA. This case involves such a section 505(b)(2) application. "Like the full NDA, a [section] 505(b)(2) application must directly demonstrate that the proposed drug product is safe and effective[.]" *Veloxis Pharms., Inc. v. FDA*, 109 F. Supp. 3d 104, 108 (D.D.C. 2015). But to do so, the section 505(b)(2) NDA "can rely on clinical studies that were previously submitted to FDA in support of another drug and that were not conducted or licensed by the [section] 505(b)(2) sponsor." *Id.* at 109 (alterations omitted). In other words, a section 505(b)(2) application uses clinical studies to demonstrate the safety and effectiveness of the proposed new drug but differs from a section 505(b)(1) application because it relies, in whole or in part, on another sponsor's safety or efficacy data from a previously approved drug.

## B.    Patent disputes under the Hatch-Waxman Act

Many innovative drug products that improve the lives of patients also are the type of novel and valuable inventions that are rewarded with a patent. To strike a balance between expediting the entry of follow-on products and respecting innovators' patent rights, the Hatch-Waxman Act creates a carefully calibrated process for identifying and resolving patent disputes between brand-name manufacturers and would-be generic and section 505(b)(2) competitors. Considered as a whole, this statutory framework promotes the orderly resolution of patent disputes *before* a follow-on product from an ANDA or section 505(b)(2) application enters the market.

The process begins with the brand-name manufacturer's public identification of its patent interests. When an applicant files an NDA, it must list each patent that claims the proposed drug or a method of using the proposed drug for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1)(A)(viii); 21 C.F.R. § 314.50(h). The brand manufacturer must also submit timely updates to FDA of any such newly issued patents, both while the application is pending and after approval of the NDA. 21 U.S.C. § 355(c)(2); 21 C.F.R. § 314.53(d). FDA publishes all listed patents for each approved drug in a compendium called *Approved Drug Products with Therapeutic Equivalence Evaluations*, more commonly known as the "Orange Book." 21 U.S.C. § 355(c)(2), (j)(7)(A)(i).

A section 505(b)(2) applicant must then include in its application a certification regarding all such Orange Book-listed patents. Several types of certifications exist; relevant here is the "paragraph IV" certification. If there are any patents listed in the Orange Book for a given brand-name drug, and if the section 505(b)(2) applicant wants to market its product before the expiration of any of those patents, a "paragraph IV" certification allows it to represent that, in its view, the patent is invalid or unenforceable or will not be infringed by the proposed follow-on drug. 21 U.S.C. § 355(b)(2)(A)(iv); 21 C.F.R. §§ 314.50(i)(1)(i)(A)(4), 314.94(a)(12).

Submitting a paragraph IV certification "comes with a risk" because it is a technical act of patent infringement that allows the patent owner to sue immediately—*i.e.*, before the product has been approved and marketed. *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1305 (D.C. Cir. 2010); 35 U.S.C. § 271(e)(2)(A). Filing suit within 45 days of receiving notice of the paragraph IV certification typically triggers an automatic stay of FDA's ability to approve the 505(b)(2) application for up to 30 months. 21 U.S.C. § 355(c)(3)(C). This stay allows patent disputes to be

litigated before approval and market entry of the follow-on product.  *See Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 557 F.3d 1346, 1348-49 (Fed. Cir. 2009).  If the patent litigation ends sooner than 30 months, so does the stay.  *See* 21 U.S.C. § 355(c)(3)(C)(i)-(ii).

As explained in more detail below, pp. 10-11, *infra*, the automatic 30-month stay is only available for patents submitted to FDA before the original 505(b)(2) application was submitted to the agency.  *See* 21 U.S.C. § 355(c)(3).  During the 30-month stay, the patent disputes are litigated, and FDA reviews the follow-on application in parallel.

### C.    FDA's Bundling Rule

For more than three decades, FDA's "Bundling Rule" has provided that an applicant may not add a new indication to a pending application—including a "tentatively approved" application—via an amendment.  Instead, FDA has long maintained that requests to seek approval for new indications, together with several other types of requests, require entirely new applications.

In its 1993 articulation of the rule, FDA explained to applicants "what should be contained in separate marketing applications and what should be combined into one application."  FDA, *Interim Guidance: Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees Under the Prescription Drug User Fee Act of 1992* at 2 (July 12, 1993) ("1993 Bundling Rule") (Ex. A to UTC's Memorandum in Opposition).  FDA stated that certain proposed additions or alternatives were not proper subjects for amendment, but rather could be sought only in a new application.  As most relevant here, the 1993 Bundling Rule directed that "[a]fter initial submission, a pending original or supplemental application should not be amended to add a new indication."  *Id.* at 6; *see also id.* ("New clinical or *in vitro* data to support a new claim(s) should not be submitted to an already submitted original application during the review of that application.").  Instead, "[i]f the original application is not yet approved, a request for approval of other indications or claims" should "be submitted in a separate, original application."  *Id.*

Likewise, "[e]very different active ingredient … should be submitted in a separate original application," as should "[p]roducts to be administered using different routes of administration" and "[d]ifferent dosage forms" (subject to narrow exceptions).  *Id.* at 3-4.  In contrast, applicants seeking approval for "[d]ifferent strengths or concentrations" of a drug were directed to combine their requests into a single application.  *Id.*

FDA has carried forward the Bundling Rule throughout the years with only minor changes, immaterial here.  In its current form, issued by FDA in 2004, the agency reiterated that:

> After initial submission, a pending original or supplemental application should not be amended to add a new indication or claim. … If the original application is not yet approved, a request for approval of other new indications or claims should be submitted in a separate, original application.

FDA, *Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees* at 4-5 (Dec. 2004) ("2004 Bundling Rule"[2]) (ECF No. 69-4); *see also* Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg. 69,580, 69,616 (Oct. 6, 2016) ("Most requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to the 505(b)(2) application[.]").  FDA has repeatedly applied this rule since 2004.  *See, e.g.*, *id.* at 69,635 (maintaining that applicant may not "amend[] or supplement[] a 505(b)(2) application to seek approval of a drug that has been modified to have a different active ingredient, different route of administration, different dosage form, or certain differences in excipients than the drug proposed in the original submission of the 505(b)(2) application").  Indeed, FDA reiterated the rule at least as recently as January 2024.  *See* FDA, SOPP 8401: Administrative Processing of Original Biologics License Applications (BLA) and New Drug Applications (NDA) at 12 (2024), https://www.fda.gov/media/85659/download.

---

[2] This memorandum refers to the 1993 Bundling Rule and 2004 Bundling Rule collectively as "the Bundling Rule," reflecting the fact that there are no material differences between the two versions.

FDA has understood the Bundling Rule to bind both itself and applicants.  For example, before FDA accepts an application (including an amendment) for substantive review, FDA staff must complete the agency's "RPM Filing Review" checklist to ensure that the submission is lawful and consistent with the statute.  As relevant here, that checklist permits FDA to accept only those applications that comply with the Bundling Rule: "Has the user fee bundling policy been appropriately applied? *If no, or you are not sure, consult the User Fee Staff*."  FDA, Approval Package, Other Review(s), Application No. 208603, at PDF p. 4 (May 21, 2021), https://www. accessdata.fda.gov/drugsatfda_docs/nda/2017/208603Orig1s000OtherR.pdf.

In addition, FDA has repeatedly enforced the Bundling Rule against companies that seek to add new indications by way of an amendment.[3]  The Bundling Rule has also been applied in various additional contexts, including sought-after changes to pending applications that are likely to implicate patent rights, such as changes to the dosage form or route of administration.[4]  Unsurprisingly, FDA has characterized the Bundling Rule as a "require[ment]."  FDA, Proposed

---

[3] *See, e.g.*, FDA, Approval Package, Administrative and Correspondence Documents, Application No. 021822, at PDF pp. 5-6 (May 2006), https://www.accessdata.fda.gov/drugsatfda_docs/nda/ 2008/021822s000admincorres.pdf  (Aptivus  Correspondence);  FDA,  Approval  Package, Administrative & Correspondence Documents, Application No. 206682, PDF p. 45 (Jan. 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/206628Orig1s000Admincorres.pdf (Dexmedetomidine Correspondence); FDA, Approval Package, Proprietary Name Review(s), Application No. 761223, PDF p. 3 (May 24, 2021), https://www.accessdata.fda.gov/drugsatfda_ docs/nda/2021/761223Orig1s000NameR.pdf (Jemperli Correspondence); *see also* FDA, Approval Package, Proprietary Name Review(s), Application Nos. 761285 & 761331, PDF p. 3 (Sept. 22, 2023), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2024/761285Orig1s000,761331Orig 1s000NameR.pdf (Ustekinumab Correspondence).

[4] *See, e.g.*, FDA, Approval Package, Administrative & Correspondence Documents, NDA 210709, PDF p. 60 (May 2017), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/210709Orig1s 000AdminCorres.pdf (Tekturna Correspondence); FDA, Approval Package, Administrative & Correspondence Documents, NDA 209400, PDF pp. 63-64 (Nov. 2015), https://www.accessdata. fda.gov/drugsatfda_docs/nda/2017/209400Orig1s000AdminCorres.pdf          (Omeprazole Correspondence); FDA, Approval Package, Administrative & Correspondence Documents, NDA 208780, PDF p. 76 (May 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/2087 80Orig1s000AdminCorres.pdf (Esbriet Correspondence).

Rule, Abbreviated New Drug Applications and 505(b)(2) Applications, 80 Fed. Reg. 6802, 6851 (Feb. 6, 2015) ("Consistent with FDA's 'bundling' policy …, the applicant is *required* to submit a new 505(b)(2) application [in certain circumstances]." (emphasis added)).

### D.    The Medicare Modernization Act

In 2003, Congress enacted the Medicare Modernization Act (MMA), Pub. L. No. 108-173, 117 Stat. 2066.  Among other things, the MMA reformed the process for the automatic stay to ensure it operates for its intended purpose: to provide an opportunity to litigate significant patent disputes prior to market-altering approvals.  Before passage of the MMA, brand manufacturers sometimes could secure multiple 30-month stays by listing new—but insignificant—patents after the submission of a section 505(b)(2) application or ANDA.  For example, a brand manufacturer might have secured a patent covering minor secondary changes to a drug product (*e.g.*, related to color or packaging) and used it to trigger a new stay, even though the change "really did not indicate a different or improved use for the product."  148 Cong. Rec. S6844 (daily ed. July 16, 2002) (statement of Sen. Collins).  Congress curbed this practice by amending the language of section 505(c) to provide that a 30-month stay only kicks in with respect to patents listed in the Orange Book "before the date on which the [ANDA or section 505(b)(2)] application (excluding an amendment or supplement to the application) was submitted."  21 U.S.C. § 355(c)(3)(C).

In passing the MMA, Congress legislated against the backdrop of—and, indeed, effectively codified—the Bundling Rule.  As discussed above, the Bundling Rule was a fixture of FDA's regulatory regime for more than a decade before the MMA's passage.  *See* pp. 7-10, *supra*.  And Congress "d[id] *not* intend [the MMA] to alter current [FDA] practice regarding acceptance of … amendments and supplements to pending and approved [applications]."  H.R. Rep. No. 108-391, at 835 (2003) (emphasis added).  Instead, Congress "intend[ed] [the MMA] to reflect FDA's current practice regarding those changes and variations to both innovator and generic drugs that

may be approved under amendments and supplements to previously filed NDAs and ANDAs." *Id.* With the Bundling Rule in place, Congress understood that the MMA would not prevent a 30-month stay in the event of a follow-on patent for significant changes reflecting "different or improved use[s] for [a] product," 148 Cong. Rec. at S6844, because the Bundling Rule would bar the addition of such "different or improved" uses by way of an amendment to an existing application. Developing a new use for a drug is exactly that type of innovation, which often results in issuance of a new patent for the method of treatment. *See, e.g., Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1133-36 (Fed. Cir. 2018) (recognizing that discoveries of applying an existing drug "to treat a particular disease" are eligible for patent protection).

Consistent with the Bundling Rule, the MMA provides that "[a]n applicant may not amend or supplement an application … to seek approval of a drug that is a different drug than the drug identified in the application as submitted to the Secretary." 21 U.S.C. § 355(b)(4)(A). Congress further echoed the Bundling Rule by making an exception for "approval of a different strength," as the MMA *permits* an applicant to submit an amendment to a pending NDA to seek approval for a different strength—the type of minor change that is unlikely to implicate the innovator's patent rights. *See* 21 U.S.C. § 355(b)(4)(B) ("[N]othing in this subsection or subsection (c)(3) prohibits an applicant from amending or supplementing the application to seek approval of a different strength."). By contrast, the statute contains no exception allowing for the addition of a new indication by amendment—a possibility that would have directly contradicted the Bundling Rule and the exact type of change that *is* likely to implicate the innovator's patent rights.

## II.   Factual Background

This case concerns a prescription drug containing treprostinil and its innovative use to treat a form of pulmonary hypertension (PH). PH is a rare, chronic, and often fatal disease generally characterized by increased pressure in the blood vessels between the heart and lungs. Crossclaim

¶ 38.  That increased pressure strains the heart and, over time, can result in heart failure and death. *Id.*  The World Health Organization has designated five subcategories of PH, each with a different cause and different expected clinical outcomes.  Treprostinil is one of several therapies approved for Group I PH (also known as pulmonary arterial hypertension (PAH)).  In contrast, treprostinil is the only therapy ever approved to treat patients with pulmonary hypertension associated with interstitial lung disease (PH-ILD), part of Group III PH.

As discussed, UTC has pioneered several inventions to treat various forms of PH.  For its part, Liquidia is seeking to launch a follow-on product that leverages UTC's innovations.

### A.    UTC develops novel treatments for rare diseases.

UTC develops and commercializes products designed to address the needs of patients with chronic and life-threatening rare conditions.  Crossclaim ¶ 3.  Indeed, UTC was created to develop treatments for PAH.  UTC, *United Therapeutics Corporation History*, https://www.unither.com/about-us/history.   UTC's treprostinil-based drug products include: an infusion administered subcutaneously or intravenously (Remodulin®), an extended-release tablet (Orenitram®), a nebulized inhaler (Tyvaso®), and a dry powder inhaler (Tyvaso DPI®).  UTC's efforts to develop innovative treprostinil-based therapies have led to numerous UTC patents, including U.S. Patent No. 11,826,327 ('327 patent), which issued on November 28, 2023 and expires in 2042.  Crossclaim ¶¶ 44, 56.  The '327 patent claims methods of using inhaled treprostinil to improve exercise capacity in patients with PH-ILD.  *See id.* ¶ 56.

In 2009, FDA approved Tyvaso, the first inhaled treprostinil therapy to treat PAH.  Crossclaim ¶ 40.  In 2020, UTC discovered that inhaled treprostinil can improve exercise capacity in patients with PH-ILD and, in 2021, received FDA approval for a treprostinil-based treatment for patients with PH-ILD.  *Id.* ¶ 43.  This first-and-only approved therapy for PH-ILD follows

multiple failures to use other drugs to successfully treat PH-ILD. In 2022, FDA also approved Tyvaso DPI, the first dry powder inhaler version of treprostinil, to treat both PAH and PH-ILD.

**B.      Liquidia applies to market a follow-on treprostinil product, leading to patent litigation.**

Liquidia is a biopharmaceutical company seeking FDA approval to market Yutrepia™, a dry powder inhaler version of treprostinil. Crossclaim ¶ 45. When filing its original section 505(b)(2) application in 2020, Liquidia relied on the approval of UTC's Tyvaso product to shortcut its approval to treat PAH. *Id.* Liquidia included paragraph IV certifications for UTC's patents that were then listed in the Orange Book. *Id.* ¶ 46.

After Liquidia submitted its original section 505(b)(2) application in 2020, UTC promptly filed suit against Liquidia in the District of Delaware, asserting that Liquidia's Yutrepia product would infringe several patents. Crossclaim ¶ 50. After a four-day trial, the District of Delaware concluded that Liquidia infringed certain claims of UTC's Patent No. 10,716,793 ('793 patent) and awarded the statutory Hatch-Waxman remedy: an order barring FDA from granting final approval of Liquidia's NDA before May 14, 2027. *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-cv-755, D.I. 436 ¶¶ 3-4 (D. Del. Sept. 9, 2022). The Federal Circuit affirmed this decision. *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360 (Fed. Cir. 2023), *cert denied*, No. 23-804, 2024 WL 675262 (Feb. 20, 2024). In parallel to that litigation, Liquidia sought to administratively cancel certain claims of the '793 patent through a process at the U.S. Patent & Trademark Office (Patent Office) called "*inter partes* review." *See Liquidia Techs., Inc. v. United Therapeutics Corp.*, No. IPR2021-00406, 2022 WL 2820717 (P.T.A.B. July 19, 2022). The PTAB found the claims unpatentable, and UTC appealed to the Federal Circuit, which affirmed. *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 2023 WL 8794633 (Fed. Cir. Dec. 20, 2023). After UTC fully exhausted its appellate rights, the Patent Office cancelled the '793 patent on November

12, 2024.  Thus, the '793 patent no longer stands in the way of Liquidia's approval.

### C.    Liquidia submits an amendment to add the PH-ILD indication, and UTC and Liquidia engage in litigation related to Liquidia's 505(b)(2) application.

On July 27, 2024, Liquidia announced that it had submitted an amendment to its pending NDA No. 213005 to add the PH-ILD indication.  Crossclaim ¶ 51.  This submission launched a series of disputes between the parties concerning Liquidia's infringement of UTC's patents, the validity of those patents, and FDA's acceptance of Liquidia's amendment to its pending NDA to add a new indication.

As relevant here, in September 2023, within 45 days of receiving notice of Liquidia's paragraph IV certifications, UTC asserted infringement of the '793 patent in a suit against Liquidia in the District of Delaware.  *Id.* ¶ 54.[5]  But FDA determined that UTC's timely patent suit would *not* trigger an automatic 30-month stay for patents listed after the date of Liquidia's original 505(b)(2) application submission (in 2020).  *Id.* ¶ 59.  In December 2023, Liquidia amended its section 505(b)(2) application to include a paragraph IV certification for the '327 patent.  *Id.* ¶ 61.  Within 45 days of receiving notice of that paragraph IV certification, UTC amended that complaint to assert infringement of the '327 patent.  *Id.* ¶ 60.  Patent litigation between UTC and Liquidia is ongoing in the District of Delaware.  On May 31, 2024, the district court denied UTC's motion to preliminarily enjoin Liquidia from launching Yutrepia for the PH-ILD indication.  *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, 2024 WL 2805082 (D. Del.).  That case is currently scheduled for a bench trial to begin on June 23, 2025.

Separately, UTC pressed objections to FDA regarding its improper receipt of Liquidia's amendment to its pending 505(b)(2) application to add the new PH-ILD indication—a decision

---

[5] In view of the Federal Circuit's later decision affirming the Patent Office's administrative review decision, UTC ultimately stipulated to the dismissal of counts of infringement of the '793 patent.

that allowed Liquidia to bypass the automatic 30-month stay.  On December 29, 2023, UTC submitted a letter to FDA, explaining to FDA that its decision to accept Liquidia's amendment for Yutrepia adding the PH-ILD indication violates the agency's longstanding Bundling Rule. Crossclaim ¶ 57.  UTC thus asked FDA to rescind its unlawful action and require Liquidia to file a new application if it still wished to pursue the PH-ILD indication.  *Id.*  At FDA's invitation, Liquidia submitted a response to UTC's letter and UTC submitted a reply.  *Id.*

Because of the irreparable harm FDA's acceptance of Liquidia's amendment threatened to imminently inflict on UTC, in February 2024, UTC filed suit against FDA in this District and filed a motion for preliminary injunction.  *See United Therapeutics Corp. v. FDA*, No. 24-cv-484.  UTC alleged that FDA violated the Administrative Procedure Act (APA) and long-established agency policy by accepting Liquidia's amendment to add a new indication (PH-ILD) to its pending section 505(b)(2) application.  Compl., No. 24-cv-484, ECF No. 1.  Liquidia intervened as a defendant in that action.  Minute Order, No. 24-cv-484 (D.D.C. Mar. 5, 2024).

In response to the suit, FDA represented that it had not yet decided whether "Liquidia's amendment is proper" and was "actively considering" that issue in light of UTC and Liquidia's submissions to the agency.  Crossclaim ¶ 58.  Relying on that representation, the district court denied UTC's motion for preliminary injunction, reasoning that FDA likely had not yet taken final agency action.  No. 24-cv-484, ECF No. 34.  But recognizing that a final approval decision could immediately ripen UTC's claim for irreparable harm, the Court ordered FDA to provide the Court and parties with at least three business days' notice prior to issuing any decision on Liquidia's amended NDA.  No. 24-cv-484, ECF No. 18.  On August 13, 2024, FDA provided that notice pursuant to the Court's order, without specifying the substance of that decision.

**D.    FDA reaffirms its decision to accept Liquidia's amendment and to depart from the Bundling Rule.**

On August 16, 2024, FDA issued a 26-page letter decision in response to UTC's submission.  FDA "conclud[ed]" that Liquidia's request to add the PH-ILD indication to its pending 505(b)(2) application "is not precluded by statute or regulation and is appropriate for FDA to review."  Bundling Decision at 26.

In the Bundling Decision, FDA acknowledged its longstanding guidance instructed "against amendments seeking to add a new indication" to a pending application.  Bundling Decision at 8.  And FDA reaffirmed that "most requests for a new indication must be submitted in a new original application or supplemental application."  *Id.* at 1-2.  But FDA concluded it should "depart from the policy stated in its guidance documents" in Liquidia's case, based on a purported (and previously undisclosed) exception for 505(b)(2) applications that in FDA's view did not provide new data to support approval of the additional indication.  *Id.* at 22-23.  Under this view, follow-on 505(b)(2) applicants that do the least independent work—because they only "request[] a change to seek approval for an indication approved for the relied-upon listed drug"—are exempted from the Bundling Rule's restrictions on amendments.  *Id.* at 23.

In support of its decision, FDA asserted that the statute and agency regulations permit Liquidia's amendment, and that the Bundling Rule was only "nonbinding" and "d[id] not create legal rights or obligations."  *Id.* at 1, 10, 22.  (Notably, however, FDA rejected Liquidia's contention that agency regulations had "superseded" the Bundling Rule as "sweep[ing] too broadly."  *Id.* at 25.)  FDA admitted that it had previously told applicants that "a new indication should not be submitted as an amendment," and that "on at least one occasion," the agency had gone further and "advised an applicant that it *could not* submit an amendment to add a new indication."  *Id.* at 24-25 & n.111 (emphasis added).  And FDA acknowledged that agency manuals

16

describe steps that applicants should take "to be in compliance with the Bundling Guidance," a directive FDA argued "could be misunderstood" to suggest "the guidance is binding." *Id.* at 25 n.113. But FDA insisted that the Bundling Rule provides recommendations that the agency is free to discard, and it promised to clarify the matter moving forward "to avoid the possibility of confusion among FDA staff or the public." *Id.* FDA further asserted that the "reliance interests" of innovators like UTC in the agency "maintaining its interpretation" are "doubtful and at most limited," and that the Bundling Rule "did not create a reliance interest" related to how FDA's filing practices determine application of "a 30-month statutory stay of approval." *Id.* at 23 & n.105.

On the same day that FDA issued the Bundling Decision, the agency also informed Liquidia that it was granting tentative approval for its Yutrepia product for both the PAH and the PH-ILD indications. Crossclaim ¶ 64. FDA did not grant final approval to Liquidia because, as it explained in a separate letter decision, Yutrepia falls within the scope of a three-year regulatory exclusivity that UTC earned in securing approval of Tyvaso DPI—a novel dry powder dosage form of treprostinil. *Id.* UTC's exclusivity will expire on May 23, 2025. *Id.* Following FDA's decision, UTC voluntarily dismissed its action. No. 24-cv-484, ECF No. 56. As UTC explained, it took this step in response to Liquidia's argument that UTC's initial suit—filed before FDA's letter decision on the Bundling Rule—was "incurably premature" as filed. ECF No. 36 at 4 n.1.

### E.    Liquidia brings this action, and UTC files a crossclaim.

On August 21, 2024, Liquidia filed the present suit against the Federal Defendants to challenge FDA's decision finding that final approval of Yutrepia is blocked by UTC's unexpired three-year exclusivity. The Court granted UTC's motion to intervene. Minute Order (Aug. 30, 2024).

On September 16, 2024, UTC filed its answer to Liquidia's complaint, which included a crossclaim against the Federal Defendants challenging FDA's decision to allow Liquidia's

amendment in contravention of the longstanding Bundling Rule.  Crossclaim ¶¶ 77-91.  Cognizant of the connection between its crossclaim and Liquidia's affirmative action (which is set for hearing on December 5, 2024), UTC moved to expedite production of the administrative record in the interest of the Court hearing argument on both the Complaint and Crossclaim together.  ECF No. 36.  The Federal Defendants opposed and took the further position that they could delay producing the administrative record until after a ruling on the motion to dismiss, notwithstanding Local Rule 7(n)(1) requiring the government to submit the administrative record "simultaneously with the filing of a dispositive motion."  *See* ECF No. 43 at 3 n.2.

The Federal Defendants and Liquidia then moved to dismiss.  *See* ECF Nos. 69, 71.  The Federal Defendants did not provide the administrative record with the filing, but instead formally moved for relief from Local Rule 7(n).  On November 19, 2024, this Court ordered that the Federal Defendants shall produce the administrative record by December 19, 2024.

## LEGAL STANDARDS

 "A complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Electronic Privacy Info. Ctr. v. IRS*, 575 F. Supp. 3d 84, 88 (D.D.C. 2021) (citation and quotation marks omitted).  The complaint must also "plead facts that, taken as true, render it plausible that the Court has subject-matter jurisdiction."  *Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 27 (D.D.C. 2018) (citation omitted).  This Court "must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged."  *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 109 (D.D.C. 2018) (citation and quotation marks omitted).

In considering Liquidia and FDA's motions, this Court may take judicial notice of public documents available on FDA's website, *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 47 n.1 (D.D.C. 2017), and it may also consider documents incorporated by reference in the Complaint,

*Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).  But the Court may not resolve merits disputes over whether agency action is arbitrary and capricious or otherwise contrary to law on a motion to dismiss, given that such claims require production of the administrative record. *See, e.g.*, *Swed. Am. Hosp. v. Sebelius*, 691 F. Supp. 2d 80, 89 (D.D.C. 2010); *see also Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) ("To review less than the full administrative record might allow a party to withhold evidence unfavorable to its case, and so the APA requires review of 'the whole record.'" (quoting 5 U.S.C. § 706)).

## ARGUMENT

### I.    There is no basis for this Court to decline to rule on UTC's APA claims.

Neither the Federal Defendants nor Liquidia dispute that FDA has taken final agency action by concluding that Liquidia may amend its now-tentatively approved 505(b)(2) application to add the PH-ILD indication.  The Federal Defendants nonetheless urge the Court to delay review of this purely legal question, insisting that UTC's claim will not ripen until after FDA finally approves Liquidia's 505(b)(2) application once UTC's three-year exclusivity expires on May 23, 2025.  But as Liquidia correctly recognizes, UTC's claim is ripe now:  FDA has conclusively resolved the relevant legal issue, and deferring review would cause *both* "Liquidia and UTC [to] experience hardship."  Liquidia Mem. at 36.  Defendants' challenge to UTC's standing fares no better.  If FDA had followed its own precedent and applied the Bundling Rule, Liquidia could not pursue an amendment to add the PH-ILD indication to its 505(b)(2) application without triggering UTC's statutory right to a 30-month stay of Liquidia's approval.  By contrast, as matters now stand, UTC faces imminent irreparable harm because Liquidia can convert its tentative approval to final approval for *both* the PAH and PH-ILD indications immediately once UTC's three-year exclusivity for Tyvaso DPI expires.

Beyond their jurisdictional challenges, Defendants also raise additional arguments to avoid this Court's review of FDA's arbitrary and capricious decision to disregard the Bundling Rule and accept Liquidia's amendment. But none is availing. This action provides the only avenue for UTC to challenge FDA's unlawful action and secure an effective remedy that restores its statutory rights, and a crossclaim is an appropriate and efficient way for UTC to pursue relief.

A.    **UTC's claims are ripe for review.**

1.    The question whether a claim is ripe for review has both constitutional and procedural dimensions. *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). Constitutional ripeness "is subsumed into the Article III requirement of standing," *id.*, which UTC establishes here for the reasons discussed in Part I.B, *infra*. In "assessing the prudential ripeness of a case," courts "focus on two aspects: the 'fitness of the issues for judicial decision' and the extent to which withholding a decision will cause 'hardship to the parties.'" *Id.* at 387 (citation omitted). Both prongs of this test support ripeness here.

First, UTC's challenge to FDA's decision permitting Liquidia to amend its 505(b)(2) application—an admitted "depart[ure]" from the Bundling Rule, Bundling Decision at 1—is fit for review. The "fitness of an issue 'depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'" *Am. Petrol. Inst.*, 683 F.3d at 387 (citation omitted). Here, UTC's challenge presents a purely legal question: whether FDA acted arbitrarily and capriciously or otherwise unlawfully in departing from the Bundling Rule and allowing Liquidia's amendment. FDA has reached a definitive conclusion on that question, as articulated in its extensive letter decision and as demonstrated by its decision to tentatively approve Liquidia's application.

The Federal Defendants assert in conclusory fashion that UTC's "challenge will not be fit for review unless and until FDA [finally] approves Liquidia's application" (Fed. Defs.' Mem. at

8), but they identify no way in which review of the legal issue presented might change if review is delayed. Rather, they only speculate that UTC might want to bring *different* challenges to a different agency action. *Id.* Notably, the Federal Defendants never suggest FDA's Bundling Decision is open to reconsideration, which is in stark contrast to the situation when UTC filed its initial suit. Then, the Federal Defendants represented to Judge Bates that FDA was still "actively considering" the propriety of Liquidia's amendment, which led Judge Bates to conclude that FDA likely had not taken final agency action. *See* Crossclaim ¶ 58. FDA completed that consideration when it issued its Bundling Decision and granted tentative approval to Liquidia. Indeed, as Liquidia recognizes, "FDA could not have granted tentative approval … for both PAH and PH-ILD *unless* it had made a final determination that the amendment to add PH-ILD was proper." Liquidia Mem. at 36 (emphasis added).

Second, delaying review of UTC's crossclaim would cause hardship to both UTC and Liquidia. UTC claims a statutory right to an automatic 30-month stay, which has been abrogated by FDA's decision to allow Liquidia to avoid filing a new 505(b)(2) application to seek approval for the PH-ILD indication. Deferring any judicial review until after FDA finally approves Liquidia's amended 505(b)(2) application will make it impossible for UTC to ever recover its lost statutory right, and it will expose UTC to immediate irreparable harm once Liquidia launches Yutrepia and permanently alters the treprostinil market. *See* Crossclaim ¶ 84. As Liquidia recognizes, UTC will inevitably be forced to "seek emergency relief to stop FDA's full approval from taking immediate effect." Liquidia Mem. at 36-37. Forcing UTC's action into an emergency posture would place an unnecessary burden on both the parties and the Court, wasting resources and risking potential business disruptions. *Accord id.* And the Court would be placed "in an awkward bind" of needing to "miraculously manage to resolve the merits issue" of UTC's

crossclaims "more or less instantaneously." *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1311 (D.C. Cir. 2010).

2.      In arguing that UTC's crossclaims are not ripe, the Federal Defendants rely almost exclusively on *Pfizer Inc. v. Shalala*, 182 F.3d 975 (D.C. Cir. 1999), failing to adequately account for the D.C. Circuit's more recent *Teva* decision.  And, in any event, as Liquidia observes, "*Pfizer* is a materially different case."  Liquidia Mem. at 35.

In *Pfizer*, the innovator company (Pfizer) sued to challenge FDA's acceptance of a competitor's ANDA for processing where the ANDA product used a different mechanism of release than the referenced brand drug.  182 F.3d at 977-78.  The D.C. Circuit held that Pfizer's claims were not ripe for review, and that this remained so even after (following oral argument) FDA granted tentative approval to the ANDA product because FDA might never actually approve the competing application, including if the agency ultimately agreed with Pfizer's argument on dosage form.  *Id.* at 978-81.  The Court further reasoned that neither FDA's acceptance of the ANDA for review nor "the agency's tentative approval causes Pfizer [] hardship at present or in the near future" because Pfizer had gained the "substantial statutory benefit" of an automatic "stay of the FDA's approval."  *Id.* at 979.  And the Court expressed concern that allowing immediate review under the circumstances would create a risk of "piecemeal litigation."  *Id.* at 980.

In direct contrast to *Pfizer*, UTC is injured by FDA's decision to accept a competitor's application because allowing Liquidia to amend its 505(b)(2) application has deprived UTC of the "substantial statutory benefit" of an automatic stay.  *Id.* at 979; *see* pp. 25-26, *infra*.  Nor is there any genuine "uncertainty" over whether FDA will finally approve Liquidia's drug for sale based on its decision.  *Teva*, 595 F.3d at 1309 (identifying such residual uncertainty as motivating the *Pfizer* decision).  By tentatively approving Liquidia's application, FDA has already concluded both

that Liquidia's amendment is proper and that the Yutrepia 505(b)(2) application has demonstrated safety and effectiveness in treating patients with PAH and PH-ILD.  *See* Liquidia Compl. ¶ 80.  The fact that Liquidia must provide "updates" to FDA regarding any changes it has made to Yutrepia before the agency converts tentative approval to final approval (Fed. Defs.' Mem. at 8) does not justify deferring review of a final decision that FDA has already made.

As UTC has explained (ECF No. 53 at 3-4), the D.C. Circuit's decision in *Teva* provides the more relevant precedent.  There, the Court rejected a ripeness argument premised on *Pfizer* that is materially identical to the argument pressed by the Federal Defendants here.  In *Teva*, the Court held that the plaintiff's purely legal challenge to FDA's decision was ripe even before final approval given "[t]he absence of any colorable factual dispute," as the agency made "no suggestion that any possible deficiency or uncertainty" with plaintiff's application "could thwart final approval." 595 F.3d at 1309.  Likewise, here, FDA has addressed all the potential impediments to Liquidia's final approval, including UTC's challenge based on the Bundling Rule, leaving no open issues to prevent final approval once UTC's three-year exclusivity expires on May 23, 2025.  *See* Liquidia Compl. ¶ 80; Crossclaim. ¶ 12.  And as in *Teva*, the Federal Defendants identify nothing that could change in those six months that would have any impact on UTC's crossclaims or inform this Court's review.

The Federal Defendants try to minimize *Teva* (Fed. Defs.' Mem. at 9), but their arguments fall short.  The Federal Defendants contend that the *Teva* court was particularly concerned about the plaintiff's potential loss of a first-mover advantage, which they insist does not apply here because UTC is already on the market.  *Id.*  But that is a distinction without a difference.  The relevant issue in *Teva* was that the plaintiff would suffer hardship from delayed review because it would lose a statutory exclusivity right that could not be restored once a competing application is

finally approved—resulting in irreparable harm unless the district court "miraculously manages to resolve the merits" of the challenge "more or less instantaneously" after the approval decision. 595 F.3d at 1311.  UTC is in the same position, as it will forever lose the benefit of the statutory automatic stay and suffer irreparable harm from permanent change to the market once Liquidia launches its product.  *See* p. 25-26, 30-31, *infra*; *see also Bayer HealthCare, LLC v. FDA*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013) ("Courts have recognized that price erosion and diminished market share can constitute irreparable harm.").  It is thus perplexing how the Federal Defendants could suggest that UTC "asserts no … interest" in "any period of non-competition to which it is entitled" that could "vanish before its claims can be litigated." Fed. Defs.' Mem. at 9.  To the contrary, that is the central premise of UTC's challenge, as it has explained how FDA's wrongful acceptance of Liquidia's amendment allowed it to bypass the automatic 30-month stay to which UTC would otherwise be entitled.  *See, e.g.*, Crossclaim ¶¶ 12-13, 59-62, 80, 82.

Precedent and judicial efficiency thus point in the same direction:  the Court should resolve UTC's claims now rather than require the parties to litigate the same legal issues in an emergency posture mere months from now.

## B.    UTC has standing to challenge FDA's Bundling Decision.

A plaintiff has Article III standing if (1) the plaintiff seeks relief for an actual or imminent injury-in-fact, (2) the injury is fairly traceable to the defendant's conduct, and (3) a favorable judgment would provide relief from the injury.  *See Jibril v. Mayorkas*, 20 F.4th 804, 813-14 (D.C. Cir. 2021).  As explained below, FDA's decision to depart from the Bundling Rule and allow Liquidia to amend its pending application to add the PH-ILD indication caused the deprivation of a statutory right (the loss of the 30-month stay) and threatens imminent economic harm from the premature approval of the bundled application.  Both injuries give UTC standing.

**1. UTC has been deprived of its statutory 30-month stay.**

a.     The Hatch-Waxman Act provides for a careful balance between the interests of innovative pharmaceutical companies and those that follow in their footsteps.  *Bristol-Myers Squibb Co. v. Royce Labs., Inc.*, 69 F.3d 1130, 1132 (Fed. Cir. 1995).  As discussed, p. 6, *supra*, when a company like Liquidia uses the innovator's data to support its own application, it must certify that the company's product will not infringe any valid patents that the innovator has listed.  If the innovator files suit based on the listed patents, FDA is statutorily prohibited from approving Liquidia's application for up to 30 months during the pendency of the litigation.  *See* 21 U.S.C. § 355(c)(3)(C).  The statutorily guaranteed stay provides an important "mechanism designed to guard against infringement of patents relating to pioneer drugs."  *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676-77 (1990).

FDA has deprived UTC of this statutorily prescribed 30-month stay by expressly "depart[ing] from the policy" set forth in the Bundling Rule and allowing Liquidia to amend a pending application to seek approval for a new indication.  Bundling Decision at 1.  If FDA had adhered to the Bundling Rule when Liquidia submitted its amendment in September 2023, Liquidia's request for approval of the PH-ILD indication would have proceeded by way of a separate application, and UTC's timely suit for patent infringement following Liquidia's paragraph IV certification would have triggered an automatic 30-month stay.  *See* Crossclaim ¶¶ 52-54, 59-60.  Likewise, if FDA had properly applied the Bundling Rule in August 2024 when issuing a final decision in response to UTC's administrative challenge, Liquidia could not have continued to pursue the PH-ILD indication without converting its amendment into a new application and triggering the 30-month stay.  *See id.* ¶¶ 60-62.  Instead, it granted tentative approval to the improperly bundled application, allowing Liquidia to bypass the automatic stay and secure final approval for the PH-ILD indication once UTC's three-year exclusivity from the approval of

Tyvaso DPI expires.  *See id.* ¶¶ 63-64.

The loss of a "statutory entitlement" that cannot be "recaptured" is plainly an injury in fact. *Endo Par Innovation Co. v. Becerra*, 2024 WL 2988904, at *7 (D.D.C. June 10, 2024) (citation omitted); *see also Heuer v. Smithsonian Inst.*, 619 F. Supp. 3d 202, 208 (D.D.C. 2022) ("Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue ...." (citation omitted)).  That loss is directly traceable to FDA's decision allowing Liquidia to improperly bundle its amendment and would be redressed by a judicial order setting aside FDA's decision.  Indeed, Congress's determination that an amendment to a pending 505(b)(2) application would not trigger a 30-month stay was built on the understanding that FDA would continue to enforce its policies limiting amendments, as established in the Bundling Rule.  As noted, pp. 10-11, *supra*, when Congress enacted the MMA in 2003, it intended for the statute "to reflect FDA's current practice regarding those changes and variations to both innovator and generic drugs that may be approved under amendments and supplements to previously filed NDAs and ANDAs." H.R. Rep. No. 108-391, at 835 (2003).  Congress thus understood that, in view of the Bundling Rule's restriction on amendments, a 30-month stay would remain available for new patents on significant changes reflecting "different or improved use[s] for [a] product."  148 Cong. Rec. at S6844.  It is only because FDA "depart[ed]" from the Bundling Rule here, *see* Bundling Decision at 1, that UTC lost its statutory right to an automatic 30-month stay before Liquidia can market treprostinil for the innovative new use (treatment of PH-ILD) that UTC pioneered.

b.      Resisting this conclusion, Liquidia and the Federal Defendants deny that FDA's decision on the Bundling Rule deprived UTC of a statutory 30-month stay, as they conjure other scenarios in which the automatic stay could have been avoided.  *See* Fed. Defs.' Mem. at 10-12; Liquidia Mem. at 13-19.  But Article III only requires that UTC show "a genuine nexus between

[its] injury and [FDA's] alleged illegal conduct," which would be redressable by judicial relief—it does not demand "scientific certainty."  *Ipsen Biopharms., Inc. v. Becerra*, 678 F. Supp. 3d 20, 31 (D.D.C. 2023) (citation omitted).  Those requirements are met here.

The Defendants fixate on the fact that the patent UTC is currently litigating (the '327 patent) had not been listed in the Orange Book when Liquidia filed its amendment.  They suggest that UTC's injury is too speculative to confer standing because it assumes that "Liquidia would have submitted a standalone application containing a Paragraph IV certification to the '327 patent."  Fed. Defs.' Mem. at 11; *see also* Liquidia Mem. at 14-15.  But this argument obscures the relevant factual background.  When Liquidia submitted its amendment, it provided a paragraph IV certification to the '793 patent, which was then listed in the Orange Book, and UTC filed suit within 45 days.[6]  Crossclaim ¶¶ 52-54.  If FDA had applied the Bundling Rule and required Liquidia to file a new original application, its paragraph IV certification to the '793 patent would have triggered a 30-month stay.  *Id.* ¶ 54; *see* Liquidia Mem. at 15 n.2.

As a rejoinder, Liquidia notes (Liquidia Mem. at 15 n.2) that, in January 2024, UTC voluntarily dismissed its infringement claim based on the '793 patent.  But UTC did so only *after* it had filed suit (in November 2023) based on the newly listed '327 patent to which Liquidia also submitted a paragraph IV certification.  Crossclaim ¶ 60.  Thus, if FDA had enforced the Bundling Rule when UTC alerted it of Liquidia's improper bundling attempt in December 2023 and required Liquidia to seek approval of the PH-ILD indication through a new application, Liquidia's

---

[6] Liquidia states (Liquidia Mem. at 9) that the PTAB "had already invalidated" the '793 patent before UTC's suit, but it fails to note that the Federal Circuit had previously affirmed a district court judgment finding that the '793 patent was not invalid and was infringed by Liquidia's proposed 505(b)(2) product.  *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1363 (Fed. Cir. 2024).  UTC thus unquestionably had a good-faith basis to assert the '793 patent while its appeal of the PTAB's administrative decision was still on appeal.  35 U.S.C. § 318(a) (explaining that PTAB decision does not take effect until appeals are exhausted).

paragraph IV certification to the '327 patent would have triggered a 30-month stay.  Crossclaim ¶ 62.  The same legal consequences would have flowed from a decision by FDA in August 2024 to honor the Bundling Rule, rather than "depart" from it.  Bundling Decision at 1.  And they would apply today if the Court issues a decision in UTC's favor and sets aside FDA's acceptance of Liquidia's improper amendment adding the new PH-ILD indication.

Anticipating this response, the Defendants argue that FDA cannot require Liquidia to file a new NDA.  *See* Fed. Defs.' Mem. at 12; Liquidia Mem. at 15-16.  But that misses the point.  If Liquidia chooses not to file a new application, that choice would *also* redress UTC's injury.  Ordering FDA to reject the bundled amendment would prevent Liquidia from circumventing the 30-month automatic stay while still seeking approval of the PH-ILD indication, which is the basis of UTC's injury.  The possibility that Liquidia would respond by forgoing an application altogether could only benefit UTC; it does not somehow negate the harm UTC is suffering from an agency action that allowed a follow-on applicant to take a shortcut.  For similar reasons, UTC's standing is not somehow undermined by Liquidia's suggestion that it would respond to an adverse decision by waiting until FDA finally approves its original (unamended) application and then filing a supplemental application.  *See* Fed. Defs.'s Mem. at 12; Liquidia Mem. at 17-18.  This option would not let Liquidia unlawfully bypass the 30-month stay, either, and it would almost certainly lead to a separate FDA timeline for review and approval of the PH-ILD indication.  It is only by violating the Bundling Rule that FDA has permitted Liquidia to leapfrog over that waiting period and the automatic stay to begin marketing for both indications as soon as final approval is issued.

At bottom, Defendants' arguments misstate the standing inquiry.  To satisfy Article III, UTC "does not have to negate these kind of speculative and hypothetical possibilities" or engage with Liquidia and FDA's construction of a "counterfactual world" to establish standing.  *Ipsen*,

678 F. Supp. 3d at 31-32 (brackets and quotation marks omitted).  UTC has alleged that FDA unlawfully allowed Liquidia to amend its application to add the new PH-ILD application, which injured UTC by allowing Liquidia to avoid the statutory automatic stay that would otherwise apply.  The argument "that a hypothesized future event that might injure [UTC] in the same way as the challenged agency decision" is immaterial—UTC's "access to judicial relief does not require that it disprove any speculated alternative source of injury that [Liquidia] conjures."  *Braeburn Inc. v. FDA*, 389 F. Supp. 3d 1, 16 (D.D.C. 2019).  All that matters is that if UTC is right about the merits, FDA would be required to reject Liquidia's PH-ILD indication in the form Liquidia submitted it.

      c.    Going further than the Federal Defendants, Liquidia alone offers further counterfactual scenarios that it contends undermines UTC's standing.  But none succeeds.

      First, Liquidia suggests (Liquidia Mem. at 16-17) that a decision rejecting FDA's departure from the Bundling Rule would not impact the timing of Liquidia's approval because FDA could "unbundle" the improper amendment and then backdate the PH-ILD application as if it had been submitted as a stand-alone application in July 2023 (*i.e.*, before UTC had listed the '327 patent in the Orange Book).  Liquidia advanced this *nunc pro tunc* argument in previous litigation, *see* No. 24-cv-484, ECF No. 38-1 at 14, but FDA conspicuously has not endorsed it—either in court or in the Bundling Decision.  And for good reason: there is no precedent supporting such an unbundle and backdate two-step.  Although Liquidia invokes (Liquidia Mem. at 16-17) an FDA manual, that manual explains only that FDA "may determine after approval that the *application or supplement* should have been separated into more than one *application or supplement.*"  FDA's *Manual of Policies and Procedures 6050.1 Rev. 2: Effect of Failure to Pay PDUFA Fees* at 4 (Dec. 3, 2021) (emphases added).  The manual says nothing about converting amendments into standalone applications and then backdating the application, *nunc pro tunc*.  In any event, UTC's standing is

not undermined by Liquidia's speculation about a hypothetical FDA action that FDA itself has never endorsed.  *See Ipsen*, 678 F. Supp. 3d at 31-32; *Braeburn*, 389 F. Supp. 3d at 16.

Second, Liquidia contends (Liquidia Mem. at 18-19) that the automatic 30-month stay is only discretionary for 505(b)(2) applications, so FDA could disregard the stay even if it were triggered by a stand-alone application for the PH-ILD indication.  Liquidia identifies no precedent supporting its theory, which is contrary to long-settled FDA practice.  *See* 21 C.F.R. § 314.107(b)(1) (applying identical rules for the "[t]iming of approval based on patent certification" to 505(b)(2) applications and ANDAs); 81 Fed. Reg. at 69,582 (same).  Indeed, Liquidia has contradicted its own novel theory in this very litigation, as it represented to the Court that "[b]ecause of the statutory patent stay, FDA *could not* approve Yutrepia."  Liquidia Mem. in Supp. of Renewed Motion for Preliminary Injunction and Summ. J. at 12 n.16 (ECF No. 32-1) (emphasis added).  Liquidia cannot defeat UTC's standing by reference to a novel theory of agency discretion that FDA does not endorse and has never exercised and that Liquidia itself recognizes is contrary to agency practice.  In any event, Liquidia's argument is also implausible as a textual matter, because it relies on a misreading of the word "may."  In saying that an application "may be made effective upon the expiration of the thirty-month period," the statute specifies that an application *may not* be made effective before that period is up.  The statute uses "may" to mean permission (in the sense of *No, you may not*), rather than to mean a hypothetical possibility (in the sense of *I think it may rain*).  Liquidia's contrary interpretation would guarantee arbitrariness, as the statute identifies no reasons to guide an FDA decision on when to honor the 30-month stay.

### 2.  UTC faces a substantial risk of competitive harm because of FDA's acceptance of Liquidia's PH-ILD amendment.

In addition to suffering an injury from the loss of a valuable statutory right, UTC also has standing because it faces an imminent threat of future harm—the irreversible erosion of UTC's

market position.  *See Jibril*, 20 F.4th at 814 ("[A]n alleged future injury may suffice to establish standing if … there is a substantial risk it will occur." (quotation marks omitted)); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021) ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial.").  The Defendants ignore this additional basis for standing when they wrongly assert that UTC's "sole" alleged injury is the loss the 30-month stay.  *See* Fed. Defs.' Mem. at 10.

Here, there is a "substantial risk" that Liquidia's NDA for its PH-ILD product will be approved as amended as soon as Tyvaso DPI's exclusivity period expires in May 2025.  FDA has found that the bundled application "demonstrated safety and effectiveness in treating patients with PAH and PH-ILD, and provided complete labeling for Yutrepia covering both indications." Liquidia Compl. ¶ 80.  And Liquidia has made clear that it is ready to "launch[] distribution of Yutrepia to patients nationwide within days of FDA's decision."  *Id.* ¶ 20.  The competitive harm that UTC will suffer from the imminent but premature approval of Liquidia's Yutrepia for the PH-ILD indication provides ample basis for Article III standing.  *See Sandoz Inc. v. Becerra*, 2022 WL 2904262, at *4 (D.D.C. July 22, 2022) (recognizing an injury in fact from being exposed to "allegedly unlawful competition" (quoting *Teva*, 595 F.3d at 1312)).

### C.   UTC's patent-infringement action against Liquidia is not an adequate remedy for FDA's APA violations and the resulting loss of UTC's statutory rights.

Under the APA, "final agency action for which there is no other adequate remedy in a court" is subject to judicial review.  5 U.S.C. § 704.  Neither the Federal Defendants nor Liquidia

dispute that FDA has now taken final agency action.[7] Instead, they seek to evade review of FDA's final regulatory action by reference to the separate patent litigation between UTC and Liquidia. But patent litigation is not an adequate remedy for FDA's APA violation. Rather, this action provides UTC's only avenue for challenging FDA's unlawful decision accepting Liquidia's amendment and for restoring UTC's lost statutory right to a 30-month stay.

Section 704 of the APA "reflects Congress' judgment that the general grant of review in the APA ought not 'duplicate existing procedures for review of agency action' or 'provide additional judicial remedies in situations where Congress has provided special and adequate review procedures.'" *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW*"), 846 F.3d 1235, 1244 (D.C. Cir. 2017) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)). But this "exception … to avoid [] duplication should not be construed to defeat the [APA's] central purpose of providing a broad spectrum of judicial review of agency action." *Bowen*, 487 U.S. at 903. Before precluding APA review, courts demand "clear and convincing evidence of legislative intent to create a special, alternative remedy." *CREW*, 846 F.3d at 1244 (quotation marks omitted). Several principles guide review of adequacy under that standard. *Gonzalez Boisson v. Pompeo*, 459 F. Supp. 3d 7, 13 (D.D.C. 2020). First, "although an alternative remedy 'need not provide relief identical to relief under the APA,'" it "must nevertheless be of the 'same genre'; 'doubtful and limited relief' will not suffice." *Id.* (quoting *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009)). Second, "an alternative is not adequate where it requires a person to undergo an arduous, expensive, and long process." *Id.* (quotation marks omitted). Third, "the alternative remedy must actually result in a determination of the underlying legal question, rather

---

[7] Nor may Defendants raise such an argument for the first time on reply: "[b]ecause the 'requirement of final agency action' is not jurisdictional," it may be waived. *Colorado Wild Horse & Burro Coalition v. Salazar*, 639 F. Supp. 2d 87, 90 n.7 (D.D.C. 2009).

than a peripheral issue." *Id.*

Under this framework, UTC's ability to pursue a patent-infringement claim against Liquidia and to seek emergency relief in that case does not divest this Court of authority to review UTC's APA claim against FDA. In this case, UTC challenges the legality of FDA's decision to accept Liquidia's amendment in violation of the agency's own rules, policies, and precedents (Crossclaim ¶¶ 77-91)—not whether Liquidia's product would infringe any UTC patents. As a result, the patent-infringement case will not "actually result in a determination of the underlying legal question" presented in this lawsuit. *Gonzalez Boisson*, 459 F. Supp. 3d at 13. The action is entirely unlike case law, referenced by the Federal Defendants (Fed. Defs.' Mem. at 13), involving an attempt to "maintain an action under the APA directly against a federal agency for failure to investigate and rectify the wrongdoing of a third party where Congress has provided the plaintiff with a private right of action against the third party." *Garcia*, 563 F.3d at 524-25; *see also* Liquidia Mem. at 31 (invoking the same line of cases, which "disfavor[] suits directly against federal enforcement authorities administering anti-discrimination laws" (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1271 (D.C. Cir. 2005))). The relevant wrongdoing is *by FDA*, which departed from its own policies to deprive UTC of a statutory right. UTC cannot vindicate that right by pursuing patent litigation against Liquidia.

Nor does the ability of UTC to pursue preliminary injunctive relief in the patent litigation provide an adequate remedy for UTC's loss of a statutory right to a 30-month stay. Indeed, Defendants' argument on this point (*see* Fed. Defs.' Mem. at 14-15; Liquidia Mem. at 32-33) reframes the problem as the solution. Congress established the automatic 30-month stay *to avoid* forcing patent owners to pursue emergency relief to protect their patent rights before a market-

altering launch of a potential infringing product. Because patent litigation is typically fact- and discovery-intensive, early preliminary injunction motions are highly burdensome for both the parties and the court. In a preliminary injunction proceeding, a patent holder like UTC shoulders the burden of showing that it is likely to succeed on the merits before it has fully developed the record in addition to satisfying the other equitable factors. *See Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009). By contrast, this suit seeks to restore the *automatic* stay to which UTC is entitled, which would prevent FDA approval of Liquidia's amended NDA without imposing any evidentiary burden on UTC or necessitating emergency proceedings. Treating a preliminary injunction motion as an adequate substitute for APA relief restoring the automatic 30-month stay thus gets matters backwards. Defendants' approach would also make the loss of a valuable statutory right resulting from unlawful FDA action unreviewable, since a preliminary injunction in a patent suit could *always* be touted as a substitute remedy.[8]

Contrary to Defendants' assertions, *Avadel CNS Pharms., LLC v. Becerra*, 638 F. Supp. 3d 23 (D.D.C. 2022), does not support their effort to insulate FDA's decision from APA review. In *Avadel*, FDA required a 505(b)(2) applicant to provide a patent certification to an Orange Book-listed patent. *Id.* at 31-35. The applicant sued under the APA, alleging no such certification was required, but the district court held that the applicant had an adequate alternative remedy in the patent litigation resulting from its certification. *Id.* The court emphasized that Congress had

---

[8] The Federal Defendants also oddly suggest that the remedy "upon a final judgment" in patent litigation "would give UTC what it seeks from this case: preventing the introduction of Liquidia's product into the market *during the pendency of the patent litigation*." Fed. Defs.' Mem. at 15 (emphasis added). But as the emphasized text shows, that is self-evidently wrong: the possibility of winning a final judgment at the end of patent litigation does not substitute for a statutory stay that would apply "during the pendency" of that litigation. *Id.* Nor does the fact that the statutory stay dissolves if a patent holder loses at the end of the case (Liquidia Mem. at 33) somehow minimize the significance of securing the automatic stay during the litigation.

created "an independent cause of action and an alternative review procedure" for applicants disputing patent certifications: they can file a "counterclaim" in the patent lawsuit "to challenge the patentholder's Orange Book listing," which, if successful, would remove any obligation to certify. *Id.* at 32, 34; *see* 21 U.S.C. § 355(c)(3)(D)(ii). No such cause of action or review procedure exists here for UTC to challenge FDA's decision accepting Liquidia's amendment.

Liquidia admits that this aspect of *Avadel* "doesn't apply here." Liquidia Mem. at 34. But Liquidia nonetheless asserts that the Court should be persuaded by the *Avadel* court's "broader" assertion that an affirmative infringement action provided an adequate remedy for the patent-listing dispute. That reasoning was not necessary to the Court's decision, and it is inapposite in any event. As a later decision explained in distinguishing *Avadel* and providing APA review, the claim at issue in *Avadel* challenging whether a drug product implicated a use claimed by a listed patent "was of the very sort that a patent infringement suit triggered by a paragraph IV certification is intended to resolve." *Norwich Pharms., Inc. v. Becerra*, 703 F. Supp. 3d 1, 18 (D.D.C. 2023). Not so here, where UTC's legal challenge is directed at FDA's disregard of its own rules limiting amendments, rather than any issue bearing directly on UTC's and Liquidia's patent dispute.

As Liquidia concedes (Liquidia Mem. at 34), "the immediate question UTC poses … cannot be answered in its patent case." Nevertheless, it contends that so long as both this action and a patent-infringement suit can address the same "ultimate question[]" as to "the timing of FDA's approval," UTC's patent-infringement suit provides an adequate alternative remedy. *See id.* at 34-35. But a patent suit cannot restore the loss of UTC's statutory right to a 30-month stay— because that specific "injury" cannot be "remedied in another action," the APA's "adequate remedy" bar does not apply. *Coker v. Sullivan*, 902 F.2d 84, 90 n.5 (D.C. Cir. 1990).

**D.    UTC's crossclaim is procedurally appropriate and will facilitate the efficient resolution of the parties' entire controversy regarding FDA's ability to approve Liquidia's 505(b)(2) application.**

The Federal Defendants (but not Liquidia) also object to UTC pursuing its APA challenge as a crossclaim in this case rather than filing a stand-alone action.  The Federal Defendants' argument is not supported by the Rules of Civil Procedure and would result in pointless procedural complication and inefficiency.

As a general rule, "[i]ntervenors under Rule 24(a)(2) assume the status of full participants in a lawsuit and are normally treated as if they were original parties once intervention is granted." *D.C. v. Merit Sys. Prot. Bd.*, 762 F.2d 129, 132 (D.C. Cir. 1985); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003) ("As an intervenor, [a party] 'participates on an equal footing with the original parties to a suit.'" (citation omitted)).  This rule applies to the right to pursue crossclaims: "Federal Rule of Civil Procedure 13 does not distinguish between intervenors and other parties with respect to their ability to assert counterclaims or cross-claims." *City of Jersey City v. Consol. Rail Corp.*, 968 F. Supp. 2d 302, 305 (D.D.C. 2013), *aff'd*, No. 13-7175, 2014 WL 1378306 (D.C. Cir. Feb. 19, 2014); *see also Consolo v. Fed. Maritime Comm.*, 383 U.S. 607, 617 n.14 (1966) ("[A]n intervenor of right may assert a crossclaim without independent jurisdictional grounds.").

Nevertheless, the Federal Defendants insist (Fed. Defs.' Mem. at 15-16) that a crossclaim is unavailable to UTC on the theory that UTC is not a "co-party" under Rule 13(g) because "Liquidia seeks no relief against UTC."  But that argument ignores that UTC was granted leave under Rule 24(a) to intervene of right "*as Defendant*" precisely because Liquidia's claim challenging the award of three-year exclusivity to UTC threatens to "impair or impede" UTC's interests.  Minute Order (Aug. 30, 2024) (emphasis added).  UTC and FDA thus have "like status, … as co-defendants" in Liquidia's action.  *Int'l Paving Systems, Inc. v. Van-Tulco, Inc.*, 866 F.

Supp. 682, 695 (E.D.N.Y. 1994) (cited by Fed. Defs.' Mem. at 15) (stating that "[m]ost courts and commentators" apply a "like status" test for a co-party). The Federal Defendants' contrary view is unsupported. They rely exclusively on a footnote in a 42-year-old decision, in which the court suggested in dicta that "it appears" a crossclaim against an intervenor-defendant would still be improper under Rule 13(g) even if a jurisdictional bar were overcome. *Opal Mfg. Co., Ltd. v. UMC Indus. Inc.*, 553 F. Supp. 131, 133 n.3 (D.D.C. 1982). This stray assertion, which was not supported by any authority, provides no basis to withhold from UTC "the status of full participant[]" as a defendant to Liquidia's suit. *D.C.*, 762 F.2d at 132.

The Federal Defendants fare no better in arguing (Fed. Defs.' Mem. at 16-17) that UTC's crossclaim improperly "alter[s] the nature of the proceeding" initiated by Liquidia by expanding the scope of the action. UTC's crossclaims and Liquidia's claims are closely related (and are certainly part of the same transaction and occurrence): they challenge FDA decisions, issued the same day, that both concern the question of whether and when FDA can grant final approval to Liquidia's amended 505(b)(2) application. Indeed, as Liquidia notes, FDA's decision to grant tentative approval to Liquidia's application depended both on the agency's conclusion that three-year exclusivity applied *and* FDA's "final determination that the amendment to add PH-ILD was proper." Liquidia Mem. at 36. Moreover, as UTC has explained, Liquidia's action seeks relief—immediate final approval of its amended 505(b)(2) application—that UTC's crossclaim would bar. *See* ECF No. 53 at 6; *see also* Minute Order (Nov. 19, 2024) (recognizing that "the Court may have to pivot to addressing the merits of UTC's cross claim quickly after resolving Liquidia's" action). It is thus unsurprising that Liquidia sought to intervene to defend against UTC's crossclaims—a motion this Court granted. *See* Minute Order (Nov. 5, 2024).

In short, there are obvious efficiency benefits to resolving Liquidia and UTC's challenges

in a single proceeding, and nothing would be gained by the pointless formality of requiring UTC

to file an independent suit and then move to consolidate or coordinate its action with Liquidia's.

Neither of the decisions cited by the Federal Defendants (Fed. Defs.' Mem. at 16) involve remotely

comparable circumstances. *See Van Hollen v. Fed. Elec. Com'n*, 291 F.R.D. 11, 13 (D.D.C. 2013)

(acknowledging the general right of intervenors to file crossclaims, but denying leave for the

intervenor-defendant to supplement its pleading after the entry of judgment and appeal to add

claims that arose post-appeal); *Seminole Nation of Oklahoma v. Norton*, 206 F.R.D. 1, 6-8 (D.D.C.

2001) (denying motion to intervene as a plaintiff by party that sought to pursue "an ambitious and

wide-ranging ten-count complaint" raising issues largely distinct from the original action).

## II.    UTC has plausibly alleged an APA claim, which cannot be resolved on a motion to dismiss without the administrative record.

Liquidia alone uses its motion to dismiss to press merits arguments, insisting that its

amendment adding a new indication "was bundled appropriately" with its pending application.

Liquidia Mem. at 20-31.  The Federal Defendants do not join any of these arguments, and for an

obvious reason:  they have yet to produce the administrative record, and it would be premature to

pass on the merits of UTC's APA claims without it.  UTC has stated a plausible claim for relief

under the APA, alleging, among other things, that FDA acted arbitrarily and capriciously by

disregarding requirements and procedures that the agency had treated as binding norms, engaging

in differential treatment of similarly situated parties, and failing to meaningfully consider the

reliance interests of innovators like UTC in the agency's established policies.  *See* Crossclaim

¶¶ 77-88.  These are plainly cognizable claims under the APA, and their resolution depends on

review of the full administrative record.  The Court should reject the attempt by an intervenor

(here, Liquidia) to short-circuit the ordinary process for merits review.

The APA requires that the Court "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. Consistent with the statute, the D.C. Circuit has held that "[i]f a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984); *see also Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 37 (D.D.C. 2019) (Kelly, J.). It would be inappropriate for this Court to weigh in on the merits before the parties have had the opportunity to review and brief the issues with the benefit of the full administrative record. *Boswell*, 749 F.2d at 792; *see also Farrell v. Tillerson*, 315 F. Supp. 3d 47, 69 (D.D.C. 2018) (explaining that the court "cannot dismiss the plaintiff's arbitrary and capricious claim" because production of the administrative record was needed "to allow for meaningful judicial review" (quoting *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 339 (D.C. Cir. 1989))); *Vargus v. McHugh*, 87 F. Supp. 3d 298, 302-03 (D.D.C. 2015) (requiring production of the administrative record before ruling on merits arguments presented in a motion to dismiss); *Swedish Am. Hosp. v. Sebelius*, 691 F. Supp. 2d 80, 89 (D.D.C. 2010) (explaining that the court was "unable to assess the merits" of arguments concerning whether the agency had engaged in arbitrary and capricious action "without considering the administrative record.").

To be sure, FDA set out some of its reasoning for allowing Liquidia's amendment in its Bundling Decision. But as noted, review in an APA case is premised on the "whole record," 5 U.S.C. § 706—not merely those limited portions that an agency deems fit for a sneak preview. *See Boswell*, 749 F.2d at 793 (explaining that APA review cannot be based on a "partial record" where "both sides" have not had an opportunity to "fully review[] the complete record"); *Vargus*, 87 F. Supp. 3d at 302-03 (same). There is no basis to depart from that established rule here. To the contrary, this case illustrates its importance. In defending its decision to "depart" from the

Bundling Rule, FDA averted to an unwritten and previously undisclosed exception supposedly in place "[s]ince 2018." Bundling Decision at 2. But the Federal Defendants have not provided those previous decisions to UTC or the Court, nor have they provided any internal decisional documents addressing such a policy. Without the complete administrative record, the Court cannot properly evaluate claims alleging that FDA acted arbitrarily and capriciously, including by disregarding binding norms and deviating from agency precedent. *See* Crossclaim ¶¶ 77-88.

Liquidia's invitation for the Court to resolve the merits of UTC's crossclaims on a motion to dismiss is particularly misguided because Liquidia advances several arguments that the existing record suggests FDA rejected or at least declined to endorse. For example, Liquidia asserts that the policies underlying the Bundling Rule do not apply to instances where "[n]ew-indication amendments are *submitted after tentative approval*." Liquidia Mem. at 24; *see id.* at 26, 28. But FDA's Bundling Decision never relies on that rationale, and it is inconsistent with agency precedent.[9] Similarly, Liquidia has tried to explain away inconvenient FDA precedent and the agency's departure from the express terms of the Bundling Rule by arguing that FDA's current regulations "trump" any earlier understanding. *Id.* at 25-26, 28. But FDA stated in the Bundling Decision that "Liquidia's contention that" these regulations "'superseded' the Bundling Rule" "sweeps too broadly." Bundling Decision at 25. Along the same lines, Liquidia's assertion (Liquidia Mem. at 21) that "FDA's regulations specifically recognize a right to amend 505(b)(2)

---

[9] *See* Crossclaim ¶ 71 (citing FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 021822 (Aptivus), PDF pages 5-6 (May 2006), https://www.accessdata. fda.gov/drugsatfda_docs/nda/2008/021822s000admincorres.pdf (enforcing the Bundling Rule even where applicant had previously received an "approvable letter")). Liquidia asserts that the "approvable letter" is different from tentative approval (Liquidia Mem. at 28 n.9), but never explains why its same policy arguments would not apply to the "approvable letter." In any event, it identifies nothing in the limited material available to suggest that FDA agrees with Liquidia's purported distinction of precedent.

NDAs *to add new indications*" is misguided.  In adopting the regulations on which Liquidia relies, FDA made clear that "[m]ost requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to the 505(b)(2) application," Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg 69,580, 69,616 (2016), with the agency recognizing a limited (and inapplicable) exception for "a drug product for which the indication has changed from prescription status to OTC [over-the-counter] use," FDA, Proposed Rule, Abbreviated New Drug Applications and 505(b)(2) Applications, 80 Fed. Reg. 6802, 6851 (Feb. 6, 2015).  The preamble also described the regulations as "[c]onsistent with FDA's 'bundling policy.'"  *Id.*

It is "a bedrock principle of administrative law" that "agency action is upheld only upon the validity of the grounds upon which the agency itself based its action" as reflected in the administrative record.  *Vinal Inst., Inc. v. EPA*, 106 F.4th 1118, 1126 (D.C. Cir. 2024) (brackets and quotation marks omitted).  The Court should reject Liquidia's effort to resolve the merits of UTC's APA claims without the administrative record and based in significant part on rationales it does not appear FDA itself adopted.

For understandable reasons, Liquidia seeks to expedite resolution of UTC's crossclaims. UTC shares that interest, which is why it sought expedited production of the administrative record and opposed the Federal Defendants' request to defer production longer than allowed by the Local Rules.  But the Court has now ordered the Federal Defendants to produce the administrative record, *see* p. 18, *supra*, and there is no basis to take shortcuts by resolving this case on a motion to dismiss. UTC has plausibly alleged an APA violation, and its APA claims should be adjudicated on cross-motions for summary judgment expeditiously briefed after the Federal Defendants serve the administrative record.

## CONCLUSION

For the reasons stated above, this Court should deny Liquidia and the Federal Defendants' motions to dismiss and the Federal Defendants' Motion for Relief from Local Rule 7(n).

December 2, 2024

Respectfully submitted.

Shaun R. Snader (D.C. Bar No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

Douglas Carsten (admitted *pro hac vice*)
Art Dykhuis (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

Adam W. Burrowbridge (D.C. Bar No. 1001783)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

 /s/ *Brian T. Burgess*
William C. Jackson (D.C. Bar. No. 475200)
William M. Jay (D.C. Bar No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20001
(202) 346-4000

Kurt R. Karst (D.C. Bar No. 482615)
Michael D. Shumsky (D.C. Bar No. 495078)
Sara Wexler Koblitz (D.C. Bar No. 1017284)
HYMAN, PHELPS & MCNAMARA, P.C.
700 13th Street, NW, Suite 1200
Washington, DC 20005
(202) 737-5600

*Counsel for United Therapeutics Corporation*