IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LIQUIDIA TECHNOLOGIES, INC.,<br><br>   *Plaintiff and Intervenor-Cross-Defendant*,<br><br> v.<br><br>UNITED STATES FOOD AND DRUG ADMINISTRATION, ROBERT M. CALIFF, M.D., in his official capacity as COMMISSIONER OF FOOD AND DRUGS, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, XAVIER BECERRA, in his official capacity as SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>   *Defendants*,<br><br> and<br><br>UNITED THERAPEUTICS CORP.,<br><br>   *Intervenor-Defendant and Cross-Plaintiff.* | No. 1:24-cv-2428-TJK |

LIQUIDIA TECHNOLOGIES, INC.'S
REPLY IN SUPPORT OF ITS MOTION TO DISMISS
UNITED THERAPEUTICS CORPORATION'S CROSSCLAIM

# Table of Contents

Table of Contents ................................................................................ i

Table of Authorities ............................................................................ ii

Glossary ............................................................................................ iv

Argument ........................................................................................... 1

    I.     UTC hasn't been deprived of a 30-month stay. ...................... 1

         1.     Section 505(c)(3)(C) authorizes 30-month stays in discrete circumstances not presented here. ............................. 1

         2.     FDA's acceptance of the July Amendment didn't cause UTC to lose a 30-month stay. ...................................... 3

         3.     The '793 patent does not save UTC's case. ................. 7

         4.     UTC has not shown that FDA's acceptance of the July Amendment lets Liquidia market Yutrepia for PH-ILD prematurely. ................................................... 8

    II.    UTC has another adequate remedy for delaying FDA's approval of Yutrepia for PH-ILD. ........................................... 12

    III.   The Court can and should consider whether UTC has stated a claim. ........................................................................... 15

Conclusion ....................................................................................... 17

# Table of Authorities

**Page(s)**

## Cases

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
   271 F.3d 262 (D.C. Cir. 2001) ..................................................................... 15

*Avadel CNS Pharms., LLC v. Becerra*,
   638 F. Supp. 3d 23 (D.D.C. 2022) ......................................................... 13, 14

*Banner Health v. Sebelius*,
   797 F. Supp. 2d 97 (D.D.C. 2011) ............................................................. 15

*Bristol-Myers Squibb Co. v. Shalala*,
   91 F.3d 1493 (D.C. Cir. 1996) ................................................................... 10

*Camreta v. Greene*,
   563 U.S. 692 (2011) .................................................................................. 13

*Ctr. for L. & Educ. v. Dep't of Educ.*,
   396 F.3d 1152 (D.C. Cir. 2005) ................................................................... 9

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   591 U.S. 1 (2020) ..................................................................................... 16

*Endo Par Innovation Co. v. Becerra*,
   2024 WL 2988904 (D.D.C. June 10, 2024) (Kelly, J.) ................................ 17

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .................................................................................. 16

*Fla. Audubon Soc. v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) ..................................................................... 10

*Int'l Bhd. of Elec. Workers, Loc. Union No. 474, AFL-CIO v. NLRB*,
   814 F.2d 697 (D.C. Cir. 1987) ..................................................................... 2

*Karem v. Trump*,
   404 F. Supp. 3d 203 (D.D.C. 2019) ........................................................... 13

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007) .................................................................................. 17

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .............................................................................. 4, 10

*MediNatura, Inc. v. FDA,*
    496 F. Supp. 3d 416 (D.D.C. 2020), *aff'd*, 998 F.3d 931 (D.C. Cir.
    2021) .......................................................................................................... 17

*Norwich Pharms., Inc. v. Becerra,*
    703 F. Supp. 3d 1 (D.D.C. 2023) ............................................................ 14

*Simon v. Eastern Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ..................................................................................... 4

*UTC v. Liquidia Techns., Inc.,*
    2024 WL 2805082 (D. Del. May 31, 2024) ............................................ 12

## Statutes

5 U.S.C. § 704 ..................................................................................... 14, 15

21 U.S.C. § 355(b)(4)(A) ............................................................................ 2

29 U.S.C.
    § 355(c)(3)(C) ............................................................. 2, 6, 7, 11, 13
    § 355(c)(3)(C)(i)–(iv) ............................................................... 12
    § 355(j)(5)(B)(iii) ......................................................................... 6

## Other Authorities

21 C.F.R.
    § 314.3 ...................................................................................................... 5
    § 314.50 .................................................................................................... 5
    § 314.60(a) ............................................................................................... 5
    § 314.60(b)(6) ........................................................................................ 16
    § 314.60(f) .............................................................................................. 16
    § 314.101 .................................................................................................. 5

# Glossary

| | |
|---|---|
| ANDA | abbreviated new drug application |
| Bundling Guidance | FDA, *Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing Prescription Drug User Fees* (Dec. 2004), attached to Liquidia's Motion to Dismiss as Killian Decl Ex. B (ECF 69-4) |
| "Cross-Compl. ¶ #" | citation of UTC's cross-complaint in this action |
| FDA | the Cross-Defendant Food and Drug Administration |
| the July Amendment | Liquidia's amendment to its 505(b)(2) NDA seeking FDA approval to market YUTREPIA for PH-ILD |
| "Killian Decl. Ex #" | citation of Liquidia's declaration exhibits filed in support of this motion to dismiss |
| Liquidia MTD | Liquidia's Memorandum of Points and Authorities, filed in Support of its Motion to Dismiss (ECF 69-1) |
| the MaPP | FDA's *Manual of Policies and Procedures 6050.1 Rev 2: Effect of Failure to Pay PDUFA Fees* (Dec. 3, 2021) |
| MMA | Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2065 (2003) |
| NDA | new drug application |
| PAH | pulmonary arterial hypertension |
| PH-ILD | pulmonary hypertension associated with interstitial lung disease |
| UTC | the Cross-Plaintiff United Therapeutics Corp. |
| UTC Opp. | UTC's Memorandum in Opposition to Liquidia's and the Federal Defendants' Motions to Dismiss (ECF 81) |

# Argument

## I.    UTC hasn't been deprived of a 30-month stay.

The foundation of UTC's crossclaim—UTC's assertion that FDA's acceptance of the July Amendment (UTC Opp. 3, 14, 15, 22, 24, 28, 30) violated UTC's "statutory right" (UTC Opp. 1, 3, 19, 20, 21, 24, 26, 30, 31, 32, 33, 34, 35) to an "automatic" 30-month stay of FDA's approval of Liquidia's 505(b)(2) NDA (UTC Opp. 1, 3, 6, 7, 10, 14, 15, 21, 22, 24, 25, 26, 28, 29, 30, 33, 34)—is wrong as a matter of law. FDA indisputably complied with Section 505(c)(3)(C) because amendments and supplements don't trigger stays for new patents, and UTC presents no factual or legal basis for assuming that Liquidia must file a brand-new NDA, the only thing that does trigger stays for new patents. UTC thus fails to allege a legally sound theory of injury, causation, and redressability.

### 1.    Section 505(c)(3)(C) authorizes 30-month stays in discrete circumstances not presented here.

Every time manufacturers list a new patent for a listed drug in FDA's Orange Book, applicants with pending 505(b)(2) NDAs relying on FDA's approval of the listed drug must make certifications concerning the new patent. Before the MMA, that certification could trigger a new 30-month stay, so drug manufacturers like UTC, driven to preserve their profitable monopolies, could continually list new patents and string together 30-month stays to keep competitors like Liquidia off the market. *See* UTC Opp. 10. To limit that anticompetitive practice and promote patient access to life-saving medications, the MMA amended Section 505(c)(3)(C) to state expressly that FDA may stay approval of a 505(b)(2) NDA only for patents listed before the 505(b)(2)

1

NDA was originally submitted. *See* 29 U.S.C. § 355(c)(3)(C). This rule is rigid. Even if an applicant amends or supplements its 505(b)(2) NDA, FDA cannot stay approval of the amended or supplemented NDA except for patents listed before the underlying 505(b)(2) NDA was originally submitted. *See id.*

UTC insinuates that Congress amended Section 505(c)(3)(C) to *expand* 30-month stays—to make them available whenever a drug manufacturer obtains a "follow-on patent for significant changes" to its listed drug. UTC Opp. 11; *see id.* at 33 ("Congress established the automatic 30-month stay to avoid forcing patent owners to pursue emergency relief to protect their patent rights"). In reality, the MMA amendments *limited* 30-month stays, making them available only when the strict sequencing requirement is met, no matter how significant a new patent may be or how significant an amendment or supplement to a 505(b)(2) NDA may be.[1]

When the statute's strict sequencing requirement is not met, FDA is powerless to delay approval of a 505(b)(2) NDA, and the only way to delay FDA approval is the old-fashioned way: the patentholder must file an infringement claim and obtain equitable relief from the patent court. That is UTC's only recourse here. Section

---

[1]    UTC also insinuates that, through stray remarks in the MMA's legislative history, Congress tethered Section 505(c)(3)(C) to the Bundling Guidance and codified a blanket rule against new-indication amendments, which UTC reads into the Guidance. *See* UTC Opp. 10–11, 26. Of course, "a committee report cannot serve as an independent statutory source having the force of law." *Int'l Bhd. of Elec. Workers, Loc. Union No. 474, AFL-CIO v. NLRB*, 814 F.2d 697, 712 (D.C. Cir. 1987). And here, the enacted text of Section 505 explodes UTC's argument. In the MMA, Congress codified a single rule limiting amendments to 505(b)(2) NDAs: amendments cannot change the drug itself. *See* 21 U.S.C. § 355(b)(4)(A). Congress did not forbid new-indication amendments or otherwise codify the Bundling Guidance. The Bundling Guidance thus remains guidance.

505(c)(3)(C) forbids FDA to stay approval of Liquidia's 505(b)(2) NDA based on either the '793 patent or the '327 patent because UTC listed both patents *after* Liquidia submitted its NDA in January 2020. For that reason, the July Amendment could not and did not trigger a new 30-month stay based on either patent. So, UTC asked the patent court for equitable relief. The Delaware District Court denied UTC's motion for preliminary equitable relief, and trial is set for next year to adjudicate whether UTC is entitled to permanent equitable relief.

## 2.    FDA's acceptance of the July Amendment didn't cause UTC to lose a 30-month stay.

Since FDA cannot lawfully stay approval of Liquidia's amended 505(b)(2) NDA based on UTC's new patents, UTC links together a flimsy chain of "if-then" counter-factuals to try to show how, assuming the July Amendment was procedurally im-proper (it was not), FDA's acceptance of the July Amendment caused FDA to withhold a 30-month stay. *See* UTC Opp. 25–26. Specifically, UTC imagines that FDA's ac-ceptance of the July Amendment caused Liquidia not to file a brand-new NDA, which caused FDA not to stay that hypothetical, brand-new NDA for 30 months. Thus, UTC concludes that vacating FDA's acceptance of the July Amendment would cause Liquidia to file a brand-new NDA, which in turn would trigger a 30-month stay of approval of this brand-new NDA.

The chain of causation that UTC creates to link FDA's acceptance of the July Amendment to a denial of a 30-month stay is flawed and not grounded in reality. *See* Liquidia MTD 14–20. The fundamental problem is not, as UTC characterizes in its brief, that each link has a low probability of occurring. *See* UTC Opp. 27. The

fundamental problem is that each link is legally defective and/or implausibly speculating about the independent reactions of Liquidia. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976); *see also* Liquidia MTD 14–19. UTC does not allege facts showing that Liquidia would file a brand-new NDA if the July Amendment were deemed procedurally improper, nor does UTC identify any law or rule that would require Liquidia to file a brand-new NDA in that scenario. *See* UTC Opp. 25. The facts show that Liquidia would not, and the law is clear that Liquidia need not.

1. <u>FDA need not reject procedurally improper amendments</u>. The first link in UTC's chain of causation is contrary to law—FDA is not "required to reject" procedurally improper amendments. UTC Opp. 29. Per FDA's *Manual of Policies and Procedures 6050.1 Rev 2: Effect of Failure to Pay PDUFA Fees*, the agency can administratively unbundle an improperly amended application, splitting it into two applications. As long as the applicant pays the filing fee for the unbundled application, FDA's review proceeds unabated. *See* Liquidia MTD 16–17. UTC rightly does not allege that Liquidia is unable to pay the filing fee. So, even if FDA's acceptance of the July Amendment was arbitrary or unlawful, FDA would unbundle Liquidia's amended 505(b)(2) NDA and Liquidia would promptly pay the filing fee—preserving FDA's tentative approval of Yutrepia for both PAH and PH-ILD without Liquidia filing a brand-new NDA, the statutory prerequisite for a 30-month stay.

UTC disputes Liquidia's reading of the *MaPP*, noting that it refers only to unbundling an "application or supplement," but not to unbundling an "amendment." *See*

UTC Opp. 29–30. That is not a significant distinction. The *MaPP* refers to "applications" and "supplements" because "amendments" become fully incorporated into the applications or supplements they amend. *See* 21 C.F.R. § 314.60(a) ("[T]he applicant may submit an amendment to an NDA, supplement, or resubmission that has been filed under § 314.101 but is not yet approved."); *see also* 21 C.F.R §314.3 ("Application, new drug application, or NDA is the application described under §314.50, including all amendments and supplements to the application."). FDA's power to unbundle applications and supplements, which UTC does not contest, necessarily extends to unbundling *amended* applications and *amended* supplements; UTC certainly identifies no authority that cuts off FDA's unbundling power after an applicant amends an application or supplement. The *MaPP* clearly states that FDA can unbundle an application or supplement anytime "during the course of the review," FDA, *Manual of Policies and Procedures 6050.1 Rev 2: Effect of Failure to Pay PDUFA Fees* (Dec. 3, 2021) p. 4, which is also when applicants can submit amendments.[2]

    2. Liquidia could supplement and obtain FDA approval for PH-ILD without a brand-new NDA. The second link in UTC's chain is contrary to law, too. An applicant whose amendment FDA rejects can seek FDA approval for the subject matter of the amendment without filing a brand-new NDA. Critically, the applicant can resubmit its request by filing a *supplement* after the original NDA is approved, as the Bundling

---

[2]    UTC observes that FDA took no position on unbundling in UTC's earlier litigation against FDA or in its Bundling Decision, UTC Opp. 29–30, but that's meaningless. FDA had no need to do so in either context because FDA rightly concluded that the July Amendment was procedurally proper.

Guidance explicitly allows. *See* Liquidia MTD 17–18. Like amendments, supplements do not trigger 30-month stays for new patents. *See* 29 U.S.C. § 355(c)(3)(C).

UTC rightly admits (UTC Opp. 2, 28) that Liquidia could seek FDA approval to market Yutrepia for PH-ILD by submitting a supplement—a supplement is how UTC sought and obtained FDA approval to market Tyvaso for PH-ILD. UTC's admission independently refutes UTC's assumption that Liquidia would have had to file a "separate application" or "new application" even if UTC's reading of the Bundling Guidance was correct. UTC Opp. 25.

3. A brand-new 505(b)(2) NDA would not automatically trigger a stay. When UTC says that 30-month stays are "automatic," UTC assumes that FDA has no discretion and must stay approval of a 505(b)(2) NDA for 30 months. That assumption is unsound. Section 505(c)(3)(C) uses archetypically discretionary language: when the strict sequencing requirement is met, "the approval [of a 505(b)(2) NDA] *may* be made effective upon the expiration of the thirty-month period." 29 U.S.C. § 355(c)(3)(C) (emphasis added). That the verb "may" in Section 505(c)(3)(C) confers discretion on FDA is confirmed by Section 505(j)(5)(B)(iii), the stay provision for ANDAs, which is worded identically except for substituting the mandatory verb "shall": "the approval [of an ANDA] *shall* be made effective upon the expiration of the thirty-month period." 29 U.S.C. § 355(j)(5)(B)(iii) (emphasis added); *see* Liquidia MTD 18–19.

UTC has no response to the statutory text. UTC totally ignores the text of Section 505(j)(5)(B)(iii). UTC instead focuses only on the text of Section 505(c)(3)(C), arguing that the verb "may" makes Section 505(c)(3)(C) mandatory because it really

means "that an application *may not* be made effective before that period is up." UTC Opp. 30 (emphasis in original). "May" does not mean "may not." UTC's effort to twist Section 505(c)(3)(C) into a prohibition fails on its own terms because the 30-month stay in Section 505(c)(3)(C) is not the default rule. Section 505(c)(3)(C) states a mandatory requirement that approval of a 505(b)(2) NDA "*shall* be made effective immediately *unless*" the strict sequencing requirement is met, in which case "the approval *may* be made effective upon the expiration of the thirty-month period." 29 U.S.C. § 355(c)(3)(C) (emphases added). There is no way to read Section 505(c)(3)(C) in full as forbidding FDA to approve 505(b)(2) NDAs before the 30-month stay expires.

### 3. The '793 patent does not save UTC's case.

A separate-yet-related defect in UTC's loss-of-statutory-right argument is that UTC is cagey about *when* Liquidia should have filed or would in the future file a hypothetical brand-new application. Because of Section 505(c)(3)(C)'s strict sequencing requirement, UTC needs to take a position on that timing question to allege a deprivation of its statutory rights. *See* Liquidia MTD 14–15.

UTC now contends that Liquidia should have filed a brand-new application sometime between July and September 2023—either instead of filing the July Amendment in July 2023 or in response to FDA's imagined rejection of the July Amendment in September 2023. *See* UTC Opp. 27. Because UTC had listed the '793 patent before July 2023, UTC concludes that a brand-new application filed between July and September 2023 "would have triggered a 30-month stay" based on the '793 patent. *Id.* Maybe, but that hypothetical stay would have expired in January 2024,

when UTC dismissed the '793 patent from its infringement case. *See* Liquidia MTD 15 n.2. On this theory, UTC's crossclaim was moot before filing.[3]

UTC alternatively contends that Liquidia should have filed a brand-new application after UTC's December 2023 letter objecting to the July Amendment. *See* UTC Opp. 27–28. Because UTC had listed the '327 patent in November 2023, UTC concludes that a brand-new application filed anytime after the letter "would have triggered a 30-month stay." *Id.* at 28. This theory of injury is anachronistic: FDA's acceptance of the July Amendment either injured UTC or not *in September 2023*; UTC's listing of the '327 patent *in November 2023* could not possibly affect whether that FDA's procedural decision was or was not harmful.

To be clear, even if the July Amendment was procedurally improper (it was not), Liquidia has no obligation to file a brand-new NDA. UTC's imprecision about the timeline simply underscores the legal flaws in UTC's theory of its case.

### 4.    UTC has not shown that FDA's acceptance of the July Amendment lets Liquidia market Yutrepia for PH-ILD prematurely.

UTC ultimately recognizes that "FDA cannot require Liquidia to file a new NDA." UTC Opp. 28. So, UTC pivots and contends that simply vacating FDA's acceptance of the July Amendment "would *also* redress UTC's injury," *id.*, no matter what Liquidia does afterward. That's obviously false. The only way to redress UTC's

---

3    In November 2024, the PTO formally cancelled the '793 patent. *See* Killian Decl. Ex. A (cancellation certificate). Now, there is no plausible basis whatsoever for a 30-month stay based on that patent.

alleged loss of a "statutory automatic stay," UTC Opp. 29, is for FDA to issue a 30-month stay, and FDA cannot do that unless Liquidia files a brand-new application.

In pivoting to this fallback contention, UTC is asserting an entirely different type of injury—an economic injury from "premature[ly]" facing competition from Liquidia in the PH-ILD market. UTC Opp. 31. That is, UTC contends that FDA's acceptance of the July Amendment accelerates Yutrepia's entry into the PH-ILD market and that, had FDA rejected the July Amendment (or if this Court orders FDA to reject it), Liquidia would have been (or will be) sent back to the starting block, prolonging UTC's monopoly in the PH-ILD market for some unstated length of time.

UTC has not adequately alleged an economic injury based on the timing of Yutrepia's entry into the PH-ILD market. Monopolists like UTC do not automatically have standing to challenge any and every procedural decision an agency makes in connection with a new competitor's application simply because one procedural decision versus another may affect the time when the competitor receives final approval. Like everyone else, a monopolist must establish that a particular agency action violated its rights and caused it particularized economic injury. *See Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) (noting that injury and causation are vital for plaintiffs alleging procedural injuries).

UTC has established neither. Apart from a claimed right to a 30-month stay (and NCI exclusivity), UTC claims no legally protected right in the timing of FDA's approval of Yutrepia for PH-ILD or FDA's procedural decision to accept the July Amendment for review. That, alone, is fatal to UTC's fallback argument, for "a

plaintiff may have standing to challenge the failure of an agency to abide by a procedural requirement only if that requirement was '*designed* to protect some threatened concrete interest' of the plaintiff." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.8 (1992)) (emphasis added); *see Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1497 (D.C. Cir. 1996) (holding that a competitor can demand agency compliance when "a statutory provision reflects a legislative purpose to protect a competitive interest"). UTC does not argue that FDA designed the Bundling Guidance, or that Congress designed any law or regulation concerning the timing of FDA's approval, to protect UTC's competitive interests. FDA published the Bundling Guidance, not to protect monopolists, but to facilitate FDA's satisfaction of its statutory duty to complete timely review of NDAs—a.k.a. the "review clock." *See* Liquidia MTD 24.

Moreover, UTC has not demonstrated that FDA's acceptance of the July Amendment accelerates the timing of FDA's approval of Yutrepia for PH-ILD (causation) and that vacating the acceptance would materially delay the timing of FDA's approval of Yutrepia for PH-ILD (redressability). UTC simply assumes that, if the Court found the July Amendment procedurally improper, FDA would be "required to reject" it (UTC Opp. 29); that Liquidia would file a post-approval supplement to seek approval to market Yutrepia for PH-ILD (UTC Opp. 2); and that FDA would take an unspecified but presumably long time to review and approve whatever filing Liquidia makes (UTC Opp. 28). These assumptions are unsupported:

- FDA does *not* have to reject the July Amendment if it is procedurally improper. FDA could administratively unbundle it, and since Liquidia can promptly pay the filing fee, FDA's approval of Yutrepia for PH-ILD would be preserved—with no material impact on timing. *See* pp. 4–5, *supra*.

- UTC also does not establish that the supplement alternative would change the timing of FDA's approval of Yutrepia for PH-ILD. *Ipse dixit*, UTC asserts that a supplement "would almost certainly lead to a separate FDA timeline for review." UTC Opp. 28. Why UTC is "almost certain" of that result, UTC does not say. Supplements, like amendments, don't trigger 30-month stays for new patents. *See* 29 U.S.C. § 355(c)(3)(C). No law or regulation forbids FDA from approving a supplement quickly or guarantees a waiting period before FDA can approve a supplement. In this case, FDA would need little time to review a supplement because FDA has already found Yutrepia is safe and effective for PH-ILD. FDA could approve any supplement Liquidia filed *immediately*—a critical point that UTC admits. *See* UTC Opp. 1 ("Absent extraordinary judicial intervention, *FDA is free to approve the potentially infringing product immediately*." (emphasis added)).

The upshot is this: because FDA has found that Yutrepia is safe and effective for PH-ILD, there is no basis for suggesting that vacating FDA's acceptance of the July Amendment would materially delay Liquidia from marketing Yutrepia for PH-ILD. The economic, market-timing injury UTC tries to trace to the July Amendment does not exist on the facts alleged here.

11

## II.  UTC has another adequate remedy for delaying FDA's approval of Yutrepia for PH-ILD.

Like other patentholders who want to keep allegedly infringing products off the market, UTC filed an ordinary, far from "highly burdensome" (UTC Opp. 34), motion for preliminary equitable relief in its infringement case. The Delaware District Court applied the traditional four-factor standard for equitable relief and held that UTC is not entitled to keep Yutrepia out of the PH-ILD market while UTC litigates its infringement claims. *See UTC v. Liquidia Techns., Inc.*, 2024 WL 2805082 (D. Del. May 31, 2024). UTC failed to prove *all four equitable factors*. UTC failed to prove that Yutrepia likely infringes—because of a "substantial question of invalidity" of the '327 patent. *Id.* at *6. UTC failed to prove that money damages will not cover any infringement—because Liquidia will be able to pay if needed. And UTC failed to prove that public interest supports delay—because seriously ill patients will benefit from accessing Yutrepia, which FDA has now found to be safe and effective.

Having failed to delay Liquidia the old-fashioned way, UTC comes to this Court to get the same relief via a 30-month stay. UTC does not dispute that its crossclaim and its infringement claims seek the same *ultimate* relief. Though the parties call it a "30-month stay," a stay under Section 505(c)(3)(C) functions like a preliminary injunction in an infringement case and might not last 30 months. It could be shorter— if the Delaware District Court rejects UTC's infringement claims sooner or shortens the stay for other reasons. It could be longer—if the Delaware District Court rules for UTC and enjoins FDA approval until the '327 patent expires. *See* 29 U.S.C. § 355(c)(3)(C)(i)–(iv).

UTC nowhere acknowledges that the statutory text of Section 505(c)(3)(C) *explicitly* links 30-month stays with infringement litigation and *explicitly* gives the infringement court sole control over the length of any stay and over the ultimate question of when a 505(b)(2) applicant can market its FDA-approved product. Those many statutory links are what Judge Mehta relied upon in *Avadel* when he held that "Congress plainly contemplated that the affirmative patent infringement action filed pursuant to Section 355(c)(3)(C) would itself resolve any dispute between the patentholder and the NDA applicant and lead to the establishment of the effective date of approval for the NDA." *Avadel CNS Pharms., LLC v. Becerra*, 638 F. Supp. 3d 23, 33 (D.D.C. 2022).

Instead of tackling Judge Mehta's textual analysis of Section 505(c)(3)(C), UTC urges this Court to ignore *Avadel* because, supposedly, that analysis was part of an alternative holding and "not necessary to the Court's decision." UTC Opp. 35. Even though "it is well-established that an alternative holding is not dicta," *Karem v. Trump*, 404 F. Supp. 3d 203, 211 (D.D.C. 2019), UTC's objection misses the mark. The question isn't whether *Avadel* is *binding*—it's not. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). The question is whether *Avadel* is *persuasive*—it is.

At bottom, UTC is arguing that *Avadel* is wrong. Whereas Judge Mehta focused on the similarity of the relief available in both actions and on the infringement court's power under Section 505(c)(3)(C) to shorten or lengthen a stay and to set the effective date of a 505(b)(2) NDA, UTC focuses on the fact that the Delaware District Court is considering only patent infringement issues and will not interpret FDA's

13

bundling policy. *See* UTC Opp. 33. Judge Mehta has the better of it. Section 704 of the APA authorizes suits challenging final agency action "for which there is no other adequate *remedy* in a court." 5 U.S.C. § 704 (emphasis added). Accordingly, "the test for determining adequacy of relief is not whether there is perfect alignment of the legal 'questions' before the respective courts. Rather, the inquiry centers on the remedies available to the plaintiff and the ability of those remedies to put the plaintiff in the position in which they seek to be placed." *Avadel*, 638 F. Supp. 3d at 33.

UTC errs in arguing that Judge Moss, in *Norwich Pharms., Inc. v. Becerra*, 703 F. Supp. 3d 1 (D.D.C. 2023), took UTC's side by "distinguishing *Avadel*" in a way material to UTC's cross claim. UTC Opp. 35. *Norwich* did not involve Section 505(c)(3)(C) or the statutory links between Section 505(c)(3)(C) and infringement litigation. The defendants in *Norwich* sought to extend *Avadel* to a different situation: where the plaintiff was simultaneously appealing an infringement ruling and challenging the FDA's implementation of that ruling. *See Norwich Pharms*, 707 F. Supp. 3d at 18. Judge Moss concluded that those two paths were not alternatives because each sought different relief—the plaintiff's appeal sought to *overturn* the judgment, and the APA action sought to correct the FDA's *effectuation* of the judgment. *See id.* (finding a material "distinction between the *relief* that a Paragraph-IV-triggered adjudication provides and the *relief* that Norwich is seeking here") (emphases added). Viewed rightly, *Norwich* supports Liquidia, for on the critical question of how to apply Section 704 of the APA, it's clear that Judge Moss agreed with Judge Mehta (and with

14

Liquidia) that Section 704 requires examining the *relief* available in the non-APA action, not the *legal or factual questions* in the non-APA action.

## III. The Court can and should consider whether UTC has stated a claim.

Because UTC's goal is delay, UTC asks the Court to wait for FDA to submit the administrative record before the Court examines whether UTC's crossclaim states an APA claim. *See* UTC Opp. 38–41. The Court should not let UTC draw this case out.

First, the administrative record can speak only to FDA's acceptance of the July Amendment. It will not speak to the threshold problems with UTC's claims, like the actions FDA and Liquidia would take if the Court vacated FDA's acceptance of the July Amendment. The Court therefore does not need the administrative record to dismiss UTC's crossclaim with prejudice.

Second, an administrative record is unnecessary to evaluate purely legal objections to agency action. *See, e.g.*, *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266–267 (D.C. Cir. 2001). Here, UTC admits that its cross-complaint presents "purely legal" objections to FDA's acceptance of the July Amendment. UTC Opp. 19, 20. The Court can dispose of those objections right now, without the administrative record, simply by reading "the relevant statute," "its legislative history," and "materials published in the Federal Register." *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 112 (D.D.C. 2011). The Court does not need the administrative record to hold, no matter how many times UTC says it, that the Bundling *Guidance* is not a "Bundling *Rule*" and that the MMA's legislative history did not transform the

guidance into a statutory command. *See* Liquidia MTD 21–24, 26–27. The Court also does not need the administrative record to hold that, even if UTC rightly interpreted the Bundling Guidance as *categorically prohibiting* new-indication amendments, *see* Cross-Compl. ¶ 1, FDA's more recent notice-and-comment rules *specifically allow* new-indication amendments of 505(b)(2) NDAs. *See* Liquidia MTD 20–21, 25 (discussing 21 C.F.R. § 314.60(b)(6) & (f), neither of which UTC mentions in its brief). Put another way, UTC bases its claims on legal assertions that are contrary to law and does not plead a viable cause of action. The administrative record can't improve UTC's theories.

The Court can resolve even UTC's arbitrary-and-capricious challenge without the full administrative record. That's because UTC complains that FDA treated Liquidia differently than similarly situated applicants. *See* Cross-Compl. ¶ 86. An agency, however, can change its mind on its policies as long as it "display[s] awareness that it is changing position" and accounts for the possibility that its policies "engendered serious reliance interests." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, UTC admits FDA did both.

- The first sentence of UTC's opposition brief claims that FDA announced a "depart[ure]" from its past practice, UTC Opp. 1, the surest display of awareness of a change of position.

- As for reliance interests, FDA was "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v.*

*Regents of the Univ. of California*, 591 U.S. 1, 33 (2020). UTC alleges that FDA did all three things—recognized reliance interests, deemed them unsubstantial, and weighed them. *See* Cross-Compl. ¶ 63 (quoting FDA's decision); *see also* ECF 69-3 at 23 & n.105 (FDA's decision). Trying to minimize the impact of that allegation, UTC asserts that FDA's consideration of reliance interest was "cursory." Cross-Compl. ¶ 63. But even if that characterization were true, the APA "does not set a high bar," and a "cursory" review of reliance interests is sufficient. *MediNatura, Inc. v. FDA*, 496 F. Supp. 3d 416, 458 (D.D.C. 2020), *aff'd*, 998 F.3d 931 (D.C. Cir. 2021); *see, e.g.*, *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007) (finding no "significant legal problem" with a "reasonable, albeit brief" explanation). *Compare Endo Par Innovation Co. v. Becerra*, 2024 WL 2988904, *6 (D.D.C. June 10, 2024) (Kelly, J.) (finding a claim likely to succeed because FDA did "not discuss any reliance interests").

## Conclusion

The Court should dismiss UTC's cross-complaint with prejudice.

Dated: December 16, 2024                    Respectfully submitted,

                                            /s/ Bryan Killian
                                            Bryan Killian (DC Bar No. 989803)
                                            MORGAN, LEWIS & BOCKIUS LLP
                                            1111 Pennsylvania Avenue, NW
                                            Washington, DC 20004
                                            T: (202) 739-3000
                                            F: (202) 739-3001
                                            bryan.killian@morganlewis.com

                                            *Counsel for Plaintiff and Intervenor-Cross-Defendant Liquidia Technologies, Inc.*