# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIQUIDIA TECHNOLOGIES, INC.,

      *Plaintiff,*

v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, ROBERT M.
CALIFF, M.D., in his official capacity as
COMMISSIONER OF FOOD AND
DRUGS, UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES, XAVIER
BECERRA, in his official capacity as
SECRETARY OF HEALTH AND
HUMAN SERVICES,

      *Defendants*, and

UNITED THERAPEUTICS CORP.,

      *Intervenor-Defendant and
Cross-Claimant.*

**PUBLIC/UNREDACTED**

No. 1:24-cv-2428-TJK

**ORAL ARGUMENT REQUESTED**

## UTC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Shaun R. Snader (D.C. Bar No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

Douglas Carsten (admitted *pro hac vice*)
Art Dykhuis (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

Adam W. Burrowbridge (D.C. Bar No. 1001783)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

William C. Jackson (D.C. Bar No. 475200)
William M. Jay (D.C. Bar No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20001
(202) 346-4000

Kurt R. Karst (D.C. Bar No. 482615)
Michael D. Shumsky (D.C. Bar No. 495078)
Sara Wexler Koblitz (D.C. Bar No. 1017284)
HYMAN, PHELPS & MCNAMARA, P.C.
700 13th Street, NW, Suite 1200
Washington, DC 20005
(202) 737-5600

*Counsel for United Therapeutics Corporation*
January 17, 2025

## TABLE OF CONTENTS

Introduction..........................................................................................................1

Background..........................................................................................................3

    I.      Statutory and Regulatory Framework .......................................................3

            A.     The FDCA, the Hatch-Waxman Act, and PDUFA .................................... 3

            B.     Patent disputes under the Hatch-Waxman Act ........................................ 5

            C.     FDA's Bundling Rule ............................................................................... 6

            D.     The Medicare Modernization Act ............................................................ 10

    II.     Factual Background .................................................................................12

            A.     UTC develops novel treatments for pulmonary hypertension. ................ 12

            B.     Liquidia applies to market a follow-on treprostinil product, leading to patent litigation. ................................................................................... 13

            C.     Liquidia submits an amendment to add the PH-ILD indication, after telling FDA it would wait until after final approval of its original application. ................................................................................... 14

            D.     UTC challenges FDA's acceptance of Liquidia's improperly bundled application. ................................................................................... 16

            E.     FDA reaffirms its decision to accept Liquidia's amendment and to depart from the Bundling Rule. ............................................................... 18

            F.     Liquidia brings this action, and UTC files a crossclaim. .......................... 20

LEGAL STANDARDS ....................................................................................21

ARGUMENT ...................................................................................................21

    I.     FDA's decision to accept Liquidia's amendment in direct contravention of the Bundling Rule was arbitrary and capricious. ..................................................21

            A.     The Bundling Rule prohibits adding indications through amendments and required FDA to reject Liquidia's proposed amendment. ............................................................................................ 22

            B.     FDA's newly announced exception to the Bundling Rule fails to address an important aspect of the Bundling Rule's historic purpose. ................................................................................................. 28

i

C.    FDA failed to meaningfully consider the reliance interests of innovators like UTC in faithful application of the Bundling Rule. .......... 33

II.    This Court should vacate FDA's decision accepting the PH-ILD amendment for review. ........................................................................................36

Conclusion ................................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Am. Acad. of Pediatrics v. FDA,*
    379 F. Supp. 3d 461 (D. Md. 2019) ..................................................................35

*\*Appalachian Power Co. v. EPA,*
    208 F.3d 1015 (D.C. Cir. 2000) .................................................................23, 24

*Bristol-Myers Squibb Co. v. Royce Labs., Inc.,*
    69 F.3d 1130 (Fed. Cir. 1995) .......................................................................29

*City of Port Isabel v. FERC,*
    111 F.4th 1198 (D.C. Cir. 2024) ....................................................................23

*CSL Plasma Inc. v. U.S. Customs & Border Prot.,*
    628 F. Supp. 3d 243 (D.D.C. 2022) ...........................................................35, 36

*Ctr. for Biol. Diversity v. Regan,*
    734 F. Supp. 3d 1 (D.D.C. 2024) ..................................................................37

*\*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) .................................................................................33, 34

*Eli Lilly & Co. v. Teva Pharms. USA, Inc.,*
    557 F.3d 1346 (Fed. Cir. 2009) .......................................................................6

*\*Endo Par Innovation Co. v. Becerra,*
    No. 24-cv-999-TJK, 2024 WL 2988904 (D.D.C. Jun. 10, 2024) .....................1, 29, 33, 35, 37

*\*Gen. Elec. Co. v. EPA,*
    290 F.3d 377 (D.C. Cir. 2002) .............................................................23, 24, 26

*Int'l Org. of Masters, Mates & Pilots v. NLRB,*
    61 F.4th 169 (D.C. Cir. 2023) .......................................................................33

*Jennings v. Rodriguez,*
    583 U.S. 281 (2018) ....................................................................................31

*Jicarilla Apache Nation v. U.S. Dep't of Interior,*
    613 F.3d 1112 (D.C. Cir. 2010) ......................................................................21

*Ky. Mun. Energy Agency v. FERC,*
    45 F.4th 162 (D.C. Cir. 2022) ........................................................................28

*Liquidia Techs., Inc. v. United Therapeutics Corp.*,
   No. IPR2021-00406, 2022 WL 2820717 (P.T.A.B. July 19, 2022) ........................................14

*\*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983).........................................................................................2, 21, 28, 32

*Mylan Pharms., Inc. v. Sebelius*,
   856 F. Supp. 2d 196 (D.D.C. 2012) .................................................................................29

*NAACP v. Trump*,
   298 F. Supp. 3d 209 (D.D.C. 2018) .................................................................................36

*Ohio v. EPA*,
   603 U.S. 279 (2024).........................................................................................................32

*Pol'y & Rsch., LLC v. HHS*,
   313 F. Supp. 3d 62 (D.D.C. 2018) ...................................................................................21

*Quantum Ent't, Ltd. v. U.S. Dep't of Interior, Bureau of Indian Affairs*,
   597 F. Supp. 2d 146 (D.D.C. 2009) .................................................................................28

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943)...........................................................................................................23

*Syncor Int'l Corp. v. Shalala*,
   127 F.3d 90 (D.C. Cir. 1997)...........................................................................................35

*Teva Pharms. USA, Inc. v. Sebelius*,
   595 F.3d 1303 (D.C. Cir. 2010)....................................................................................6, 29

*United Therapeutics Corp. v. Liquidia Techs., Inc.*,
   2023 WL 8794633 (Fed. Cir. Dec. 20, 2023) ..................................................................14

*United Therapeutics Corp. v. Liquidia Techs., Inc.*,
   2024 WL 2805082 (D. Del. May 31, 2024).....................................................................16

*United Therapeutics Corp. v. Liquidia Techs., Inc.*,
   74 F.4th 1360 (Fed. Cir. 2023), *cert denied*, No. 23-804, 2024 WL 675262
   (Feb. 20, 2024)................................................................................................................14

*Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*,
   887 F.3d 1117 (Fed. Cir. 2018)........................................................................................11

*Veloxis Pharms., Inc. v. FDA*,
   109 F. Supp. 3d 104 (D.D.C. 2015) ..................................................................................4

**Statutes:**

5 U.S.C. § 706.........................................................................................................................21

5 U.S.C. § 706(2) ..................................................................................................36

21 U.S.C. § 355:

    § 355.......................................................................................................................3

    § 355(a)...................................................................................................................3

    § 355(b)...................................................................................................................4

    § 355(b)(1)..............................................................................................................3

    § 355(b)(1)(A).........................................................................................................3

    § 355(b)(1)(A)(viii)................................................................................................5

    § 355(b)(2)(A)(iv)..................................................................................................6

    § 355(b)(4)(A)..................................................................................................11, 30

    § 355(b)(4)(B)...................................................................................................11, 31

    § 355(c)(2)...............................................................................................................5

    § 355(c)(3)...............................................................................................................6

    § 355(c)(3)(C)...............................................................................................6, 10, 30

    § 355(c)(3)(C)(i).....................................................................................................6

    § 355(c)(3)(C)(ii)....................................................................................................6

    § 355(d)(2)..............................................................................................................3

    § 355(j)(2)(A)..........................................................................................................4

    § 355(j)(7)(A)(i).....................................................................................................5

21 U.S.C. § 371(h)(C)(i)........................................................................................28

21 U.S.C. § 379g.....................................................................................................4

21 U.S.C. § 379g(1).................................................................................................4

21 U.S.C. § 379h(a)(1)(A).......................................................................................4

35 U.S.C. § 271(e)(2)(A).........................................................................................6

Drug Price Competition and Patent Term Restoration Act (Hatch-Waxman Act),
    Pub. L. No. 98-417, 98 Stat. 1585 (1984)............................................................3

Medicare Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066 (2003) ................................10

Prescription Drug User Fee Act (PDUFA), Pub. L. 102-571, 106 Stat. 4491
(1992) ........................................................................................................................................4

**Regulations & Regulatory Materials:**

21 C.F.R. § 314.50(h) ....................................................................................................................5

21 C.F.R. § 314.50(i)(1)(i)(A)(4) ..................................................................................................6

21 C.F.R. § 314.53(d) ....................................................................................................................5

21 C.F.R. § 314.60(e) ..................................................................................................................30

21 C.F.R. § 314.70 ......................................................................................................................32

21 C.F.R. § 314.70(h) ..................................................................................................................30

21 C.F.R. § 314.94(a)(12) .............................................................................................................6

21 C.F.R. § 314.96(d)(1) ..............................................................................................................33

21 C.F.R. § 314.110(b)(1)(ii) ......................................................................................................15

148 Cong. Rec. S6844 (daily ed. July 16, 2002) ...............................................2, 10, 11, 25, 29

Abbreviated New Drug Applications and 505(b)(2) Applications,
81 Fed. Reg. 69,580 (Oct. 6, 2016) ....................................................................................8, 12

*Proposed Rule, Abbreviated New Drug Applications and 505(b)(2) Applications,
80 Fed. Reg. 6802 (Feb. 6, 2015) .......................................................9, 11, 23, 26, 29, 31, 33

**Other Authorities:**

*Examining Issues Related to Competition in the Pharmaceutical Marketplace: A
Review of the FTC Report, Generic Drug Entry Prior to Patent Expiration:
Hearing Before the Subcomm. on Health of the H. Comm. on Energy & Com.*,
107th Cong. 49 (2002) ............................................................................................................26

FDA, Approval Package, Administrative & Correspondence Document(s), NDA
021822 (Aptivus) (May 19, 2006),
https://www.accessdata.fda.gov/drugsatfda_docs/nda/
2008/021822s000admincorres.pdf ........................................................................................23

FDA, Approval Package, Administrative & Correspondence Documents, NDA
208780 (May 2015),
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/208780Orig1s000
AdminCorres.pdf ......................................................................................................................9

FDA, Approval Package, Administrative & Correspondence Documents, NDA
209400 (Nov. 2015),
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/209400Orig1s000
AdminCorres.pdf ...................................................................................................9

FDA, Approval Package, Administrative & Correspondence Documents, NDA
210709 (May 2017),
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/210709Orig1s000
AdminCorres.pdf ...................................................................................................9

FDA, Approval Package, Proprietary Name Review(s), Application Nos. 761285
& 761331 (Sept. 22, 2023),
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2024/761285Orig1s000,
761331Origs000NameR.pdf ..................................................................................9

FDA PDUFA Reauthorization Performance Goals and Procedures Fiscal Years
2023 Through 2027,
https://www.fda.gov/media/151712/download?attachment ....................................5

FDA, SOPP 8401: Administrative Processing of Original Biologics License
Applications (BLA) and New Drug Applications (NDA) ,(2024)
https://www.fda.gov/media/85659/download..........................................................8

H.R. Rep. No. 108-391 (2003).................................................................10, 11, 25, 36

Notice, Draft Guidance for Industry on Separate Marketing Applications and
Definition of Clinical Data for Purposes of Assessing User Fees; Availability,
66 Fed. Reg. 11175 (Feb. 13, 2001), *available at*
https://www.govinfo.gov/content/pkg/FR-2001-02-22/pdf/01-4311.pdf ................7

A. Scalia & B. Garner, *Reading Law* (2012) .............................................................31

United Therapeutics, *Press Release* (May 24, 2022), https://ir.unither.com/press-
releases/2022/05-24-2022 ....................................................................................13

UTC, *United Therapeutics Corporation History*, https://www.unither./us/history......................12

# GLOSSARY

ANDA ................................................abbreviated new drug application

APA....................................................Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*

Cross-claim .......................................United Therapeutics Corporation's Cross-Claims Against Food and Drug Administration, Robert M. Califf, M.D., in his official capacity as Commissioner of FDA; the United States Department of Health and Human Services ("HHS"); and Xavier Becerra, in his official capacity as Secretary of HHS (ECF No. 30)

FDA...................................................Food and Drug Administration

FDCA.................................................Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq.

Liquidia ..............................................Liquidia Technologies, Inc.

MMA..................................................Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003)

NDA...................................................new drug application

PAH....................................................pulmonary arterial hypertension

PH ......................................................pulmonary hypertension

PH-ILD ..............................................pulmonary hypertension associated with interstitial lung disease

UTC....................................................United Therapeutics Corporation

## INTRODUCTION

For more than three decades, the U.S. Food and Drug Administration has communicated a clear rule to drug companies: if you want to add a new approved use ("indication") for a drug product while your initial application is pending, file a new standalone application—not an amendment. This "Bundling Rule" is a procedural directive with outsized substantive impact. Under the Hatch-Waxman Act (as amended), when a company seeking to market a follow-on version of an approved drug product files a new application with a "paragraph IV" certification— effectively challenging the scope and/or validity of patents listed by the innovator for the existing product—that certification typically triggers a statutory 30-month stay before FDA can approve the follow-on product. This automatic stay provides a critical protection for both innovators and follow-on companies allowing them to resolve patent disputes before market entry. But matters proceed differently when the follow-on applicant seeks approval for a new use via an amendment rather than a new application. For any patent listed by the innovator after the competitor's original application but before the amendment, the competitor can submit a paragraph IV certification *without triggering a stay*. Thus, the question of whether FDA allows an amendment (or requires submission of a new application) often makes the difference between whether an innovator secures "its statutory entitlement to the 30-month stay." *Endo Par Innovation Co. v. Becerra*, No. 24-cv-999-TJK, 2024 WL 2988904, at *6-7 (D.D.C. Jun. 10, 2024).

In this case, Liquidia is seeking approval for a follow-on version of UTC's inhaled treprostinil product. Although Liquidia's original application is still pending, FDA let Liquidia add a new indication by amendment rather than a new standalone application, contradicting the decades-old Bundling Rule. As a result, Liquidia avoided the 30-month stay that would have been triggered if it had instead filed a new application. None of this is disputed. Indeed, FDA concedes that it "depart[ed]" from the Bundling Rule, invoking a purported exception to the Bundling Rule

1

that it supposedly first applied in 2018 but has never previously disclosed or explained. FDA-000162. To this day, FDA's written instructions to applicants remain unchanged (and preclude Liquidia's amendment). The agency has merely offered that it "intends to further consider" whether to provide "additional clarification of its position" sometime in the future. FDA-000178 n.93.

FDA's decision to disregard its Bundling Rule and accept Liquidia's amendment is arbitrary and capricious. Although FDA disparages the Bundling Rule as mere informal guidance, it is a binding norm that has governed the application process for decades. Indeed, Congress legislated against the backdrop of FDA's Bundling Rule when it amended the Hatch-Waxman Act, as it recognized that FDA's limits on amendments would ensure the automatic stay would apply to patents on important innovations, such as a "different or improved use for the product." 148 Cong. Rec. S6844 (daily ed. July 16, 2002) (statement of Sen. Collins). FDA's creation of a new exception to allow amendments adding new indications—if the follow-on applicant relies on no new clinical data—falls short of reasoned decision-making. FDA has sought to justify its exception based on considerations of administrative convenience, disregarding the central role the Bundling Rule plays in protecting innovators' patent rights. This failure to "consider an important aspect of the problem" was arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). FDA also failed to seriously consider the significant reliance interests of UTC and other innovators in faithful application of the Bundling Rule, with the agency describing those interests "as doubtful and at most limited" before asserting in conclusory fashion that they are "outweighed." FDA-000184. This, too, is inadequate. Before abrogating a three-decades-old policy, FDA was required to do more than offer lip service to the significant reliance interests at stake. In failing to do so, FDA deprived UTC of a critical statutory

protection, stripping away its opportunity to secure an automatic 30-month stay while pursuing its patent rights.

For all these reasons, and as further explained below, the Court should set aside FDA's decision to accept Liquidia's amendment in contravention of the agency's Bundling Rule.

## BACKGROUND

### I.    Statutory and Regulatory Framework

#### A.    The FDCA, the Hatch-Waxman Act, and PDUFA

Before marketing a drug, an applicant must first demonstrate to FDA's satisfaction that the product is effective and safe for its intended use.  *See* 21 U.S.C. § 355(d)(2); *see generally id.* § 355(a).  To do so, the applicant must submit either an NDA under section 505(b)(1) of the FDCA, 21 U.S.C. § 355(b)(1),[1] or one of the more streamlined applications created by the Drug Price Competition and Patent Term Restoration Act (Hatch-Waxman Act), Pub. L. No. 98-417, 98 Stat. 1585 (1984).  The choice depends on whether (and to what extent) the applicant relies on other sponsors' previous FDA approvals and their associated studies.

If an applicant seeks approval for an entirely new drug product—a "brand-name" drug—it typically submits a full, standalone NDA under section 505(b)(1).  An NDA must include the "full reports of investigations" conducted or licensed by the sponsor showing "whether such drug is safe for use and whether such drug is effective in use."  21 U.S.C. § 355(b)(1)(A).  By contrast, if an applicant seeks to market a generic drug that is a copy of an approved brand drug, the applicant may submit an abbreviated new drug application (ANDA) establishing that the proposed generic

---

[1] Section 505 of the FDCA is codified at 21 U.S.C. § 355.  This memorandum refers to provisions of the session law in text and provisions of the U.S. Code in citations.

drug is bioequivalent and pharmaceutically equivalent to a previously approved "reference listed drug" (*i.e.*, the brand-name product). *See id.* § 355(j)(2)(A).

The Hatch-Waxman Act also establishes an intermediate pathway for approval of a new drug product that shares features with a previously approved drug: an application under section 505(b)(2) of the FDCA. This case involves such a section 505(b)(2) application. "Like the full NDA, a [section] 505(b)(2) application must directly demonstrate that the proposed drug product is safe and effective[.]" *Veloxis Pharms., Inc. v. FDA*, 109 F. Supp. 3d 104, 108 (D.D.C. 2015). But to do so, the section 505(b)(2) NDA "can rely on clinical studies that were previously submitted to FDA in support of another drug and that were not conducted or licensed by the [section] 505(b)(2) sponsor." *Id.* at 109 (alterations omitted). In other words, a section 505(b)(2) application uses clinical studies to demonstrate the safety and effectiveness of the proposed new drug but differs from a section 505(b)(1) application because it relies, in whole or in part, on another sponsor's safety or efficacy data from a previously approved drug.

FDA requires applicants submitting certain human drug applications to pay user fees under the Prescription Drug User Fee Act (PDUFA). *See* Pub. L. 102-571, 106 Stat. 4491 (1992), codified at 21 U.S.C. § 379g *et seq.* Under the PDUFA statute, a "human drug application" includes applications for the "approval of a new drug submitted under [21 U.S.C. § 355(b)]" but "does not include a supplement to such an application." 21 U.S.C. § 379g(1). PDUFA provides that human drug applications "shall be subject to a fee," including the fee "established … for a human drug application for which clinical data (other than bioavailability or bioequivalence studies) with respect to safety or effectiveness are required for approval" or the fee established for a human drug application for which these data "are not required for approval." *Id.* § 379h(a)(1)(A). As part of its obligations under PDUFA, FDA sets its performance goals in a "commitment letter,"

which lays out its intended timeline for acting on NDAs. *See* FDA PDUFA Reauthorization Performance Goals and Procedures Fiscal Years 2023 Through 2027 at 4-6, https://www.fda.gov/media/151712/download?attachment.

### B.    Patent disputes under the Hatch-Waxman Act

Many innovative drug products that improve the lives of patients also are the type of novel and valuable inventions that earn a patent. To strike a balance between expediting the entry of follow-on products and respecting innovators' patent rights, the Hatch-Waxman Act creates a carefully calibrated process for identifying and resolving patent disputes between brand-name manufacturers on the one hand and would-be generic and section 505(b)(2) competitors on the other. Considered as a whole, this statutory framework promotes the orderly resolution of patent disputes *before* a follow-on product from an ANDA or section 505(b)(2) application enters the market.

The process begins with the brand-name manufacturer's public identification of its patents. When an applicant files an NDA, it submits to FDA for listing information on each patent that claims the proposed drug or a method of using the proposed drug for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1)(A)(viii); 21 C.F.R. § 314.50(h). The brand manufacturer must also submit timely updates to FDA of any such newly issued patents, both while the application is pending and after NDA approval. 21 U.S.C. § 355(c)(2); 21 C.F.R. § 314.53(d). FDA publishes all such listed patents for each approved drug in a compendium called *Approved Drug Products with Therapeutic Equivalence Evaluations*, more commonly known as the "Orange Book." 21 U.S.C. § 355(c)(2), (j)(7)(A)(i).

When seeking approval, generic and section 505(b)(2) applicants must then include in their applications a certification regarding all such Orange Book-listed patents. Several types of

certifications exist; relevant here is the "paragraph IV" certification. If there are any patents listed in the Orange Book for a given brand-name drug, and if the section 505(b)(2) applicant that cites such brand-name drug wants to market its product before the expiration of any of those patents, a "paragraph IV" certification allows it to represent that, in its view, the patent is invalid or unenforceable or will not be infringed by the proposed follow-on drug. 21 U.S.C. § 355(b)(2)(A)(iv); 21 C.F.R. §§ 314.50(i)(1)(i)(A)(4), 314.94(a)(12).

Submitting a paragraph IV certification "comes with a risk" because it is a technical act of patent infringement that allows the patent owner to sue immediately—*i.e.*, before the follow-on product has been approved and marketed. *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1305 (D.C. Cir. 2010); 35 U.S.C. § 271(e)(2)(A). Filing suit within 45 days of receiving notice of the paragraph IV certification typically triggers an automatic stay of FDA's ability to approve the 505(b)(2) application for up to 30 months. 21 U.S.C. § 355(c)(3)(C). This stay allows patent disputes to be litigated in an orderly manner before approval and market entry of the follow-on product. *See Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 557 F.3d 1346, 1348-49 (Fed. Cir. 2009). If the patent litigation ends sooner than 30 months, so does the stay. *See* 21 U.S.C. § 355(c)(3)(C)(i)-(ii).

As explained in more detail below, pp. 10-12, *infra*, the automatic 30-month stay is available only for patents submitted to FDA before the relevant original 505(b)(2) application was submitted to the agency. *See* 21 U.S.C. § 355(c)(3).

## C.    FDA's Bundling Rule

For more than three decades, FDA's "Bundling Rule" has provided that an applicant may not add a new indication to a pending application—including a "tentatively approved" application—via an amendment. Instead, FDA has long maintained that efforts to seek new indications, together with several other types of requests, require entirely new applications.

In its 1993 articulation of the rule, FDA explained to applicants "what should be contained in separate marketing applications and what should be combined into one application."  FDA-000936.  FDA stated that certain proposed additions or alternatives were not proper subjects for amendment, but rather could be sought only in a new application.  As most relevant here, the 1993 Bundling Rule directed that "[a]fter initial submission, a pending original or supplemental application should not be amended to add a new indication."  FDA-000940.  Instead, "[i]f the original application is not yet approved, a request for approval of other indications or claims" should "be submitted in a separate, original application."  *Id.*  Notably, this proscription was in addition to the Bundling Rule's directive that "[n]ew clinical or *in vitro* data to support a new claim(s) should not be submitted to an already submitted original application during the review of that application."  *Id.*  FDA stated, however, that "in rare instances," supplementary clinical data could be provided to support "[p]reviously submitted indications or claims."  *Id.*  Leaving aside indications, FDA instructed that "[e]very different active ingredient … should be submitted in a separate original application," as should "[p]roducts to be administered using different routes of administration" and "[d]ifferent dosage forms" (subject to narrow exceptions).  FDA-000937-938. In contrast, applicants seeking approval for "[d]ifferent strengths or concentrations" of a drug were directed to combine their requests into a single application.  *Id.*

FDA has carried forward the Bundling Rule throughout the years with only minor changes, immaterial here, with FDA providing notice to the public of revisions and providing an opportunity for written comments.  *See* Notice, Draft Guidance for Industry on Separate Marketing Applications and Definition of Clinical Data for Purposes of Assessing User Fees; Availability, 66 Fed. Reg. 11175, 11175-11176 (Feb. 13, 2001), *available at* https://www.govinfo.gov/content/pkg/FR-2001-02-22/pdf/01-4311.pdf.   In its current form, issued by FDA in 2004, the Bundling

Rule provides that:

> After initial submission, a pending original or supplemental application should not
> be amended to add a new indication or claim. … If the original application is not
> yet approved, a request for approval of other new indications or claims should be
> submitted in a separate, original application.

FDA-000974-975.[2]

FDA has repeatedly applied the Bundling Rule to reject non-compliant submissions. *See,
e.g.*, Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg. 69,580, 69,635
(Oct. 6, 2016) (maintaining that applicant may not "amend[] or supplement[] a 505(b)(2)
application to seek approval of a drug that has been modified to have a different active ingredient,
different route of administration, different dosage form, or certain differences in excipients than
the drug proposed in the original submission of the 505(b)(2) application"). Indeed, FDA
reiterated the rule at least as recently as January 2024. *See* FDA, SOPP 8401: Administrative
Processing of Original Biologics License Applications (BLA) and New Drug Applications (NDA)
at 12 (2024), https://www.fda.gov/media/85659/download. The guidance documents articulating
the Bundling Rule are publicly available from FDA to this day, with no hint that any of the
agency's rules, policies, and procedures have changed.

Over this extended period, FDA has also shown that it understood the Bundling Rule to
bind both itself and applicants. For example, before FDA accepts an application (including an
amendment) for substantive review, FDA staff must complete the agency's "RPM Filing Review"
checklist to ensure that the submission is lawful and consistent with the statute. As relevant here,
that checklist permits FDA to accept only those applications that comply with the Bundling Rule:

---

[2] This memorandum refers to the 1993 Bundling Rule and 2004 Bundling Rule collectively as "the
Bundling Rule," reflecting the fact that there are no material differences between the two versions.

"Has the user fee bundling policy been appropriately applied? *If no, or you are not sure, consult the User Fee Staff.*"  FDA-001276.

FDA has repeatedly enforced the Bundling Rule against companies seeking to add new indications by way of an amendment.[3]  Indeed, in rejecting an applicant's attempt to "resubmit [an] NDA" with a new indication, FDA emphasized that this proposed submission "does not follow" the Bundling Rule and explained that the new indication "must be submitted as a new NDA application."[4]  FDA similarly referred applicants to the Bundling Rule when informing them that any amendments adding an indication "should be submitted in a separate original application" and even offering to "set up a teleconference with [the agency's] User Fee staff to discuss this matter."[5]  FDA has also applied the Bundling Rule in various additional contexts, including sought-after changes to pending applications that are likely to implicate patent rights, such as changes to the dosage form or route of administration.[6]  Given its consistent enforcement of the Bundling Rule as a mandatory, binding rule, FDA has unsurprisingly characterized the Bundling Rule as a "require[ment]."  FDA, Proposed Rule, Abbreviated New Drug Applications and 505(b)(2) Applications, 80 Fed. Reg. 6802, 6851 (Feb. 6, 2015) ("Consistent with FDA's

---

[3] *See, e.g.*, FDA-001195-1196; FDA-000512; FDA-001286; *see also* FDA, Approval Package, Proprietary Name Review(s), Application Nos. 761285 & 761331, PDF p. 3 (Sept. 22, 2023), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2024/761285Orig1s000,761331Orig 1s000NameR.pdf (Ustekinumab Correspondence).

[4] *See, e.g.*, FDA-001195-1196.

[5] FDA-000512.

[6] *See, e.g.*, FDA, Approval Package, Administrative & Correspondence Documents, NDA 210709, PDF p. 60 (May 2017), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/210709Orig1s 000AdminCorres.pdf (Tekturna Correspondence); FDA, Approval Package, Administrative & Correspondence Documents, NDA 209400, PDF pp. 63-64 (Nov. 2015), https://www.accessdata. fda.gov/drugsatfda_docs/nda/2017/209400Orig1s000AdminCorres.pdf (Omeprazole Correspondence); FDA, Approval Package, Administrative & Correspondence Documents, NDA 208780, PDF p. 76 (May 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/2087 80Orig1s000AdminCorres.pdf (Esbriet Correspondence).

'bundling' policy …, the applicant is *required* to submit a new 505(b)(2) application [in certain circumstances]." (emphasis added)).

### D.  The Medicare Modernization Act

In 2003, a decade after FDA established the Bundling Rule, Congress enacted the Medicare Modernization Act (MMA), Pub. L. No. 108-173, 117 Stat. 2066.  Among other things, the MMA reformed the process for the automatic 30-month stay to ensure that it operates for its intended purpose: to provide an opportunity to litigate significant patent disputes prior to market-altering approvals.  Before the MMA, brand manufacturers sometimes could secure multiple 30-month stays by listing new—but insignificant—patents after the submission of a section 505(b)(2) application or ANDA.  For example, a brand manufacturer might have secured a patent covering minor secondary changes to a drug product (*e.g.*, related to color or packaging) and used it to trigger a new stay, even though the change "really did not indicate a different or improved use for the product."  148 Cong. Rec. S6844 (daily ed. July 16, 2002) (statement of Sen. Collins).  Congress curbed this practice by amending the language of section 505(c) to provide that a 30-month stay kicks in only with respect to patents listed in the Orange Book "before the date on which the [ANDA or section 505(b)(2)] application (excluding an amendment or supplement to the application) was submitted."  21 U.S.C. § 355(c)(3)(C).

In passing the MMA, Congress legislated against the backdrop of the Bundling Rule, building off its understood constraints on submitting amendments.  As discussed, the Bundling Rule was a fixture of FDA's regulatory regime for more than a decade before the MMA's passage.  *See* pp. 5-9, *supra*.  And Congress "d[id] *not* intend [the MMA] to alter current [FDA] practice regarding acceptance of … amendments and supplements to pending and approved [applications]."  H.R. Rep. No. 108-391, at 835 (2003) (emphasis added).  Instead, Congress "intend[ed] [the MMA] to reflect FDA's current practice regarding those changes and variations to both innovator

10

and generic drugs that may be approved under amendments and supplements to previously filed NDAs and ANDAs." *Id.* With the Bundling Rule in place, Congress understood that the MMA would not prevent a 30-month stay in the event of a follow-on patent for significant changes reflecting "different or improved use[s] for [a] product," 148 Cong. Rec. at S6844, because the Bundling Rule would bar the addition of such "different or improved" uses by way of an amendment to an existing application. Developing a new use for a drug is exactly the type of innovation that often results in issuance of a new patent for the method of treatment. *See, e.g., Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1133-36 (Fed. Cir. 2018) (recognizing that discoveries of applying an existing drug "to treat a particular disease" are eligible for patent protection).

Consistent with the Bundling Rule, the MMA provides that "[a]n applicant may not amend or supplement an application … to seek approval of a drug that is a different drug than the drug identified in the application as submitted to the Secretary." 21 U.S.C. § 355(b)(4)(A). Congress further echoed the Bundling Rule by making an exception for "approval of a different strength," as the MMA *permits* an applicant to submit an amendment to a pending NDA to seek approval for a different strength—the type of minor change that is unlikely to implicate the innovator's patent rights. *See* 21 U.S.C. § 355(b)(4)(B) ("[N]othing in this subsection or subsection (c)(3) prohibits an applicant from amending or supplementing the application to seek approval of a different strength."). By contrast, the MMA contains no exception allowing for the addition of a new indication by amendment—a possibility that would have contradicted the Bundling Rule and the exact type of change that *is* likely to implicate the innovator's patent rights.

In adopting regulations to implement the MMA, FDA reaffirmed that the Bundling Rule established what an applicant is "required" to do. 80 Fed. Reg. at 6851. On the specific issue here,

FDA reiterated in the preamble to its Final Rule that "[m]ost requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to the 505(b)(2) application." Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg. 69,580, 69,616 (Oct. 6, 2016). FDA identified just a single exception to that general rule (irrelevant here) where an "indication changed from prescription status to OTC use." *Id.* Such a change, which concerns only the regulatory status of a product without altering its treatment use, is unlikely to implicate new patent protections connected to that change in status.

## II.    Factual Background

This case concerns a prescription drug containing treprostinil and its innovative use to treat a form of pulmonary hypertension (PH). PH is a rare, chronic, and often fatal disease generally characterized by increased pressure in the blood vessels between the heart and lungs. Crossclaim ¶ 38. That increased pressure strains the heart and, over time, can result in heart failure and death. *Id.* The World Health Organization has designated five subcategories of PH, each with a different cause and different expected clinical outcomes. Treprostinil is one of several therapies approved for Group I PH (also known as pulmonary arterial hypertension (PAH)). In contrast, treprostinil is the only therapy ever approved to treat patients with pulmonary hypertension associated with interstitial lung disease (PH-ILD), part of Group III PH.

As discussed, UTC has pioneered several inventions to treat various forms of PH. For its part, Liquidia is seeking to launch a follow-on product that leverages UTC's innovations.

### A.    UTC develops novel treatments for pulmonary hypertension.

UTC develops and commercializes products designed to address the needs of patients with chronic and life-threatening rare conditions. Indeed, UTC was created to develop treatments for PAH. UTC, *United Therapeutics Corporation History*, https://www.unither.com/about-us/history. UTC's treprostinil-based drug products include: an infusion administered

subcutaneously or intravenously (Remodulin®), an extended-release tablet (Orenitram®), a nebulized inhaler (Tyvaso®), and a dry powder inhaler (Tyvaso DPI®). UTC's efforts to develop innovative treprostinil-based therapies have led to numerous UTC patents, including U.S. Patent No. 11,826,327 ('327 patent), which issued on November 28, 2023 and expires in 2042. FDA-000166; Crossclaim ¶¶ 44, 56. The '327 patent claims methods of using inhaled treprostinil to improve exercise capacity in patients with PH-ILD. *See* Crossclaim ¶ 56.

In 2009, FDA approved Tyvaso, the first inhaled treprostinil PAH therapy. *See* FDA-000163. In 2020, UTC discovered that inhaled treprostinil can improve exercise capacity in patients with PH-ILD and, in 2021, received FDA approval for a treprostinil-based treatment for patients with PH-ILD. *See* FDA-000163. This first-and-only approved PH-ILD therapy follows multiple failures to use other drugs to successfully treat PH-ILD. In 2022, FDA also approved Tyvaso DPI, the first dry powder inhaler version of treprostinil, to treat both PAH and PH-ILD. United Therapeutics, *Press Release* (May 24, 2022), https://ir.unither.com/press-releases/2022/05-24-2022.

**B.    Liquidia applies to market a follow-on treprostinil product, leading to patent litigation.**

Liquidia is a biopharmaceutical company seeking FDA approval to market Yutrepia™, a dry powder inhaled version of treprostinil. FDA-000163-164. When filing its original 505(b)(2) application in 2020, Liquidia relied on UTC's approved Tyvaso product as a shortcut for securing approval of its own product to treat PAH. FDA-000164. Liquidia included paragraph IV certifications to UTC's then-listed Orange Book patents. FDA-000164-165.

After Liquidia submitted its original 505(b)(2) application in 2020, UTC filed suit against Liquidia in the District of Delaware, asserting that Liquidia's Yutrepia product would infringe several patents. FDA-000164-165. As a result of UTC's timely suit, Liquidia was subject to a 30-

month stay on final approval of its application.  Thus, in reviewing Liquidia's original 505(b)(2) application, FDA determined it could receive only tentative approval, because final approval was subject to termination of the 30-month stay and potentially other exclusivities.  FDA-000240.

After a four-day trial, the District of Delaware concluded that Liquidia infringed certain claims of UTC's Patent No. 10,716,793 ('793 patent) and awarded the statutory Hatch-Waxman remedy: an order barring FDA from granting final approval of Liquidia's NDA before May 14, 2027.  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-cv-755, ECF No. 436 ¶¶ 3-4 (D. Del. Sept. 9, 2022).  The Federal Circuit affirmed this decision.  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360 (Fed. Cir. 2023), *cert denied*, No. 23-804, 2024 WL 675262 (Feb. 20, 2024).  In parallel to that litigation, Liquidia sought to administratively cancel claims of the '793 patent through a process at the U.S. Patent & Trademark Office (Patent Office) called "*inter partes* review."  *Liquidia Techs., Inc. v. United Therapeutics Corp.*, No. IPR2021-00406, 2022 WL 2820717 (P.T.A.B. July 19, 2022).  The Patent Trial and Appeal Board found the claims unpatentable, and UTC appealed to the Federal Circuit, which affirmed.  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 2023 WL 8794633 (Fed. Cir. Dec. 20, 2023).  After UTC exhausted its appellate rights, the Patent Office cancelled the '793 patent on November 12, 2024.

**C.    Liquidia submits an amendment to add the PH-ILD indication, after telling FDA it would wait until after final approval of its original application.**

After UTC secured approval for the new PH-ILD indication, Liquidia strategized over how to piggyback on that new approval.  In a May 2022 correspondence from FDA memorializing its discussion with Liquidia, the agency noted that "[w]ith the assumption of final approval" for its original application, Liquidia "plans to submit a supplemental 505(b)(2) application" "to pursue alignment with the Tyvaso labeling by expanding the indication statement to include" PH-ILD.  FDA-000277.  Proceeding in this manner—*i.e.*, waiting until after FDA finally approved

Liquidia's original NDA—would have aligned with the Bundling Rule, which prohibits amending a "pending original or supplemental application … to add a new indication." FDA-000974.

Yet Liquidia then changed course. Liquidia chose not to submit "a supplemental … application" after final approval. FDA-000277. Instead, on July 24, 2023, Liquidia submitted an amendment to "expand[] the indication statement" of its application by adding PH-ILD. FDA-000286; *see* FDA-000287-306. FDA acknowledged receipt of the amendment, which it treated as a "complete, class 2 response" to the agency's earlier tentative approval letter, triggering a new six-month review period for the amendment. FDA-000316.[7]

Liquidia submitted paragraph IV certifications based on its amendment adding the PH-ILD indication, including with respect to the '793 patent. FDA-000166. UTC again timely filed suit, asserting infringement claims against Liquidia in the District of Delaware. Compl., *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 23-cv-975 (D. Del. Sept. 5, 2023), ECF No. 1.[8] But this time, FDA determined that UTC's timely patent suit would *not* trigger an automatic 30-month stay for patents listed after the submission date of Liquidia's original 505(b)(2) application (in 2020). FDA-000166. In December 2023, Liquidia amended its 505(b)(2) application again to include a paragraph IV certification for the '327 patent. FDA-000166. Within 45 days of receiving notice of that paragraph IV certification, UTC amended its Delaware complaint to assert infringement of the '327 patent. First Am. Compl., *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 23-cv-975 (D. Del. Nov. 30, 2023), ECF No. 8.

Patent litigation between UTC and Liquidia is ongoing. On May 31, 2024, the district

---

[7] A Class 2 resubmission is a "resubmission of an application or efficacy supplement that … constitutes an agreement by the applicant to start a new 6-month review cycle." 21 C.F.R. § 314.110(b)(1)(ii).

[8] In view of the Federal Circuit's later decision affirming the Patent Office's administrative review decision, UTC ultimately stipulated to the dismissal of counts of infringement of the '793 patent.

court denied UTC's motion to preliminarily enjoin Liquidia from launching Yutrepia for the PH-ILD indication. *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, 2024 WL 2805082 (D. Del.). The court scheduled trial to begin on June 23, 2025.

**D.    UTC challenges FDA's acceptance of Liquidia's improperly bundled application.**

When UTC became aware that FDA had accepted Liquidia's amended application in contravention of the Bundling Rule, it promptly raised objections. On December 29, 2023, UTC submitted a letter to FDA, explaining to FDA that acceptance of Liquidia's amendment for Yutrepia adding the PH-ILD indication violates the agency's longstanding Bundling Rule. FDA-000001-18. UTC asked FDA to rescind its unlawful action and require Liquidia to file a new application if it still wished to pursue the PH-ILD indication. FDA-000002.

Unbeknownst to UTC at the time, Liquidia initially reacted to UTC's submission by proposing to amend its application, in a manner that would come into compliance with the Bundling Rule. Specifically, on January 8, 2024, Liquidia submitted another amendment to FDA requesting final approval for "*only* … the PAH indication." FDA-000354 (emphasis added). In response, FDA convened a teleconference with Liquidia. In that conference, FDA sought to clarify Liquidia's position, warning about the impact a further amendment would have on the review timeline. FDA-000353-356. Liquidia then backtracked, stating that it still "wish[ed] to seek approval of both the PAH and PH-ILD indications" in a single amended application. FDA-000356. Before doing so, Liquidia "asked FDA to confirm" that patents listed in the Orange Book after its July 2023 amendment "would not give rise to a 30-month stay of approval," and FDA agreed. *Id.*

After formally withdrawing its PAH-only amendment, *id.*, Liquidia chose to double-down, submitting a letter to FDA in response to UTC. FDA-000019-36. In the letter, Liquidia defended

its submission and argued, among other things, that FDA's "Bundling Guidance has been superseded in relevant part" by the 2003 MMA and the agency's implementing regulations. FDA-000020. UTC submitted a reply, explaining that Liquidia's attempt to treat the Bundling Rule as outdated and inoperative was contrary to the MMA, FDA regulations, and established FDA practice. FDA-000086-103. UTC further explained that because final approval of Liquidia's improperly bundled 505(b)(2) application would cause UTC to suffer irreparable harm, UTC would need to file suit unless FDA took prompt corrective action. FDA-000103.

In February 2024, after FDA failed to timely respond, UTC filed suit against FDA in this District, which UTC promptly followed with a motion for preliminary injunction. *See United Therapeutics Corp. v. FDA*, No. 24-cv-484. UTC alleged that FDA violated the Administrative Procedure Act (APA) and long-established agency policy by accepting Liquidia's amendment to add the new PH-ILD indication to its pending application. Compl., No. 24-cv-484, (D.D.C. Feb. 20, 2024), ECF No. 1. Liquidia intervened as a defendant. Minute Order, No. 24-cv-484 (D.D.C. Mar. 5, 2024).

In response to the suit, FDA represented to the District Court (Bates, J.) that it had not yet decided whether "Liquidia's amendment is proper," and that the agency was still "actively considering that issue in light of UTC and Liquidia's submissions to the agency." Fed. Defs.' Opp. to Pl.'s TRO/PI Mot. at 11-12, No. 24-cv-484-JDB (D.D.C. Mar. 18, 2024), ECF No. 25.[9] Relying on FDA's representation, the district court denied UTC's motion for preliminary injunction, reasoning that FDA likely had not yet taken final agency action. Transcript of Motions Hearing, No. 24-cv-484 (D.D.C. Mar. 29, 2024), ECF No. 34. But recognizing that a final approval decision

---

[9] FDA's representation is difficult to reconcile with the agency's unqualified statement to Liquidia that Liquidia would face no 30-month stay based on submission of its PH-ILD amendment. *See* p. 15, *supra*.

could immediately ripen UTC's claim for irreparable harm, the court ordered FDA to provide the court and the parties with at least three business days' notice before issuing any decision on Liquidia's amended NDA.  No. 24-cv-484, ECF No. 18.  On August 13, 2024, FDA provided that notice pursuant to the Court's order without specifying the substance of its decision.

### E.    FDA reaffirms its decision to accept Liquidia's amendment and to depart from the Bundling Rule.

On August 16, 2024, FDA issued a letter decision in response to UTC's submission (the "Bundling Decision").  FDA-000162-187.  FDA "conclud[ed]" that Liquidia's request to add the PH-ILD indication to its pending 505(b)(2) application "is not precluded by statute or regulation and is appropriate for FDA to review."  FDA-000187.

In the Bundling Decision, FDA acknowledged that its longstanding guidance instructed "against amendments seeking to add a new indication" to pending applications.  FDA-000169. And FDA reaffirmed that "most requests for a new indication must be submitted in a new original application or supplemental application."  FDA-000162-163.  But FDA concluded it should "depart from the policy stated in its guidance documents" in Liquidia's case, based on a purported (and previously undisclosed) exception for 505(b)(2) applications that, in FDA's view, did not provide any new data to support approval of the additional indication.  FDA-000162, -183-184. Under this view, follow-on 505(b)(2) applicants that do the least independent work—because they only "request[] a change to seek approval for an indication approved for the relied-upon listed drug" without providing any further supportive data—are exempted from the Bundling Rule's restrictions on amendments.  FDA-000184.

In support of its decision, FDA asserted that the statute and agency regulations permit Liquidia's amendment, and that the Bundling Rule was only "nonbinding" and "d[id] not create legal rights or obligations."  FDA-000162, -171, -183.  Notably, however, FDA rejected Liquidia's

contention that agency regulations had "superseded" the Bundling Rule as "sweep[ing] too broadly." FDA-000186.

FDA admitted that it had previously told applicants that "a new indication should not be submitted as an amendment," and that "on at least one occasion," the agency had gone further and "advised an applicant that it *could not* submit an amendment to add a new indication." FDA-000185-186 & n.111 (emphasis added). And FDA acknowledged that agency manuals describe steps applicants should take "to be in compliance with the Bundling Guidance"—a directive FDA recognizes "could be misunderstood" to imply "the guidance is binding." FDA-000186 & n.113 (brackets omitted). But FDA insisted that the Bundling Rule merely provides recommendations that the agency may choose to discard, with the agency suggesting it might clarify the matter moving forward "to avoid the possibility of confusion among FDA staff or the public." *Id.* FDA further asserted that the "reliance interests" of innovators like UTC in the agency "maintaining its interpretation" are "doubtful and at most limited," and that the Bundling Rule "did not create a reliance interest" related to how FDA's filing practices determine application of "a 30-month statutory stay of approval." FDA-000184 & n.105.

As support for its departure from the Bundling Rule, FDA pointed to a December 2018 decision to allow a pending NDA (pemetrexed) to be amended to add a new indication. According to FDA, the pemetrexed application was "not based on new data" because the "applicant has already provided an adequate scientific bridge" to the relied-upon listed drug. FDA-000178. But the reasoning in the 2018 internal memorandum is scant: the memo is just two paragraphs, one of which merely summarizes the NDA and amendment at issue. FDA-001272. The only paragraph of analysis noted that the amendment was not based on new data, with no explanation as to why this justified departing from the Bundling Rule. FDA-001272. Nor did the paragraph address the

relationship between the Bundling Rule and the Hatch-Waxman Act's patent certification requirements. Instead, it simply noted that FDA was "currently considering whether the bundling guidance and policy regarding amendments to add a new indication are appropriate under these circumstances." *Id.* Ultimately, FDA did not approve the inappropriately bundled pemetrexed 505(b)(2) application, because the applicant withdrew the new indication after FDA issued a complete response letter based on a different deficiency. FDA-000178 n.92.

On the same day that FDA issued the Bundling Decision, FDA informed Liquidia that it was granting tentative approval for its Yutrepia product for both the PAH and the PH-ILD indications. FDA-000358-360. FDA did not grant final approval to Liquidia because, as it explained in a separate letter, Yutrepia falls within the scope of a three-year regulatory exclusivity that UTC earned in securing approval of Tyvaso DPI—a novel dry powder dosage form of treprostinil. FDA-000358. UTC's exclusivity will expire on May 23, 2025. Crossclaim ¶ 12.

Following FDA's decision, UTC voluntarily dismissed its action. No. 24-cv-484, ECF No. 56. As UTC explained, it took this step in response to Liquidia's argument that UTC's initial suit—filed before FDA's letter decision on the Bundling Rule—was "incurably premature" as filed. *Id.*, ECF No. 36 at 4 n.1.

### F.      Liquidia brings this action, and UTC files a crossclaim.

On August 21, 2024, Liquidia filed the present suit against the Federal Defendants to challenge FDA's decision finding that final approval of Yutrepia is blocked by UTC's three-year exclusivity. The Court granted UTC's motion to intervene. Minute Order (Aug. 30, 2024).

On September 16, 2024, UTC filed its answer to Liquidia's complaint, which included a crossclaim against the Federal Defendants challenging FDA's decision to allow Liquidia's amendment in contravention of the Bundling Rule. Crossclaim ¶¶ 77-91. The Federal Defendants resisted producing the administrative record, ECF No. 43 at 3 n.2, until this Court ordered them to

do so by December 19, 2024.  The Federal Defendants and Liquidia moved to dismiss UTC's crossclaim on November 15, 2024.  Those motions remain pending.  Now that the Federal Defendants have produced the administrative record, however, this Court may adjudicate the merits of UTC's crossclaim.  UTC accordingly moves for summary judgment on its crossclaim.

## LEGAL STANDARDS

The summary judgment standard "functions slightly differently" in the APA context, as the "court must limit its review to the 'administrative record' and the facts and reasons contained therein to determine whether the agency's action was consistent with the relevant APA standard of review."  *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 74 (D.D.C. 2018) (citation and quotation marks omitted).  Under the APA, this Court must set aside FDA's agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  If the agency "has 'failed to consider an important aspect of the problem before it, [courts] will hold the agency action to be arbitrary and capricious."  *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010) (quoting *State Farm*, 463 U.S. at 43).  The "agency's explanation for its decision must be 'sufficient to enable [the court] to conclude that it was the product of reasoned decisionmaking.'"  *Id.* (quoting *State Farm*, 463 U.S. at 52) (alteration omitted).

## ARGUMENT

**I.    FDA's decision to accept Liquidia's amendment in direct contravention of the Bundling Rule was arbitrary and capricious.**

If FDA had followed its Bundling Rule—set forth in long-established guidance that the agency has not changed—it could not have accepted Liquidia's amendment adding the new PH-ILD indication to its pending application.  FDA concedes as much, recognizing that its decision to accept Liquidia's amendment marked a "depart[ure] from the policy stated in its guidance

documents." FDA-000162. FDA's about-face was arbitrary and capricious and should be set aside. In purporting to apply a previously undisclosed exception to the Bundling Rule, FDA ignored an important aspect of the issue it faced, failing to account for the manner in which the Bundling Rule intersects with, and reinforces the objectives of, the Hatch-Waxman Act's patent-certification requirements. FDA also improperly disregarded the significant reliance interests of innovators like UTC in the agency's adherence to its longstanding public position.

### A. The Bundling Rule prohibits adding indications through amendments and required FDA to reject Liquidia's proposed amendment.

The Bundling Rule sets forth FDA's decades-old policy establishing the types of changes that require a "separate marketing application." FDA-000971. By its terms, the Bundling Rule precludes adding an indication through an amendment, providing that "[a]fter initial submission, a pending original or supplemental application *should not* be amended to add a new indication or claim." FDA-000975 (emphasis added). The Rule goes on to emphasize that "[i]f the original application is not yet approved, a request for approval of other new indications or claims should be submitted in a separate, original application." *Id.* It is only *after* "the initial application is approved," that "the application can be subsequently supplemented to add a new indication." *Id.*

Liquidia's amendment violates the plain terms of the Bundling Rule, as that Rule has been articulated to the public for decades. Liquidia's original 505(b)(2) application "is not yet approved." *Id.*; *see* FDA-000241 (letter from FDA to Liquidia explaining that "[u]ntil we issue a final approval letter, this NDA is <u>not</u> approved"). Yet Liquidia amended its pending application to add the new PH-ILD indication, FDA-000286—exactly what the Bundling Rule specifies an applicant "should not" do, FDA-000975. Notably, although Liquidia has argued that the Bundling Rule did not apply here because it submitted its amendment after FDA granted *tentative* approval to its original 505(b)(2) application, ECF No. 69-1 at 24, 26, 28, FDA has rejected such an

exception.[10]  An application that has been tentatively approved is still "pending."  FDA-000975.

The drug product "may not be legally marketed" until FDA grants *final* approval.  FDA-000241.

In any event, there is no basis for Liquidia to defend FDA's decision based on a rationale that FDA

itself did not endorse.  *See City of Port Isabel v. FERC*, 111 F.4th 1198, 1215 (D.C. Cir. 2024)

(citing *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)).

      Without disputing that the clear terms of the Bundling Rule preclude Liquidia's

amendment, FDA observed that its Bunding Rule is set forth in agency "guidance" that is

"nonbinding" and "does not create legal rights or obligations."  FDA-000162.  But FDA cannot

disregard the Bundling Rule on this basis.  To the contrary, the D.C. Circuit has made clear that a

nominally non-binding guidance document can have the "force of law" if it "is applied by the

agency in a way that indicates it is binding."  *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383-84 (D.C.

Cir. 2002) (treating EPA guidance document as binding because "[t]o the applicant reading the

Guidance Document the message is clear: in reviewing applications the Agency will not be open

to considering approaches other than those prescribed in the Document"); *see also Appalachian

Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (treating agency guidance document as

binding notwithstanding disclaimer that "[t]he policies set forth in this paper are intended solely

as guidance, do not represent final Agency action, and cannot be relied upon to create any rights

enforceable by any party").

      Here, FDA's public statements on the Bundling Rule showed that it binds both applicants

and the agency.  FDA has described the rule as a "require[ment]."  80 Fed. Reg. at 6851.  It has

---

[10]  *See* FDA, Approval Package, Administrative & Correspondence Document(s), NDA 021822
(Aptivus), PDF pages 5-6 (May 19, 2006), https://www.accessdata.fda.gov/drugsatfda_docs/nda/
2008/021822s000admincorres.pdf (applying the Bundling Rule to reject a request for approval of
a new indication, notwithstanding an earlier determination by the agency that the original
application was "approvable" because it was still "pending").

developed a checklist that precludes agency staff from accepting a submission that does not comply with the Bundling Rule, as staff must ensure that the Bundling Rule has "been appropriately applied." *See* FDA-001276 ("Has the user fee bundling policy been appropriately applied? If no, or you are not sure, consult the User Fee Staff."). Similarly, FDA's Manual of Policies and Procedures directs that an NDA seeking to add "a new indication or claim for a drug product" must be "submitted as a separate NDA so as *to be in compliance*" with the Bundling Rule. FDA-001550 (emphasis added). FDA concedes that the word "compliance" could reasonably imply that the Bundling Rule sets a binding obligation, stating only that it "intend[s] to revise this statement" sometime in the future "to avoid the possibility of confusion among FDA staff or the public." FDA-000186 n.113. That FDA proposes such a *revision* in the future underscores the point: as matters stand, the Bundling Rule and various agency documents referencing it all "read[] like a ukase"—they "command[]," "order[]," "dictate[]." *Appalachian Power*, 208 F.3d at 1023. Based on these agency documents, "private parties are reasonably led to believe that failure to conform" to the Bundling Rule "will bring adverse consequences, such as … denial of an application." *Gen. Elec. Co.*, 290 F.3d at 383 (citation omitted).

FDA's historic practice of applying the Bundling Rule confirms what is apparent from these regulatory directives: it is a command that structures the agency's review process, not an idle suggestion that applicants may choose to ignore. As FDA concedes, "on at least one occasion," it "advised an applicant that it could not submit an amendment to add a new indication." FDA-000185 n.111. The record shows that this conceded instance of mandatory treatment is not isolated, as FDA has rejected proposed amendments that included a new indication where that amendment "does not follow the Guidance for Industry" articulating the Bundling Rule. FDA-001195. *See* pp. 5-10 & nn. 3-6, *supra*. For instance, in 2006, FDA denied Boehringer Ingelheim

Pharmaceuticals' attempt to amend an NDA for Aptivus (tipranavir) oral solution. As the agency then explained, "[b]ecause [the] original NDA … was intended for an adult indication," the "proposal to resubmit the NDA with a pediatric indication [was] considered a new indication and thus [had to] be submitted as a new NDA application." FDA-001195-1196. Similarly, in 2015, FDA explained to HQ Specialty Pharma that it could not amend a previously submitted NDA for a dexmedetomidine hydrochloride injection product to include a new indication. FDA-000512. Citing the Bundling Rule, the agency explained to HQ Specialty Pharma that "if you amend a pending application and add another indication, it should be submitted in a separate original application." *Id.*

Any effort to minimize the Bundling Rule as mere nonbinding advice also fails to account for the manner in which FDA's policy on amendments has long been understood to structure the Hatch-Waxman review process. As described above, pp. 10-12, *supra*, when Congress enacted the MMA to amend the FDCA in 2003, it legislated against the backdrop of the Bundling Rule. The House Committee Report for the MMA expressly noted Congress's "inten[t] . . . to reflect the FDA's current practice regarding those changes and variations to both innovator and generic drugs that may be approved under amendments and supplements to previously filed NDAs and ANDAs." H.R. Rep. No. 108-391, at 835 (2003). Thus, when Congress amended the law to prevent innovators from securing serial 30-month stays based on insignificant modifications, it was understood that the Bundling Rule would ensure that an automatic stay would still be available for patents covering significant innovations such as "different or improved use[s] for [a] product"— *i.e.*, new indications. 148 Cong. Rec. at S6844.

In its decision, FDA contends (at FDA-000185 & n.109) that the Bundling Rule provides no clear background rule restricting amendments adding new indications because FDA has stated

that there may be limited "scenarios" where an applicant may submit an amendment to a 505(b)(2) application for a new indication. *See* 80 Fed. Reg. 6802, 6849 (Feb. 6, 2015) (preamble to proposed rule implementing the MMA). But the only example identified by FDA is revealing—specifically, a request for approval of a drug product that has "changed from prescription status to OTC use for the listed drug." *Id.* Such a regulatory switch does not involve the treatment of a new condition, much less one protected by new valuable patents tied to the new regulatory status. As a result, the amendment process poses no risk of the applicant "us[ing] the amendment … process to evade the possibility of a 30-month stay of approval." *Id.* at 6851. In contrast, a "substantial change in indication" that involves using an existing product to treat a new condition is the type of "innovation" that requires a new drug application. *Examining Issues Related to Competition in the Pharmaceutical Marketplace: A Review of the FTC Report, Generic Drug Entry Prior to Patent Expiration: Hearing Before the Subcomm. on Health of the H. Comm. on Energy & Com.*, 107th Cong. 49 (2002) (colloquy between Rep. Waxman and FDA Commissioner).

"In sum, the commands of the [Bundling Rule]," as backed up by decades of agency practice, "indicate that it has the force of law." *Gen. Elec. Co.*, 290 F.3d at 385. That remains so notwithstanding FDA's assertion that, since 2018, it has applied a previously undisclosed exception to the Bundling Rule in instances where an amendment for a new indication does not rely on any clinical data in the submission. FDA-000178-179. None of the agency decisions referenced in FDA's decision letter purport to rely on any such exception—indeed, they contain no relevant reasoning at all. *See* FDA-000637-695 (Fulvestrant); FDA-000886-909 (Romidepsin);

26

FDA-000726-756 (Paclitaxel NDA 211875); FDA-000791-828 (Paclitaxel NDA 216338); FDA-000456-505 (Bortezomib).[11]

To the contrary, the only reference to an unwritten exception in the administrative record comes from a previously undisclosed 2018 FDA decision involving an amendment to an application for a product (pemetrexed) that was *not* ultimately approved. *See* FDA-000177-178 & n.92. The decision is described in a two-paragraph "memorandum to file" with minimal reasoning. FDA-001272. Indeed, that secret internal memorandum observed that the agency was "currently considering whether the bundling guidance and policy regarding amendments to add a new indication" should be modified for situations in which no new data was submitted. *Id.* But until the decision challenged here, the record reveals no instances of FDA expressly embracing such an exception, much less explaining it to the public. Certainly, FDA never modified its directives in any of its guidance documents or other public-facing communications. Even now, FDA states only that it "intends to further consider whether an additional clarification" is appropriate. FDA-000178 n.93.

This is not how the administrative process is supposed to work. Notwithstanding boilerplate disclaimers about established guidance being nonbinding, regulated entities are entitled to take an agency's written directives at face value, rather than suppose categorical instructions that applicants "should not" submit certain amendments, FDA-000975, are subject to secret, unexplained exceptions. Indeed, recognizing the importance of consistent agency guidance in this

---

[11] Many of the decisions also arise in materially different factual circumstances. In Fulvestrant, Romidepsin, Paclitaxel NDA 211875, and Paclitaxel NDA 216338, the applicant sought to amend because of a change in the patent landscape protecting the innovator product, such as patent expiration or settlement. Fulvestrant NDA 210326 (FDA-00547); Romidepsin NDA 208574 (FDA-000854); Paclitaxel NDA 211875 (FDA-000720); Paclitaxel NDA 216338 (FDA-000780). These were not cases where, as here, the innovator produced new data showing that its product was safe and effective in a new indication, upon which the 505(b)(2) applicant then sought to rely.

industry, Congress requires FDA to "ensure public participation" before implementing "changes in interpretation or policy." 21 U.S.C. § 371(h)(C)(i). FDA has flouted that directive, as it now purports to apply an unwritten exception to an established guidance document while still describing the Bundling Rule to the public as representing the agency's "current thinking on this topic." FDA-000971. FDA's admitted disregard of the clear terms of the Bundling Rule is arbitrary and capricious.

### B. FDA's newly announced exception to the Bundling Rule fails to address an important aspect of the Bundling Rule's historic purpose.

FDA's decision "to depart from the policy" stated in the Bundling Rule, FDA-000162, is arbitrary and capricious also because it "fail[ed] to consider important aspects of the problem presented to the agency." *Quantum Ent't, Ltd. v. U.S. Dep't of Interior, Bureau of Indian Affairs*, 597 F. Supp. 2d 146, 153 (D.D.C. 2009) (citing *State Farm*, 463 U.S. at 43); *see also Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 177 (D.C. Cir. 2022) ("Agencies cannot disregard important aspects of a problem before them.").

In deciding to allow Liquidia's amendment because it presents no clinical data of its own, and instead piggybacks entirely on UTC's concerning the use of treprostinil to treat PH-ILD, FDA relied on the "limited" "amount of work required for the Agency's review." FDA-000184. According to FDA, "concerns about developing an application on the clock that supported the more general policy stated in the Bundling Guidance are substantially reduced" "[i]n this limited circumstance," and permitting the amendment would further "PDUFA program goals of efficient and effective" application processing. *Id.* But even if this rationalization were credited, it accounts for only one of the historic purposes underlying the Bundling Rule, disregarding the important role the Bundling Rule has come to serve in ensuring the patent-certification process in the Hatch-Waxman Act operates in the manner Congress intended.

As discussed above, pp. 3-6, 10-12, *supra*, the Hatch-Waxman Act, as amended by the MMA, reflects a careful balance of the public's interests in innovation and access to lower-priced prescription drugs. *Bristol-Myers Squibb Co. v. Royce Labs., Inc.*, 69 F.3d 1130, 1132 (Fed. Cir. 1995); *Teva Pharms. USA Inc. v. Sebelius*, 595 F.3d 1303, 1315 n.4 (D.C. Cir. 2010). A central aspect of the statutory framework is the automatic 30-month stay that ordinarily applies when a patent owner brings a timely suit in response to a follow-on applicant's Paragraph IV certification. The patent owner's "30-month stay is independent of whether its patent claims ... turn out to succeed," as the very "point of the 30-month stay is to 'allow[] the patent holder to assert its patent rights before the generic competitor is permitted to enter the market.'" *Endo*, 2024 WL 2988904, at *7 (quoting *Mylan Pharms., Inc. v. Sebelius*, 856 F. Supp. 2d 196, 201 (D.D.C. 2012)).

But following the 2003 MMA amendments, FDA policy on when and how 505(b)(2) applicants may amend pending applications plays a critical role in ensuring the automatic-stay process operates as intended. If a 505(b)(2) applicant is permitted to expand its requested approval by filing an amendment—rather than submitting a new application—it can avoid triggering the 30-month stay on any newly issued patent. FDA itself has recognized this framework creates a potential "incentive for a 505(b)(2) ... applicant to seek approval for a change to drug ... through an amendment" in order to "evade the possibility of a 30-month stay of approval that otherwise would have applied." 80 Fed. Reg. at 6851.

In some cases, permitting an amendment that avoids a stay may be appropriate. After all, Congress amended the automatic-stay rules so that new patents on minor changes to a drug product that did not reflect "a different or improved use" would not trigger second a 30-month stay. 148 Cong. Rec. S6844 (daily ed. July 16, 2002) (statement of Sen. Collins). For example, if, after a 505(b)(2) application was filed, a patent owner obtains and timely lists a new patent on the

product's packaging, the 505(b)(2) applicant might need to submit a new patent certification, but a paragraph IV certification would not result in an automatic stay; the patent would postdate the original application, insulating any amendment to address the packaging issue from a new stay. *See* 21 U.S.C. § 355(c)(3)(C). By contrast, there are also instances in which permitting an amendment would circumvent Congress's intended policy. In particular, when Congress enacted the MMA, 505(b)(2) applicants could not avoid triggering a stay with a paragraph IV certification on a new patent claiming a new use of a drug product. That is a more significant innovation, which is reflected by the fact that FDA policies in place then did not allow 505(b)(2) applicants to add new indications via amendment. *See* pp. 10-12, *supra*. And Congress made clear that it was building upon that status quo, as it "intend[ed] [the MMA] to reflect the FDA's current practice regarding those changes and variations to both innovator and generic drugs that may be approved under amendments and supplements to previously filed NDAs and ANDAs." *Id.*

FDA's ad hoc decision to carve out an exception to the Bundling Rule's general bar on new indications via amendment fails to adequately consider this legal backdrop. Instead, much of its decision is devoted to arguing that it had discretion to adopt an exception—a distinct question from whether the exception is reasonable and adequately explained.

In its Bundling Decision, FDA observes that the MMA prohibits applicants from amending or supplementing a 505(b)(2) application to seek approval of a "different drug," 21 U.S.C. § 355(b)(4)(A), and it then notes that the agency, by regulation, "did not define 'different drug' to include a request for approval of a new indication." FDA-000180 (citing 21 C.F.R. §§ 314.60(e), 314.70(h)). FDA then leaps to infer that because (in its view) neither the statute nor agency regulations specifically bar amendments for new indications, it would "chang[e] the legislative balance rather than preserv[e] it" for FDA policy to preclude such amendments. FDA-000182.

30

That reasoning is backwards. In dictating rules for amendments, Congress specified that applicants should be allowed to "amend[] or supplement[]" an application "to seek approval of a different strength" for a drug product. 21 U.S.C. § 355(b)(4)(B). Conspicuously, no such allowance is provided for new indications, signaling that Congress preserved the status quo in which such amendments were not allowed. *See Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018) ("The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)." (quoting A. Scalia & B. Garner, *Reading Law* 107 (2012)).

But even assuming neither the statute nor agency regulations *preclude* FDA from creating an exception to the Bundling Rule to allow certain amendments adding new indications, the decision alters the status quo with significant implications for patent rights. Yet FDA skipped over this key issue. After concluding its departure was not barred by statute or regulation, FDA justified its previously undisclosed exception to the Bundling Rule based *exclusively* on questions of administrative convenience and "user fee implications." FDA-000184. Thus, even though FDA has previously recognized that the permissibility of certain categories of amendments is properly informed by the impact of allowing the amendment on patent rights and the question whether an "opportunity for 30-month stay would be appropriate," 80 Fed. Reg. at 6851, FDA disregarded that issue here.[12] In particular, FDA never explained why a 505(b)(2) application that omits any new clinical information in support of a new indication should be allowed to avoid a 30-month stay, whereas an application that includes some of its own clinical information cannot. Nor is it

---

[12] FDA did assert (in cursory fashion) that it doubted whether any innovator "has a cognizable interest" in FDA adhering to the Bundling Rule, and that any such interest was "outweighed" by other considerations. FDA-000184. As discussed below, this brief discussion of reliance interests was itself inadequate. *See* Part I.C, *infra*. Regardless, reliance aside, this passing reference is non-responsive to the point that FDA failed to address the impact of changing its policies on the effective operation of the Hatch-Waxman litigation process, as envisioned by Congress.

clear how FDA could justify such treatment—if anything, instances where the 505(b)(2) application is *completely* piggybacking on the innovator's data are *more* likely to implicate patents on a significant new innovation. But regardless of what explanation FDA might theoretically provide, its failure "to consider an important aspect of the problem" in the Bundling Decision (or anywhere else in the administrative record) renders its decision arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

It is no answer that FDA displayed some general awareness of the impact its unwritten exception to the Bundling Rule will have on an innovator's statutory right to an automatic stay. *E.g.*, FDA-000184. "[A]wareness is not itself an explanation." *Ohio v. EPA*, 603 U.S. 279, 295 (2024). FDA created an exception on the theory that some of the Bundling Rule's animating rationales were not implicated by Liquidia's 505(b)(2) amendment, without meaningfully addressing the pivotal role the Bundling Rule now plays in protecting patent rights or considering whether that purpose counsels against an exception grounded in administrative convenience. *See* FDA-000184.

FDA's brief reference to the Bundling Rule's treatment of supplements (rather than amendments) does not fill the gap. *See* FDA-000182. FDA seems to imply that because applicants are allowed to pursue new indications by supplement—which sometimes may also allow them to avoid an automatic stay—the Bundling Rule's restrictions on amendments is not connected to the protection of patent rights. But as this case illustrates, the distinction between a right to supplement an application and amendment can be significant, with the amendment route typically providing a more accelerated path for a follow-on applicant to expand its approval since it allows applicants to stack requests together without waiting for FDA to finally approve the initial application (following expiry of any applicable regulatory exclusivities). *See* 21 C.F.R. § 314.70 (explaining

that a supplement allows only certain changes to an "approved NDA"). It is thus unremarkable that there would be tighter restrictions on a 505(b)(2) applicant's ability to amend versus supplement. Indeed, in other contexts, FDA regulations impose certain patent-certification rules only for amendments, not supplements. *See* 21 C.F.R. § 314.96(d)(1). In any event, the divergence between FDA's rules for amendments and supplements is longstanding, and Congress legislated against the backdrop of stricter rules for amendments when it enacted the 2003 MMA. *See* pp. 10-12, *supra*. It is thus nonresponsive for FDA to point to its long-established policy on supplements as an explanation for "depart[ing]" from its equally long-established policy for amendments. FDA-000162.[13]

### C. FDA failed to meaningfully consider the reliance interests of innovators like UTC in faithful application of the Bundling Rule.

Even when an agency has discretion to change course, it must consider the fact that its "'longstanding policies may have engendered serious reliance interests that must be taken into account,' as failure to do so renders the new rule arbitrary and capricious." *Int'l Org. of Masters, Mates & Pilots v. NLRB*, 61 F.4th 169, 179 (D.C. Cir. 2023) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020)); *see also Endo*, 2024 WL 2988904, at *6 ("[A] change of policy must also consider the alternatives that are within the ambit of the existing policy and must address whether there was legitimate reliance on the old policy." (quotation marks and citation omitted)). Agencies are subject to this obligation regardless of whether a policy purported to disclaim conferral of "substantive rights." *Regents*, 591 U.S. at 31.

---

[13] FDA's reference to ANDAs (FDA-000181) is likewise a *non-sequitur*. FDA has recognized that the Bundling Rule requires treating 505(b)(2) applications and ANDAs differently in the patent context, *see* 80 Fed. Reg. at 6851, and FDA did not justify its decision to depart from the Bundling Rule as based on any desire to harmonize treatment of ANDAs and 505(b)(2) applications.

The agency fell short here.  Rather than seriously engage with reliance interests fostered by a written policy that has been in place for decades and repeatedly reaffirmed, FDA disparaged the "potential reliance interests of innovators" like UTC as "doubtful and at most limited."  FDA-000184 & n.105.  It then asserted in conclusory fashion that "any such interest" is "outweighed by" the agency's "reasons for changing position."  FDA-000184.  But none of FDA's passing reasons for discounting the reliance interests of innovators withstand scrutiny.

First, FDA "not[ed] that Congress made separate provision to protect innovators' intellectual property rights when it enacted the Hatch-Waxman, and the MMA, and these protections do not preclude" Liquidia's amendment.  FDA-000184.  That argument misses the point twice over.  The issue is not whether FDA's decision is "preclude[d]" by statute—agencies must account for reliance interests *precisely when* the statutory framework provides them with "flexibility."  *Regents*, 591 U.S. at 32.  More fundamentally, the notion that the Bundling Rule is "separate" from the statutory protections provided for innovators' patent rights, FDA-000184, ignores the way the Bundling Rule interacts with those protections.  If FDA had applied the Bundling Rule here rather than applying a secret exception, Liquidia would have had to file a new NDA for the PH-ILD indication while its original application is still pending, which would have provided UTC with an opportunity to secure an automatic stay.  *E.g.*, UTC Crossclaim ¶ 13.  And while FDA "note[d]" that NDA holders may still pursue patent litigation and "seek injunctive relief" when a 505(b)(2) applicant bypasses an automatic stay by filing an amendment, FDA-000182 n.101, that is no substitute for the statutory protection.  As this Court recognized, the statutory "entitlement to a 30-month stay is independent" of whether the patent claims ultimately succeed, since "the point" of the protection is to provide the innovator with a chance to vindicate

its patent rights "before" the follow-on product enters the market. *Endo*, 2024 WL 2988904, at *7 (quotation marks omitted).[14]

Second, FDA argued that innovators lacked a reliance interest in FDA's longstanding policy because the Bundling Rule was articulated in "guidance" that "was not binding," and the agency had advised that there might be exceptions to the general bar on indication-adding amendments. FDA-000184 n.105. But that attempt to explain away reliance is likewise misguided. "An agency remains obligated to weigh reliance interests against policy concerns even if the policy or practice in question was never formally implemented" in a binding regulation. *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 628 F. Supp. 3d 243, 259 (D.D.C. 2022). That is especially true where, as with FDA, an agency has a history of using guidance documents to articulate effectively binding rules. *See, e.g.*, *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 93 (D.C. Cir. 1997); *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 487-88, 497-98 (D. Md. 2019). As explained above, pp. 5-9, *supra*, FDA has long applied the Bundling Rule to applicants as a binding rule.

FDA's contention that the regulated industry was nonetheless on notice of the possibility for exceptions is baseless. As discussed, p. 12, *supra*, the *only* exception to the Bundling Rule for indication-adding amendments previously disclosed by FDA concerned switches, which by their nature are unlikely to implicate new innovator patent rights. And the purported other "occasions" that FDA "reviewed and approved amendments to 505(b)(2) applications," FDA-000184 n.105,

---

[14] FDA also again referenced the possibility that an applicant could wait until after obtaining final approval to submit a supplement for a new indication. FDA-000184 n.105. But as discussed, pp. 32-33, *supra*, a supplemental application proceeds on a different timeline than an amendment, and FDA's Bundling Rule has long distinguished between the two with respect to applications for a new indication. The existence of this alternative, often slower, path for 505(b)(2) applicants to pursue approval for new uses thus does nothing to diminish the reliance interest of innovators on FDA adhering to its longstanding policies limiting amendments.

could not possibly impact legitimate reliance interests, since none of the departures from the Bundling Rule that FDA now invokes were previously disclosed to the public, much less explained.  Once again, the public is entitled to take an agency at its word when the agency represents that its written directions reflect its "current thinking."  FDA-000971

Finally, FDA asserted that its Bundling Rule was "issued to provide FDA's policies for implementing the PDUFA, and to allow FDA to carry out an orderly review process aligned with its negotiated commitments under the statute."  FDA-000184 n.105.  But as discussed, pp. 29-30, *supra*, that characterization ignores the additional role the Bundling Rule now plays after the MMA's enactment in policing whether 505(b)(2) applicants should be allowed to seek expanded approvals without triggering an automatic stay.  The connection is no accident:  Congress built the MMA provisions on its understanding that FDA's practices "regarding acceptance of … amendments" would carry forward undisturbed.  H.R. Rep. No. 108-391, at 835 (2003).

Once FDA's improper grounds for minimizing UTC's reliance interests are stripped away, all that remains is its unreasoned one-sentence assertion that any "limited" reliance interests are "outweighed" by the agency's "reasons for changing position."  FDA-000184.  This boilerplate assertion is plainly inadequate.  An agency's burden to "address why the policy shift outweighs the alleged reliance interests" "is not satisfied by a one-sentence acknowledgement."  *CSL Plasma*, 628 F. Supp. 3d at 261.  For this reason, too, the Bundling Decision is arbitrary and capricious.

## II.    This Court should vacate FDA's decision accepting the PH-ILD amendment for review.

Because FDA's decision to accept Liquidia's PH-ILD amendment for review was arbitrary and capricious, this Court should "set aside [the] agency action."  5 U.S.C. § 706(2).  FDA's decision was unsupported, and "[u]nsupported agency action normally warrants vacatur."  *NAACP v. Trump*, 298 F. Supp. 3d 209, 244 (D.D.C. 2018) (citation omitted).  There is no basis for an

exception to that default remedy here.  FDA's decision to accept Liquidia's amendment contains "serious" "flaws" that cannot readily be cured.  *Ctr. for Biol. Diversity v. Regan*, 734 F. Supp. 3d 1, 62 (D.D.C. 2024).

Moreover, vacating FDA's unlawful decision would not have "disruptive consequences." *Id.*  To the contrary, vacatur would preserve the status quo by preventing the premature final approval of Liquidia's NDA in contravention of UTC's statutory right to a 30-month stay, which would have been triggered by the filing of a new 505(b)(2) application for PH-ILD in compliance with the Bundling Rule.   As this Court has recognized, "the loss of [the] statutory entitlement to the 30-month stay," and the resulting economic injuries, qualify as "irreparable" harm because "it cannot be recaptured later."  *Endo*, 2024 WL 2988904, at *7.  And although FDA and Liquidia have speculated about possible alternative pathways for Liquidia to pursue if the Bundling Rule were properly enforced, FDA Mot. to Dismiss, ECF No. 71-1 at 12; Liquidia Mot. to Dismiss, ECF No. 69-1, at 17-18, such speculation is irrelevant to the issues before this Court.

## CONCLUSION

For the reasons stated above, this Court should grant UTC's motion for summary judgment and vacate FDA's decision accepting Liquidia's PH-ILD amendment for review.

January 17, 2025

Shaun R. Snader (D.C. Bar No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

Douglas Carsten (admitted *pro hac vice*)
Art Dykhuis (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

Adam W. Burrowbridge (D.C. Bar No.
  1001783)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

Respectfully submitted.

 /s/ *Brian T. Burgess*
William C. Jackson (D.C. Bar. No. 475200)
William M. Jay (D.C. Bar. No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20001
(202) 346-4000

Kurt R. Karst (D.C. Bar No. 482615)
Michael D. Shumsky (D.C. Bar No. 495078)
Sara Wexler Koblitz (D.C. Bar No. 1017284)
HYMAN, PHELPS & MCNAMARA, P.C.
700 13th Street, NW, Suite 1200
Washington, DC 20005
(202) 737-5600

*Counsel for United Therapeutics Corporation*