**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LIQUIDIA TECHNOLOGIES, INC., | |
| *Plaintiff*, | |
| v. | |
| UNITED STATES FOOD AND DRUG ADMINISTRATION, ROBERT M. CALIFF, M.D., in his official capacity as COMMISSIONER OF FOOD AND DRUGS, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, XAVIER BECERRA, in his official capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, | **PUBLIC/UNREDACTED** <br><br> No. 1:24-cv-2428-TJK <br><br> **HEARING REQUESTED** |
| *Defendants*, and | |
| UNITED THERAPEUTICS CORP., | |
| *Intervenor-Defendant and Cross-Claimant.* | |

**UTC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

Shaun R. Snader (D.C. Bar No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

Douglas Carsten (admitted *pro hac vice*)
Art Dykhuis (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

Adam W. Burrowbridge (D.C. Bar No. 1001783)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

William C. Jackson (D.C. Bar No. 475200)
William M. Jay (D.C. Bar No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20001
(202) 346-4000

Kurt R. Karst (D.C. Bar No. 482615)
Michael D. Shumsky (D.C. Bar No. 495078)
Sara Wexler Koblitz (D.C. Bar No. 1017284)
HYMAN, PHELPS & MCNAMARA, P.C.
700 13th Street, NW, Suite 1200
Washington, DC 20005
(202) 737-5600

*Counsel for United Therapeutics Corporation*
April 17, 2025

# TABLE OF CONTENTS

Introduction ................................................................................................................... 1

    I.     Statutory and Regulatory Framework ................................................... 3

          A.    The FDCA, the Hatch-Waxman Act, and PDUFA ................................... 3

          B.    Patent disputes under the Hatch-Waxman Act ........................................ 4

          C.    FDA's Bundling Rule ............................................................................... 5

          D.    The Medicare Modernization Act ............................................................ 8

    II.    Factual Background ............................................................................ 10

          A.    UTC develops novel treatments for pulmonary hypertension. ............... 10

          B.    Liquidia applies to market a follow-on treprostinil product, leading to patent litigation. .................................................................................. 11

          C.    Liquidia submits an amendment to add the PH-ILD indication, after telling FDA it would wait until after final approval of its original application. .................................................................................. 12

          D.    UTC challenges FDA's acceptance of Liquidia's improperly bundled application. .................................................................................. 13

          E.    FDA reaffirms its decision to accept Liquidia's amendment and to depart from the Bundling Rule. .............................................................. 15

          F.    Liquidia brings this action, and UTC files a crossclaim. ......................... 17

Argument ....................................................................................................................... 18

    I.    UTC is likely to succeed on the merits. ............................................. 19

          A.    This Court has jurisdiction to grant relief. ............................................. 20

          B.    UTC is likely to prevail on the merits of its APA claims. ........................ 22

               1.    The Bundling Rule prohibits adding indications through amendments, and FDA's acceptance of Liquidia's amendment violated that rule. ....................................................... 22

               2.    FDA's newly announced exception to the Bundling Rule fails to address an important aspect of the Bundling Rule's historic purpose. ........................................................................... 27

3.      FDA failed to meaningfully consider the reliance interests of innovators like UTC in faithful application of the Bundling Rule. ............................................................... 32

II.     UTC will suffer irreparable harm if the Court does not grant immediate injunctive relief. ...........................................................................................35

A.      UTC will suffer an irreparable injury to a statutory right if FDA's unlawful conduct is not enjoined. ............................................................ 36

B.      UTC will face irreparable economic harm if Liquidia is allowed to enter the market ...................................................................................... 37

III.    The balance of harms and public interest strongly favor entry of an injunction. ...........................................................................................................40

IV.     This Court should enter relief now to protect UTC's rights. ................................42

Conclusion ...........................................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Air Transp. Ass'n of Can. v. FAA*,
  323 F.3d 1093 (D.C. Cir. 2003) ........................................................................... 19

*Am. Acad. of Pediatrics v. FDA*,
  379 F. Supp. 3d 461 (D. Md. 2019) ...................................................................... 34

*Am. Petrol. Inst. v. EPA*,
  683 F.3d 382 (D.C. Cir. 2012) .............................................................................. 21

*Apotex Inc. v. FDA*,
  508 F. Supp. 2d 78 (D.D.C. 2007) ........................................................................ 41

*Apotex, Inc. v. FDA*,
  2006 WL 1030151 (D.D.C. Apr. 19, 2006), *aff'd*, 449 F.3d 1249 (D.C. Cir.
  2006) ..................................................................................................................... 36

*Appalachian Power v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) ....................................................................... 23, 24

*AstraZeneca Pharms. LP v. Burwell*,
  197 F. Supp. 3d 53 (D.D.C. 2016) ........................................................................ 42

*\*Bayer HealthCare, LLC v. FDA*,
  942 F. Supp. 2d 17 (D.D.C. 2013) .................................................................. 38, 40

*Bristol-Myers Squibb Co. v. Royce Labs., Inc.*,
  69 F.3d 1130 (Fed. Cir. 1995) ......................................................................... 28, 36

*Collagenex Pharms., Inc. v. Thompson*,
  2003 WL 21697344 (D.D.C. July 22, 2003), *as amended* (Aug. 26, 2003) ......... 39, 41, 42

*CSL Plasma Inc. v. U.S. Customs & Border Prot.*,
  628 F. Supp. 3d 243 (D.D.C. 2022) ............................................................... 34, 35

*D.A.M. v. Barr*,
  474 F. Supp. 3d 45 (D.D.C. 2020) ........................................................................ 19

*DHS v. Regents of Univ. of Cal.*,
  591 U.S. 1 (2020) ............................................................................................ 32, 33

*Eagle Broad. Grp. v. FCC*,
  563 F.3d 543 (D.C. Cir. 2009) .............................................................................. 19

*Eli Lilly & Co. v. Medtronic, Inc.*,
  496 U.S. 661 (1990)............................................................................................36

*Eli Lilly & Co. v. Teva Pharms. USA, Inc.*,
  557 F.3d 1346 (Fed. Cir. 2009)..........................................................................5

*Endo Par Innovation Co. v. Becerra*,
  No. 24-cv-999-TJK, 2024 WL 2988904 (D.D.C. June 10, 2024)
  ..............................................................2, 3, 20, 22, 28, 32, 33, 37, 38, 39

*FDA v. Wages & White Lion Invs., L.L.C.*,
  __ S. Ct. __, 2025 WL 978101 (Apr. 2, 2025) ....................................................34

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015)............................................................................20

*Gen. Elec. v. EPA*,
  290 F.3d 377 (D.C. Cir. 2002)..................................................................23, 24, 26

*Gonzalez Boisson v. Pompeo*,
  459 F. Supp. 3d 7 (D.D.C. 2020)..................................................................21, 22

*Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016)............................................................................41

*Hi-Tech Pharmacal Co. v. FDA*,
  587 F. Supp. 2d 1 (D.D.C. 2008)..................................................................40, 43

*Int'l Org. of Masters v. NLRB*,
  61 F.4th 169 (D.C. Cir. 2023)............................................................................32

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018)............................................................................................30

*Jibril v. Mayorkas*,
  20 F.4th 804 (D.C. Cir. 2021)............................................................................20

*Ky. Mun. Energy Agency v. FERC*,
  45 F.4th 162 (D.C. Cir. 2022)............................................................................27

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)................................................................................41

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983)..............................................................................................31

*Mova Pharm. Corp. v. Shalala*,
  140 F.3d 1060 (D.C. Cir. 1998)....................................................................19, 36

*Mylan Labs., Inc. v. Leavitt*,
    484 F. Supp. 2d 109 (D.D.C. 2007) ...................................................................41

*Mylan Labs. Ltd. v. FDA*,
    910 F. Supp. 2d 299 (D.D.C. 2012) ...................................................................36

*Mylan Pharms., Inc. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000) .......................................................................36

*Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ...........................................................................19

*Ohio v. EPA*,
    603 U.S. 279 (2024) ...........................................................................................31

*Quantum Ent't, Ltd. v. U.S. Dep't of Interior*,
    597 F. Supp. 2d 146 (D.D.C. 2009) ...................................................................27

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011) .........................................................................38

*Sandoz Inc. v. Becerra*,
    2022 WL 2904262 (D.D.C. July 22, 2022) .......................................................21

*Sanofi-Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006) .........................................................................41

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) .............................................................................34

*Teva Pharms. USA, Inc. v. Sebelius*,
    595 F.3d 1303 (D.C. Cir. 2010) .....................................................................5, 42

*Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*,
    887 F.3d 1117 (Fed. Cir. 2018) ...........................................................................9

*Veloxis Pharms., Inc. v. FDA*,
    109 F. Supp. 3d 104 (D.D.C. 2015) .....................................................................3

*Xiaomi Corp. v. Dep't of Def.*,
    2021 WL 950144 (D.D.C. Mar. 21, 2021) ........................................................38

**Statutes:**

5 U.S.C. § 706(2)(A) ...............................................................................................19

21 U.S.C. § 355 .........................................................................................................3

21 U.S.C. § 355(a) .....................................................................................................3

21 U.S.C. § 355(b)(1) ....................................................................................................3

21 U.S.C. § 355(b)(1)(A)(viii) ......................................................................................4

21 U.S.C. § 355(b)(2)(A)(iv) ........................................................................................5

21 U.S.C. § 355(b)(4)(A) ........................................................................................9, 29

21 U.S.C. § 355(b)(4)(B) ........................................................................................9, 30

21 U.S.C. § 355(c)(2) .....................................................................................................4

21 U.S.C. § 355(c)(3) .....................................................................................................5

*21 U.S.C. § 355(c)(3)(C) .....................................................................................5, 8, 29

21 U.S.C. § 355(d)(2) .....................................................................................................3

21 U.S.C. § 355(j)(7)(A)(i) ............................................................................................4

21 U.S.C. § 379g *et seq.* ...............................................................................................4

21 U.S.C. § 379h(a)(1)(A) .............................................................................................4

35 U.S.C. § 271(e)(2)(A) ...............................................................................................5

Drug Price Competition and Patent Term Restoration Act (Hatch-Waxman Act),
   Pub. L. No. 98-417, 98 Stat. 1585 (1984) ..............................................................3

*Medicare Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066 (2003) .................8

Prescription Drug User Fee Act (PDUFA), Pub. L. 102-571, 106 Stat. 4491
   (1992) ........................................................................................................................4

**Regulations and Rulemakings:**

21 C.F.R. § 314.50(i)(1)(i)(A)(4) ................................................................................5

21 C.F.R. § 314.50(h) ....................................................................................................4

21 C.F.R. § 314.53(d) ....................................................................................................4

21 C.F.R. § 314.60(e) ..................................................................................................29

21 C.F.R. § 314.70 ........................................................................................................31

21 C.F.R. § 314.70(h) ..................................................................................................29

21 C.F.R. § 314.96(d)(1) ..............................................................................................32

42 C.F.R. § 413.234(e)(7)(i)(A) ................................................................................ 24

Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg.
69,580 (Oct. 6, 2016) ..................................................................................... 6, 10

**Legislative History:**

148 Cong. Rec. S6844 (daily ed. July 16, 2002) ............................................. 9, 25, 29

H.R. Rep. No. 108-391 (2003) ..................................................................... 8, 9, 25, 35

**Other Authorities:**

*Examining Issues Related to Competition in the Pharmaceutical Marketplace: A
Review of the FTC Report, Generic Drug Entry Prior to Patent Expiration:
Hearing Before the Subcomm. on Health of the H. Comm. on Energy & Com.*,
107th Cong. 49 (2002) ......................................................................................... 26

FDA, Approval Package, Administrative & Correspondence Documents, NDA
208780 (May 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/
2017/208780Orig1s000AdminCorres.pdf ............................................................. 8

FDA, Approval Package, Administrative & Correspondence Documents, NDA
209400 (May 2017), https://www.accessdata.fda.gov/drugsatfda_docs/nda/
2017/210709Orig1s000AdminCorres.pdf ............................................................. 8

FDA, Approval Package, Administrative & Correspondence Documents, NDA
209400 (Nov. 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/
2017/209400Orig1s000AdminCorres.pdf ............................................................. 8

FDA, Approval Package, Proprietary Name Review(s), Application Nos. 761285
& 761331 (Sept. 22, 2023),
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2024/761285Orig1s000,
761331Origs000NameR.pdf .................................................................................. 7

FDA PDUFA Reauthorization Performance Goals and Procedures Fiscal Years
2023 Through 2027,
https://www.fda.gov/media/151712/download?attachment ..................................... 4

FDA, Proposed Rule, Abbreviated New Drug Applications and 505(b)(2)
Applications, 80 Fed. Reg. 6802 (Feb. 6, 2015) ..................... 8, 9, 24, 25, 28, 30, 32

Notice, Draft Guidance for Industry on Separate Marketing Applications and
Definition of Clinical Data for Purposes of Assessing User Fees; Availability,
66 Fed. Reg. 11175 (Feb. 13, 2001), *available at*
https://www.govinfo.gov/content/pkg/FR-2001-02-22/pdf/01-4311.pdf ................ 6

# GLOSSARY

ANDA ..................................................abbreviated new drug application

APA....................................................Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*

Cross-claim ........................................United Therapeutics Corporation's Cross-Claims Against Food and Drug Administration, Robert M. Califf, M.D., in his official capacity as Commissioner of FDA; the United States Department of Health and Human Services ("HHS"); and Xavier Becerra, in his official capacity as Secretary of HHS (ECF No. 30)

FDA....................................................Food and Drug Administration

FDCA.................................................Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq.

Liquidia ..............................................Liquidia Technologies, Inc.

MMA..................................................Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003)

NDA...................................................new drug application

PAH....................................................pulmonary arterial hypertension

PH ......................................................pulmonary hypertension

PH-ILD ..............................................pulmonary hypertension associated with interstitial lung disease

UTC....................................................United Therapeutics Corporation

## INTRODUCTION

UTC files this motion for preliminary injunctive relief on its crossclaim that FDA acted arbitrarily and capriciously in accepting Liquidia's amended application to market a follow-on treprostinil product in violation of the agency's longstanding "Bundling Rule." If FDA had applied its Bundling Rule, Liquidia would not have been allowed to amend its pending drug application to seek approval for a new use of treprostinil (the PH-ILD indication). Instead, Liquidia would have needed to pursue such approval in a new standalone application, and the patent certifications included in that application would have triggered UTC's statutory right to a 30-month stay of approval, allowing UTC to vindicate its patent claims before a market-altering launch of a follow-on treprostinil product. But because FDA jettisoned its long-established policy, Liquidia was allowed to bypass the 30-month stay even as Liquidia's amendment required it to submit new "paragraph IV" certifications challenging UTC's patents for the PH-ILD indication. FDA's action eviscerates UTC's rights and unlawfully accelerates Liquidia's approval.

UTC recognizes that Defendants' motions to dismiss UTC's crossclaims are under review, and UTC does not seek emergency relief at this stage lightly. But as UTC has explained throughout this litigation, it will suffer immediate irreparable harm if FDA grants final approval to Liquidia's application. Absent action by the Court, that date is now just 5 weeks away. UTC's three-year exclusivity (upheld by this Court) will expire on May 23, 2025. FDA has already granted tentative approval to Liquidia's application, confirming the agency's view that it meets all the requirements for approval and can be finally approved as of May 23. Following FDA's guidance, Liquidia recently resubmitted its application in order to convert its tentative approval to final on that date, and the agency has already set Liquidia's user fee goal date as May 24, 2025. *See* ECF No. 97-1 at 2. Liquidia has also repeatedly announced plans to launch its product *immediately* upon FDA approval. Indeed, Liquidia has represented to this Court that it will "launch[] distribution of

Yutrepia to patients nationwide within days of FDA's decision."  Liquidia Compl. ¶ 20.

Time is thus of the essence, and, as set forth below, all the relevant factors support granting preliminary injunctive relief to UTC.  First, UTC is likely to succeed in its claim that FDA's final decision to "depart" from longstanding policy by accepting Liquidia's application in violation of the Bundling Rule, FDA-000162, is subject to review by this Court and is arbitrary and capricious. Second, UTC faces irreparable harm from the imminent final approval of Liquidia's follow-on treprostinil product in violation of the Administrative Procedure Act and in derogation of UTC's statutory rights.  Third, the balance of hardships and the public interest all weigh in favor of maintaining the status quo while this litigation moves forward rather than allowing FDA's unlawful action to permanently disrupt the market.

Just one year ago, this Court granted a preliminary injunction in closely analogous circumstances. *See Endo Par Innovation Co. v. Becerra*, No. 24-cv-999-TJK, 2024 WL 2988904 (D.D.C. June 10, 2024).  As in this case, FDA reached a decision there that contradicted long-established agency policy, the result of which was to allow a 505(b)(2) applicant to bypass the automatic 30-month stay.  The Court granted the innovator's motion for preliminary injunction, concluding that FDA had failed to adequately justify its sudden shift.  *See id.* at *5-6.  And the Court held that the innovator would be irreparably harmed absent emergency relief, notwithstanding its ability to pursue patent litigation.  As the Court explained, "the loss of [a] statutory entitlement to the 30-month stay" represents harm that "is unrecoverable because it cannot be recaptured later."  *Id.* at *7.  And patent litigation is not a viable alternative, the Court explained, because the innovator's "entitlement to a 30-month stay is independent of whether its patent claims … turn out to succeed"—"[i]ndeed, the point of the 30-month stay is to allow the patent holder to assert its patent rights before the generic competitor is permitted to enter the

market." *Id.* (citation, quotation marks, and brackets omitted).  In addition, the Court recognized that harm from "irreversible price erosion" and the loss of good will resulting from the launch of a 505(b)(2) follow-on product also qualify as irreparable.  *Id.* at *7-8.

The same considerations that drove the decision in *Endo Par* apply here and support preliminary injunctive relief, which must come before May 23, 2025, to be meaningful.  At a minimum, this Court should take action to ensure that UTC has a full and fair opportunity to seek emergency relief before FDA grants final approval to Liquidia's application and Liquidia launches its product, as Judge Bates did when UTC first filed suit against FDA.  *See* pp. 42-43, *infra*.

## I.    Statutory and Regulatory Framework

### A.    The FDCA, the Hatch-Waxman Act, and PDUFA

Before marketing a drug, an applicant must first demonstrate to FDA's satisfaction that the product is effective and safe for its intended use.  *See* 21 U.S.C. § 355(a), (d)(2).  To do so, the applicant must submit either an NDA under section 505(b)(1) of the FDCA, 21 U.S.C. § 355(b)(1),[1] or one of the more streamlined applications (ANDAs or section 505(b)(2) applications) created by the Drug Price Competition and Patent Term Restoration Act (Hatch-Waxman Act), Pub. L. No. 98-417, 98 Stat. 1585 (1984).  The choice depends on whether (and to what extent) the applicant relies on other sponsors' previous FDA approvals and their studies.  As relevant here, a 505(b)(2) application allows an applicant to rely on the innovator's data, as well as its own studies and the published literature, to obtain approval for a follow-on new drug.  *Veloxis Pharms., Inc. v. FDA*, 109 F. Supp. 3d 104, 108-09 (D.D.C. 2015).

FDA requires applicants submitting certain human drug applications to pay user fees under

---

[1] Section 505 of the FDCA is codified at 21 U.S.C. § 355.  This memorandum refers to provisions of the session law in text and provisions of the U.S. Code in citations.

the Prescription Drug User Fee Act (PDUFA).  *See* Pub. L. 102-571, 106 Stat. 4491 (1992), codified at 21 U.S.C. § 379g *et seq.*  PDUFA provides human drug applications "shall be subject to a fee," including the fee "established … for a human drug application for which clinical data (other than bioavailability or bioequivalence studies) with respect to safety or effectiveness are required for approval" or the fee established for a human drug application for which these data "are not required for approval."  *Id.* § 379h(a)(1)(A).  As part of its PDUFA obligations, FDA sets performance goals in a "commitment letter," which lays out its intended timeline for acting on NDAs.  *See* FDA, PDUFA Reauthorization Performance Goals & Procedures Fiscal Years 2023 Through 2027 at 4-6, https://www.fda.gov/media/151712/download?attachment.

### B.    Patent disputes under the Hatch-Waxman Act

Many innovative drug products that improve the lives of patients also are the type of novel and valuable inventions that earn a patent.  To balance expediting the entry of follow-on products and respecting innovators' patent rights, the Hatch-Waxman Act creates a carefully calibrated process for identifying and resolving patent disputes between brand-name manufacturers on the one hand and companies seeking to market follow-on products on the other.

The Hatch-Waxman statutory framework promotes the orderly resolution of patent disputes *before* a follow-on product from an ANDA or section 505(b)(2) application enters the market.  Innovative manufacturers submit to FDA information on each patent that covers the brand drug or a method of using it.  21 U.S.C. § 355(b)(1)(A)(viii); 21 C.F.R. § 314.50(h).  The brand manufacturer must also submit timely updates to FDA of any such newly issued patents.  21 U.S.C. § 355(c)(2); 21 C.F.R. § 314.53(d).  FDA lists all such patents in a compendium called *Approved Drug Products with Therapeutic Equivalence Evaluations*, or the "Orange Book."  21 U.S.C. § 355(c)(2), (j)(7)(A)(i).  As discussed further below, litigation over Orange Book patents usually takes place under the protection of a 30-month stay of FDA approval for a generic or 505(b)(2)

drug, before the follow-on manufacturer has come to market.

When seeking approval, section 505(b)(2) applicants must include in their applications a certification regarding all Orange Book-listed patents. Several types of certifications exist; relevant here is the "paragraph IV" certification. If there are any patents listed in the Orange Book for a brand drug, and if the section 505(b)(2) applicant wants to market its product before the expiration of those patents, a "paragraph IV" certification allows it to represent that, in its view, the patents are invalid or unenforceable or will not be infringed by the proposed follow-on drug. 21 U.S.C. § 355(b)(2)(A)(iv); 21 C.F.R. § 314.50(i)(1)(i)(A)(4).

Submitting a paragraph IV certification "comes with a risk" because it is a technical act of patent infringement that allows the patent owner to sue immediately—*i.e.*, before the follow-on product has been approved and marketed. *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1305 (D.C. Cir. 2010); 35 U.S.C. § 271(e)(2)(A). If the innovator files suit within 45 days of receiving notice of the paragraph IV certification, it enjoys an automatic stay of FDA's ability to approve the 505(b)(2) application for up to 30 months. 21 U.S.C. § 355(c)(3)(C). This stay allows patent disputes to be litigated in an orderly manner before approval and market entry of the follow-on product. *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 557 F.3d 1346, 1348-49 (Fed. Cir. 2009). This automatic 30-month stay is available only for patents submitted to FDA before the relevant original 505(b)(2) application was submitted to the agency. *See* 21 U.S.C. § 355(c)(3).

### C.    FDA's Bundling Rule

For more than three decades, FDA's "Bundling Rule" has provided that an applicant may not add a new indication to a pending application via an amendment. Instead, FDA has long maintained that efforts to seek new indications, together with several other types of requests, require entirely new applications.

In its 1993 articulation of the rule, FDA explained to applicants "what should be contained

in separate marketing applications and what should be combined into one application." FDA-000936. FDA stated that certain proposed additions or alternatives were not proper subjects for amendment, but rather could be sought only in a new application. As most relevant here, the 1993 Bundling Rule directed that "[a]fter initial submission, a pending original or supplemental application should not be amended to add a new indication." FDA-000940. Instead, "[i]f the original application is not yet approved, a request for approval of other indications or claims" should "be submitted in a separate, original application." *Id.* Notably, this proscription was in addition to the Bundling Rule's directive that "[n]ew clinical or *in vitro* data to support a new claim(s) should not be submitted to an already submitted original application during the review of that application." *Id.* FDA stated, however, that "in rare instances," supplementary clinical data could be provided to support "[p]reviously submitted indications or claims." *Id.*

FDA has carried forward the Bundling Rule throughout the years with only minor changes, immaterial here, with FDA providing notice to the public of revisions and providing an opportunity for written comments. *See* Notice, Draft Guidance for Industry on Separate Marketing Applications & Definition of Clinical Data for Purposes of Assessing User Fees; Availability, 66 Fed. Reg. 11175, 11175-11176 (Feb. 13, 2001), https://www.govinfo.gov/content/pkg/FR-2001-02-22/pdf/01-4311.pdf. In its current form, issued by FDA in 2004, the Bundling Rule provides:

> After initial submission, a pending original or supplemental application should not be amended to add a new indication or claim. … If the original application is not yet approved, a request for approval of other new indications or claims should be submitted in a separate, original application.

FDA-000974-975.[2] The Rule has been articulated in agency regulations. *See, e.g.*, Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg. 69,580, 69,635 (Oct. 6, 2016)

---

[2] This memorandum refers to the 1993 Bundling Rule and 2004 Bundling Rule collectively as "the Bundling Rule," reflecting the fact that there are no material differences between the two versions.

(maintaining that applicant may not "amend[] or supplement[] a 505(b)(2) application to seek approval of a drug that has been modified to have a different active ingredient, different route of administration, different dosage form, or certain differences in excipients than the drug proposed in the original submission of the 505(b)(2) application"). And the guidance documents articulating the Bundling Rule are publicly available from FDA to this day, with no hint that any of the agency's rules, policies, and procedures have changed.

Over this extended period, FDA has also shown that it understood the Bundling Rule to bind both itself and applicants. For example, before FDA accepts an application (including an amendment) for substantive review, FDA staff must complete the agency's "RPM Filing Review" checklist to ensure that the submission is lawful and consistent with the statute. As relevant here, that checklist permits FDA to accept only those applications that comply with the Bundling Rule: "Has the user fee bundling policy been appropriately applied? *If no, or you are not sure, consult the User Fee Staff.*" FDA-001276. FDA also has repeatedly enforced the Bundling Rule against companies seeking to add new indications by way of an amendment.[3] Indeed, in rejecting an applicant's attempt to "resubmit [an] NDA" with a new indication, FDA emphasized that this proposed submission "does not follow" the Bundling Rule and explained that the new indication "must be submitted as a new NDA application."[4] FDA similarly referred applicants to the Bundling Rule when informing them that any amendments adding an indication "should be

---

[3] *See, e.g.*, FDA-001195-1196; FDA-000512; FDA-001286; *see also* FDA, Approval Package, Proprietary Name Review(s), Application Nos. 761285 & 761331, PDF p. 3 (Sept. 22, 2023), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2024/761285Orig1s000,761331Orig 1s000NameR.pdf (Ustekinumab Correspondence).

[4] *See, e.g.*, FDA-001195-1196.

submitted in a separate original application."[5]  Given its consistent enforcement of the Bundling Rule as a binding rule, FDA has unsurprisingly characterized its guidance as a "require[ment]." FDA, Proposed Rule, Abbreviated New Drug Applications and 505(b)(2) Applications, 80 Fed. Reg. 6802, 6851 (Feb. 6, 2015) ("Consistent with FDA's 'bundling' policy …, the applicant is *required* to submit a new 505(b)(2) application [in certain circumstances]." (emphasis added)).

### D.    The Medicare Modernization Act

In 2003, a decade after FDA established the Bundling Rule, Congress enacted the Medicare Modernization Act (MMA), Pub. L. No. 108-173, 117 Stat. 2066.  Among other things, the MMA reformed the process for the automatic 30-month stay by amending the language of section 505(c) to provide that a 30-month stay kicks in only with respect to patents listed in the Orange Book "before the date on which the [ANDA or section 505(b)(2)] application (excluding an amendment or supplement to the application) was submitted."  21 U.S.C. § 355(c)(3)(C).

In passing the MMA, Congress legislated against the backdrop of the Bundling Rule, building off its understood constraints on submitting amendments.  Congress "d[id] *not* intend [the MMA] to alter current [FDA] practice regarding acceptance of … amendments and supplements to pending and approved [applications]."  H.R. Rep. No. 108-391, at 835 (2003) (emphasis added). Instead, Congress "intend[ed] [the MMA] to reflect FDA's current practice regarding those

---

[5] FDA-000512.  FDA has also applied the Bundling Rule in various additional contexts, including sought-after changes to pending applications that are likely to implicate patent rights, such as changes to the dosage form or route of administration.  *See, e.g.*, FDA, Approval Package, Administrative & Correspondence Documents, NDA 210709, PDF p. 60 (May 2017), https:// www.accessdata.fda.gov/drugsatfda_docs/nda/2017/210709Orig1s000AdminCorres.pdf (Tekturna Correspondence); FDA, Approval Package, Administrative & Correspondence Documents, NDA 209400, PDF pp. 63-64 (Nov. 2015), https://www.accessdata.fda.gov/ drugsatfda_docs/nda/2017/209400Orig1s000AdminCorres.pdf  (Omeprazole  Correspondence); FDA, Approval Package, Administrative & Correspondence Documents, NDA 208780, PDF p. 76 (May 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/208780Orig1s000Admin Corres.pdf (Esbriet Correspondence).

changes and variations to both innovator and generic drugs that may be approved under amendments and supplements to previously filed NDAs and ANDAs." *Id.* With the Bundling Rule in place, Congress understood that the MMA would not prevent a 30-month stay in the event of a follow-on patent for significant changes reflecting "different or improved use[s] for [a] product," 148 Cong. Rec. at S6844, because the Bundling Rule would bar the addition of such "different or improved" uses by way of an amendment to an existing application. Developing a new use for a drug is exactly the type of innovation that often results in the issuance of a new patent for the method of treatment. *See, e.g., Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1133-36 (Fed. Cir. 2018) (recognizing that discoveries of applying an existing drug "to treat a particular disease" are eligible for patent protection).

Consistent with the Bundling Rule, the MMA provides that "[a]n applicant may not amend or supplement an application … to seek approval of a drug that is a different drug than the drug identified in the application as submitted to the Secretary." 21 U.S.C. § 355(b)(4)(A). Congress further echoed the Bundling Rule by making an exception for "approval of a different strength," as the MMA *permits* an applicant to submit an amendment to a pending NDA to seek approval for a different strength—the type of minor change that is unlikely to implicate the innovator's patent rights. *See* 21 U.S.C. § 355(b)(4)(B) ("[N]othing in this subsection or subsection (c)(3) prohibits an applicant from amending or supplementing the application to seek approval of a different strength."). By contrast, the MMA contains no exception allowing for the addition of a new indication by amendment—a possibility that would have contradicted the Bundling Rule and the exact type of change that *is* likely to implicate the innovator's patent rights.

In adopting regulations to implement the MMA, FDA reaffirmed that the Bundling Rule established what an applicant is "required" to do. 80 Fed. Reg. at 6851. On the specific issue here,

FDA reiterated in the preamble to its Final Rule that "[m]ost requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to the 505(b)(2) application." Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg. 69,580, 69,616 (Oct. 6, 2016). FDA identified just a single exception to that general rule (irrelevant here) where an "indication changed from prescription status to OTC use." *Id.* Such a change, which concerns only the regulatory status of a product without altering its treatment use, is not itself a patentable improvement and is therefore unlikely to implicate new patent protections connected to that change in status.

## II.    Factual Background

This case concerns a prescription drug containing treprostinil and its innovative use to treat a form of pulmonary hypertension. Treprostinil is one of several therapies approved for pulmonary arterial hypertension (PAH). In contrast, treprostinil is the only therapy ever approved to treat patients with pulmonary hypertension associated with interstitial lung disease (PH-ILD). UTC has pioneered several inventions to treat various forms of PH. For its part, Liquidia is seeking to launch a follow-on product that leverages UTC's innovations.

### A.    UTC develops novel treatments for pulmonary hypertension.

UTC has developed several treprostinil-based drug products, including, as relevant here, a nebulized inhaler (Tyvaso®) and a dry powder inhaler (Tyvaso DPI®). UTC's efforts to develop innovative treprostinil-based therapies have led to numerous UTC patents, including U.S. Patent No. 11,826,327 ('327 patent), which issued on November 28, 2023 and expires in 2042. FDA-000166; Crossclaim ¶¶ 44, 56. The '327 patent claims methods of using inhaled treprostinil to improve exercise capacity in patients with PH-ILD. *See* Crossclaim ¶ 56.

In 2009, FDA approved Tyvaso, the first inhaled treprostinil PAH therapy. *See* FDA-000163. In 2020, UTC discovered that inhaled treprostinil can improve exercise capacity in

patients with PH-ILD and, in 2021, received FDA approval for a treprostinil-based treatment for patients with PH-ILD.  *See* FDA-000163.  This first-and-only approved PH-ILD therapy follows multiple failures to use other drugs to successfully treat PH-ILD.  In 2022, FDA also approved Tyvaso DPI, the first dry powder inhaler version of treprostinil, to treat both PAH and PH-ILD. *See* ECF No. 95 at 5.

    **B.**    **Liquidia applies to market a follow-on treprostinil product, leading to patent litigation.**

When filing its initial 505(b)(2) application in 2020, Liquidia relied on UTC's approved Tyvaso product as a shortcut for securing approval of its own product, a dry powder inhaled version of treprostinil (Yutrepia), to treat PAH.  FDA-000163-164.  Liquidia included paragraph IV certifications to UTC's then-listed Orange Book patents.  FDA-000164-165.  UTC filed suit in the District of Delaware, asserting that Liquidia's Yutrepia product would infringe several patents. FDA-000164-165.  Because of UTC's timely suit, Liquidia was subject to a 30-month stay on final approval of its application.  Thus, in reviewing Liquidia's original 505(b)(2) application, FDA determined it could receive only tentative approval, because final approval was subject to termination of the 30-month stay and potentially other exclusivities.  FDA-000240.

After a four-day trial, the District of Delaware concluded that Liquidia infringed certain claims of UTC's Patent No. 10,716,793 ('793 patent) and awarded the statutory Hatch-Waxman remedy: an order barring FDA from granting final approval of Liquidia's NDA before May 14, 2027.  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-cv-755, ECF No. 436 ¶¶ 3-4 (D. Del. Sept. 9, 2022).  The Federal Circuit affirmed this decision.  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360 (Fed. Cir. 2023), *cert denied*, 144 S. Ct.  873 (2024).  In parallel to that litigation, Liquidia sought to administratively cancel claims of the '793 patent through a process at the U.S. Patent & Trademark Office (Patent Office) called "*inter partes*

review." *Liquidia Techs., Inc. v. United Therapeutics Corp.*, No. IPR2021-00406, 2022 WL 2820717 (P.T.A.B. July 19, 2022). The Patent Trial and Appeal Board found the claims unpatentable, and UTC appealed to the Federal Circuit, which affirmed. *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 2023 WL 8794633 (Fed. Cir. Dec. 20, 2023). After UTC exhausted its appellate rights, the Patent Office cancelled the '793 patent on November 12, 2024.

### C.    Liquidia submits an amendment to add the PH-ILD indication, after telling FDA it would wait until after final approval of its original application.

After UTC secured approval for the new PH-ILD indication, Liquidia strategized over how to piggyback on that new approval. In a May 2022 correspondence from FDA memorializing its discussion with Liquidia, the agency noted that "[w]ith the assumption of final approval" for its original application, Liquidia "plans to submit a supplemental 505(b)(2) application" "to pursue alignment with the Tyvaso labeling by expanding the indication statement to include" PH-ILD. FDA-000277. Proceeding in this manner—*i.e.*, waiting until after FDA finally approved Liquidia's original NDA—would have aligned with the Bundling Rule, which prohibits amending a "pending original or supplemental application … to add a new indication." FDA-000974.

But Liquidia changed course. On July 24, 2023, Liquidia instead submitted an amendment to "expand[] the indication statement" of its application by adding PH-ILD. FDA-000286; *see* FDA-000287-306. FDA acknowledged receipt of the amendment. FDA-000316.

Liquidia submitted paragraph IV certifications based on its amendment adding the PH-ILD indication, including with respect to the '793 patent. FDA-000166. UTC again timely filed suit, asserting infringement claims against Liquidia in the District of Delaware. Compl., *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 23-cv-975 (D. Del. Sept. 5, 2023), ECF No. 1.[6]

---

[6] In view of the Federal Circuit's later decision affirming the Patent Office's administrative review decision, UTC ultimately stipulated to the dismissal of counts of infringement of the '793 patent.

But this time, FDA determined that UTC's timely patent suit would *not* trigger an automatic 30-month stay for patents listed after the submission date of Liquidia's original 505(b)(2) application (in 2020). FDA-000166. In December 2023, Liquidia amended its 505(b)(2) application again to include a paragraph IV certification for the '327 patent. FDA-000166. Within 45 days of receiving notice of that paragraph IV certification, UTC amended its Delaware complaint to assert infringement of the '327 patent. First Am. Compl., *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 23-cv-975 (D. Del. Nov. 30, 2023), ECF No. 8.

Patent litigation between UTC and Liquidia is ongoing. On May 31, 2024, the district court denied UTC's motion to preliminarily enjoin Liquidia from launching Yutrepia for the PH-ILD indication. *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, 2024 WL 2805082 (D. Del.). The court scheduled trial to begin on June 23, 2025.

### D.  UTC challenges FDA's acceptance of Liquidia's improperly bundled application.

When UTC became aware that FDA had accepted Liquidia's amended application in contravention of the Bundling Rule, it promptly raised objections. On December 29, 2023, UTC submitted a letter to FDA, explaining to FDA that acceptance of Liquidia's amendment for Yutrepia adding the PH-ILD indication violates the agency's longstanding Bundling Rule. FDA-000001-18. UTC asked FDA to rescind its unlawful action and require Liquidia to file a new application if it still wished to pursue the PH-ILD indication. FDA-000002.

Unbeknownst to UTC at the time, Liquidia initially reacted to UTC's submission by proposing to amend its application, in a manner that would come into compliance with the Bundling Rule. On January 8, 2024, Liquidia submitted another amendment to FDA requesting final approval for "*only* … the PAH indication." FDA-000354 (emphasis added). In response, FDA convened a teleconference with Liquidia. In that conference, FDA sought to clarify

Liquidia's position, warning about the impact a further amendment would have on the review timeline. FDA-000353-356. Liquidia then backtracked, stating it still "wish[ed] to seek approval of both the PAH and PH-ILD indications" in a single amended application. FDA-000356. Before doing so, Liquidia "asked FDA to confirm" that patents listed in the Orange Book after its July 2023 amendment "would not give rise to a 30-month stay of approval," and FDA agreed. *Id.*

After formally withdrawing its PAH-only amendment, *id.*, Liquidia chose to double-down, submitting a letter to FDA in response to UTC. FDA-000019-36. In the letter, Liquidia defended its submission and argued, among other things, that FDA's "Bundling Guidance has been superseded in relevant part" by the 2003 MMA and the agency's implementing regulations. FDA-000020. UTC submitted a reply, explaining that Liquidia's attempt to treat the Bundling Rule as outdated and inoperative was contrary to the MMA, FDA regulations, and established FDA practice. FDA-000086-103. UTC further explained that because final approval of Liquidia's improperly bundled 505(b)(2) application would cause UTC to suffer irreparable harm, UTC would need to file suit unless FDA took prompt corrective action. FDA-000103.

In February 2024, after FDA failed to respond, UTC filed suit against FDA in this District, which UTC followed with a motion for preliminary injunction. *UTC v. FDA*, No. 24-cv-484. UTC alleged that FDA violated the APA by accepting Liquidia's amendment to add the new PH-ILD indication to its pending application. Compl., No. 24-cv-484, (D.D.C. Feb. 20, 2024), ECF No. 1. Liquidia intervened as a defendant. Minute Order, No. 24-cv-484 (D.D.C. Mar. 5, 2024).

In response, FDA represented to the District Court that it had not yet decided whether "Liquidia's amendment is proper," and the agency was still "actively considering that issue in light of UTC and Liquidia's submissions to the agency." Fed. Defs.' Opp. to Pl.'s TRO/PI Mot. at 11-12, No. 24-cv-484 (D.D.C. Mar. 18, 2024), ECF No. 25. Relying on FDA's representation, the

14

court denied UTC's motion for preliminary injunction, reasoning that FDA likely had not yet taken final agency action.  Tr. of Motions Hearing, No. 24-cv-484 (D.D.C. Mar. 29, 2024), ECF No. 34. But recognizing that a final approval decision could immediately ripen UTC's claim for irreparable harm, the court ordered FDA to provide the court and parties with at least three business days' notice before issuing any decision on Liquidia's amended NDA.  Scheduling Order at 1, No. 24-cv-484 (D.D.C. Mar. 7, 2024), ECF No. 18.  On August 13, 2024, FDA provided that notice without specifying the substance of its decision.

> ### E.    FDA reaffirms its decision to accept Liquidia's amendment and to depart from the Bundling Rule.

On August 16, 2024, FDA issued a letter decision in response to UTC's submission (the "Bundling Decision").  FDA-000162-187.  FDA "conclud[ed]" that Liquidia's request to add the PH-ILD indication to its pending 505(b)(2) application "is not precluded by statute or regulation and is appropriate for FDA to review."  FDA-000187.  FDA acknowledged its longstanding guidance instructed "against amendments seeking to add a new indication" to pending applications.  FDA-000169.  And FDA reaffirmed that "most requests for a new indication must be submitted in a new original application or supplemental application."  FDA-000162-163.  But FDA concluded it should "depart from the policy stated in its guidance documents" in Liquidia's case, based on a purported (and previously undisclosed) exception for 505(b)(2) applications that, in FDA's view, did not provide any new data to support approval of the additional indication. FDA-000162, -183-184.  Under this view, follow-on 505(b)(2) applicants that do the least independent work—because they only "request[] a change to seek approval for an indication approved for the relied-upon listed drug" without providing any further supportive data—are exempted from the Bundling Rule's restrictions on amendments.  FDA-000184.

In support of its decision, FDA asserted that the statute and agency regulations permit

Liquidia's amendment, and that the Bundling Rule was only "nonbinding" and "d[id] not create legal rights or obligations." FDA-000162, -171, -183. Notably, however, FDA rejected Liquidia's contention that agency regulations had "superseded" the Bundling Rule as "sweep[ing] too broadly." FDA-000186. FDA admitted that it had previously told applicants that "a new indication should not be submitted as an amendment," and that "on at least one occasion," the agency had gone further and "advised an applicant that it *could not* submit an amendment to add a new indication." FDA-000185-186 & n.111 (emphasis added). And FDA acknowledged that agency manuals describe steps applicants should take "to be in compliance with the Bundling Guidance"—a directive FDA recognizes "could be misunderstood" to imply "the guidance is binding." FDA-000186 & n.113 (brackets omitted). But FDA insisted that the Bundling Rule merely provides recommendations that the agency may choose to discard, with the agency suggesting it might clarify the matter moving forward "to avoid the possibility of confusion among FDA staff or the public." *Id.* FDA further asserted that the "reliance interests" of innovators like UTC in the agency "maintaining its interpretation" are "doubtful and at most limited," and that the Bundling Rule "did not create a reliance interest" related to how FDA's filing practices determine application of "a 30-month statutory stay of approval." FDA-000184 & n.105.

As support for its departure from the Bundling Rule, FDA pointed to a December 2018 decision to allow a pending NDA (pemetrexed) to be amended to add a new indication. According to FDA, the pemetrexed application was "not based on new data" because the "applicant has already provided an adequate scientific bridge" to the relied-upon listed drug. FDA-000178. But the reasoning in the 2018 internal memorandum is scant: the memo is just two paragraphs, one of which merely summarizes the NDA and amendment at issue. FDA-001272. The only paragraph of analysis noted that the amendment was not based on new data, with no explanation as to why

this justified departing from the Bundling Rule. FDA-001272. Nor did the paragraph address the relationship between the Bundling Rule and the Hatch-Waxman Act's patent certification requirements. Instead, it simply noted that FDA was "currently considering whether the bundling guidance and policy regarding amendments to add a new indication are appropriate under these circumstances." *Id.* Ultimately, FDA did not approve the inappropriately bundled pemetrexed 505(b)(2) application, because the applicant withdrew the new indication after FDA issued a complete response letter based on a different deficiency. FDA-000178 n.92.

On the same day that FDA issued the Bundling Decision, FDA informed Liquidia that it was granting tentative approval for its Yutrepia product for both the PAH and the PH-ILD indications. FDA-000358-360. FDA did not grant final approval to Liquidia because, as it explained in a separate letter, Yutrepia falls within the scope of a three-year regulatory exclusivity that UTC earned in securing approval of Tyvaso DPI—a novel dry powder dosage form of treprostinil. FDA-000358. UTC's exclusivity will expire on May 23, 2025. ECF No. 95 at 1. After Liquidia resubmitted its application in March 2025, FDA set Liquidia's user fee goal date as May 24, 2025—the day after UTC's exclusivity expires. *See* ECF No. 97-1 at 2.

Following FDA's decision, UTC voluntarily dismissed its action. No. 24-cv-484 (D.D.C. Aug. 20, 2024), ECF No. 56. As UTC explained, it did so in response to Liquidia's argument that UTC's initial suit—filed before FDA's Bundling Decision—was "incurably premature" as filed. ECF No. 36 at 4 n.1.

### F.    Liquidia brings this action, and UTC files a crossclaim.

On August 21, 2024, Liquidia filed this suit against the Federal Defendants to challenge FDA's decision finding that final approval of Yutrepia is blocked by UTC's three-year exclusivity. The Court granted UTC's motion to intervene. Minute Order (Aug. 30, 2024). In February 2025,

this Court concluded that FDA's exclusivity decision "was proper" and denied Liquidia's summary judgment motion while granting UTC and FDA's motions.  ECF No. 95 at 1.

On September 16, 2024, UTC filed its answer to Liquidia's complaint, which included a crossclaim against the Federal Defendants challenging FDA's decision to allow Liquidia's amendment in contravention of the Bundling Rule.  Crossclaim ¶¶ 77-91.  Contrary to the requirements of Local Rule 7(n), the Federal Defendants declined to promptly produce the administrative record for UTC's crossclaim, leading UTC to file a motion to expedite production. As UTC noted in its motion, UTC's crossclaim needed to be adjudicated in parallel to Liquidia's challenge to FDA's exclusivity decision, since the core argument in UTC's crossclaim is that Liquidia's current (improperly bundled) application for Yutrepia cannot be approved as of May 23, 2025, when UTC's exclusivity expires.  *See* ECF No. 36 at 1-2.  UTC further explained that "UTC would suffer immediate irreparable harm" if FDA finally approves Liquidia's application in violation of the Bundling Rule, "creating a significant prospect of an emergency injunction on UTC's crossclaims" absent expedition.  *Id.* at 2, 6; *see also* ECF No. 53 at 6-7; Tr. 54:8-14 (Dec. 5, 2024).  The Court ordered FDA to produce the administrative record by December 19, 2024, but it declined to set a summary judgment briefing schedule.  Minute Order (Nov. 19, 2024).

The Federal Defendants and Liquidia moved to dismiss UTC's crossclaim on November 15, 2024.  Those motions remain pending.  UTC moved for summary judgment on January 17, 2025.  This Court stayed briefing on that motion pending its decisions on Liquidia and the Federal Defendants' motions to dismiss.  Minute Order (Jan. 30, 2025).

## ARGUMENT

In assessing a motion for preliminary injunction, a court considers four factors: (1) the likelihood the plaintiff will succeed on the merits; (2) the probability the plaintiff will suffer irreparable injury if the requested injunction is denied; (3) the balance of the equities; and (4) the

public interest.  *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); *see also D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55-56 (D.D.C. 2020).  All four factors strongly support granting preliminary injunctive relief to maintain the status quo and prevent FDA from finally approving Liquidia's application as of May 23, 2025.

## I.    UTC is likely to succeed on the merits.

Under the APA, a federal court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency decision flunks this test if, among other things, the agency "disregard[s] [a] statutory mandate," *Air Transp. Ass'n of Can. v. FAA*, 323 F.3d 1093, 1094 (D.C. Cir. 2003), "fails to comply with its own regulations," *Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (citation and quotation marks omitted), or takes an "unexplained departure from [agency] precedent," *Eagle Broad. Grp. v. FCC*, 563 F.3d 543, 551 (D.C. Cir. 2009) (citation omitted).

UTC  is likely to succeed in its claim that FDA violated these principles.  If FDA had followed its Bundling Rule—set forth in long-established guidance that the agency has not changed—it could not have accepted Liquidia's amendment adding the new PH-ILD indication to its pending application. FDA concedes as much, recognizing that its decision to accept Liquidia's amendment marked a "depart[ure] from the policy stated in its guidance documents." FDA-000162.  UTC is likely to establish that FDA's about-face was arbitrary and capricious and should be set aside.  In purporting to apply a previously undisclosed exception to the Bundling Rule, FDA ignored an important aspect of the issue it faced, failing to account for the manner in which the Bundling Rule intersects with, and reinforces the objectives of, the Hatch-Waxman Act's patent certification requirements.  FDA also improperly disregarded the significant reliance interests of innovators like UTC in the agency's adherence to its longstanding public position.

A.      **This Court has jurisdiction to grant relief.**

To start, there is a "substantial likelihood" this Court has jurisdiction over UTC's crossclaim. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912-13 (D.C. Cir. 2015). Indeed, as explained in UTC's Memorandum in Opposition to Liquidia and the Federal Defendants' Motion to Dismiss (ECF No. 81), the Defendants' various jurisdictional and procedural challenges to UTC's crossclaim are all unavailing. Since those arguments have been fully briefed and are pending before this Court for decision, UTC offers only a brief summary here.

1.      With respect to standing, FDA's decision to depart from the Bundling Rule and allow Liquidia to amend its application has deprived UTC of its statutory right to a 30-month stay and threatens imminent economic harm from the premature approval of the bundled application. Both injuries give UTC standing. If FDA had adhered to the Bundling Rule when Liquidia submitted its amendment in September 2023, Liquidia's request for approval of the PH-ILD indication would have proceeded through a separate application, and UTC's timely suit for patent infringement following Liquidia's paragraph IV certification would have triggered a 30-month stay. *See* Crossclaim ¶¶ 52-54, 59-60. Similarly, if FDA had applied the Bundling Rule in August 2024 when issuing a final decision in response to UTC's administrative challenge, Liquidia could not have continued to pursue the PH-ILD indication without using a new application that would have triggered the 30-month stay. *See id.* ¶¶ 60-62. But FDA's decision to allow Liquidia to evade the Bundling Rule has deprived UTC of its statutory entitlement, a loss that cannot be "recaptured" and is plainly an injury in fact. *Endo Par*, 2024 WL 2988904, at *7.

In addition, UTC faces a separate injury—the substantial risk of competitive harm—which also confers standing. *See Jibril v. Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021) ("[A]n alleged future injury may suffice to establish standing if … there is a 'substantial risk' it will occur."). There is a "substantial risk"—indeed, a virtual certainty—that Liquidia's NDA for its PH-ILD

product will be approved as amended as soon as Tyvaso DPI's exclusivity period runs in May 2025. And Liquidia has made clear it plans to "launch[] distribution of Yutrepia to patients nationwide within days of FDA's decision." Liquidia Compl. ¶ 20. The competitive harm UTC will suffer from the imminent but premature approval of Liquidia's Yutrepia for the PH-ILD indication provides ample basis for Article III standing. *See Sandoz Inc. v. Becerra*, 2022 WL 2904262, at *4 (D.D.C. July 22, 2022) (recognizing injury in fact from being exposed to "allegedly unlawful competition").

       2.     UTC's claim is also ripe for review. In assessing ripeness, courts consider "the fitness of the issues for judicial decision"—whether the issue "is purely legal"—and "the extent to which withholding a decision will cause 'hardship to the parties.'" *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (citations omitted). Here, UTC's challenge to FDA's decision permitting Liquidia to amend its application presents a purely legal question: whether FDA acted arbitrarily and capriciously or otherwise unlawfully in departing from the Bundling Rule. And delaying review of UTC's crossclaim would cause hardship to UTC. UTC is being deprived of its statutory right to an automatic 30-month stay, and delaying review until after FDA finally approves Liquidia's amended application would make it impossible for UTC to recover its lost statutory right. *See* ECF No. 81 at 21. Notably, even Liquidia concedes that UTC's crossclaim is ripe, as it recognizes that delaying adjudication until after a final approval order would risk significant market disruption, prejudicing *both* UTC *and* Liquidia. *See* ECF No. 69-1 at 36.

       3.     Finally, UTC has no alternative remedy to this APA claim. "[A]lthough an alternative remedy 'need not provide relief identical to relief under the APA,'" it "must nevertheless be of the 'same genre'; 'doubtful and limited relief' will not suffice." *Gonzalez Boisson v. Pompeo*, 459 F. Supp. 3d 7, 13 (D.D.C. 2020) (citation omitted). The "alternative

remedy must actually result in a determination of the underlying legal question, rather than a peripheral issue." *Id.* Here, UTC's ability to pursue patent litigation against Liquidia is not an adequate alternative remedy to APA relief. The patent infringement action provides no avenue for addressing FDA's departure from the Bundling Rule and it cannot possibly provide a substitute for UTC's statutory right to a 30-month stay. Indeed, the entire premise behind that stay is to ensure innovators like UTC are protected against the market-alerting effects of FDA approval of a follow-on product while the patent infringement case is being litigated. *See* p. 4, *supra*. The possibility that UTC could secure an infringement judgment *after* FDA approves Liquidia's application is thus plainly inadequate. Defendants' contrary position is directly contrary to this Court's decision in *Endo Par* granting a preliminary injunction to give effect to a 30-month stay after FDA arbitrarily and capriciously changed its policy without properly considering reliance interests. *See* 2024 WL 2988904, at *4-10. As this Court explained, an innovator's statutory "entitlement to a 30-month stay is *independent* of whether its patent claims … turn out to succeed." *Id.* at *7 (emphasis added). Indeed, "the point of the 30-month stay is to allow the patent holder to assert its patent rights before the generic competitor is permitted to enter the market." *Id.* (citation, quotation marks, and brackets omitted).

## B. UTC is likely to prevail on the merits of its APA claims.

UTC is also likely to succeed on the merits of its claims that FDA arbitrarily and capriciously departed from long-established agency policy.

### 1. The Bundling Rule prohibits adding indications through amendments, and FDA's acceptance of Liquidia's amendment violated that rule.

By its terms, the Bundling Rule precludes adding an indication through an amendment, providing that "[a]fter initial submission, a pending original or supplemental application *should not* be amended to add a new indication or claim." FDA-000975 (emphasis added). The Rule

goes on to emphasize that "[i]f the original application is not yet approved, a request for approval of other new indications or claims should be submitted in a separate, original application." *Id.* It is only *after* "the initial application is approved" that "the application can be subsequently supplemented to add a new indication." *Id.*

Liquidia's amendment violates the plain terms of the Bundling Rule, as that Rule has been articulated to the public for decades. Liquidia's original 505(b)(2) application "is not yet approved." *Id.*; *see* FDA-000241 (letter from FDA to Liquidia explaining that "[u]ntil we issue a final approval letter, this NDA is <u>not</u> approved"). Yet Liquidia amended its pending application to add the new PH-ILD indication, FDA-000286—exactly what the Bundling Rule specifies an applicant "should not" do, FDA-000975.

Without disputing that the clear terms of the Rule preclude Liquidia's amendment, FDA observed its Bunding Rule is set forth in agency "guidance" that is "nonbinding" and "does not create legal rights or obligations." FDA-000162. But FDA cannot disregard the Bundling Rule on this basis. To the contrary, the D.C. Circuit has made clear a nominally non-binding guidance document can have the "force of law" if it "is applied by the agency in a way that indicates it is binding." *Gen. Elec. v. EPA*, 290 F.3d 377, 383-84 (D.C. Cir. 2002) (treating EPA guidance document as binding because "[t]o the applicant reading the Guidance Document the message is clear: in reviewing applications the Agency will not be open to considering approaches other than those prescribed in the Document"); *Appalachian Power v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (treating guidance document as binding even with disclaimer that "policies set forth in this paper are intended solely as guidance, do not represent final Agency action, and cannot be relied upon to create any rights enforceable by any party").

Here, FDA's public statements on the Bundling Rule show it binds both applicants and the

agency.  FDA has described the rule as a "require[ment]."  80 Fed. Reg. at 6851.  It has developed

a checklist precluding agency staff from accepting submissions that do not comply with the rule.

*See* FDA-001276 ("Has the user fee bundling policy been appropriately applied?  If no, or you are

not sure, consult the User Fee Staff.").  Similarly, FDA's Manual of Policies and Procedures directs

that an NDA seeking to add "a new indication or claim for a drug product" must be "submitted as

a separate NDA so as *to be in compliance*" with the Bundling Rule.  FDA-001550 (emphasis

added).[7]  FDA concedes the word "compliance" could reasonably imply the rule sets a binding

obligation, stating only that it "intend[s] to revise this statement" in the future "to avoid the

possibility of confusion among FDA staff or the public."  FDA-000186 n.113.  That FDA proposes

such a *revision* in the future underscores the point:  as matters stand, the Bundling Rule and various

agency documents referencing it all "read[] like a ukase"—they "command[]," "order[],"

"dictate[]."  *Appalachian Power*, 208 F.3d at 1023.  Based on these documents, "private parties

are reasonably led to believe that failure to conform" to the Bundling Rule "will bring adverse

consequences, such as … denial of an application."  *Gen. Elec.*, 290 F.3d at 383 (citation omitted).

FDA's historic practice of applying the Bundling Rule confirms what is apparent from

these regulatory directives:  it is a command that structures the agency's review process, not an

idle suggestion applicants may choose to ignore.  As FDA concedes, "on at least one occasion," it

"advised an applicant that it could not submit an amendment to add a new indication."  FDA-

000185 n.111.  The record shows this conceded instance of mandatory treatment is not isolated,

as FDA has rejected proposed amendments that included a new indication where that amendment

---

[7] Regulations from the Centers for Medicare & Medicaid Services similarly reference the binding
nature of the Bundling Rule.  *See*  42 C.F.R. § 413.234(e)(7)(i)(A) ("Generally, a Type 9 NDA is
submitted as a separate NDA so as *to be in compliance* with the guidance for industry on
Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User
Fees." (emphasis added)).

"does not follow the Guidance for Industry" articulating the Bundling Rule.  FDA-001195.  *See* pp. 7-8, *supra*.

Any effort to minimize the Bundling Rule as mere nonbinding advice also fails to account for the manner in which FDA's policy on amendments has long been understood to structure the Hatch-Waxman review process.  As described above, pp. 8-9, *supra*, when Congress enacted the MMA to amend the FDCA in 2003, it legislated against the backdrop of the Bundling Rule.  The House Committee Report for the MMA expressly noted Congress's "inten[t] … to reflect the FDA's current practice regarding those changes and variations to both innovator and generic drugs that may be approved under amendments and supplements to previously filed NDAs and ANDAs." H.R. Rep. No. 108-391, at 835 (2003).  Thus, when Congress amended the law to prevent innovators from securing serial 30-month stays based on insignificant modifications to a drug product, it was understood that the Bundling Rule would ensure that an automatic stay would still be available for patents covering significant innovations such as "different or improved use[s] for [a] product"—*i.e.*, new indications.  148 Cong. Rec. at S6844.

In its decision, FDA contends (at FDA-000185 & n.109) the Bundling Rule provides no clear background rule restricting amendments adding new indications because FDA has stated that there may be limited "scenarios" where an applicant may submit an amendment to a 505(b)(2) application for a new indication.  *See* 80 Fed. Reg. at 6849.  But the only example FDA identified is revealing:  a request for approval of a drug product that has "changed from prescription status to OTC use for the listed drug."  *Id.*  Such a regulatory switch does not involve the treatment of a new condition—nor is it the type of modification that can even be protected by a follow-on patent. As a result, the amendment process poses no risk of the applicant "us[ing] the amendment … process to evade the possibility of a 30-month stay of approval."  *Id.* at 6851.  In contrast, a

25

"substantial change in indication" that involves using an existing product to treat a new condition is the type of "innovation" that requires a new drug application and which can give rise to follow-on patents. *Examining Issues Related to Competition in the Pharm. Marketplace: A Review of the FTC Report, Generic Drug Entry Prior to Patent Expiration: Hearing Before the Subcomm. on Health of the H. Comm. on Energy & Com.*, 107th Cong. 49 (2002) (colloquy between Rep. Waxman and FDA Commissioner).

"In sum, the commands of the [Bundling Rule]," as backed up by decades of agency practice, "indicate that it has the force of law." *Gen. Elec.*, 290 F.3d at 385. That remains so notwithstanding FDA's assertion that, since 2018, it has applied a previously undisclosed exception to the Bundling Rule in instances where an amendment for a new indication does not rely on any clinical data in the submission. FDA-000178-179. None of the agency decisions referenced in FDA's decision letter purport to rely on any such exception—indeed, they contain no relevant reasoning at all. *See* FDA-000637-695 (Fulvestrant); FDA-000886-909 (Romidepsin); FDA-000726-756 (Paclitaxel NDA 211875); FDA-000791-828 (Paclitaxel NDA 216338); FDA-000456-505 (Bortezomib).[8]

To the contrary, the only reference to an unwritten exception in the administrative record comes from a previously undisclosed 2018 FDA decision involving an amendment to an application for a product (pemetrexed) that was *not* ultimately approved. *See* FDA-000177-178 & n.92. The decision is described in a two-paragraph "memorandum to file" with minimal

---

[8] Many of the decisions also arise in materially different factual circumstances. In Fulvestrant, Romidepsin, Paclitaxel NDA 211875, and Paclitaxel NDA 216338, the applicant sought to amend because of a change in the patent landscape protecting the innovator product, such as patent expiration or settlement. Fulvestrant NDA 210326 (FDA-00547); Romidepsin NDA 208574 (FDA-000854); Paclitaxel NDA 211875 (FDA-000720); Paclitaxel NDA 216338 (FDA-000780). These were not cases where, as here, the innovator produced new data showing that its product was safe and effective in a new indication, upon which the 505(b)(2) applicant then sought to rely.

reasoning. FDA-001272. Indeed, that secret internal memorandum observed the agency was "currently considering whether the bundling guidance and policy regarding amendments to add a new indication" should be modified for situations in which no new data was submitted. *Id.* But until the decision challenged here, the record reveals no instances of FDA embracing such an exception, much less explaining it to the public. Certainly, FDA never modified its directives in any of its guidance documents or other public-facing communications. Even in the Bundling Decision, FDA states only that it "intends to further consider whether an additional clarification" is appropriate. FDA-000178 n.93. Ten months later, no such "clarification" has been provided.

The administrative process was never meant to work through secret, unexplained exceptions to clear, written directives. UTC is likely to succeed because FDA's admitted disregard of the clear terms of its Bundling Rule is arbitrary and capricious.

### 2. FDA's newly announced exception to the Bundling Rule fails to address an important aspect of the Bundling Rule's historic purpose.

UTC is also likely to succeed because FDA's decision "to depart from the policy" stated in the Bundling Rule, FDA-000162, "fail[ed] to consider important aspects of the problem presented to the agency." *Quantum Ent't, Ltd. v. U.S. Dep't of Interior,* 597 F. Supp. 2d 146, 153 (D.D.C. 2009) (citation omitted); *see Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 177 (D.C. Cir. 2022) ("Agencies cannot disregard important aspects of a problem before them.").

FDA justified its decision to allow Liquidia's amendment, which presents no clinical data of its own and instead piggybacks entirely on UTC's concerning the use of treprostinil to treat PH-ILD, by relying on the "limited" "amount of work required for the Agency's review." FDA-000184. According to FDA, "concerns about developing an application on the clock that supported the more general policy stated in the Bundling Guidance are substantially reduced" "[i]n this limited circumstance," and permitting the amendment would further "PDUFA program goals

27

of efficient and effective" application processing.  *Id.*  But even if this rationalization were credited, it accounts for only one of the historic purposes underlying the Bundling Rule, disregarding the important role the Bundling Rule has come to serve in ensuring the patent-certification process in the Hatch-Waxman Act operates in the manner Congress intended.

The Hatch-Waxman Act, as amended by the MMA, reflects a careful balance of the public's interests in innovation and access to lower-priced prescription drugs.  *Bristol-Myers Squibb Co. v. Royce Labs., Inc.*, 69 F.3d 1130, 1132 (Fed. Cir. 1995).  A central aspect of the statutory framework is the automatic 30-month stay that ordinarily applies when a patent owner brings a timely suit in response to a follow-on applicant's Paragraph IV certification.  As noted, p. 5, *supra,* the patent owner's "30-month stay is independent of whether its patent claims … turn out to succeed," as the very "point of the 30-month stay is to 'allow[] the patent holder to assert its patent rights before the generic competitor is permitted to enter the market."  *Endo Par*, 2024 WL 2988904, at *7 (quotation marks omitted).

But following the 2003 MMA amendments, FDA policy on when and how 505(b)(2) applicants may amend pending applications plays a critical role in ensuring the automatic-stay process operates as intended.  If a 505(b)(2) applicant is permitted to expand its requested approval by filing an amendment—rather than submitting a new application—it can avoid triggering the 30-month stay on any newly issued patent.  FDA itself has previously recognized this framework creates a potential "incentive for a 505(b)(2) … applicant to seek approval for a change to drug … through an amendment" in order to "evade the possibility of a 30-month stay of approval that otherwise would have applied."  80 Fed. Reg. at 6851.

In some cases, permitting an amendment that avoids a stay may be appropriate.  After all, Congress amended the automatic-stay rules so that new patents on minor changes to a drug product

that did not reflect "a different or improved use" would not trigger a second 30-month stay. 148 Cong. Rec. S6844 (daily ed. July 16, 2002) (statement of Sen. Collins). For example, if, after a 505(b)(2) application was filed, a patent owner obtains and timely lists a new patent on the product's packaging, the 505(b)(2) applicant might need to submit a new patent certification, but a paragraph IV certification would not result in an automatic stay; the patent would postdate the original application, insulating any amendment to address the packaging issue from a new stay. *See* 21 U.S.C. § 355(c)(3)(C). By contrast, there are also instances in which permitting an amendment would circumvent Congress's intended policy. In particular, when Congress enacted the MMA, 505(b)(2) applicants could not avoid triggering a stay with a paragraph IV certification on a new patent claiming a new use of a drug product. That is a more significant innovation, which is reflected by the fact that FDA policies in place then did not allow 505(b)(2) applicants to add new indications via amendment. *See* pp. 9-10, *supra*. And Congress made clear that it was building upon that status quo, as it "intend[ed] [the MMA] to reflect the FDA's current practice regarding those changes and variations to both innovator and generic drugs that may be approved under amendments and supplements to previously filed NDAs and ANDAs." *Id.*

FDA's ad hoc decision to carve out an exception to the Bundling Rule's general bar on new indications via amendment fails to adequately consider this legal backdrop. Instead, much of its decision is devoted to arguing that it had discretion to adopt an exception—a distinct question from whether the exception is reasonable and adequately explained. FDA observes the MMA prohibits applicants from amending or supplementing a 505(b)(2) application to seek approval of a "different drug," 21 U.S.C. § 355(b)(4)(A), and it then notes that the agency, by regulation, "did not define 'different drug' to include a request for approval of a new indication." FDA-000180 (citing 21 C.F.R. §§ 314.60(e), 314.70(h)). FDA then leaps to infer that because (in its view)

neither the statute nor agency regulations specifically bar amendments for new indications, it would "chang[e] the legislative balance rather than preserv[e] it" for FDA policy to preclude such amendments. FDA-000182. That reasoning is backwards. In dictating rules for amendments, Congress specified that applicants should be allowed to "amend[] or supplement[]" an application "to seek approval of a different strength" for a drug product. 21 U.S.C. § 355(b)(4)(B). Conspicuously, no such allowance is provided for new indications, signaling that Congress preserved the status quo in which such amendments were not allowed. *See Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018) ("The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)." (citation omitted)).

But even assuming neither the statute nor agency regulations *preclude* FDA from creating an exception to the Bundling Rule, the decision alters the status quo with significant implications for patent rights. Yet FDA skipped over this key issue. After concluding its departure was not barred by statute or regulation, FDA justified its previously undisclosed exception to the Bundling Rule based *exclusively* on questions of administrative convenience and "user fee implications." FDA-000184. Thus, even though FDA has previously recognized that the permissibility of certain categories of amendments is properly informed by the impact of allowing the amendment on patent rights and the question whether an "opportunity for 30-month stay would be appropriate," 80 Fed. Reg. at 6851, FDA disregarded that issue here.[9] In particular, FDA never explained why a 505(b)(2) application that omits any new clinical information in support of a new indication should

---

[9] FDA did assert (in cursory fashion) that it doubted whether any innovator "has a cognizable interest" in FDA adhering to the Bundling Rule, and that any such interest was "outweighed" by other considerations. FDA-000184. As discussed below, this brief discussion of reliance interests was itself inadequate. *See* Part I.B.3, *infra*. Regardless, reliance aside, this passing reference is non-responsive to the point that FDA failed to address the impact of changing its policies on the effective operation of the Hatch-Waxman litigation process, as envisioned by Congress.

be allowed to avoid a 30-month stay, whereas an application including some of its own clinical information cannot. Nor is it clear how FDA could justify such treatment—if anything, instances where the 505(b)(2) application *completely* piggybacks on the innovator's data are *more* likely to implicate patents on a significant new innovation. But regardless of what explanation FDA might theoretically provide, its failure "to consider an important aspect of the problem" in the Bundling Decision (or anywhere else in the administrative record) renders its decision arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

It is no answer that FDA displayed some general awareness of the impact its unwritten exception will have on an innovator's statutory right to an automatic stay. *E.g.*, FDA-000184. "[A]wareness is not itself an explanation." *Ohio v. EPA*, 603 U.S. 279, 295 (2024). FDA created an exception on the theory that some of the Bundling Rule's animating rationales were not implicated by Liquidia's 505(b)(2) amendment, without meaningfully addressing the pivotal role the Bundling Rule now plays in protecting patent rights or considering whether that purpose counsels against an exception grounded in administrative convenience. *See* FDA-000184.

FDA's brief reference to the Bundling Rule's treatment of supplements (rather than amendments) does not fill the gap. *See* FDA-000182. FDA seems to imply that because applicants are allowed to pursue new indications by supplement—which sometimes may allow them to avoid an automatic stay—the Bundling Rule's restrictions on amendments is not connected to the protection of patent rights. But as this case illustrates, the distinction between a right to supplement an application and amendment can be significant, with the amendment route typically providing a more accelerated path for a follow-on applicant to expand its approval since it allows applicants to stack requests together without waiting for FDA to finally approve the initial application. *See* 21 C.F.R. § 314.70 (explaining supplement allows only certain changes to "approved NDA"). It

is thus unremarkable that there would be tighter restrictions on a 505(b)(2) applicant's ability to amend versus supplement.  Indeed, in other contexts, FDA regulations impose certain patent-certification rules only for amendments, not supplements.  *See* 21 C.F.R. § 314.96(d)(1).  In any event, the divergence between FDA's rules for amendments and supplements is longstanding, and Congress legislated against the backdrop of stricter rules for amendments when it enacted the 2003 MMA.  *See* pp. 8-9, *supra*.  It is thus nonresponsive for FDA to point to its long-established policy on supplements as an explanation for "depart[ing]" from its equally long-established policy for amendments.  FDA-000162.[10]

### 3.    FDA failed to meaningfully consider the reliance interests of innovators like UTC in faithful application of the Bundling Rule.

Even when an agency has discretion to change course, it must consider the fact that its "'longstanding policies may have engendered serious reliance interests that must be taken into account,' as failure to do so renders the new rule arbitrary and capricious."  *Int'l Org. of Masters v. NLRB*, 61 F.4th 169, 179 (D.C. Cir. 2023) (citation omitted); *see also Endo Par*, 2024 WL 2988904, at *6 ("[A] change of policy must also 'consider the alternatives that are within the ambit of the existing policy' and must 'address whether there was legitimate reliance on the' old policy." (citation omitted)).  Agencies are subject to this obligation even where their policy purported to disclaim conferral of "substantive rights."  *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 31 (2020).

UTC is likely to succeed in showing FDA fell short here.  Rather than seriously engage with reliance interests fostered by a decades-old and repeatedly reaffirmed written policy, FDA disparaged the "potential reliance interests of innovators" like UTC as "doubtful and at most

---

[10] FDA's reference to ANDAs (FDA-000181) is likewise a *non-sequitur*.  FDA has recognized the Bundling Rule requires treating 505(b)(2) applications and ANDAs differently in the patent context, *see* 80 Fed. Reg. at 6851, and FDA did not justify its decision to depart from the Bundling Rule as based on any desire to harmonize treatment of ANDAs and 505(b)(2) applications.

limited." FDA-000184 & n.105. It then asserted in conclusory fashion that "any such interest" is "outweighed by" the agency's "reasons for changing position." FDA-000184. But none of FDA's passing reasons for discounting the reliance interests of innovators withstand scrutiny.

First, FDA "not[ed] that Congress made separate provision to protect innovators' intellectual property rights when it enacted the Hatch-Waxman Act, and the MMA, and these protections do not preclude" Liquidia's amendment. FDA-000184. That argument misses the point twice over. The issue is not whether FDA's decision is "preclude[d]" by statute—agencies must account for reliance interests *precisely when* the statutory framework provides them with "flexibility." *Regents*, 591 U.S. at 32. More fundamentally, the notion that the Bundling Rule is "separate" from the statutory protections provided for innovators' patent rights, FDA-000184, ignores the way the Bundling Rule interacts with those protections. If FDA had applied the Bundling Rule here rather than a secret exception, Liquidia would have had to file a new NDA for the PH-ILD indication while its original application is still pending, which would have provided UTC with an opportunity to secure an automatic stay. *E.g.*, Crossclaim ¶ 13. And while FDA "note[d]" that NDA holders may still pursue patent litigation and "seek injunctive relief" when a 505(b)(2) applicant bypasses an automatic stay by filing an amendment, FDA-000182 n.101, that is no substitute for the statutory protection. Once again, as this Court recognized, the statutory "entitlement to a 30-month stay is independent" of whether the patent claims ultimately succeed, since "the point" of the protection is to provide the innovator with a chance to vindicate its patent rights "before" the follow-on product enters the market. *Endo Par*, 2024 WL 2988904, at *7.[11]

---

[11] FDA also again referenced the possibility that an applicant could wait until after obtaining final approval to submit a supplement for a new indication. FDA-000184 n.105. But as discussed, pp. 31-32, *supra*, a supplemental application proceeds on a different timeline than an amendment, and FDA's Bundling Rule has long distinguished between the two with respect to applications for a

Second, FDA argued that innovators lacked a reliance interest in FDA's longstanding policy because the Bundling Rule was articulated in "guidance" that "was not binding," and the agency had advised there might be exceptions to the general bar on indication-adding amendments. FDA-000184 n.105. But that attempt to explain away reliance is likewise misguided. "An agency remains obligated to weigh reliance interests against policy concerns even if the policy or practice in question was never formally implemented" in a binding regulation. *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 628 F. Supp. 3d 243, 259 (D.D.C. 2022). That is especially true where, as with FDA, an agency has a history of using guidance documents to articulate effectively binding rules. *See, e.g.*, *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 93 (D.C. Cir. 1997); *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 487-88, 497-98 (D. Md. 2019); *see also FDA v. Wages & White Lion Invs., L.L.C.*, __ S. Ct. __, 2025 WL 978101, at *14 n.5 (Apr. 2, 2025) (assuming, without deciding, "that the change-in-position doctrine applies to an agency's divergence from a position articulated in nonbinding guidance documents"). As explained above, pp. 7-8, *supra*, FDA has long applied the Bundling Rule to applicants as a binding rule.

FDA's contention that the regulated industry was nonetheless on notice of the possibility for exceptions is baseless. As discussed, p. 10, 25-26, *supra*, the *only* exception to the Bundling Rule for indication-adding amendments previously disclosed by FDA concerned OTC switches, which by their nature are unlikely to implicate new innovator patent rights. And the purported other "occasions" that FDA "reviewed and approved amendments to 505(b)(2) applications," FDA-000184 n.105, could not possibly impact legitimate reliance interests, since none of the departures from the Bundling Rule that FDA now invokes were previously disclosed to the public,

---

new indication. The existence of this alternative, often slower, path for 505(b)(2) applicants to pursue approval for new uses thus does nothing to diminish the reliance interest of innovators on FDA adhering to its longstanding policies limiting amendments.

much less explained.  Once again, the public is entitled to take an agency at its word when the agency represents that its written directions reflect its "current thinking."  FDA-000971.

Finally, FDA asserted that its Bundling Rule was "issued to provide FDA's policies for implementing the PDUFA, and to allow FDA to carry out an orderly review process aligned with its negotiated commitments under the statute."  FDA-000184 n.105.  But as discussed, pp. 8-10, *supra*, that characterization ignores the additional role the Bundling Rule now plays after the MMA's enactment in policing whether 505(b)(2) applicants should be allowed to seek expanded approvals without triggering an automatic stay.  The connection is no accident:  Congress built the MMA provisions on its understanding that FDA's practices "regarding acceptance of … amendments" would carry forward undisturbed.  H.R. Rep. No. 108-391, at 835 (2003).

Once FDA's improper grounds for minimizing UTC's reliance interests are stripped away, all that remains is its unreasoned one-sentence assertion that any "limited" reliance interests are "outweighed" by the agency's "reasons for changing position."  FDA-000184.  This boilerplate assertion is plainly inadequate.  An agency's burden to "address why the policy shift outweighs the alleged reliance interests" "is not satisfied by a one-sentence acknowledgement."  *CSL Plasma*, 628 F. Supp. 3d at 261.  For this reason, too, UTC's argument that the Bundling Decision is arbitrary and capricious is likely to succeed.

## II.    UTC will suffer irreparable harm if the Court does not grant immediate injunctive relief.

UTC will suffer imminent, irreparable harm if the Court does not grant preliminary injunctive relief before May 23, 2025, to bar FDA from granting final approval to Liquidia's application while this case proceeds to final judgment.  First, UTC will permanently lose a valuable statutory right—specifically, the Hatch-Waxman Amendments' grant of a 30-month stay of FDA approval of Liquidia's follow-on 505(b)(2) product while UTC litigates whether Liquidia's PH-

ILD indication infringes UTC's patent rights.  Second, UTC will suffer irreparable economic injury due to the entry of Liquidia's Yutrepia product into the market for PH-ILD, with the new market entry resulting in unrecoverable price erosion, lost market share, and loss of goodwill.

A.    **UTC will suffer an irreparable injury to a statutory right if FDA's unlawful conduct is not enjoined.**

As described above, p. 5, *supra*, the Hatch-Waxman Act's automatic stay provides an important "mechanism designed to guard against infringement of patents relating to pioneer drugs,' with enforcement provisions that 'apply only to drugs and not to other products.'" *Bristol-Myers Squibb*, 69 F.3d at 1136 (quoting *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676-77 (1990)).  "[T]he stay period was extended primarily for the benefit of the brand-name drug manufacturers," providing such companies with an opportunity to enforce their patent rights before facing follow-on competition that undercuts those patents' value.  *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 41 (D.D.C. 2000).  And it also benefits the system as a whole, ensuring patent claims can be fully and fairly litigated without forcing follow-on manufacturers to risk substantial damages or burdening courts with emergency motions.

Yet absent preliminary injunctive relief, UTC will forever lose the benefit of this statutory protection, as Liquidia can secure final approval and launch despite UTC's timely suit to enforce patents properly listed in the Orange Book.  Liquidia has made clear it is prepared to launch as soon as it receives final approval.  *See* Liquidia Compl. ¶ 20.  Courts in this Circuit have repeatedly recognized that the loss of such a "statutory entitlement … is a harm that [is] sufficiently irreparable" to support injunctive relief because "[o]nce the statutory entitlement has been lost, it cannot be recaptured."  *Apotex, Inc. v. FDA*, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006) (citing *Mova Pharm. Corp.*, 140 F.3d at 1067 n.6), *aff'd*, 449 F.3d 1249 (D.C. Cir. 2006); *see also Mylan Labs. Ltd. v. FDA*, 910 F. Supp. 2d 299, 313 (D.D.C. 2012) (explaining that the loss of an

exclusivity period "specifically intended by Congress" is inherently irreparable).

This Court's decision in *Endo Par* is directly on point.  There, an innovator alleged "it was entitled to a statutorily mandated 30-month stay," which FDA had refused to apply after the agency "changed its mind" about how the stay should operate in the case of certain supplements to 505(b)(2) applications.  2024 WL 2988904, at *1.  This Court granted the innovator's motion for preliminary injunction, holding that it would "likely suffer irreparable harm" because of, among other injuries, "the loss of its statutory right to the 30-month stay."  *Id.* at *6.  As the Court explained, this loss of "a clear statutory entitlement is not merely economic harm," and it is sufficient "to justify emergency injunctive relief because once the statutory entitlement has been lost, it cannot be recaptured."  *Id.* at *7 (citation, quotation marks, and brackets omitted).  So too here.  Even if UTC ultimately prevails in both this suit *and* its patent-infringement action against Liquidia in Delaware, it would have no way to recover the loss of its statutory right to an automatic stay once FDA grants final approval to Liquidia's improperly bundled application.

**B.    UTC will face irreparable economic harm if Liquidia is allowed to enter the market.**

UTC will also suffer irreparable economic harm if the Court does not preliminarily enjoin FDA from approving (in its current form) Liquidia's application to market its proposed Yutrepia product for the PH-ILD indication.  Liquidia's unlawful, infringing competition in the market for PH-ILD will deal severe harms to UTC, which are neither quantifiable nor compensable by money damages.  And there is a significant, imminent risk of FDA final approval and unlawful competition.  The exclusivity period for Tyvaso DPI runs on May 23, 2025, and Liquidia has made clear it intends to launch as soon as it receives final approval.  Indeed, within the past two weeks, FDA has acknowledged receipt of Liquidia's resubmission and set the user fee goal date as May 24, 2025—the day after Tyvaso DPI's exclusivity expires.  ECF No. 97-1 at 2.

To start, UTC's economic injury from a premature launch occasioned by FDA's unlawful final action is inherently irreparable because it cannot be recovered. UTC "cannot recover damages against the FDA for its claims in this suit on account of the FDA's sovereign immunity." *Endo Par*, 2024 WL 2988904, at *7. Nor would it necessarily be able to recover such damages from Liquidia in patent litigation, since UTC's "entitlement to a 30-month stay is independent of whether its patent claims … turn out to succeed." *Id.*[12]

"Although the fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm, it can constitute irreparable injury if the harm is also . . . great, certain and imminent." *Endo Par*, 2024 WL 2988904, at *7 (citation, quotation marks, and brackets omitted). That is the case here. Absent a preliminary injunction, Liquidia's imminent final approval and launch will cause UTC to suffer harm in the form of price erosion, lost market share, and loss of goodwill—all forms of injury that courts have recognized as paradigmatic examples of irreparable harm. *See id.* at *8 ("[C]ourts have recognized that irreversible price erosion can constitute irreparable harm"); *Bayer HealthCare, LLC v. FDA*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013) ("Courts have recognized that price erosion and diminished market share can constitute irreparable harm."); *Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *9 (D.D.C. Mar. 21, 2021) ("[B]ecause '[i]njury to reputation or goodwill is not easily measurable in monetary terms' it is typically 'viewed as irreparable.'" (second alteration in original) (citation omitted)).

---

[12] Moreover, Liquidia lacks the means to adequately compensate UTC for its harm. Liquidia has never turned a profit, and even were it allowed on the market, an approximation of UTC's damages from price erosion and lost sales would be of greater value than Liquidia's potential revenue, making those damages irreparable. Selck Decl. ¶ 30; *see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155-56 (Fed. Cir. 2011) (defendant's inability to satisfy damages judgment renders economic loss from patent infringement irreparable).

To begin, if Yutrepia enters the market with an indication for PH-ILD, Liquidia will offer a steep discount relative to UTC's Tyvaso products. Selck Decl. ¶¶ 63-74. When more than one drug is available to treat a condition, insurance companies and pharmacy benefit managers force manufacturers to compete for "formulary status." Selck Decl. ¶ 64. There are compelling reasons to believe this will occur here. *See* Selck Decl. ¶¶ 63-74. The amount of price erosion attributable to Liquidia's launch in the PH-ILD indication will be even more difficult to quantify than usual, because Liquidia also plans to launch Yutrepia with a PAH indication. *See* Liquidia Compl. ¶ 20. If FDA is not enjoined from approving Liquidia's amendment and Liquidia is allowed to enter the market with the PH-ILD indication for Yutrepia, this price erosion will likely be permanent because of the complex and "sticky" nature of the pharmaceutical market, regardless of whether UTC ultimately prevails in this litigation. Selck Decl. ¶ 73. *Accord Endo Par*, 2024 WL 2988904, at *8 (recognizing that harm from price erosion is likely irreparable "because once a less expensive version of a drug enters the market, the original drug manufacturer cannot maintain its initial price and stands to lose good will among its customers" (citation, quotation marks, and brackets omitted)).

Likewise, UTC has expended significant resources building up the Tyvaso and Tyvaso-DPI brands. Selck Decl. ¶¶ 96-99. FDA's unlawful actions will allow Liquidia to enter the market and freeride on UTC's goodwill by prematurely marketing a copying product that would impact UTC's reputation in the market in ways that UTC could never repair. *Id.* Moreover, the trajectory of Tyvaso and Tyvaso-DPI sales will be permanently impacted because UTC will see a significant and irrecoverable diminution of its first-mover advantages in the market for Tyvaso and Tyvaso-DPI if Yutrepia is permitted to come to market prematurely. *Id.*; *see also Collagenex Pharms., Inc. v. Thompson*, 2003 WL 21697344, at *10 (D.D.C. July 22, 2003), *as amended* (Aug. 26, 2003)

39

(finding irreparable harm in part because innovator "would lose its head start in the market."); *see also Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008).  Finally, the sales of Tyvaso and Tyvaso-DPI support UTC's efforts to research and develop innovative therapies. Selck Decl. ¶¶ 100-102.  If Liquidia enters the market, UTC may be forced to reduce its expenditures on research and development, permanently and negatively impacting its capacity to compete in the future.  *Id.*; *see Bayer*, 942 F. Supp. 2d at 26 ("[L]oss of research and development funding as a result of" generic's entry contributed to irreparable harm.).

In short, UTC will suffer imminent irreparable harm unless the Court maintains the status quo and prevents FDA from granting final approval to Liquidia's improperly bundled 505(b)(2) application, which the agency is poised to do as of May 23, 2025.

## III.    The balance of harms and public interest strongly favor entry of an injunction.

Both the balance of harms and the public interest favor the immediate entry of an injunction.  FDA would not be harmed by a preliminary injunction because the agency's only legitimate interest here is the proper administration of the law.  Ensuring the proper application of the law and protecting UTC's statutory right outweighs any purported harm to FDA stemming from an order maintaining the status quo while this litigation proceeds, particularly because UTC is prepared to move this case forward to a final resolution expeditiously.  *See Bayer*, 942 F. Supp. 2d at 26-27 (granting temporary restraining order against final approval of a generic product and concluding that FDA's "institutional interest" could not outweigh plaintiff's interest in avoiding irreparable harm from a potentially unlawful approval).

As for Liquidia, any injury it would suffer from maintenance of the status quo does not outweigh the injury UTC would suffer from the abrogation of its statutory rights and Liquidia's premature market entry.  Selck Decl. ¶¶ 145-153.  A follow-on applicant's "calculated risk" to try to launch before resolution of its patent disputes does not outweigh the harm to the innovator of

an unlawful and premature launch. *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006). As courts in this Circuit have recognized, "[t]he erosion of" an innovative pharmaceutical manufacturer's "statutory right" to exclusivity "is a significant harm" in the context of the balance of harms prong of the preliminary injunction analysis. *Apotex Inc. v. FDA*, 508 F. Supp. 2d 78, 88 (D.D.C. 2007). It is not offset by any inconvenience to Liquidia in waiting for final approval of its application until after this dispute is resolved. *See* Selck Decl. ¶¶ 145-153.

Finally, the relief UTC requests would serve the public interest. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (recognizing that the weighing of relative harms and public interests "merge when the Government is the opposing party" because "the government's interest *is* the public interest" (citation omitted)). "There is generally no public interest in the perpetuation of unlawful agency action" like FDA's current course. *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

Moreover, as discussed, pp. 4-5, *supra*, the Hatch-Waxman Act balances the interests of the public in obtaining innovative drugs and lower cost generic versions of those drugs. Allowing violations of the Bundling Rule would tilt the balance away from innovators by depriving them of the 30-month stay Congress expected would be available under circumstances like those giving rise to this case, particularly where follow-on applicants rely entirely on the innovator's data. "The public interest does not favor a distortion of the principles of the Hatch-Waxman Act." *Mylan Labs., Inc. v. Leavitt*, 484 F. Supp. 2d 109, 124 (D.D.C. 2007); *see also Collagenex*, 2003 WL 21697344, at *11 ("[T]he barriers to competition that Congress has erected are in the public interest because they encourage the development of innovative drugs by ensuring a period of market exclusivity."). Permitting FDA to subvert the structure of the Hatch-Waxman Act and prevent innovators from being able to defend their patent rights before follow-on products are approved

41

would erode the value of those patents and reduce the incentive for companies to develop lifesaving medicines in the first place.

## IV. This Court should enter relief now to protect UTC's rights.

The Court should enter a preliminary injunction before May 23, 2025, to preserve the status quo and prevent UTC from suffering irreparable harm from the loss of its statutory right to an automatic stay and the unlawful approval of Liquidia's competing treprostinil product. There is no reason for the Court to delay action until after FDA has finally approved Liquidia's application Indeed, once such approval is issued, UTC will already have suffered irreparable injury from the loss of its statutory right to seek enforcement of its patents before the agency approves a follow-on product for launch. Because UTC's challenges are "purely legal" in nature, and because this suit to protect UTC's statutory rights is highly "time-sensitive," the Court should grant injunctive relief now before UTC suffers irreparable injury. *Teva v. Sebelius*, 595 F.3d at 1308, 1311; *see also Collagenex*, 2003 WL 21697344, at *1, *4-5 (granting preliminary injunctive relief and holding that a brand manufacturer's suit challenging an FDA legal determination that would permit final approval of generic competitors' applications was ripe even though FDA had not yet approved any generic-drug applications).

At a minimum, this Court should use its equitable authority to require FDA to provide notice to the Court and UTC before FDA grants final approval to Liquidia's amended NDA for the PH-ILD indication. Judges in this District have repeatedly exercised such authority to ensure plaintiffs like UTC are not irreparably harmed by an FDA final approval order before they can be heard on an emergency motion. *See, e.g.*, *AstraZeneca Pharms. LP v. Burwell*, 197 F. Supp. 3d 53, 56-60 (D.D.C. 2016) (exercising authority under the All Writs Act to require FDA to provide notice to the Court before approving pending ANDAs in order to allow the Court to hold a hearing on the plaintiff's motion for injunctive relief before generic competitors could launch); *Hi-Tech*,

587 F. Supp. 2d at 13 (requiring FDA to provide "the Court and the parties notice of its intent to release an exclusivity decision" in advance of that determination to ensure an opportunity for a legal challenge before final approval of a generic application).

Indeed, as discussed above, p. 15, *supra*, Judge Bates imposed such a requirement in UTC's initial suit against FDA challenging the agency's decision to accept Liquidia's amended 505(b)(2) application in violation of the Bundling Rule.  Specifically, Judge Bates ordered FDA to "provide the Court and the parties with at least three business days' advance notice prior to the issuance of any decision on Liquidia's amended 505(b)(2) application."  Scheduling Order at 1, No. 24-cv-484 (D.D.C. Mar. 7, 2024), ECF No. 18.  UTC respectfully suggests that such a procedure is not necessary in this case because FDA has already reached a final decision about the Bundling Rule, which the agency represented was not true at the time of the earlier litigation.  Therefore, the Court should simply order a preliminary injunction now because the final approval of Liquidia's application as of May 23, 2025, is reasonably certain and imminent.  But if the Court declines to order such relief before the expiration of UTC's remaining regulatory exclusivity, it should at least order FDA to provide UTC with sufficient notice of its forthcoming final approval order so that UTC may seek a TRO from this Court before suffering irreparable harm.

## CONCLUSION

For the reasons stated above, this Court should grant UTC's motion for preliminary injunction and enter a preliminary injunction precluding FDA from approving Liquidia's amended section 505(b)(2) application.

April 17, 2025

Shaun R. Snader (D.C. Bar No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

Douglas Carsten (admitted *pro hac vice*)
Art Dykhuis (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

Adam W. Burrowbridge (D.C. Bar No.
  1001783)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

Respectfully submitted.

 /s/ *Brian T. Burgess*
William C. Jackson (D.C. Bar. No. 475200)
William M. Jay (D.C. Bar. No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20001
(202) 346-4000

Kurt R. Karst (D.C. Bar No. 482615)
Michael D. Shumsky (D.C. Bar No. 495078)
Sara Wexler Koblitz (D.C. Bar No. 1017284)
HYMAN, PHELPS & MCNAMARA, P.C.
700 13th Street, NW, Suite 1200
Washington, DC 20005
(202) 737-5600

*Counsel for United Therapeutics Corporation*