## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LIQUIDIA TECHNOLOGIES, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> FOOD AND DRUG ADMINISTRATION et al., <br><br> *Defendants*, <br><br> v. <br><br> UNITED THERAPEUTICS CORPORATION, <br><br> *Intervenor-Defendant*. | Civil Action No. 24-2428 (TJK) |

## <u>MEMORANDUM OPINION</u>

Liquidia Technologies, Inc. ("Liquidia") sued the U.S. Food and Drug Administration and other federal defendants (collectively, the "FDA"), asserting that the FDA acted arbitrarily, capriciously, or otherwise contrary to law in refusing to immediately approve Liquidia's New Drug Application ("NDA") for its drug product Yutrepia because of another drug product's period of marketing exclusivity. After United Therapeutics Corporation ("UTC") intervened as a defendant to protect its interests as the beneficiary of the FDA's exclusivity decision, the Court granted summary judgment to UTC and the FDA on Liquidia's claims. ECF No. 90. Remaining are UTC's cross-claims that challenge the FDA's decision to allow Liquidia to amend Yutrepia's NDA. The FDA and Liquidia move to dismiss them. Because the Court concludes that UTC has failed to plausibly allege that it has standing, and because its cross-claims are not ripe, the Court will grant the motions.

I.      **Background**

    A.      **Legal Background**

As explained more fully in the Court's prior Memorandum Opinion, the Food, Drug, and Cosmetic Act ("FDCA") prohibits "introduc[ing] into interstate commerce any new drug, unless an approval of an application filed pursuant to [the FDCA] is effective with respect to such drug." 21 U.S.C. § 355(a); *Veloxis Pharms., Inc. v. FDA*, 109 F. Supp. 3d 104, 107 (D.D.C. 2015). As a part of the approval process, companies must submit an NDA with the FDA. *AstraZeneca Pharms. LP v. FDA*, 872 F. Supp. 2d 60, 62 (D.D.C. 2012), *aff'd*, 713 F.3d 1134 (D.C. Cir. 2013). The requirements for an NDA vary depending on the specifics of the drug and the method the company uses to seek approval.

One method of approval permits applicants to rely on research conducted in connection with other applicants. ECF No. 95 at 3. A requirement for this method of approval—brought under 21 U.S.C. § 355(b)(2) and commonly known as a 505(b)(2) NDA—is that the NDA must include a "certification" that "the manufacture, use, or sale of the new drug for which the application is submitted" will not infringe any valid patents listed in the FDA's "Orange Book" that "claim[] the drug" at issue.[1] 21 U.S.C. § 355(b)(2)(A), (A)(iv).

This certification, known as a "Paragraph IV" certification, "has important legal ramifications." *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 32 (D.D.C. 2000). For example, it obligates applicants to "give notice to—(i) each owner of the patent that is the subject of the certification . . . and (ii) the holder of the approved [NDA] . . . for the drug that is claimed by the patent." 21 U.S.C. § 355(b)(3)(C). This notice is important as "[i]t automatically creates a cause

---

[1] The Orange Book is "an FDA publication that includes all patent information that companies have submitted to the agency." *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 880 (D.C. Cir. 2004).

of action for patent infringement." *Mylan Pharms., Inc.*, 81 F. Supp. 2d at 32; 35 U.S.C. § 271(e)(2)(A). And should a patent holder bring a patent-infringement action within 45 days of receipt of that notice, the FDA's approval of an otherwise acceptable NDA "may be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice . . . or such shorter or longer period as the court" in which the patent-infringement suit is brought "may order." 21 U.S.C. § 355(c)(3)(C).

When applicants make certain non-minor amendments to their 505(b)(2) NDAs, they must also submit "an appropriate patent certification . . . or a recertification for a previously submitted paragraph IV certification" to cover the changes. 21 C.F.R. § 314.60(f)(1). But what happens if the amendment implicates a patent that was not in the Orange Book when the initial NDA was filed but was included before the amendment? Though applicants must include those patents in their new Paragraph IV certifications, such amendments do not trigger the FDCA's 30-month-stay provision. Instead, that provision applies only when the allegedly infringed patent was listed in the Orange Book "before the date on which the [NDA] (*excluding an amendment or supplement to the application*) was submitted." 21 U.S.C. § 355(c)(3)(C) (emphasis added).

### B.    Factual Background

In January 2020, Liquidia filed an NDA for its proposed drug Yutrepia. ECF No. 30 ("Cross-Claims") ¶¶ 5, 12.[2] Initially, the Yutrepia NDA sought approval "exclusively for the treatment of" pulmonary arterial hypertension ("PAH"), a serious disease that "increases strain on the right ventricle of the heart, often leading to heart failure and death." *Id.* ¶¶ 5, 38. As a part of that NDA, Liquidia included Paragraph IV certifications for five patents held by UTC and added

---

[2] UTC incorporated both its answer and its cross-claims in the document it filed at ECF No. 30. For ease of reference, the Court will refer to the second half of that document, starting on page 55, as the "Cross-Claims."

an additional certification when a sixth appeared in the Orange Book about six months later. *Id.* ¶¶ 46–48. Based on those certifications, UTC sued Liquidia for patent infringement in the District of Delaware. *Id.* ¶ 50. While that court first found that Liquidia's NDA would infringe one of UTC's patents and temporarily blocked final approval of the Yutrepia NDA, it vacated that portion of its final judgment following a decision by the U.S. Patent Trial and Appeal Board that the subject matter of the identified patent was "unpatentable." *Id.* UTC's appeal of that decision is pending. *Id.*

On July 24, 2023, while that patent litigation was ongoing, "Liquidia submitted an amendment to its tentatively approved [Yutrepia] NDA, seeking to add a new indication"—or new intended use—for treatment of pulmonary hypertension associated with interstitial lung disease ("PH-ILD"), "a group of parenchymal lung diseases that are characterized by significant scaring and increased fibrotic tissue within the bronchioles and alveolar sacs of the lungs." Cross-Claims ¶¶ 42, 51. The amendment included additional Paragraph IV certifications, including two for patents UTC had added to the Orange Book between the filing of Yutrepia's initial NDA and the amendment. *Id.* ¶¶ 44, 52. "Within 45 days of receipt of notice" of Liquidia's paragraph IV certifications, UTC filed another patent-infringement suit against Liquidia. *Id.* ¶ 54. Despite this second suit, in September 2023, the "FDA accepted for review Liquidia's amendment to add the new PH-ILD indication to Liquidia's Original 505(b)(2) NDA." *Id.* ¶ 55. At the time, the FDA explained that, because Liquidia had *amended* its prior NDA rather than filing a new NDA, "a new 30-month stay period would not be triggered by" the second round of patent litigation. *Id.* ¶ 59.

UTC, believing the FDA's acceptance of Liquidia's amendment to be "unlawful," "submitted a letter to FDA . . . urging FDA to rescind" its decision. Cross-Claims ¶ 57. Following additional correspondence from Liquida and UTC—as well as a short-lived lawsuit that UTC

voluntarily dismissed—the FDA issued a final decision on August 16, 2024, "affirm[ing] its decision to accept Liquidia's amendment to add an indication for PH-ILD to its pending" NDA. *Id.* ¶¶ 57, 63. Along with that decision, the FDA tentatively approved Liquidia's NDA—including for both the PAH and PH-ILD indications. *Id.* ¶ 64. While the FDA concluded that Liquidia had shown that its NDA satisfied "the requirements for approval under the" FDCA, it decided that it could not immediately approve the NDA because it was blocked by a temporary period of exclusivity held by UTC for its prior-approved NDA for its drug product Tyvaso DPI. 21 C.F.R. § 314.3(b); *see* ECF No. 95.

### C. Procedural Background

Liquidia sued the FDA to set the above-referenced decision aside. ECF No. 1 ¶ 1. UTC intervened as a defendant to protect its interests as the beneficiary of the FDA's exclusivity decision. Minute Order of Aug. 30, 2024; ECF No. 6 at 2. It then answered and asserted cross-claims against the FDA, alleging that the agency's decision to accept Liquidia's amendment to the Yutrepia NDA violated the FDCA and the Administrative Procedure Act ("APA"). ECF No. 30. Then the Court, recognizing Liquidia's "cognizable interest" in the FDA's "decision to permit Liquidia to amend its" NDA, similarly permitted Liquidia to "intervene in this case as Intervenor-Cross-Defendant." Minute Order of Nov. 5, 2024. As noted above, the Court has already granted summary judgment to UTC and the FDA on Liquidia's claims in the original complaint, i.e., that the FDA acted arbitrarily, capriciously, or otherwise contrary to law in refusing to immediately approve Liquidia's NDA for Yutrepia. The FDA and Liquidia now move to dismiss UTC's cross-claims for lack of jurisdiction and for failure to state a claim. ECF Nos. 69, 71.[3]

---

[3] In its opposition, UTC requests oral argument. ECF No. 81 at 1. Whether to grant such a request is "within the discretion of the Court." LCvR 7(f). "The Court denies this request because a hearing will not assist the Court's resolution of the motion, as the parties' filings

## II.    Legal Standard

Because "federal courts are courts of limited jurisdiction," "the law presumes that 'a cause lies outside [of that] limited jurisdiction.'"  *Bailey v. Wash. Metro. Area Transit Auth.*, 696 F. Supp. 2d 68, 70–71 (D.D.C. 2010) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  Thus, in response to a motion to dismiss a case for lack of subject-matter jurisdiction, a cross-claimant "bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction" over its cross-claims.  *Id.* at 71.  In evaluating such a motion, "the court is not limited to the allegations contained in the [cross] complaint."  *Id.*  Instead, "the court may consider the [cross] complaint supplemented by undisputed facts evidenced in the record."  *Id.*  But it remains the cross-claimant's burden "as the party invoking federal jurisdiction" to show that it has adequately alleged that its claims fall within the Court's jurisdiction.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016).

## III.    Analysis

Article III of the Constitution limits a federal court's jurisdiction to "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  To clear that bar, the dispute must be of the kind "appropriately resolved through the judicial process."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).  "[T]he doctrine of standing" is a "landmark[]" consideration for whether a case is "of the justiciable sort referred to in Article III." *Id.*  Like with all jurisdictional questions, the party seeking a court's intervention—here, UTC— bears the burden of establishing that it has standing.  *Spokeo, Inc.*, 578 U.S. at 338.  So at the motion-to-dismiss stage, a cross-claimant must show that it has "clearly . . . allege[d] facts

---

sufficiently address the issues presented."  *Cherokee Nation v. U.S. Dep't of the Interior*, 643 F. Supp. 3d 90, 103 n.4 (D.D.C. 2022).

demonstrating" that it has satisfied each element of standing inquiry. *Id.* (first alteration in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). Those three "irreducible" elements are well-known. *Lujan*, 504 U.S. at 560. First, the cross-claimant must show that it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* (cleaned up). Second, that injury must have resulted from the "conduct complained of." *Id.* That is, it must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." *Id.* (cleaned up) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

UTC says that two injuries support its standing to challenge the FDA's decision to accept Liquidia's amendment to the Yutrepia NDA. First, that decision allegedly "caused the deprivation of a statutory right (the loss of the 30-month stay)." ECF No. 81 at 35. Second, it "threatens imminent economic harm from the premature approval of the [amended] application." *Id.* But neither does the trick. Accordingly, the Court will dismiss UTC's cross-claims for lack of subject-matter jurisdiction. And for similar reasons, the Court concludes that its cross-claims are not yet ripe.

### A.    Any Injury Related to UTC's Purported Entitlement to a 30-Month Stay Does Not Support Its Standing to Bring Its Cross-Claims Against the FDA

First, UTC argues that, if the FDA had rejected Liquidia's amendment and required it to file a new NDA, UTC could have asserted a statutory right to a 30-month stay. And since the FDA's decision prevented UTC from claiming the 30-month stay, the FDA deprived it of a statutory right, which constitutes an injury-in-fact for standing purposes. But while the "alleged deprivation" of a congressionally established right or entitlement "can confer standing to sue," *Warth*,

422 U.S. at 514, the FDCA's 30-month-stay provision, 21 U.S.C. § 355(c)(3)(C), creates no such right or entitlement. And even if it did, the deprivation of that right would neither be fairly traceable to the FDA's action nor redressable by a favorable court decision. So any such injury does not confer standing.

1.    **The FDCA Does Not Create a Private Right to a 30-Month Stay, so UTC Has Not Plausibly Alleged That Its Loss Is an Injury-in-Fact**

UTC's argument founders right out of the gate because UTC has no statutory right to a 30-month stay. True, the "deprivation" of a "right or entitlement" may confer standing. *Warth*, 422 U.S. at 514; *see also Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973) ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute."); *but see Spokeo, Inc.*, 578 U.S. at 341 (rejecting the position that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."). But 21 U.S.C. § 355(c)(3)(C) is not a rights-creating provision.

First, by its own terms, § 355(c)(3)(C) is discretionary, so it can hardly create a right. The provision explains that if a patent holder brings an infringement suit within 45 days of receiving a Paragraph IV certification, the FDA "*may*" make its approval of an otherwise acceptable NDA "effective upon the expiration of the thirty-month period beginning on the date of the receipt." 21 U.S.C. § 355(c)(3)(C) (emphasis added). While "the word 'shall' usually connotes a requirement," "the word 'may' . . . implies discretion." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016). So a straightforward reading of the statutory language suggests that a patent holder is not entitled to a 30-month stay simply because it filed an infringement suit.

UTC, placed in the unenviable position of arguing that "may" means "shall," responds by arguing that the word "may" in § 355(c)(3)(C) signals a mandate—"in the sense of *No, you may*

*not*." ECF No. 81 at 41. Two reasons convince the Court otherwise. First, § 355(c)(3)(C) is not phrased in the negative. While the phrase "may not" can imply the lack of permission (in that "may not" is like "must not"), the positive construction connotes only that an act is possible or allowed. Bryan A. Garner, *The Chicago Guide to Grammer, Usage, and Punctuation* 122 (2016). But that an act is *allowed* hardly means it is *required*. Congress did not say that the FDA *may not* approve an NDA *until* the expiration of the 30-month period.

Second, Congress knows how to use mandatory language when that is what it intends, and it did so elsewhere in the same statute. In the nearly identical provision which provides for 30-month patent stays when an abbreviated NDA (or "ANDA") is filed under § 355(j), the FDCA requires that otherwise acceptable ANDAs subject to patent suits brought within 45 days of the receipt of a Paragraph IV certification "*shall* be made effective upon the expiration of the thirty-month period beginning on the date of the receipt." 21 U.S.C. § 355(j)(5)(B)(iii) (emphasis added). And it is a typical rule of statutory interpretation that when a statute uses different words within the same statutory scheme—such as "may" and "shall" here—those words have different meanings. *Pulsifer v. United States*, 601 U.S. 124, 149 (2024). This is especially so when, as here, the two provisions were passed into law at the same time and have nearly identical language otherwise. *See id.* (noting that this rule is weakest when "dissimilar looking" provisions were passed at different times); *see also* Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, sec. 101, § 505(j)(4)(B)(iii), sec. 103, § 505(c)(3)(C), 98 Stat. 1585, 1589, 1594 (adding both provisions to the FDCA at the same time).

With the statutory text firmly against it, UTC points out that, as a regulatory matter, the FDA treats the 30-month stay under § 355(c)(3)(C) the same as the mandatory 30-month stay under § 355(j)(5)(B)(iii). *See* ECF No. 81 at 41 (citing 21 C.F.R. § 314.107(b)(1)). So what? UTC's

argument is that it has a *statutory* entitlement to the stay. Thus, regulations have no role to play.[4] In other words, that the FDA's current regulations do not recognize room for discretion does not mean that discretion does not exist under the statute. Indeed, for many reasons (such as mere ease of administrability) the FDA might, as an exercise of discretion, decide to adopt a blanket policy automatically enforcing the 30-month stay. But agency practice does not a statutory entitlement make.

In sum, UTC's statutory arguments would require the Court to interpret "may" to mean "shall" or to invert the positively constructed sentence into a negative construction. But of course, it is not the role of the Court to rewrite statutes. *See United States v. Stevens*, 559 U.S. 460, 481 (2010). And § 355(c)(3)(C) provides that the FDA "may," upon the timely filing of a patent-infringement suit, delay approval of an NDA for thirty months. The Court fails to see how UTC could have a statutory right or entitlement to a stay the FDA need not provide. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 24 (1981) (noting that a statute does not vest rights in individuals when it is not "mandatory").

But even assuming § 355(c)(3)(C) is mandatory, it still does not follow that UTC has a statutory entitlement to a 30-month stay. Put differently, that the stay is mandatory is merely a necessary, but not sufficient, condition to deem it a statutory right or entitlement. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 282–83 (2002). Instead, "[s]tatutory provisions must *unambiguously* confer individual federal rights." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 180 (2023). So falling "within the general zone of interest that the statute is intended to protect" is not enough. *Gonzaga Univ.*, 536 U.S. at 283. "[T]he provision in question [must be]

---

[4] UTC does not argue that the deprivation of a *regulatory* entitlement confers standing, and the Court considers no such argument.

phrased in terms of the persons benefited and contain[] rights-creating, individual-centric language with an unmistakable focus on the benefited class." *Talevski*, 599 U.S. at 183 (internal quotation and quotation marks omitted).  Thus, statutes do not create private rights or entitlements when they "contain no rights-creating language, they have an aggregate, not individual, focus, and they serve primarily to direct" the federal government's actions.  *Gonzaga Univ.*, 536 U.S. at 290.

Section 355(c)(3)(C) contains nothing to suggest that Congress intended to vest patent holders with a statutory right to a 30-month stay.  While patent holders would appear to fall within the statute's general "zone of interest," *Gonzaga Univ.*, 536 U.S. at 283, § 355(c)(3)(C) lacks any usual rights-creating language.  The provision does not, for example, say that any individual applicant or patent holder has a "right" to such a stay.  21 U.S.C. § 355(c)(3)(C); *see Talevski*, 599 U.S. at 184–85.  While Congress used the word "right" seven times within § 355, it never used it to refer to a purported "right" that an individual might have in the procedures it created.  *See* 21 U.S.C. § 355(b)(2), (c)(3)(E)(ii)–(iv), (i)(4), (y)(2)(B).[5]  In sum, the FDCA never uses rights-creating language in connection with the 30-month stay.

Additionally, § 355(c)(3)(C) "speak[s] only in terms of institutional policy or practice." *Gonzaga Univ.*, 536 U.S. at 288.  While the 30-month stay can be triggered only when an individual files a timely patent infringement suit, the consequences of that litigation are phrased in terms of when *the FDA* "may" make "the approval" of an NDA "effective."  21 U.S.C. § 355(c)(3)(C). That is, the statute "speak[s] only to the [FDA], directing" *it* on how to conduct its affairs.  *Gonzaga Univ.*, 536 U.S. at 287.  It does not create a right or entitlement for an individual.  *Id.* at 287–

_____

[5] Six of those occurrences appear in the phrase "right of reference," which refers to an applicant's right to use the data obtained from clinical investigations.  *E.g.* 21 U.S.C. § 355(b)(2); *see also* 21 C.F.R. § 314.3(b) (defining "Right of reference").  And the seventh, rather than creating rights, authorizes the FDA to regulate in ways that "protect" preexisting rights.  21 U.S.C. § 355(i)(4).

88.

For these reasons, § 355(c)(3)(C) does not provide UTC a statutory right or entitlement to a 30-month stay. So UTC has not been deprived of any such right or entitlement, and it has not suffered an injury-in-fact under this theory.

### 2. UTC Has Not Plausibly Alleged That the FDA's Decision to Accept Liquidia's Amendment Caused Its Loss of the 30-Month Stay

Even assuming UTC had a statutory right to a 30-month stay, the FDA did not cause any deprivation of that right. To satisfy the causation prong of the standing inquiry, UTC must have plausibly alleged that the deprivation of its asserted right is "fairly traceable to" the FDA. *Allen v. Wright*, 468 U.S. 737, 757 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). But an injury is often not fairly traceable to the government when it only arises from the "allegedly unlawful regulation (or lack of regulation) of *someone else*." *Lujan*, 504 U.S. at 562. "In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction." *Id.* So, where "[t]he existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors," "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* (internal quotation and quotation marks omitted).

Even more specifically, an injury is not fairly traceable to the government when the injury would have occurred even if the government had acted differently. In *Allen v. Wright*, for example, parents claimed that the "IRS's grant of tax exemptions to some racially discriminatory schools" resulted in "their children's diminished ability to receive an education in a racially integrated school." 468 U.S. at 756–57. The Supreme Court recognized that this asserted injury was "one

of the most serious injuries recognized in our legal system." *Id.* at 756.  But it still concluded that "[t]he links in the chain of causation between the challenged Government conduct and the asserted injury [we]re far too weak for the chain as a whole to sustain [the parents]' standing." *Id.* at 759. That is because "it [wa]s entirely speculative . . . whether withdrawal of a tax exemption from any particular school would lead the school" to accept minority students. *Id.* at 758.  And "[i]t [wa]s just as speculative whether any given parent of a child attending such a private school would decide to transfer the child to public school as a result of any changes in educational or financial policy made by the private school once it was threatened with loss of tax-exempt status." *Id.*  In other words, because the Court could not say that the plaintiffs would not have suffered their injuries but for the government's allegedly unlawful conduct, it was speculative whether that conduct caused those injuries.

UTC's theory of causation is similarly speculative.  UTC alleges that (1) it is entitled to a 30-month stay for NDAs filed after its patents were listed in the Orange Book; (2) one of its patents was "timely submitted for listing in the Orange Book . . . on or around July 21, 2020," which post-dated Liquidia's initial NDA for Yutrepia but pre-dated its amendment, Cross-Claims ¶ 47; (3) Liquidia's amendment infringed that patent, *id.* ¶ 54; (4) Liquidia's amendment was procedurally improper, so the FDA should have rejected it, *id.* ¶ 10; (5) in response, Liquidia would have filed a new NDA; and (6) following the submission of that new NDA, UTC would have filed a timely patent suit, which would have triggered the 30-month stay, *id.* ¶ 13.  Thus, since the FDA did not reject the amendment, that prevented Liquidia from filing a new NDA, and UTC could not then file a new patent-infringement suit to claim a 30-month stay.

But it is speculative whether, if the FDA rejected Liquidia's amendment, Liquidia would have decided to file a new, standalone NDA.  At first, UTC tried to bridge this gap by arguing that,

to seek approval for a new indication, an "applicant must submit a new application," such that the "FDA should have . . . *required* Liquidia to submit a new NDA." Cross-Claims ¶¶ 9, 10 (emphasis added). In their motions to dismiss, however, both the FDA and Liquidia argue that the FDA has no authority to force an applicant to file a new NDA in the face of a rejected amendment. ECF No. 71-1 at 18; ECF No. 69-1 at 21–22. UTC does not contest that position or provide any authority for the proposition that the FDA could compel the filing of an NDA. *See* ECF No. 81 at 39–40. Indeed, despite using mandatory language like "require[]," what UTC really seems to allege is that, if Liquidia had *decided* "to seek marketing approval for" the PH-ILD indication, it would have had to "submit a new application." *See* Cross-Claims ¶¶ 10, 14. But if the FDA cannot require Liquidia to file a new NDA, then § 355(c)(3)(C) would only have been triggered if Liquidia decided to do so. Thus, for UTC to plausibly allege that the FDA's decision caused UTC's asserted injury, it must have plausibly alleged that Liquidia would have chosen to file a new NDA had its amendment been rejected.

UTC does not come close to meeting that standard. At best, it alleges that, because Liquidia sought approval for the PH-ILD indication (the subject of the amendment), it would not have been content to do nothing following the FDA's rejection of that amendment. *Cf.* Cross-Claims ¶¶ 60–61 (alleging that Liquidia had the "intention to engage in the commercial manufacture, use, and/or sale of" Yutrepia in a way that would infringe its PH-ILD-related patent). But that does not necessarily mean that Liquidia would have filed a new NDA. Instead, as the FDA and Liquidia point out, Liquidia could have elected to wait for the FDA to approve its Yutrepia NDA for the PAH indication and then file a supplement to that approved NDA seeking approval for the PH-ILD indication. ECF No. 71-1 at 18; ECF No. 69-1 at 23–24. Indeed, in a hearing before another court

in this district, Liquidia asserted that that is what it would have done.[6]  And that makes sense, as it would likely have been a more expedient procedure.  Yet filing a supplement does not trigger a stay.  21 U.S.C. § 355(c)(3)(C).  UTC disputes none of this; it merely argues that it "misses the point."  ECF No. 81 at 39.[7]

But it is UTC, it appears, that "misses the point."  To successfully plead that the FDA caused its asserted injury, UTC must plausibly allege that Liquidia, in response to a denial of its amendment, would have filed a new NDA.  *Lujan*, 504 U.S. at 561–62.  It does not.  Because Liquidia could have decided to seek approval for the PH-ILD indication *either* through filing a new NDA *or* through waiting and filing a supplement, UTC has the burden to allege "facts showing that [Liquidia's] choices . . . will be made in such [a] manner as to produce causation."  *Id.* at 562.  Since it is at best speculative—if not, on this record, unlikely—that Liquidia's choices would have done so, Liquidia's "decisions [a]re sufficiently uncertain to break the chain of causation between [UTC's] injury and the challenged Government action."  *Allen*, 468 U.S. at 759.

Thus, because UTC has not plausibly alleged that it would not have suffered its injury but for the FDA's allegedly unlawful decision, it has not plausibly alleged that the FDA caused that injury.

---

[6] Transcript of Motions Hearing at 56, *United Therapeutics Corporation v. FDA*, No. 24-cv-484 (D.D.C. Apr. 5, 2024), ECF No. 34.

[7] UTC first alleged that companies cannot seek approval for new indications through supplements.  Cross-Claims ¶ 35.  But oddly, it also alleged that it had benefited from that exact procedure.  Cross-Claims ¶ 43.  In any event, it now recognizes that supplementing an approved NDA is a valid "option" for adding an indication.  ECF No. 81 at 39.  So the Court treats UTC as abandoning the assertion that this path is impossible.  And for good reason.  The document UTC cites in support of this claim refers to various "changes to a drug" that applicants may not seek approval for through an amendment or supplement, and adding an indication is conspicuously absent (potentially because adding an indication does not change the drug at all).  *See* FDA, Proposed Rule, Abbreviated New Drug Applications and 505(b)(2) Applications, 80 Fed. Reg. 6802, 6851 (Feb. 6, 2015).

### 3.    UTC Has Not Plausibly Alleged That the Court Can Redress Its Loss of the 30-Month Stay

For similar reasons, UTC has not plausibly alleged that its asserted injury is redressable by the Court. As the Supreme Court has noted, "causation and redressability . . . are often 'flip sides of the same coin.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). "[I]f a defendant's action" does not "cause[] an injury, enjoining the action" will not "typically redress that injury." *Id.* at 381. So too here. As discussed above, UTC has not plausibly alleged that, had the FDA rejected Liquidia's amendment, Liquidia would have submitted a new NDA, thereby allowing UTC to assert its "right" to a 30-month stay. Thus, setting aside the FDA's decision would not redress UTC's asserted injury by providing it a 30-month stay.[8]

In response, UTC argues that an order setting aside the FDA's decision to accept Liquidia's amendment would be good enough since it "could only benefit UTC" to delay the FDA's consideration of Liquidia's application for PH-ILD approval. ECF No. 81 at 39. But the question is not whether the Court can order something that would benefit UTC in some way; it is whether the Court can redress the injury UTC asserts. *Lujan*, 504 U.S. at 561. That injury is the deprivation of its "statutory right" to a 30-month stay, which, for the reasons explained, the Court cannot redress. True, an order setting aside the FDA's decision might prevent Liquidia from "leap-frog[ging] over" the "timeline for review and approval of the PH-ILD indication" that would accompany a supplement. ECF No. 81 at 39. But Liquidia questions whether that is so. ECF No.

_____

[8] In its prayer for relief, UTC asks the Court not just to set aside the FDA's decision but also to "compel FDA to Order Liquidia to submit a new 505(b)(2) NDA." ECF No. 30 at 85. But as discussed above, UTC concedes that the FDA has no such power. Indeed, under the APA, the Court can only "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Thus, UTC appears to concede that the Court cannot provide this relief.

69-1 at 22–23.  Regardless, UTC has not asserted that it has any cognizable interest in that "waiting period" under this theory of standing.  *Id.*  In sum, UTC has not plausibly alleged that its requested relief would redress its asserted injury: the loss of the 30-month stay.

For all these reasons, UTC has not plausibly alleged that any injury related to its purported entitlement to a 30-month stay provides it standing to bring its cross-claims.

### B.    UTC Lacks Standing Based on Its Alleged Future Economic Harms

Perhaps anticipating the weakness of its main argument, UTC also contends in its opposition that it has standing because the FDA's decision to accept Liquidia's amendment to the Yutrepia NDA "threatens" to cause it "imminent economic harm" because Yutrepia's subsequent entry into the PH-ILD market will lead to "the irreversible erosion of UTC's market position."  ECF No. 81 at 35, 41–42.[9]  That is, UTC maintains that, if the FDA's decision is allowed to stand, the FDA will approve Yutrepia to treat PH-ILD, Liquidia will enter the PH-ILD market, Liquidia's product will compete against UTC's, and UTC will suffer economic losses that it would not otherwise suffer because of that increased competition.  The D.C. Circuit refers to this theory of standing, through which a competitor seeks to challenge the alleged under-regulation of another party based on the economic harms that could stem from an imminent increase in competition, as "competitor standing."  *See New World Radio, Inc. v. FCC*, 294 F.3d 164, 170 (D.C. Cir. 2002).

While standing is typically grounded in an injury that has already happened, in some cases,

---

[9] The Court notes that this theory of standing does not clearly appear on the face of UTC's cross-claims, in which UTC makes no mention of what concrete economic harm it will suffer should it face increased competition.  For example, the cross-claims lack any mention of the relevant market or how Liquidia's future entry in that market would impact UTC's revenues or other financial interests.  *See generally* Cross-Claims.  And "at the pleading stage[,] a plaintiff's standing to pursue a claim typically turns on 'the theory of injury presented in the complaint and the facts alleged in support of the claim.'"  *Cherokee Nation*, 643 F. Supp. 3d at 107 (quoting *Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987)).  But the Court need not address this potential forfeiture as it concludes that, even if the theory is properly presented, UTC still lacks standing.

standing based on an anticipated future harm suffices. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). A threatened future injury like the one recognized by the "competitor standing" doctrine can constitute an injury-in-fact, but, like all threatened future harms, the "the risk of harm [must be] sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021). To make this showing under the competitor-standing doctrine, the party challenging the agency's decision "must show that the challenged government action results in 'an actual or imminent increase in competition.'" *Air Excursions LLC v. Yellen*, 66 F.4th 272, 279 (D.C. Cir. 2023) (quoting *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010)). In addition, the challenger must "show that it is in fact 'a *direct* and *current* competitor' in that market, in which case the [challenger]'s 'bottom line may be adversely affected by the challenged government action.'" *Id.* at 280 (quoting *KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004)). So parties seeking to rely on the "competitor standing" doctrine cannot rely on an attenuated chain of events leading from the challenged agency action to possible future competition and harm—instead, they must challenge "an agency action that itself imposes a competitive injury, i.e., that provides benefits to an existing competitor or expands the number of entrants in the petitioner's market, not an agency action that is, at most, the first step in the direction of future competition." *New World Radio, Inc.*, 294 F.3d at 172.

*New World Radio, Inc. v. FCC* illustrates how competitor standing works. In that case, New World Radio, the operator of a radio station in Washington, D.C., challenged "an order of the Federal Communications Commission (Commission or FCC) granting the application of Birach Broadcasting Corporation (Birach) to renew its license for" a radio station not presently competing with New World "located in Pocomoke City, Maryland." *New World Radio, Inc.* 294 F.3d at 166. New World claimed that it had standing to challenge the FCC's decision to renew Birach's

license "because renewal allows Birach to keep its license, moving one step closer to competing with, and therefore economically injuring," "New World's Washington, D.C. station." *Id.* at 170.

The D.C. Circuit recognized that competitor standing can exist "even though the economic injury [is] latent." *New World Radio, Inc.* 294 F.3d at 170. That said, it ultimately concluded that New World lacked standing. *Id.* at 170–72. It noted that prior cases allow competitor standing only where the challenger has the "status as a *direct* and *current* competitor" to the beneficiary of the agency's allegedly unlawful action. *Id.* at 170. Thus, for example, where agency action permitted a second, new radio station to broadcast in an area where "there existed insufficient advertising revenue, talent and need for an additional station," the first, already-existing station *could* challenge the approval of the second station. *Id.* (discussing *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470 (1940)). But in contrast, in *Mount Wilson FM Broadcasters, Inc. v. FCC*, 884 F.2d 1462 (D.C. Cir. 1989), the grounds for competitor standing came up short. In that case, "Mount Wilson, an FM station licensee, challenged the FCC's decision to allot a new FM channel on a nearby frequency, claiming that the mere allotment made the possibility of future competition more likely and thereby adversely affected the current market value of its station." *New World Radio, Inc.* 294 F.3d at 171 (citing *Mount Wilson FM Broads., Inc.*, 884 F.2d at 1463). The Circuit "found doubtful whether the mere allotment, without the issuance of a license, could damage Mount Wilson's concrete, economic interest sufficiently to confer standing." *Id.* (internal quotation marks and quotation omitted).

Thus, in *New World*, the Circuit held that future competitors lack standing to challenge an agency decision that allegedly under-regulates other entities where the decision, "standing alone," does not "'financially injure' [the challenger]'s position in the [relevant] marketplace." *New World Radio, Inc.* 294 F.3d at 171. More specifically, it held that "the 'competitor standing'

doctrine" applies only where "an agency action" "itself imposes a competitive injury" on the challenger by either (1) "provid[ing] benefits to an existing competitor" or (2) "expand[ing] the number of entrants in the [challenger]'s market." *Id.* at 172. Absent such circumstances, challengers lack standing because their "concrete, economic interest[s]" are not "*perceptibly damaged*" by the agency action. *Id.* (quoting *Orange Park Fla. T.V., Inc. v. FCC*, 811 F.2d 664, 673 (D.C. Cir. 1987). Nor does the action present the required "*clear* and *immediate* potential" that competition will increase. *Id.* (quoting *Associated Gas Distribs. v. FERC*, 899 F.2d 1250, 1259 (D.C. Cir. 1990)). Only then can the challenged act "by itself" be said to "adequately harm [the challenger] to establish standing." *Id.* at 171. On the other hand, challenged decisions that represent merely "the first step in the direction of future competition" do not suffice. *Id.* at 172.

Applying these principles to the facts in *New World*, the D.C. Circuit held that the challenger lacked standing because it could not "allege that granting Birach's Renewal Application for *Pocomoke City*,"—a separate radio market—would, "standing alone, 'financially injure' New World's position in the *Washington, D.C.* marketplace." *New World Radio, Inc.* 294 F.3d at 171; *see also id.* ("Similarly here, granting Birach's Renewal Application *by itself* does not adequately harm New World to establish standing." (emphasis added)). Because New World's feared competitive harm would only materialize following a subsequent "chain of events" requiring additional action by the agency—permitting Birach to relocate its license to Washington, D.C.—and by Birach itself—resuming its broadcasting activities and moving from Pocomoke City to Washington D.C.—the FCC's decision to renew Birach's license represented only "the first step in the direction of future competition," which was not enough to confer standing. *Id.* at 172.

The same is true here. UTC, like New World, claims that the FDA's decision to permit Liquidia to amend Yutrepia's NDA "allows" the FDA to consider approving Yutrepia for the PH-

ILD indication, "moving [Liquidia] one step closer to competing with, and therefore economically injuring," UTC. *New World Radio, Inc.* 294 F.3d at 170. But just like in *New World*, that is not enough to plausibly allege that UTC faces a sufficiently imminent risk of future competitive or economic harm such that it has standing because the FDA's decision to accept the amendment did not make UTC "a *direct* and *current* competitor" against Liquidia in the PH-ILD marketplace. *Id.* Furthermore, the FDA's decision neither "provides benefits to an existing competitor"—because, as all agree, Liquidia's Yutrepia NDA has not been approved, meaning Liquidia is not currently in the PH-ILD market—nor itself "expands the number of entrants in [UTC]'s market"—because, again, the FDA's decision does not alone permit Liquidia to enter the market. *Id.* at 172.

Instead, the FDA's decision to permit the amendment is only a "first step in the direction of future competition." *Id.* Indeed, without it, the FDA could not have tentatively approved Yutrepia for the PH-ILD indication, much less consider it for (the as-of-yet not-granted) final approval. And without final approval, Liquidia cannot compete against UTC and bring about "the irreversible erosion of UTC's market position" that UTC so fears. ECF No. 81 at 41–42. And even if the FDA were to finally approve the Yutrepia NDA, the Circuit found it "critical" that challengers like UTC "*will* have an opportunity to challenge any [agency] decision that directly affects it as a competitor," undermining the imminence of any potential future harm and the directness with which the injury could be tied to preliminary decisions like the FDA's here. *New World Radio, Inc.*, 294 F.3d at 172. In sum, the FDA's decision to permit the amendment at issue does not *itself* "'financially injure' [UTC]'s position in the [PH-ILD] marketplace." *Id.* at 171. So the decision does not pose a sufficiently imminent risk of future potential competition to constitute an injury-in-fact.

Still, UTC argues that it has adequately pleaded that it has standing because it has purportedly alleged that there is a "substantial risk" that the FDA's decision to allow Liquidia to amend

the Yutrepia NDA will eventually lead to the FDA's final approval of Yutrepia for PH-ILD, which in turn will lead to Liquidia's entry into the PH-ILD market, which in turn will result in its feared economic harms.  ECF No. 81 at 42 (quoting *Jibril v. Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021)).  That is, UTC argues that its allegations show that the FDA's future final approval of the Yutrepia NDA is imminent, meaning the Court may impute the harm that could arise from that possible future decision to the FDA's preliminary decision to allow Liquidia's amendment.  *See Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1308 n.2, 1311–14 (D.C. Cir. 2010) (blessing this theory where final approval and future competition were "almost certain").  But UTC's allegations do not accomplish that.  Indeed, UTC itself seems to recognize the speculative nature of this allegation: in its cross-claims, it alleges only that the "FDA *may* approve Liquidia's NDA for both the PAH and PH-ILD indications immediately once the new clinical investigation exclusivity expires."  Cross-Claims ¶ 12 (emphasis added).  Thus, UTC's asserted future injury does not flow directly from the FDA's challenged action to permit the amendment and depends on speculation about what the FDA may do in the future.  Yet when even one link in a threatened future injury's chain of causation "amounts to mere speculation," that injury is not sufficiently "imminent" to constitute an injury-in-fact.  *Clapper*, 568 U.S. at 409–10.

That the FDA has already tentatively approved Liquidia's NDA does not change this conclusion.  *See* Cross-Claims ¶ 64.  As UTC itself recognizes, tentative approval is different from final approval.  *Id.*; 21 C.F.R. § 314.105(a) ("A drug product that is granted tentative approval is not an approved drug . . . .").  Nor does tentative approval mean that the FDA necessarily will or even likely will grant final approval upon the expiration of a term of exclusivity because the "FDA's tentative approval of a drug product is based on information available to FDA at the time" the NDA is tentatively approved.  21 C.F.R. § 314.105(a).  *Final* approval, on the other hand, must

be based on information available to the FDA at the time such final approval is granted. Thus, "a drug product that is granted tentative approval . . . will not be approved until FDA issues an approval after any necessary additional review of the NDA," and tentative approval is "subject to change on the basis of new information that may come to FDA's attention."[10] *Id.* And the tentative-approval letter the FDA sent to Liquidia requires Liquidia to "submit an amendment" that includes "the legal/regulatory basis for" "final approval," "a safety update," and "changes, if any, in the conditions under which [Yutrepia] was tentatively approved," including "updated labeling; chemistry, manufacturing, and controls data; and risk evaluation and mitigation strategy." J.A. 1182. And the FDA must review those updates "before final approval." *Id.* So final approval is much more than a mere rubber stamp for a prior tentative approval.

Whether Liquidia's NDA will ultimately be approved, therefore, turns on what will happen during the FDA's review of that NDA following the expiration of UTC's period of statutory exclusivity. But UTC makes no allegations about this process beyond saying only that the "FDA *may* approve Liquidia's NDA for both the PAH and PH-ILD indications." Cross-Claims ¶ 12 (emphasis added). UTC argues that there is no "genuine 'uncertainty' over whether FDA will finally approve Liquidia's drug for sale." ECF No. 81 at 33 (quoting *Teva Pharms. USA, Inc.*, 595 F.3d at 1309). Yet the Court struggles to square that argument with UTC's concession and the record evidence that "Liquidia must provide 'updates' to FDA" before it can finally approve the NDA. *See id.* at 34; J.A. 1182. Though UTC asserts that the FDA "identif[ies] nothing that could change" between now and the expiration of UTC's exclusivity "that would have any impact" on final approval, ECF No. 81 at 34, that inverts the analysis. *UTC* has the burden to plausibly allege

---

[10] For example, "the status of current good manufacturing practices of the facilities used in the manufacturing and testing of the drug product." 21 C.F.R. § 314.105(a).

that there is a "sufficiently imminent and substantial" risk that the FDA will approve Liquidia's NDA and that Liquidia will compete against it. *TransUnion*, 594 U.S. at 435. Nothing in UTC's cross-claims does so.

For the above reasons, the Court sees no reason to depart from the approach outlined in *New World*. What's more, the D.C. Circuit continues to invoke *New World* and its logic. The Circuit has reemphasized that *New World*'s "'direct and current competitor' formulation . . . simply distinguishes an existing market participant from a potential—and unduly speculative—participant." *Save Jobs USA v. DHS*, 942 F.3d 504, 510 (D.C. Cir. 2019). So parties asserting a future competitive injury must "sufficiently allege[] that" they are "*in fact*" the "*direct* and *current* competitor[s]" of the beneficiary of the agency's decision. *Air Excursions LLC*, 66 F.4th at 281 n.2 (first emphasis added). Allegations of future harm "couched in language of uncertainty and futurity" are not enough. *Animal Legal Def. Fund, Inc. v. Espy*, 29 F.3d 720, 725 (D.C. Cir. 1994). So too here.

In sum, because UTC has not plausibly alleged that the FDA's decision to allow Liquidia to amend Yutrepia's NDA, "standing alone, 'financially injure[s]' [UTC]'s position in the [PH-ILD] marketplace," it lacks standing. *New World Radio, Inc.* 294 F.3d at 171. That conclusion is reinforced by UTC's failure to plausibly allege—beyond mere speculation—that the FDA will approve Liquidia's NDA for Yutrepia, undermining its claim that it will suffer future economic harm stemming from the FDA's decision to accept Liquidia's amendment. And even if the FDA does ultimately approve that NDA, UTC "critical[ly]" "*will* have an opportunity to challenge any [FDA] decision that directly affects it as a competitor." *Id.* at 172. Thus, UTC has failed to adequately plead that it has standing under its second theory of injury.

## C.    UTC's Cross-Claims Are Not Ripe

For similar reasons, UTC's cross-claims are unripe.[11]  The ripeness doctrine, which has both constitutional and prudential aspects, asks whether adjudication of a case is best left for another day.  *Toca Producers*, 411 F.3d at 265 & n.*.  The point of the doctrine is to prevent adjudicating claims based on "contingent future events that may not occur as anticipated, or indeed may not occur at all," and to protect agencies from the premature meddling of federal courts when their decisions "ha[ve] not been formalized and [their] effects felt in a concrete way by the challenging parties."  *Pfizer Inc. v. Shalala*, 182 F.3d 975, 978 (D.C. Cir. 1999) (quotations omitted).  Two considerations guide this inquiry: (1) the "fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration."  *Id.* (quoting *Texas v. United States*, 523 U.S. 296, 301 (1998)).  Both support dismissing this case.

As for the first, the FDA's decisions relating to drug approval are not fit for review where they are "merely the first step in the agency's approval process."  *Pfizer Inc.*, 182 F.3d at 978.  Thus, the D.C. Circuit has dismissed as unripe pre-final-approval claims challenging the FDA's decision to accept NDAs for processing.  *Id.*  Because "[t]he critical fact remains that the FDA may never approve [the] application—whether because it decides in the end [to reverse its challenged decision] or for some entirely different reason"—judicial intervention in such cases is often premature.  *Id.*  "'[D]epending upon the agency's future actions . . . review now may turn out to have been unnecessary' and could deprive the agency of the opportunity to apply its expertise and to correct any mistakes it may have made."  *Id.* (second alteration in original) (quoting *Ohio*

---

[11] Because ripeness is a "threshold inquiry that does not involve an adjudication on the merits," the Court may address it despite its finding that UTC lacks standing to challenge the FDA's pre-final-approval decision to accept Liquidia's amendment to its Yutrepia NDA.  *See Toca Producers v. FERC*, 411 F.3d 262, 265 n.* (D.C. Cir. 2005).

*Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 736 (1998)).

The same is true here. The FDA's decision to accept Liquidia's amendment to the Yutrepia NDA was nothing more than a decision to process that aspect of the NDA and consider Yutrepia for treatment of PH-ILD. Cross-Claims ¶ 10 (noting that the FDA's decision only "accepted Liquidia's amendment for substantive review"). It did not pass on the merits of that aspect of the NDA, nor did it "somehow foreclose[] [UTC]'s right ever to get meaningful judicial review." *Pfizer Inc.*, 182 F.3d at 979. Thus, because the FDA's decision itself does not impose "effects felt in a concrete way by" UTC, and because the challenged decision is merely a preliminary step that requires a final approval before such effects will be felt, UTC's claims are not yet fit for review. *Id.* at 978 (quotation omitted).

"Nor can [UTC] point to any imminent hardship arising from the FDA's acceptance of" Liquidia's amendment. *Pfizer Inc.*, 182 F.3d at 979. Though UTC argues that delaying review "will make it impossible for UTC to ever recover its lost statutory right," ECF No. 81 at 32, for the reasons discussed above, UTC has no such right. And its second argument, about the hardship UTC will allegedly face should Liquidia be permitted to "launch[] Yutrepia and permanently alter[] the [relevant] market," *id.*, similarly comes up short. "Before [UTC] could suffer its claimed 'economic injury from unlawful competition,' FDA approval for" the PH-ILD aspect of the Yutrepia NDA "would have to be . . . granted. That has not happened. Therefore 'no irremediable adverse consequences flow from requiring a later challenge.'" *Pfizer Inc.*, 182 F.3d at 979 (quoting *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 164 (1967)). Again, UTC does not claim that the FDA's decision to allow Liquidia's amendment to the Yutrepia NDA precludes later review (even if such later review may appear in an emergency posture). *Id.* "If the FDA eventually approves [Liquidia]'s application, [UTC] may then challenge the reasons underlying its final decision,

including the agency's" decision to accept Liquidia's amendment for substantive review.  *Id.*  So merely requiring UTC to come back to court if the FDA does finally approve the Yutrepia NDA is not a hardship sufficient to defeat ripeness concerns.

*Pfizer* also establishes that the FDA's tentative approval of Liquidia's application does not "ripen[] [UTC's] challenge to the FDA's acceptance of [Liquidia]'s application for processing." 182 F.3d at 980.  Though tentative approval makes it "more likely that the FDA will eventually approve [Liquidia]'s drug, the agency's tentative approval causes [UTC] no hardship at present or in the near future, nor does it render [UTC]'s challenge fit for review."  *Id.*  There, the Circuit concluded that it was not a hardship to make a challenger wait a few months for a patent stay delaying final approval to expire before suing, even in the face of tentative approval.  *Id.*  The Court sees no reason to treat a delay attributable to a period of statutory exclusivity any differently.  Furthermore, "[a]s to fitness," delaying review until final approval—not just tentative approval— has the benefit of permitting a challenger to renew their now-ripened claims, along with "any other claim that may arise from the agency's final approval—if and when it is given"—at the same time. *Id.*  Because "judicial intervention" before final approval "could lead to 'piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary,'" even claims challenging a tentatively approved drug are generally not ripe.  *Id.* (quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 242 (1980)).

UTC, pointing to *Teva Pharmaceuticals USA, Inc. v. Sebelius*, argues that the FDA's tentative approval ripens its claims because there is no "genuine 'uncertainty' over whether FDA will finally approve" Yutrepia.  ECF No. 81 at 33 (quoting *Teva*, 595 F.3d at 1309).  There, Teva sued the FDA, challenging an agency policy that, if enforced, would have denied one of its drug products a period of statutory exclusivity to which Teva believed it was entitled.  *Teva*, 595 F.3d at

1304–05.  The FDA argued that the case was not ripe and that Teva lacked standing, but the court disagreed.  *Id.* at 1309, 1312.  It found that Teva's claims *were* ripe, despite *Pfizer*, because there was no "colorable factual dispute" about whether Teva's ANDA would be finally approved, meaning Teva would "almost certainly face" unlawful competition upon its approval should its claim of statutory exclusivity not be adjudicated before Teva's tentative approval date.  *Id.* at 1309, 1311.

For two reasons, the Court does not find *Teva* persuasive here.  First, the D.C. Circuit's analysis turned in part on the fact that the regulations at the time established that "a 'tentative' approval [was] the same as a final approval with a delayed effective date."  *Id.* at 1311 (quoting 21 C.F.R. § 314.105(d) (2010)); *see also id.* at 1304 (stating that Teva's tentative approval "*will* become final" following a period of statutory exclusivity (emphasis added)).  Here, on the other hand, the distinction between tentative and final approval is more than just one of timing.  As discussed above, the regulations are now different, and final approval must be based on the relevant facts available to the FDA at the time it considers approval.  21 C.F.R. § 314.105(a).  Indeed, the FDA has ordered Liquidia to update its NDA through an amendment before it will grant such final approval.  J.A. 1182.  Nothing in UTC's allegations reveals what that information will be or how the FDA will respond to the updated information it must consider when making its final approval decision.  In other words, the *Teva* court found, in part because of the content of the regulations themselves, that there was no dispute about whether the ANDA there would be approved but rather what would happen upon that approval.  Not so here.

Second, in *Teva*, the ripeness (and standing) inquiries turned on whether the FDA would grant Teva a period of statutory exclusivity upon its final approval, not on whether Teva's ANDA should be finally approved.  595 F.3d at 1304, 1309 (explaining that the crux of the case was about "the six-month period of marketing exclusivity" to which Teva believed it was entitled); *cf id.* at

1312 (noting that the "injury" prong of the standing analysis largely resolved itself upon conclud-

ing that "the FDA will . . . stick to the interpretation" of the exclusivity statute "that Teva attack[ed]

[t]here").  The FDA has not committed to any similar legal position that makes a corresponding

future event similarly clear here.  More importantly, UTC's cross-claims, while nominally aimed

at the FDA's decision to allow Liquidia to amend Yutrepia's NDA, are in fact back-door ways to

preemptively challenge the FDA's approval of that NDA, at least for the PH-ILD indication.

Cross-Claims ¶ 14 (requesting that the Court vacate the FDA's decision to accept Liquidia's

amendment and consider it for approval).  Thus, while final approval of a drug product was not at

issue in *Teva*, it is center stage here.  This posture increases the possibility that UTC will bring

additional, direct claims against any decision by the FDA to approve Liquidia's NDA for Yutre-

pia—in another lawsuit in which it is not an intervenor—thereby raising the concurrent risk of

"piecemeal review," what the ripeness doctrine is meant to guard against.  *Pfizer Inc.*, 182 F.3d at

980.[12]

For these reasons, the Court finds that UTC's cross-claims are unripe.[13]

---

[12] In that way, this case is more like *Pfizer*, where the challenger argued "that the FDA
must reject"—that is, not approve—a pending ANDA.  *Id.* at 976.

[13] The Court notes that for whatever reason, UTC has not moved to amend its cross-claims.
And "the Court is not required to afford a party an opportunity to amend a complaint that is insuf-
ficient on its face in the absence of a motion to amend."  *Juergens v. Urb. Title Servs., Inc.*, 246
F.R.D. 4, 13 (D.D.C. 2007); *Elkalibe v. Ibiza Nightclub DC, LLC*, No. 10-cv-2186, 2011 WL
1395262, at *1–2 (D.D.C. Apr. 13, 2011); *Young v. Colo. Dep't of Corr.*, 94 F.4th 1242, 1256
(10th Cir. 2024).

## IV.    Conclusion

For all the above reasons, the Court will grant the FDA's and Liquidia's Motions to Dismiss, ECF Nos. 69, 71, and dismiss UTC's cross-claims.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: May 2, 2025